**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN ASSOCIATION OF PEOPLE WITH DISABILITIES, 1030 15th Street, NW, Suite 500E Washington, DC 20005, | |
| NATIONAL FEDERATION OF THE BLIND, 200 East Wells Street at Jernigan Place Baltimore, Maryland 21230, | |
| DEAF EQUALITY, 180 North LaSalle Street, Suite 3650 Chicago, Illinois 60601, | |
| NATIONAL COMMITTEE TO PRESERVE SOCIAL SECURITY AND MEDICARE, 777 North Capitol Street, NE, Suite 805 Washington, DC 20002, | |
| MASSACHUSETTS SENIOR ACTION COUNCIL, 108 Myrtle Street, Suite 112 Quincy, Massachusetts 02171, | |
| ELIZABETH ROUSE, , | Civil Action No.  1:25-cv-977 |
| TREVA OLIVERO, , | |
| MARTHA HAZEN, , | |
| MERRY SCHOCH, , | |
| WILLIAM WEISS, | |

DEJA POWELL,

███████████████████,

and

WILSHAWN TILLER,

███████████████,

            *Plaintiffs*,

    v.

LELAND DUDEK,
*in his official capacity as*
Acting Commissioner of Social Security,
6401 Security Boulevard
Baltimore, Maryland,

SOCIAL SECURITY ADMINISTRATION,
6401 Security Boulevard
Baltimore, Maryland 21235,

DEPARTMENT OF GOVERNMENT
EFFICIENCY SERVICE,
736 Jackson Place, NW
Washington, DC 20503,

AMY GLEASON,
*in her official capacity as*
Acting Administrator of DOGE,
736 Jackson Place, NW
Washington, DC 20503,

and

ELON MUSK,
*in his official capacity as*
*De Facto* Head of DOGE,
736 Jackson Place, NW
Washington, DC 20503,

            *Defendants.*

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## NATURE OF THE CASE

1.      Plaintiffs are individuals with disabilities, including older adults, who depend on Social Security benefits to meet their most basic and essential needs. They bring this action to challenge the reckless and devastating actions of the defendants, which have severely undermined the agency's public-facing services, causing significant and irreparable harm to the very individuals the Social Security Administration ("SSA") is obligated to serve.

2.      The defendants' actions are an unprecedented and unconstitutional assault on Social Security benefits, concealed beneath the hollow pretense of bureaucratic "reform." In just nine weeks, the new administration has upended the agency with sweeping and destabilizing policy changes—shifting critical agency functions onto overburdened local offices, slashing telephone-based services, and debilitating the agency's ability to meet beneficiaries' needs. The result is a systematic dismantling of SSA's core functions, leaving millions of beneficiaries without the essential benefits they are legally entitled to. The defendants have abandoned their duty, placing ideology over obligation and governance over the governed.

3.      Cloaked in the threadbare rhetoric of streamlining operations and "prioritizing essential work," the defendants have systematically dismantled, and continue to dismantle, the core functions of SSA, abandoning millions of Americans to poverty and indignity. What the defendants frame as "reform" is, in truth, administrative vandalism.

4.      Under the direction of Elon Musk and DOGE, the Social Security Administration has taken the extraordinary step of eliminating two key offices that enable SSA to meet the needs of beneficiaries with disabilities: the Office of Civil Rights and Equal Opportunity ("OCREO") and the Office of Transformation.

5.    Defendants are now executing a campaign of systemic dismantling: reducing offices, slashing the workforce by 7,000 employees, imposing a hiring freeze while drastically reducing overtime, consolidating regional offices from ten to four, and placing crushing new burdens on the agency's local offices—forcing tens of thousands of additional beneficiaries to flood them each week.

6.    The defendants' actions will stoke deeper delays in processing applications for benefits, shackle access to critical accommodations, and, in many cases, strip individuals of any means to file grievances. The individuals who bear the brunt of this bureaucratic neglect are precisely those the defendants are entrusted to protect and serve—people with disabilities.

7.    SSA's structure—vast in scope, indispensable in function—demands both fairness and efficiency. *See Richardson v. Perales*, 402 U.S. 389, 399 (1971) ("Such a system must be fair—and it must *work*.") (emphasis added). Yet the defendants have set upon a course that undermines both. By dismantling OCREO's statutorily mandated functions, dissolving the Office of Transformation's customer service operations, and slashing the agency's workforce and community presence, they have left SSA adrift—devoid of accountability, equity, and the capacity to fulfill its core duty: the just and timely administration of Social Security benefits.

8.    These actions violate the Rehabilitation Act of 1973, Administrative Procedure Act, and U.S. Constitution. They strip vital protections from those who need them most, leaving individuals with disabilities to bear the heaviest burden. This unchecked assertion of authority, unmoored from legal constraint, demands immediate redress.

9.    This Complaint seeks declaratory and injunctive relief to halt the unlawful and unconscionable restrictions on beneficiary access to Social Security's essential service and to

ensure that the Social Security Administration is compelled to fulfill its statutory duty, preserving both its purpose and its obligation to the people it was created to serve.

## JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under federal law.

11.    The declaratory and injunctive relief requested herein is proper under 28 U.S.C. §§ 2201–02, 5 U.S.C. §§ 702–06, and the inherent equitable powers of this Court.

12.    Venue is proper pursuant to 28 U.S.C. §§ 1391(b)(2) and (e)(1). Defendants are agencies of the United States and officers or employees of those federal agencies with offices in this District who are sued in their official capacity. Further, a substantial part of the events giving rise to this action occurred in the District of Columbia. In addition, the National Federation of the Blind, the American Association of People with Disabilities, and the National Committee to Preserve Social Security and Medicare are incorporated in this District.

## PARTIES

### I.    Plaintiffs

13.    The American Association of People with Disabilities ("AAPD") is a national cross-disability rights organization dedicated to securing full recognition of the rights of more than 60 million Americans with disabilities and enhancing their political and economic power.

14.    The National Federation of the Blind ("NFB") is a membership organization comprising of over 50,000 blind and low-vison individuals across the United States. Recognized by the public, Congress, executive agencies at both state and federal levels, and the courts, NFB serves as a collective and representative voice for blind Americans and their families.

15.     Deaf Equality is a nonprofit disability rights organization committed to achieving equality for more than 48 million deaf and hard-of-hearing individuals across the United States by advocating for full accessibility and dismantling oppressive attitudes and systems.

16.     The National Committee to Preserve Social Security and Medicare ("NCPSSM") is a membership organization of over 500,000, dedicated to protecting the financial security, health, and well-being of current and future generations of maturing Americans.

17.     The Massachusetts Senior Action Council ("MSAC") is a statewide, grassroots, senior-led organization that empowers its members to use their own voices to address key public policy and community issues that affect their health and well-being. It is dedicated to safeguarding and strengthening the systems that all community members need to rely on for economic and health security.

18.     Organizational Plaintiffs bring this action on behalf of themselves and their current and future members with disabilities who rely on Social Security programs and benefits and who have either already suffered harm or are at imminent risk due to Defendants' actions. Member participation is not necessary, as the relief sought—invalidating Defendants' actions—does not require consideration of the individual circumstances of any affected member.

19.     Elizabeth Rouse is a blind ███████ resident of ███ and is *sui juris* disabled as defined by 29 U.S.C. § 705(20)(B). An active member of NFB since 2016, Ms. Rouse has long relied on the organization as a vital resource.

20.     Treva Olivero is a blind ████████ resident of ██████ and is *sui juris* disabled as defined by 29 U.S.C. § 705(20)(B). An active member of NFB since 2002, Ms. Olivero has long relied on the organization as a vital resource.

21.     Martha Hazen is a blind ▮▮▮▮ resident of ▮▮▮▮ and is *sui juris* disabled as defined by 29 U.S.C. § 705(20)(B). An active member of NFB since 2006, Ms. Hazen has long relied on the organization as a vital resource.

22.     Merry Schoch is a blind ▮▮▮▮ resident of ▮▮▮▮ and is *sui juris* disabled as defined by 29 U.S.C. § 705(20)(B). An active member of NFB since 2000, Ms. Schoch has long relied on the organization as a vital resource.

23.     William Weiss is a ▮▮▮▮ blind resident of ▮▮▮▮ and is *sui juris* disabled as defined by 29 U.S.C. § 705(20)(B).

24.     Deja Powell is a ▮▮▮▮ resident of ▮▮ and is *sui juris* disabled as defined by 29 U.S.C. § 705(20)(B). An active member of NFB since 2001, Ms. Schoch has long relied on the organization as a vital resource.

25.     Wilshawn Tiller is a ▮▮▮▮ resident of ▮▮▮▮ and is *sui juris* disabled as defined by 29 U.S.C. § 705(20)(B).

## II.    Defendants

26.     The U.S. Social Security Administration is a statutorily-created independent agency within the executive branch of the U.S. government. 42 U.S.C. § 901.

27.     Leland Dudek is named in his official capacity as the Acting Commissioner of the Social Security Administration. Defendant Dudek is responsible for the exercise of all powers and the discharge of all duties of the Administration. *Id.* § 902.

28.     The U.S. Department of Government Efficiency ("DOGE") is a department of the executive branch established by Executive Order on January 20, 2025, and headquartered in Washington, D.C. Its stated purpose is to "implement the President's DOGE Agenda, by modernizing Federal technology and software to maximize governmental efficiency and

productivity." E.O. No. 14,158, 90 Fed. Reg. 8441, § 1 (Jan. 20, 2025), https://perma.cc/S7KV-8PYN.

29.     Amy Gleason is named in her official capacity as the Acting Administrator of DOGE. Defendant Gleason is purportedly responsible for the exercise of all powers and the discharge of all duties of DOGE.

30.     Elon Musk is named in his official capacity as the *de facto* leader of DOGE, as recently confirmed in a speech by President Donald Trump before Congress. *See* Brent Griffiths & Natalie Musumeci, *Trump told Congress that Musk runs DOGE—and the lawyers noticed*, BUS. INSIDER (Mar. 5, 2025), https://www.businessinsider.com/trump-musk-doge-head-address-legal-fight-2025-3 ("I have created the brand-new Department of Government Efficiency, DOGE, perhaps you've heard of it, which is headed by Elon Musk" during a joint address to Congress).

31.     Defendant Musk oversees DOGE, including a "DOGE Team Lead" embedded within the Social Security Administration, and has played a pivotal and public role in the slew of federal agency and department dissolutions.

## BACKGROUND

### I.    Social Security Administration

32.     For nearly ninety years, SSA has served as the backbone of America's commitment to economic security for people with disabilities and elderly people. Established under the Social Security Act, 42 U.S.C. §§ 601 *et seq.*, during the depths of the Great Depression, Congress tasked the agency with administering benefits to the elderly, unemployed, and disabled.

33.     Established under Title II of the Social Security Act, Social Security benefits are funded by two federal trust funds: the Old-Age and Survivors Insurance ("OASI") trust fund pays retirement and survivors benefits, and the Disability Insurance ("DI") trust fund pays disability benefits. *Id.* § 401. Each are funded primarily by payroll tax revenues and are nearly entirely

mandatory spending, representing the federal government's legal obligation to program beneficiaries.

34.    In 1956, Congress introduced Social Security Disability Insurance ("SSDI"), providing benefits to workers who, having paid into the system, became unable to work due to long-term disability. Recognizing that many disabled individuals lacked sufficient work history to qualify, Congress enacted further reforms in 1972, creating Supplemental Security Income ("SSI")—a needs-based program, funded by general tax revenue that supports low-income elderly, blind, and disabled individuals.

## A.  Social Security Beneficiaries

35.    Over 7 million Americans rely on SSI, with the vast majority—over 6.1 million—living with disabilities and more than 63,000 classified as blind. Among those aged 65 and older, over 1.2 million are disabled, and more than 13,000 are blind. SSA, SSI MONTHLY STATISTICS, FEB. 2025 (2025). 85 percent of SSI recipients qualify due to disability.

36.    For more than half of SSI recipients, no other financial recourse exists, leaving them entirely dependent on a modest monthly benefit—$967 per month for individuals, and $1,450 per month for couples in 2025—to meet their basic, day-to-day needs. *See* Michelle Diament, *SSI Recipients Can't Afford Housing Anywhere in the U.S.*, DISABILITY SCOOP (Feb. 5, 2024), https://perma.cc/PY7P-VYM4 (noting that, as of 2023, the 4.1 million people with disabilities ages 18 to 64 receiving SSI were unable to afford housing in any U.S. market without additional support).

37.    SSDI serves as a lifeline for 7.3 million Americans, providing essential financial support to those who are no longer able to work due to disability. Monthly payments typically range from $800 to $1,800, with a maximum cap of $4,018. Most beneficiaries are older, with 74 percent over the age of 50 and 41 percent over 60, reflecting the significant role the program plays

in supporting aging individuals facing disability. Ctr. on Budget & Pol'y Priorities, Chart Book: Soc. Sec. Disability Ins. 8 (2024), https://www.cbpp.org/sites/default/files/7-21-14socsec-chartbook.pdf.

38.    Social Security retirement benefits are received by approximately 56 million people aged 65, Disabilities are prevalent within this age group, with approximately 46 percent of people over age 75 reporting having a disability. S. Census Bureau, *Disability Characteristics*, https://perma.cc/7NSQ-LT4V. Forty percent of retirees rely solely on Social Security for income in retirement. Press Release, Nat'l Inst. on Retirement Sec., New Report: 40% of Older Americans Rely Solely on Social Security for Retirement Income (Jan. 13, 2020).

**B.    Application and Adjudication of Social Security Benefits**

39.    Once an SSI or SSDI application is submitted, local SSA field offices review it to verify non-medical eligibility criteria. In 2024, SSA received over two million disability claims, with an average processing time of 230 days.

40.    If the initial claim is denied, applicants may request reconsideration of their claim. In 2024, SSA received approximately 618,000 reconsideration requests, with an average processing time of seven months. If the reconsideration decision is unfavorable, applicants can request a hearing before an Administrative Law Judge. Further appeals go to the Appeals Council, and, ultimately, federal court.

41.    The Office of Disability Adjudication is responsible for holding hearings, issuing decisions, and reviewing post-hearing appeals for claims filed under Titles II and XVI of the Social Security Act. 42 U.S.C. §§ 401–33, 1381–83f. In 2024, SSA received approximately 395,000 hearing requests, with an average processing time of 345 days.

42.    Today, SSA's disability benefits programs are among the most relied-upon federal programs in the country, serving millions of Americans each year. In 2023 alone, SSA processed

11.1 million disability claims and distributed benefits to 7.4 million SSI beneficiaries. In total, SSA administers benefits to more than 72 million people and facilitates over 500 million interactions with the public annually through field offices, customer service centers, and phone-based services.

43.     Social Security benefits are not an optional social safety net; they are a statutory obligation, born from the recognition of their vital purpose. For millions living with disabilities, these benefits serve as a lifeline, holding back the tide of hunger, destitution, and erasure.

### C. Social Security Field Offices

44.     The indispensable role of SSA field offices was recognized from the program's inception. In 1935, the newly-established Social Security Board, later to become SSA, created a committee to identify the optimal locations for field offices to deliver direct public service. As committee chairman E.J. McCormick observed, regardless of the structure of the Social Security Act, "its administration, particularly in the field, will either make or defeat the entire program." IN THE FIELD: THE HISTORY OF FIELD OFFICES (SSA 2015), https://perma.cc/C5V3-QCVC.

45.     Site selection was guided by principles of administrative efficiency and public accessibility. The committee assessed factors such as population distribution and density, regional accessibility, and economic activity—including trading zones, shopping centers, and transportation networks. Other considerations included the number of wage earners, local employment conditions, and the cost and availability of office space. By 1936, the committee recommended establishing 89 district offices and 517 branch offices to serve the 222,488 Social Security beneficiaries. *Id.*

46.     SSA field offices serve as the primary point of contact for millions of Americans navigating Social Security and Medicare programs. In 2024, SSA operated 10 regional offices and 1,230 field offices, serving nearly 72 million Social Security beneficiaries. Each year, these offices handle over 40 million visits—approximately 119,000 per day.

47.    Field office staff engage with the public daily, assisting individuals with benefit claims, Social Security card applications, Medicare enrollment, and eligibility determinations for SSI payments. They also initiate continuing disability reviews and address beneficiary concerns both in person and by telephone. SSA encourages in-person field office visits for individuals who have difficulty communicating by telephone, acknowledging the complexity of Social Security program rules and the challenges many face in accessing the internet.

48.    In the administration of Medicare benefits, SSA field offices perform a range of essential functions, including processing applications for Social Security numbers and benefits, making benefit adjustments, and verifying earnings records. Certain tasks require an in-person visit, such as name changes, conditional Part A enrollments, Medicare enrollment outside the general enrollment period under special provisions, and reinstating Part B benefits after overdue premiums are paid. They also help Medicare beneficiaries secure financial assistance for prescription drug costs under the Medicare Prescription Drug Program.

49.    In addition to their in-person services, field offices handle nearly half of all calls to SSA, further underscoring their vital role in delivering essential public services. SSA recently began to require appointments to meet with representatives in field offices, with wait times averaging approximately one month.

**D.  The National 800 Number and Field Office Telephone Services**

50.    SSA beneficiaries can access SSA services telephonically through either their local field office or the National 800 Number. In 2023, SSA handled over 23 million calls through the field offices, over 28 million through the National 800 Number.

51.    Since its inception in 1988, the National 800 Number has offered individuals direct access to live representatives, providing vital assistance with retirement, survivor, disability, and

Medicare benefits, as well as SSI payments. With over 50 million calls handled annually, the service stands as a crucial bridge between SSA and the public.

52.    For many SSA beneficiaries—namely older adults and individuals with disabilities—internet access is not a viable option. With 38 percent of adults with disabilities lacking a computer, and internet usage among people with disabilities trailing far behind those without disabilities—63.8 percent vs. 83.4 percent—many beneficiaries have no viable alternative for filing claims, appealing decisions, or obtaining essential information. *See* COMM. TECH. NETWORK, *Digital Inclusion for People with Disabilities: Bridging the Accessibility Gap* (July 14, 2023), https://perma.cc/94XV-PE67.

53.    Consequently, the National 800 Number serves as the primary, and often the only, means for these individuals to seek assistance. Notably, 40 percent of all claims are processed via telephone, underscoring the indispensable role of this service in ensuring equitable access to Social Security benefits. *See* Judd Legum, *Memo details Trump plan to sabotage the Social Security Administration*, POPULAR INFO. (Mar. 17, 2025) https://perma.cc/A5Z4-HW9V.

54.    Given the vital role of telephone-based services in connecting millions to essential services, the National 800 Number Network and local office-based telephone services should stand as a models of efficiency. Yet, despite their undeniable importance, they have been undermined by persistent service delays, rooted in chronic staffing shortages and an outdated technology infrastructure. In 2024:

   a.   31 million calls processed, a one-million call increase from 2023.

   b.   48.2 percent of callers reached a live agent.

   c.   Average wait time of 1 hour and 24 minutes, with callback times averaging 2 hours.

     d.    Speed of answer reduced to 28 minutes, down from 36 minutes in 2023—an improvement attributed to technological upgrades and additional hiring.

55.    On information and belief, these response times have significantly deteriorated in 2025 as increased number of beneficiaries are funneled into the telephone-based system for a myriad of tasks, including mandatory appointment setting.

56.    Millions of beneficiaries continue to experience significant wait times, impacting their ability to access critical Social Security benefits. Ensuring sufficient workforce in field offices and modernizing technology are imperative to ensure SSA fulfills its mandate to provide timely and effective assistance to the public.

## II.    Department of Government Efficiency

### A.    Creation, Mission, and Staffing of DOGE

57.    In August 2024, Defendant Musk introduced the concept of a "government efficiency commission" to the public discourse during a podcast conversation with Lex Fridman. In that exchange, Defendant Musk acknowledged discussions with then-candidate Trump about creating a "government deficiency commission" and expressed his interest in participating in such an initiative. *See* Lex Fridman Podcast, *Elon Musk: Neuralink and the Future of Humanity*, at 1:15:45–1:16:03 (Aug. 2, 2024), https://perma.cc/8UYE-43QS; *see also* Siladitya Ray, *Trump Backs Idea of Musk Joining 'Government Efficiency Commission' If He Wins Second Term*, FORBES (Aug. 13, 2024), https://perma.cc/M2A5-QAQ4.

58.    On September 5, 2024, then-candidate Trump announced his intention to establish a "government efficiency commission" with Defendant Musk at the helm. Nick Robins-Early, *Trump Announces Plan for Elon Musk-Led 'Government Efficiency Commission'*, GUARDIAN (Sep. 5, 2024), https://perma.cc/6G2Z-XKTN. This was confirmed in a November 12, 2024, announcement by President-elect Trump that Defendant Musk would lead efforts to "dismantle

Governmental Bureaucracy, slash excess regulations, cut waste expenditures, and restructure Federal Agencies—Essential to the 'Save America' Movement.'" Donald J. Trump (@realDonaldTrump), TRUTH SOCIAL (Nov. 12, 2024, 7:46 PM), https:// www.truthsocial.com/@realDonaldTrump/posts/113472884874740859.

59.    Upon taking office, President Trump issued Executive Order No. 14158, 90 Fed. Reg. 8441 (Jan. 29, 2025), https://perma.cc/S7KV-8PYN, establishing DOGE under the Executive Office of the President and:

a.    Creating DOGE teams within each federal agency, with appointments subject to DOGE leadership approval, *id.* at § 3(c); and

b.    Requiring agency leaders to coordinate with the DOGE leadership and, to the fullest extent permitted by law, ensure DOGE has prompt access to all unclassified agency records, software, and IT systems. *Id.* at § 4(b).

60.    In February 2025, Defendant Gleason was named the Acting Administrator of DOGE, but according to reports, Defendant Musk remains in charge.

61.    Official details regarding Defendant Musk's status within DOGE remain murky. *But see Does 1-26 v. Musk*, CV 25-0462-TDC, 2025 WL 840574, at *18 (D. Md. Mar. 18, 2025) (holding that Musk was likely exercising the duties and functions of a principal government officer). The White House has characterized Defendant Musk as an unpaid special governmental employee ("SGE") with access to a government email account and office space at the White House. An SGE is a temporary federal worker, typically employed for up to 130 days. SGEs are prohibited from engaging in activities that involve financial conflicts of interest or using their position to influence elections or participate in political activities while on duty. Ty Roush, *White House Says*

*Elon Musk Trusted to Claim His Own Conflicts of Interest as 'Special Government Employee'—Here's What that Means*, FORBES (Feb. 5, 2025), https://perma.cc/VUR8-ZSBA.

62.     Despite White House claims that Defendant Gleason is the Administrator of DOGE, President Trump has consistently asserted that Defendant Musk is the head of the agency.

63.     On information and belief, Defendant Musk reports directly to President Trump and often takes unilateral action in directing DOGE operations. The *New York Times* reported that senior White House officials are often unaware of Defendant Musk's actions. One official remarked that Defendant Musk "was widely seen as operating with a level of autonomy that almost no one could control." Jonathan Swan *et al., Inside Musk's Aggressive Incursion Into the Federal Government*, N.Y. TIMES (Feb. 3, 2025), https://perma.cc/R7XD-3LA7.

64.     President Trump has repeatedly extolled Defendant Musk as "a very talented individual in terms of management and cost efficiency" and has indicated that he exercises direct oversight of Defendant Musk's actions, charging him with "assessing certain groups and financial figures." Justin Elliott *et al.*, *The Elite Lawyers Working for Elon Musk's DOGE Include Former Supreme Court Clerks*, PROPUBLICA (Feb. 7, 2025), https://perma.cc/79TH-HHNA; *accord* Statement by President-elect Donald J. Trump Announcing the Appointment of David A. Warrington as Assistant to the President and Counsel to the President (Dec. 4, 2024), https://perma.cc/WD5P-678P.

65.     Public reporting has revealed details not disclosed in official White House announcements. ProPublica has identified DOGE-affiliated individuals not only within DOGE itself—where they appear to be employed by the Executive Office of the President—but also embedded across multiple federal agencies, including SSA. *See* Avi Asher-Schapiro *et al.*, *Elon Musk's Demolition Crew*, PROPUBLICA (updated Mar. 14, 2025), https://perma.cc/BG5M-CTAH

(tracking DOGE staffing). This unprecedented staffing structure highlights how Defendant Musk has strategically placed DOGE personnel throughout various agencies, granting young, relatively inexperienced, and largely unvetted individuals unprecedented access to essential government functions. The breadth of this cross-agency presence raises serious concerns about the true scope of their roles and the potential impact on transparency and accountability within the federal government. *See* Faiz Siddiqui *et al.*, *19-Year-Old Musk Surrogate Takes on Roles at State Department and DHS*, WASH. POST (Feb 10, 2025), https://perma.cc/DP5A-24GD.

### III.    Mass Workforce Reduction and Organizational Restructuring

66.    Defendant Dudek has announced a plan to eliminate at least 7,000 Social Security employees, offering buyouts and early retirement to the agency's entire 57,000-person workforce, including field office and teleservice staff; reduce the number of regional offices from 10 to 4; reduce offices and hearing centers; and outsource Social Security customer service. Press Release, SSA, Social Security Announces Workforce and Organization Plans, (Feb. 28, 2025), https://perma.cc/L7D8-APHY.

67.    A total of 2,477 eligible SSA employees have accepted voluntary separation incentive payments, which provide a one-time payout to encourage workers to leave government service by April 19, 2025. SSA was required to submit a Reduction in Force plan to the Office of Personnel Management by March 13, 2025; however, this document has not been made publicly available. A reduction-in-force will eliminate over 4,000 positions. SSA, *Workforce Update*, https://perma.cc/3UWS-QG3U (last visited Mar. 30, 2025); Alessandra Malito, *Here's how many Social Security workers are taking a buyout—so far*, MARKETWATCH (Mar. 18, 2025), https://perma.cc/SZ3V-WGHS. Additionally, the agency initiated a hiring freeze for SSA and Disability Determination Services ("DDS") while significantly reducing overtime.

15

68.    Defendant Dudek has also announced a series of policy changes that further overburden telephone services and field office capacity, including:

a.    Requiring in-person issuance of Social Security numbers for newly naturalized citizens and work-authorized non-citizens, ending automatic issuance and increasing weekly in-person visits by 60,000 to 75,000 per week, Judd Legum, *Secret policy Shift could overwhelm Social Security offices with Millions of People*, POPULAR INFO. (Mar. 20, 2025), https://perma.cc/8TGP-LMUJ;

b.    Requiring in-person identity verification for retirement applicants unable to use web-based two-factor authentication, Press Release, SSA, Social Security Announced Identity Proofing Requirements (Mar. 26, 2025), https://perma.cc/74F5-5SPU;

c.    Requiring in-person identity verification for all survivor and auxiliary applicants, *id.*;

d.    Requiring in-person verification for any changes in banking for beneficiaries unable to use web-based two-factor authentication, Press Release, SSA Correcting the Record about Social Security Direct Deposit and Telephone Services, (Mar. 12, 2025), https://perma.cc/W6NT-T6LA; and

e.    Full clawback of overpayments—effectively terminating benefits for thousands of beneficiaries and requiring in-person adjustments for those needing modified payment plans—despite many overpayments being attributable to administrative errors. Press Release, SSA, Social Security to Reinstate Overpayment Recover Rate (Mar. 7, 2025), https://perma.cc/M4Z3-MP4L.

69.    On February 24 and 25, 2025, Defendant Dudek eliminated OCREO and the Office of Transformation. Press Release, SSA, Social Security Dissolves Duplicative Office, (Feb.25,

16

2025), https://perma.cc/UZL3-7C5B, Social Security Eliminates Wasteful Dept. (Feb. 24, 2025), https://perma.cc/547Z-QY2B.

70. These offices were foundational to ensuring equal access to benefits, ensuring that civil rights protections and equitable service delivery remained more than mere promises.

71. On information and belief, no announcement has been made regarding the transfer of functions related to reasonable accommodation or public disability discrimination complaints, despite the agency's mandate under the Rehabilitation Act to provide and enforce such.

A. **Staff Cuts and Office Reductions**

72. SSA is currently operating at historically low staffing levels, with just 57,000 employees serving 73 million people. Recently, Defenant Dudek announced plans to reduce the workforce to 50,000—its lowest level since 1972.

73. Over 2,400 SSA staff have already accepted voluntary separation incentive offers.

74. The state of SSA's field offices is unclear as DOGE and Social Security data does not align. DOGE initially announced the reduction of approximately 47 local offices, which it later scaled down to 21 offices. However, SSA's data shows 64 lease terminations focused on remote hearing office spaces across the country. The closure of local hearing offices and the uncertainty regarding other local office functions will compel people pursuing coverage to travel significant distances for hearings. Neighboring local offices will now be required to absorb the workload of those previously served by the closed offices. Furthermore, with the recent order that all SSA staff return to the office, the closure of local hearing offices will eliminate capacity for addressing the backlog of overdue appeals

75. In an agency already beset by mounting backlogs and debilitating delays, the closure and reduction of offices, and reduction of staff only exacerbates an already untenable situation, further undermining SSA's ability to perform its statutory duties.

76.     SSA itself has previously conceded that losing just 4,500 agency employees will increase claim processing times by at least 20 additional days, and add 175,000 more cases to the backlog. SSA, FY 2025 PRESIDENT'S BUDGET REQUEST 9 (2024), https://perma.cc/42A4-ZVPW.

77.     Reducing SSA workforce by 7,000 will increase claim processing times by at least 31 additional days, and an additional 272,000 backlogged cases. This estimate assumes a linear impact, but in reality, efficiency losses will compound, meaning that the actual delays and backlog growth will be even worse.

78.     Research has shown that when field offices close, the number of people receiving disability benefits nearby falls by 16 percent, cutting families off from lifesaving supports. *See* Molly Weston Williamson, *Cuts to the Social Security Administration Threaten Millions of Americans' Retirement and Disability Benefits*, CTR. FOR AM. PROGRESS (Mar. 12, 2025), https://perma.cc/YHK2-3JT9.

79.     Research has shown that for every individual staff member SSA loses, 8.6 people go without benefits. Sydney Gordon, *Employee Exodus: The Impact of Government Downsizing on Benefit Access* (Feb. 26, 2025) (Ph.D. dissertation, U.C. Irvine) (on file with author). *See* David Dayen, *How Social Security Administration Cuts Affect You*, AM. PROSPECT (Mar. 6, 2025), https://prospect.org/health/2025-03-06-how-social-security-administration-cuts-affect-you.

80.     The average wait time for an initial disability application decision is now eight months. If denied, reconsideration adds another seven months, with an additional year-long wait for a hearing.

81.     For many, the financial toll of awaiting a decision results in ruin. Between 2014 and 2019, 48,000 people filed for bankruptcy while awaiting a final decision on their appeals. Memorandum from U.S. Gov't Accountability Off. to Sen. Comm. on the Budget and H.R.

Subcomm. on Soc. Sec. (Feb. 15, 2025). With thousands succumbing to illness or financial collapse each year as they await a resolution, a greater SSA backlog is not an inconvenience—it is a profound failure of governance, with consequences that touch upon life and death.

82.     Those reliant on SSI are confined to a mere $2,000 in savings, leaving them vulnerable when payments are delayed. Without a financial cushion, they face the threat of eviction, hunger, and the inability to afford necessary medications. Worse still, the loss of SSI benefits may strip them of vital Medicaid coverage, further jeopardizing their health and survival.

83.     SSA's planned termination of 7,000 employees and reduction of local offices, is no mere exercise in fiscal restraint—administrative overhead constitutes one percent of SSA's budget.

**B.      New Identity Verification Requirements**

84.     Effective April 14, retirees, survivors, and spouses will no longer be able to use their telephone to file benefit claims, update direct deposit information, or make changes to their accounts. Instead, they must verify their identity either online or in person at a Social Security office—a shift that could disrupt access for millions.[1]

85.     In addition, SSA has frozen the automatic issuance of social security numbers and cards to newly naturalized U.S. citizens and non-citizens authorized to work, requiring them to visit field offices to obtain a social security card, increasing weekly in-person visits by an estimated 60,000 to 75,000 per week. Legum, *supra* at https://perma.cc/8TGP-LMUJ.

86.     For those not enrolled in a "my Social Security" account, in-person visits will be the only option. Phone verification is being drastically curtailed, despite the agency's overloaded call centers and the ongoing challenges faced by beneficiaries in securing timely assistance.

---

[1] While this policy was initially applied to SSI, SSDI, Medicare, and retirement beneficiaries, SSA on March 26 rolled it back for SSI, Medicare and SSDI beneficiaries. *See* Press Release, SSA, Social Security Updates Recently Announced Identity Proofing Requirements (Mar. 26, 2025).

87.     While Defendant Dudek claims this change will reduce fraud, he has provided no evidence to support this assertion. What is clear, however, is that these restrictions will create longer wait times, added frustration, and significant hurdles for those who rely on SSA services.

88.     At a time when efficiency and accessibility are alleged to be priorities, these unnecessary restrictions only make it harder for people to get the support they need. By forcing beneficiaries to navigate a complex online system or travel—sometimes long distances—to an already overwhelmed SSA office, this policy risks shutting out those in remote areas or that lack reliable transportation. Those without internet access, individuals with disabilities and the elderly, including those in remote areas, will face even greater difficulties in managing their benefits.

**C.     Office of Civil Rights and Equal Opportunity**

89.     Prior to its dissolution, OCREO oversaw discrimination complaints and civil rights enforcement within SSA, reasonable accommodation requests, and ensuring fair and equal treatment under federal law. Its organizational structure consisted of:

a.   Center for Equal Employment Opportunity;

b.   Center for Complaints Resolution;

c.   Center for Accommodations and Disability Services;

d.   Center for Information Technology;

e.   Center for Harassment Prevention;

f.   Center for Regional Equal Opportunity Management; and

g.   Center for Compliance Management.

90.     Far from being duplicative, there is no other office at SSA that has been designated, or that is capable, of handling OCREO's responsibilities.

91.     The historic underpinnings and necessity of OCREO further underscore the importance of its continued independence. The establishment and evolution of offices like OCREO

span several decades, beginning with efforts to eliminate employment discrimination during the Civil Rights Movement and culminating in the creation of the Equal Employment Opportunity Commission ("EEOC") in 1965.

92.    The elevation of OCREO to an independent office in 2021 was part of a government-wide initiative to enhance federal antidiscrimination programs.

93.    The Federal Employee Antidiscrimination Act of 2019 ("FEAA"), 5 C.F.R. §§ 724 *et seq.*, codified the EEOC's directive and amended the Notification and Federal Employee Antidiscrimination and Retaliation Act ("No FEAR Act"), P.L. 107–74, 116 Stat. 556 (2002), to strengthen protections against discrimination and retaliation. A key provision mandated that civil rights directors report directly to agency heads, ensuring their independence from other divisions.

94.    Today, each federal agency that provides federal financial assistance has an office dedicated to investigating complaints of discrimination.

95.    OCREO was SSA's designated office and remains the only one of its kind to be wholesale labeled as redundant and subsequently eliminated.

96.    As an independent office, OCREO addressed long-standing limitations and strengthened its capacity to enforce civil rights protections within SSA. Without its independent oversight, there is a significant risk of returning to conflicts of interest, diminished enforcement of anti-discrimination policies, and reduced accountability.

97.    Following its abrupt elimination, individuals attempting to file complaints, seek accommodations, or otherwise reach the civil rights office were met with an automated response stating simply that OCREO had been eliminated and to await further instructions. *See* Chris Geidner, *The Social Security Administration "eliminated" its civil rights office*, LAW DORK (Feb 25, 2025), https://perma.cc/TW8A-FT3P.

21

98.     SSA's Anti-Harassment Program workload has been transferred to the Office of Mission Support ("OMS") (previously known as Office of Budget, Finance, and Management), while its EEO authorities and workload have been transferred to the Deputy Commissioner for Mission Support and the newly named EEO Director.

99.     The transfer of critical responsibilities to OMS has proven to be an inadequate replacement for OCREO. As of March 14, 2025—less than a month after OCREO's dissolution—OMS has failed to meet SSA's established timelines for uploading employee complaint files and has encountered significant difficulty accessing essential components of its Reports of Investigation, thereby exacerbating the backlog of EEO complaints.

100.    The elimination of OCREO has effectively stripped individuals of a clear avenue to file discrimination complaints or request necessary accommodations, depriving them of their fundamental right to seek redress and support. By withholding these vital functions, SSA has unlawfully withheld a function critical to ensuring compliance with federal disability rights laws, leaving individuals with disabilities without recourse if they are denied benefits, mistreated, or face discriminatory barriers to access.

### D.     Office of Transformation

101.    In just ten days this March, SSA.gov crashed four times due to overloaded servers, locking millions of retirees and disabled Americans out of their accounts. Lisa Rein & Hannah Natanson, *Long waits, waves of calls, website crashes: Social Security is breaking down*, WASH. POST (Mar. 25, 2025), https://perma.cc/D8F4-PT55. This was not a happenstance failure but the foreseeable result of Defendants' decision to dismantle the agency's capacity to sustain and modernize its own infrastructure. With the elimination of the Office of Transformation—once tasked with overseeing the functionality and improvement of SSA's digital services—the recurrence of such outages is inescapable.

102.    The Office of Transformation, once a team of 60, was created to modernize customer service, streamline operations, and improve the claimant experience. It consisted of the Office of Customer Experience, the Office of Change Management, and the Office of Experience Design, each designed to facilitate efficiency and improve access for claimants.

103.    A core aspect of its mission was working to remedy longstanding deficiencies in the agency's outdated technological systems and expand online services. Yet today, only 25 percent of SSA's services are available online—and without this office, even that limited access is at risk. *See* Natalie Alms, *Social Security shutters its civil rights and transformation offices*, GOV. EXEC. (Feb. 26, 2025), https://perma.cc/8NCZ-TBHT.

104.    The elimination of the Office of Transformation has also stripped SSA of its ability to track and improve service quality. There is no longer a team responsible for evaluating the impact of these cuts, no structured oversight, and no accountability, the effects of which will be borne not by the agency itself, but by the individuals who depend on it.

### E.    Defendant DOGE's Role in Dismantling the Social Security Administration

105.    Defendant Dudek has made no effort to obscure the force behind these sweeping cuts—executed just days into his tenure as Acting Commissioner. He expressly attributed the dissolution of OCREO and the Office of Transformation, along with the planned reduction of offices and the mass termination of SSA employees, to Defendant Musk's directive to "streamline" agency operations by purging so-called "redundant" offices. Press Release, SSA, Social Security Eliminates Wasteful Department, *supra* (eliminating the Office of Transformation), Social Security Dissolves Duplicative Office, *supra* (eliminating OCREO).

106.    According to a recording obtained by *ProPublica* , during a closed-door meeting in March 2025, Defendant Dudek remarked that he did not wish "the system to collapse," cautioning that if DOGE were to impose changes of the magnitude seen at USAID, the Treasury Department,

and elsewhere, the consequences "would be catastrophic for the people in our country." Eli Hager, *"The President Wanted It and I Did It": Recording Reveals Head of Social Security's Thoughts on DOGE and Trump*, PROPUBLICA (Mar. 12, 2025), https://perma.cc/X7R9-ZW3A.

107. The *Washington Post* first reported Defendant Dudek's acknowledgment that DOGE and "the DOGE kids" are steering SSA policy. However, the full recording reveals a broader admission. When questioned about his refusal to disavow the President's false claims of widespread Social Security fraud, Defendant Dudek deflected, stating, "So we published, for the record, what the actual numbers were on our website." *Id.*

108. On DOGE's handling of Social Security data, Defendant Dudek remarked, "Are we going to break something?" before conceding, "I don't know." In his most unequivocal statement on DOGE's influence, and in apparent disregard for his oath to support and defend the Constitution, Defendant Dudek concluded: "That's not to say I don't have more hard choices ahead. The President has an agenda. I'm a political appointee. I need to follow that agenda." *Id.*

109. In addressing the closure and consolidation of regional offices, along with cuts to disability claim evaluations—already burdened by a mounting backlog—Defendant Dudek remarked, these decisions were "certainly done at the administration level. That would have not been my first preference. I think we need to see what's going on in terms of fallout." *Id.*

110. With an air of paradox, Defendant Dudek voiced a commitment to strengthening field offices and enhancing customer service, even as he simultaneously endorsed buyouts and a wholesale reduction of the workforce.

111. Meanwhile, reports indicate that DOGE's much-touted "efficiency" initiative is already unraveling the timely delivery of benefits. Employees report daily IT system failures, and the agency's restrictive procurement policies are hampering even the most basic tasks—like

obtaining vital records needed to process claims—leading to further delays. *Id.* In the span of just ten days this March, less than a month after the Office of Transformation's dissolution, SSA.gov suffered four crashes, a direct result of overloaded servers, locking millions of individuals out of their accounts. Lisa Rein & Hannah Natanson, *Long waits, waves of calls, website crashes: Social Security is breaking down*, WASH. POST (Mar. 25, 2025), https://perma.cc/D8F4-PT55.

112.    Meanwhile false claims propagated by Defendant Musk and DOGE regarding widespread fraud within Social Security serve a clear strategic purpose: to justify drastic agency cuts that would deprive eligible beneficiaries of their rightful payments.

113.    Defendant Musk's public statements mocking Social Security with claims that "maybe Twilight is real and there are a lot of vampires collecting Social Security"—attempt to turn serious policy discussions into a spectacle, while his follow-up assertion that "tens of millions" of deceased individuals are still recorded as "ALIVE" distorts the truth. Elon Musk (@elonmusk), X (Feb. 16, 2025, 11:55 PM), https://perma.cc/NJS5-D5QX, (Feb. 17, 2025, 1:36 PM), https://perma.cc/3SMK-DHDV. *See* Beatrice Nolan, *DOGE's plans for Social Security are a 'backdoor' way to cut payments, experts warn: 'This is the most serious threat I've ever seen to it'*, FORTUNE (Mar. 21, 2025), https://perma.cc/4JWY-C6MX.

114.    His assertions—that Social Security is plagued by "hundreds of billions" in fraud or operates as a "Ponzi scheme"—are not merely hyperbolic but demonstrably false. The actual fraud rate is minuscule, with verified cases accounting for only 0.3 percent of claims, many of which are not fraud, but mistakes. The program maintains a payment accuracy rate exceeding 99 percent. These numbers expose Defendant Musk's rhetoric for what it is—an attempt to manufacture a crisis to erode public confidence in Social Security and justify his dismantlement of SSA. *Id.*

115.    The agenda is clear: exploit exaggerated claims of fraud as a pretext for gutting the agency's ability to serve the American people. But the data does not support his narrative, and the consequences of his policies will be catastrophic. The elimination of civil rights enforcement and customer service offices, the closure of offices, and the mass reduction of SSA's workforce do not promote efficiency—they sabotage the agency's fundamental mission. By hollowing out SSA's capacity to operate effectively, Defendant Musk is not merely cutting government spending—he is forcing the agency to abandon millions of Americans who rely on the agency's protections and services without recourse.

## IV.    Impact of SSA Cuts and Restrictions on Beneficiaries

### A.    Elizabeth Rouse

116.    Elizabeth Rouse, a ▮▮▮▮▮▮ resident, has been legally blind since birth and is a member of the NFB. She balances two part-time jobs—working as an elementary school paraprofessional and helping parents navigate the complexities of special education, Medicare, and Medicaid for their children with disabilities. She spends her days making systems more accessible for others, yet when she turns to SSA for her own needs, she's met with delays, confusion, and misinformation.

117.    Ms. Rouse first signed up for SSI shortly after her 18th birthday in 2016. Today, she receives SSDI and Medicare. While her SSDI payments initially amounted to about $1,220 per month, the deduction for Medicare premiums has reduced her benefits to around $1,000—critical income that helps her cover basic expenses as she works toward her goal of living independently.

118.    Managing her Social Security benefits has been a persistent challenge. The nearest SSA office is about a 20-to-25-minute drive. Since Ms. Rouse cannot drive, she must coordinate with family, ensuring they can both take time off work and make the trip. Given the long wait times at the field office—often between 40 minutes and an hour—she plans for at least a two-hour

commitment for each visit. With only two agents typically staffing the windows and 10 to 15 people waiting at any given time, the office struggles to keep pace with the needs of its community. These waits will only get worse as staffing is cut and more transactions are required to be conducted in person.

119.    Even phone inquiries have proven unreliable. Ms. Rouse prefers calling SSA over using its difficult-to-navigate online portal, but she often waits on hold for an hour or longer—only to hang up when no agent answers. Based on her experience, she estimates that only 60 to 70 percent of her calls are ever answered. These delays will only get worse as staff cuts kick in.

**B.    Treva Olivero**

120.    Treva Olivero, ███████  █████ resident, has lived with legal blindness since birth and is an active member of the NFB. She worked two jobs to support herself before making the difficult decision to step away and pursue blindness skills training and a master's degree. Knowing she would be without income, she applied for SSDI in 2011 or 2012, seeking the stability she needed to build a secure and independent future.

121.    For years, SSDI was Ms. Olivero's financial lifeline, a steady thread of support starting at $1,400 per month and increasing to around $1,600 by 2024 through cost-of-living adjustments. However, in March 2024, SSA abruptly informed Ms. Olivero that she had been overpaid—allegedly for the past five or six years—because her income exceeded asset limits. Without warning, her benefits were terminated, and she was faced with a demand to repay over $100,000—an impossible sum. Soon after, her Medicaid coverage was terminated, leaving her without income, health insurance, or a clear path forward. Since then, Ms. Olivero has been engaged in an ongoing struggle to reinstate her SSDI benefits, a process that forced her to start from scratch.

122.    With the help of her family and an NFB consultant, Ms. Olivero reapplied for SSDI in December 2024, navigating a confusing and burdensome online application. Her SSA interview, initially set for late December, was postponed until the end of January 2025. There, an agent informed her that reinstating her benefits could take anywhere from six to nine months. In the meantime, she remains suspended in limbo—without financial support, buried under mounting medical debt, and struggling to afford even the most basic necessities.

123.    Ms. Olivero faces barriers in her local field office. The nearest SSA office is a half-hour drive away, and with no public transportation, each visit requires careful planning and a ride she must arrange. The National 800 Number is another obstacle—calls often go unanswered or result in extended hold times. Managing her benefits over the phone was once her preferred option, but as the system grows increasingly unmanageable, Ms. Olivero is forced to navigate an online portal that is anything but accessible.

124.    The stakes for Ms. Olivero are undeniable. In the past, she paid $600 a month for a room of her own—a space that meant more than shelter; it was independence. But when her benefits were stripped, so was her autonomy. Unable to work due to her health, she had no choice but to move in with her sister. Now, nearly $80,000 in medical debt hangs over her. Medicaid offers some relief, but not enough. Critical expenses such as wound care supplies remain out-of-pocket costs, adding another $200 per month to her financial burden.

125.    For Ms. Olivero, Social Security benefits are the key to her survival, independence, and dignity. Yet, she is locked in an unyielding battle for benefits she is legally entitled to.

**C.    Martha Hazen**

126.    Martha Hazen, a blind ███████ ███████ resident and member of the NFB, has long relied on SSDI benefits to support her family and cover the cost of paratransit services for her two part-time jobs.

127.    In 2023, Ms. Hazen secured full-time employment, which led to the loss of her SSDI benefits. However, after losing her job in February 2024, she reapplied for SSDI, only to be denied in September. Determined to navigate the appeals process, she turned to an NFB consultant for guidance.

128.    During the appeals process, Ms. Hazen visited her local SSA office five times. Each visit required her to rely on local paratransit services, which took a significant toll on her time and energy. Due to past struggles making appointments over the phone, she opted to arrive before the office opened. Once there, she waited between two and three hours for assistance. While she waited, she observed the office guard turning away members of the public seeking assistance from an agent. On one occasion, in July 2024, a man was told the waiting area was too crowded and had to wait outside. Hoping for a chance to meet with an agent, he stayed outside in the heat—only to collapse from heat exhaustion before he could be seen.

129.    Reaching SSA by phone or using SSA.gov has proven unreliable for Ms. Hazen. She regularly spends up to 90 minutes on hold when calling SSA. On some occasions, she is prompted to leave a message for a callback, though SSA has only returned her call once.

130.    Despite her persistence, Ms. Hazen's efforts to work with SSA have only become more challenging. With fewer staff and increasingly strict requirements to visit local offices in person, she is growing concerned that SSA will soon become virtually unreachable, further complicating her efforts to manage her SSDI application.

**D.    Merry Schoch**

131.    Merry Schoch is a blind ███████ ██████ resident. She and her husband are both longstanding members of the NFB.

132.    Receiving SSDI is critical for Ms. Schoch to support herself and her family when she has not had full-time work. Ms. Schoch was a recipient of SSDI for many years. In 2022, she

was hit by a waste management truck, which required her to undergo four surgeries. To pay exorbitant medical bills, Ms. Schoch took up a full-time job. Ms. Schoch reported her employment status to SSA, but SSA made no changes to her benefit payments.

133.    After nearly two years of full-time work, Ms. Schoch needed to leave her full-time job, so she reported her unemployment to SSA. In August 2024, SSA terminated Ms. Schoch's benefits because she had been working full-time for the past two years. On top of cutting off her benefits, SSA notified Ms. Schoch that she owed $30,000 from the SSDI payments she received while she was working full-time.

134.    In September 2024, the SSA informed Ms. Schoch that she could reapply for benefits. However, she was unable to receive in-person assistance at her local office to complete the application. Due to her limited eyesight, her granddaughter helped her fill out the necessary paperwork. Despite their efforts, the SSA lost the documents and required her to submit a second application.

135.    When Ms. Schoch called her local office for help, she was told the earliest available appointment was weeks away. She accepted the appointment, once again worked with her granddaughter to complete the paperwork, and, nearly two months after her initial submission, handed her forms directly to an SSA agent at her appointment in December 2024.

136.    Traveling to her field office is an all-day ordeal. For her December 2024 appointment, she relied on her local paratransit service, which took between an hour and 90 minutes each way. Even if her granddaughter or a friend had driven her, the trip could have easily taken 45 minutes in traffic.

137.    After her appointment, the return trip via paratransit took just as long. The time spent traveling to and from the office meant missing hours at her part-time job—their only source of income aside from her husband's SSDI payments.

138.    Seeking help from SSA via telephone is similarly taxing. Ms. Schoch is often left waiting on hold for at least an hour before speaking to anyone. On one occasion, she waited an exhausting two hours before an agent finally answered.

139.    In late March 2025, Ms. Schoch called SSA for assistance with a questionnaire about her blindness, a required part of her SSDI application. Following the instructions on the automated voicemail, she attempted to leave a message for a callback, but the phone line disconnected before she could finish. The next day, Ms. Schoch tried calling her local office right when they opened to see if someone could help her fill out the questionnaire. She waited an hour on the phone. When someone finally answered, the agent said there were no available appointments until May 20, 2025—nearly two months from the date Ms. Schoch called.

140.    As a last-ditch effort, Ms. Schoch called the state Department of Disability Determinations, the agency responsible for processing SSDI requests. However, her efforts were met with silence. She called twice, then a third time, but each call was greeted only by the sound of endless ringing and no response.

141.    As a last resort, Ms. Schoch attempted to seek help online. However, when she tried to log into her account, she was met with an error message. Her husband, using his own device, encountered similar technical glitches on SSA.gov that same day.

142.    With in-person assistance unavailable due to office overcrowding, phone support inaccessible because of long wait times, and online services plagued by technical glitches, Ms. Schoch has no way to complete the required questionnaire on her own. She must wait for her

granddaughter's help and has no means of informing the SSA that her recent customer service experiences have been even more abysmal than usual.

143.    For Ms. Schoch, receiving SSDI is the difference between having food on the table or going without. With medical bills, a mortgage, and other basic necessities at stake, she is deeply troubled by the SSA's recent actions, which have already made it even harder for her to access the financial support she needs to survive.

### E.    William Weiss

144.    William Weiss, a ▉▉▉▉▉  ▉▉▉▉ resident, has been legally blind since childhood. He began receiving Social Security Survivor benefits as a child following his father's death, and SSDI benefits at age 19, and Medicare as an adult.

145.    For years, Mr. Weiss relied on his Social Security benefits, supplemented by part-time work at a sandwich shop. Always mindful of the rules around earned income, Mr. Weiss made sure his earnings did not exceed the limit for people with blindness.

146.    Around February 2024, Mr. Weiss received a notice from Social Security stating that he had allegedly been overpaid approximately $35,000 in SSDI benefits due to excess earnings from his part-time job. Later, he discovered an additional overpayment claim of approximately $25,000 related to his Survivor benefits. Mr. Weiss disputes the assertion that he was overpaid.

147.    After receiving the overpayment notice, Mr. Weiss's monthly Social Security benefits were abruptly halted. Forced to cover his Medicare premiums out of pocket, he had to dip into his already meager savings. Without his benefits, he has been left relying on others for food, housing, and basic necessities.

148.    For the past year, Mr. Weiss has worked tirelessly to resolve his overpayment issue and have his benefits reinstated. However, recent SSA policies have made it increasingly difficult—if not impossible—for him to reach Social Security. In January 2025, Mr. Weiss visited

his local SSA office to check on the status of his appeal, only to be told that he could not be seen without an appointment. Rather than assisting him in scheduling one, the representative simply handed him a piece of paper with a toll-free number and sent him on his way.

149.    Since January 2025, Mr. Weiss has made numerous unsuccessful attempts to contact Social Security to schedule an appointment at his local office. On one occasion, after waiting nearly five hours, he finally received a call back from an agent. More often, however, he waits on hold only for the call to disconnect before he can speak to anyone. The automated phone system has informed him that his estimated wait time exceeds 120 minutes. Yet, despite his willingness to endure these long waits, he has been unable to reach anyone for assistance.

150.    Mr. Weiss is trapped in an impossible cycle. To visit his local Social Security office, he must first schedule an appointment through the SSA's phone system. Yet, no matter how many times he calls, he cannot get through to anyone to make that appointment.

**F.    Deja Powell**

151.    Deja Powell, ███████  ████ resident and member of the NFB, has been legally blind since birth.

152.    Ms. Powell had previously received both SSI and SSDI benefits before embarking on a 15-year career in the disability field, during which she oversaw the administration of disability programs. When her condition once more deprived her of the ability to work, she applied for SSDI benefits in August 2024.

153.    In December 2024, Ms. Powell received an SSDI payment direct deposited to her bank account. Ms. Powell assumed that she received the payment because her application for SSDI benefits was approved. In January 2025, Ms. Powell received a second SSDI payment direct deposited to her bank account.

154.    However, in February 2025, Ms. Powell did not receive the anticipated SSDI payment. Ms. Powell called the National 800 Number to inquire about her missing payment. She waited on hold for five and a half hours before finally speaking to an agent.

155.    The agent informed her that the payments she had received in December 2024 and January 2025 were merely "provisional payments." Confused, she spent the next 45 minutes asking questions, trying to understand what that meant and why she had received the benefits in the first place—only to have them stop without warning.

156.    Despite her efforts, the agent's explanations remained unclear. Frustrated, she was told that SSA had sent her a letter outlining the concept of provisional benefits. Ms. Powell later located the letter and read it carefully. But instead of clarity, she found only more confusion. The letter failed to explain why she had received two months of payments, only for them to suddenly disappear.

157.    The agent ended the call by informing Ms. Powell that her SSDI application, filed back in August 2024, was still in the disability determination phase—more than seven months after she had submitted it.

### G.    Wilshawn Tiller

158.    A U.S. Navy veteran and ███████ resident, Mr. Tiller's body bears the weight of his service. Post-Traumatic Stress Disorder ("PTSD") keeps him awake through the night. Chronic obstructive pulmonary disease ("COPD") and emphysema make every breath a struggle. These disabilities affect nearly every aspect of his daily life and prevent him from maintaining employment. In November 2023, he applied for SSI and SSDI.

159.    While Mr. Tiller awaited a decision, the weight of his circumstances grew heavier. After three months of waiting, he lost his job. After months of unemployment, he tried calling the National 800 Number but the wait times were upwards of an hour.

160.    Frustrated by the endless loop of unanswered calls, Mr. Tiller resolved to confront the system in person. In June 2024, he set out for a local SSA office. With his wife relying on their shared car to transport their children and herself to work, Mr. Tiller got a ride from his neighbor. He arrived early, just before the office opened, but found the line already spilling out the door. He returned the following day, again relying on his neighbor for a ride. This time, the line stretched down the block. But Mr. Tiller's need for answers drove him to wait.

161.    Under the relentless sun, Mr. Tiller and dozens of others stood outside the SSA office, trapped in a bureaucratic bottleneck. The absence of seating made the experience all the more grueling, particularly for Mr. Tiller, whose COPD and emphysema make standing for long periods a painful struggle. What should have been a routine task became an agonizing test of endurance. When he finally spoke to an SSA employee, they could offer him little more than vague reassurances: "Be patient."

162.    Over a year after his application, Mr. Tiller finally sat in an SSA interview room in February 2025—only to be told his SSI application was denied. Although he had lost his part-time job over a year earlier, he had been employed at the time of his application. With no recourse but to appeal, Mr. Tiller once again finds himself ensnared in an interminable cycle of waiting and uncertainty.

163.    Recent policy changes will force even more claimants into the already overwhelmed local office where Mr. Tiller still seeks support. Wait times will grow as more demand is placed on the limited staff available.  Meanwhile, people in critical need are denied the benefits they are entitled to. Delays will deepen, manifesting in the hollow of empty stomachs, the cold of unheated homes, and the silence of those left to wither in wait, uncertain if decisions will ever come.

164.    As SSA continues to decimate its workforce, reduce offices, dismantle essential oversight functions, and erect new barriers to claim benefits, the agency once entrusted with protecting the well-being of millions now stands as a formidable obstacle to the very services it was meant to provide.

### H.    Organizational Plaintiffs

165.    In addition to the impacts on their members and constituents, SSA's recent policy changes, staffing cuts, and office reductions have directly affected Organizational Plaintiffs. They have had to field more calls and requests for assistance from members and the public, shift staff from other priorities to responding to constituents and to advocating with SSA to prevent the harms their constituents are facing, and divert other resources other from mission-critical efforts.

**CLAIMS FOR RELIEF**

**COUNT I**

**Violation of Section 504(a) of the Rehabilitation Act of 1973**
Disparate Impact Discrimination

*All Plaintiffs against All Defendants*

166.    Plaintiffs incorporate by reference the facts and allegations set forth above as if fully set forth herein.

167.    With the enactment of the Rehabilitation Act of 1973, 42 U.S.C. §§ 701 *et seq.*, Congress for the first time recognized that people with disabilities had civil rights, not just medical needs, and created a cause of action for disability-based discrimination.

168.    Section 504(a) of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity . . . conducted by any Executive agency." 42 U.S.C. § 794(a); 45 C.F.R. § 85.21(a).

169.    A federal agency may not, on the basis of disability, "afford a qualified individual with [a disability] an opportunity to participate in or benefit from the aid, benefit or service that is not equal to that afforded others; [or] provide a qualified individual with [a disability] with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others." 45 C.F.R. § 85.21(b)(1)(ii)–(iii).

170.    A federal agency "may not, directly or through contractual or other arrangements, utilize criteria or methods of administration the purpose or effect of which would (i) subject qualified individuals with [disabilities] to discrimination on the basis of [disability]; or (ii) defeat or substantially impair accomplishment of the objectives of a program or activity with respect to individuals with [disabilities]." *Id.* § 85.21(b)(3).

171.    As a federally-conducted program, SSA's administration of Social Security benefits are subject to Section 504(a).

172.    Organizational Plaintiffs bring this action on behalf of members who are Social Security beneficiaries and applicants and on behalf of themselves as disability organizations.

173.    Individual Plaintiffs are *sui juris* disabled as defined by 29 U.S.C. § 705(20)(B).

174.    Defendants' policy changes reducing the ability of beneficiaries to access Social Security services and benefits via telephone disproportionately impact people with disabilities who rely on telephone-based services.

175.    Defendants' decision to eliminate OCREO and the Office of Transformation, reduce local offices, and cut SSA's workforce by 7,000 agency employees, along with requiring applicants and beneficiaries to visit field offices to verify their identities, disproportionately

burdens disabled individuals, based solely on their disabilities, denies them meaningful access to SSA services, and sabotages SSA's statutory obligations.

176.    The systemic delays and barriers created by these workforce reductions has prevented, and will continue to prevent disabled individuals from timely receiving critical benefits, effectively denying them meaningful access to SSA services based solely on their disabilities.

177.    The dissolution of OCREO and the Office of Transformation eliminates key mechanisms that ensure SSA's compliance with disability rights protections—further demonstrating the discriminatory impact of these decisions.

178.    Delays in receiving disability benefits cause immediate and irreparable harm.

179.    These compounding effects disproportionately harm individuals with disabilities, violating Section 504(a) of the Rehabilitation Act.

180.    Plaintiffs and other Social Security applicants and beneficiaries have been, and will continue to be, irreparably harmed by Defendants' discrimination.

## COUNT II

### Violation of the Fifth Amendment
<u>Procedural Due Process</u>

*All Plaintiffs against All Defendants*

181.    Plaintiffs incorporate by reference the facts and allegations set forth above as if fully set forth herein.

182.    Defendants' actions, specifically the elimination of grievance and reasonable accommodation request mechanisms for Social Security claimants, the ongoing staff and office cuts, and the implementation of policies that require people to visit field offices to verify their identity, have deprived individuals with disabilities of their constitutional right to procedural due process under the Fifth Amendment of the U.S. Constitution.

183.    The Fifth Amendment prohibits the federal government from depriving individuals of life, liberty, or property without due process of law. U.S. CONST. amend. V. Social Security benefits are protected property interests, thus entitling claimants to due process protections, including fair and timely decision-making processes.

184.    Due process guarantees claimants access to timely and transparent determinations regarding their claims and provides an opportunity to challenge unjustified delays or denials of benefits. The elimination of OCREO and key grievance procedures strips claimants of a vital means to challenge discrimination, thereby violating their due process rights.

185.    The right to timely benefit determinations is central to procedural due process. SSA delays deprive claimants of critical financial support, medical care, and other livelihood resources. Defendants' workforce reductions and in-person visit requirements exacerbate these delays, creating a backlog that denies claimants the opportunity for a timely, fair resolution. Forcing individuals into financial ruin or medical crises while awaiting decisions constitutes a deprivation of protected interests without due process.

186.    Defendants cannot alter or transfer SSA statutory or constitutional duties without providing viable, accessible alternatives for claimants to seek redress. The failure to maintain grievance or accommodation processes, and the lack of clarity regarding the redistribution of OCREO's responsibilities, leaves claimants in a legal and procedural void, unable to challenge discrimination or seek accommodations. Such a system is unconstitutional, as it denies individuals an avenue for recourse and violates procedural fairness.

187.    The removal of customer service and civil rights offices eliminates procedural safeguards essential for fairness in SSA determinations. Without these offices, claimants have no

means to correct wrongful delays or denials. Defendants' failure to ensure continued access to these vital procedural safeguards constitutes a violation of due process.

188.    Plaintiffs and other Social Security applicants and beneficiaries with disabilities have been, and will continue to be, irreparably harmed by Defendants' actions, which deny them the opportunity to contest delays, denials, or discrimination in SSA proceedings.

**COUNT III**

**Violation of the First Amendment**
<u>Right to Petition the Government</u>

*All Plaintiffs against All Defendants*

189.    Plaintiffs incorporate by reference the facts and allegations set forth above as if fully set forth herein.

190.    The First Amendment guarantees individuals the right to petition the government for redress of grievances. U.S. CONST. amend I. Courts have long recognized that this right extends beyond the judicial branch, encompassing meaningful administrative grievance mechanisms. *Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011). The right to petition fully protects the right of individuals to seek redress, without regard to whether their grievance arises from a matter of public concern or a purely private interest, *see Procunier v. Martinez*, 416 U.S. 396, 408 (1974) (holding that the sender of direct personal correspondence is protected under the First Amendment against unjustified governmental interference with the intended communication), *overruled on other grounds by Thornburgh v. Abbott*, 490 U.S. 401 (1989). This right may be exercised individually or through a "group of citizens," such as a civil rights group. *Kelly v. Albany, Georgia*, 335 F.2d 114, 118 (5th Cir. 1964).

191.    Prior to its dissolution, OCREO served as SSA's grievance system, processing and adjudicating discrimination complaints and handling reasonable accommodation requests. By

40

eliminating OCREO without providing a viable alternative, Defendants have not merely obstructed an administrative process—they have unconstitutionally deprived individuals of their fundamental right to petition for redress. This action directly violates the First Amendment, obstructing the ability of individuals to challenge unlawful actions and secure impartial relief.

192.     Defendants' restructuring of SSA, which places these essential responsibilities under OMS—historically tasked with operations and budgeting—creates a clear conflict of interest. OMS, now overseeing complaints about the very operations it controls, undermines the impartiality required for effective civil rights enforcement. This shift in autonomy compromises SSA's ability to address complaints impartially, thereby infringing upon individuals' constitutional right to seek redress. *See Gibson v. Berryhill*, 411 U.S. 564, 578–79 (1973) (holding that a remedy may be inadequate where the administrative body is biased or has prejudged the issue). By dismantling OCREO's independence, Defendants have engineered a grievance system that effectively nullifies access to redress guaranteed by the First Amendment.

193.     The replacement of OCREO with a system that no longer operates independently of other agency functions severely compromises the integrity of SSA's grievance system. The FEAA's directive that civil rights directors report directly to agency heads was specifically designed to protect the independence of civil rights offices, ensuring they could enforce anti-discrimination policies free from retaliation, political pressure, and conflicts of interest. OCREO's independence was a critical safeguard against such compromises.

194.     OMS has proven ill-equipped to adjudicate discrimination claims, effectively denying SSA beneficiaries meaningful access to the grievance process. OMS is incapable of absorbing the full-time responsibilities of an entire office without a substantial compromise in

efficacy. Consequently, the core functions of adjudicating discrimination complaints and enforcing civil rights are compromised, undermining the protections afforded to SSA beneficiaries.

195.    Defendants' elimination of OCREO uniquely burdens Plaintiffs and other Social Security applicants and beneficiaries with disabilities by depriving them of an effective and impartial avenue for seeking redress. This systemic obstruction violates the First Amendment, as it limits individuals' ability to petition the government and challenge discriminatory and unlawful conduct.

196.    Plaintiffs and other Social Security applicants and beneficiaries with disabilities have been irreparably injured and aggrieved by and will continue to be injured and aggrieved by Defendants' conduct.

## COUNT IV

### Violation of the Administrative Procedure Act
Unlawfully Withheld or Unreasonably Delayed Agency Action

*All Plaintiffs against All Defendants*

197.    Plaintiffs incorporate by reference the facts and allegations set forth above as if fully set forth herein.

198.    Under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702–06, a reviewing court must "compel agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1).

199.    Defendants' elimination of OCREO and its staff constitutes a reviewable "final agency action" under the APA, *id.* § 704, as it marks the consummation of the agency's decision-making process and is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)).

200.    An agency unlawfully withholds action when it fails to perform a statutorily mandated function; eliminates an essential service without ensuring its continuity; or creates a procedural void that deprives individuals with disabilities of necessary recourse.

201.    Defendants have unlawfully withheld SSA's statutory obligation to provide grievance mechanisms for claimants and employees.

202.    SSA is statutorily required to maintain mechanisms for claimants to seek redress regarding discrimination and accessibility barriers. The elimination of OCREO—the very office responsible for processing these complaints—removes this essential function without any clear replacement mechanism.

203.    Defendants' restructuring lacks a viable alternative to ensure claimants and employees can challenge discriminatory agency decisions, a violation of the APA. Defendants have not identified where claimants may now file disability-related grievances. Without a formal replacement, claimants are denied the ability to challenge discrimination, processing errors, and systemic failures in SSA benefits system.

204.    By removing OCREO without any alternative grievance process, SSA has abandoned this duty in violation of the APA. SSA's failure to provide an accessible process for filing disability complaints and seeking accommodations constitutes an unlawfully withheld action under the APA.

205.    Plaintiffs and other Social Security applicants and beneficiaries with disabilities have been irreparably injured and aggrieved by and will continue to be injured and aggrieved by Defendants' conduct.

**COUNT V**

**Violation of the Administrative Procedure Act**
Arbitrary and Capricious Agency Action

*All Plaintiffs against All Defendants*

206.    Plaintiffs incorporate by reference the facts and allegations set forth above as if fully set forth herein.

207.    Under the APA, a reviewing court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

208.    An agency acts arbitrarily and capriciously when it: (1) relies on factors Congress did not intend it to consider; (2) fails to address an important aspect of the problem; (3) offers an explanation that runs counter to the evidence; or (4) implements a decision so implausible that it cannot be ascribed to a legitimate difference in judgment or expertise. *Ark Initiative v. Tidwell*, 816 F.3d 119, 127 (D.C. Cir. 2016) (citing *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983)).

209.    Courts reviewing agency action must ensure that the agency: (1) examined the relevant data; (2) established a rational connection between the facts found and the choice made; and (3) consider reliance interest before making abrupt policy changes. *U.S. Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 30–31 (2020).

210.    Defendants have failed to articulate a reasoned or non-pretextual basis for eliminating OCREO and OT—critical offices that facilitated access to disability benefits and accommodations—nor did they provide justification for the staff eliminations at the same time they adopted policies requiring additional in-person transactions.

211.    On information and belief, Defendants did not conduct an analysis to ensure continuity of services. SSA already operates with record-low staffing, making it impractical for remaining employees to absorb these critical functions without causing severe disruptions.

212.    On information and belief, Defendants did not conduct any formal analysis to evaluate the impact of OCREO's elimination on individuals with disabilities, despite such individuals comprising a significant portion of Social Security beneficiaries.

213.    Defendants failed to consider or acknowledge the serious reliance interests implicated by the closures and cuts, including the impact on individuals with disabilities awaiting resolution of their complaints to access needed accommodations and remedy discrimination, particularly at a time when disability claims are increasing, and demand for SSA services is at an all-time high.

214.    Defendants' eliminations directly impede the agency's ability to meet its statutory obligations and contradict clear evidence that these cuts will decrease agency efficiency and efficacy, rendering it arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and in violation of the APA.

215.    Plaintiffs and other Social Security applicants and beneficiaries with disabilities have been, and will continue to be, irreparably harmed by Defendants' actions.

### COUNT VI

**Violation of the Administrative Procedure Act**
Agency Action Not in Accordance with Law

*All Plaintiffs against All Defendants*

216.    Plaintiffs incorporate by reference the facts and allegations set forth above as if fully set forth herein.

217.    Under the APA, a reviewing court must "hold unlawful and set aside agency action" that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

218.    Beyond violating the Rehabilitation Act and the First and Fifth Amendments, Defendants Musk and DOGE also contravened the Federal Vacancies Reform Act ("FVRA"), 5 U.S.C. §§ 3345 *et seq.* and the Appointments Clause of the U.S. Constitution. U.S. CONST. art. II, § 2, cl. 2. The FVRA prescribes the process for temporarily filling vacant executive positions requiring Senate confirmation, imposing clear limits on both who may serve in an acting capacity and the duration of such service. The Appointments Clause, in turn, mandates that principal officers of the United States be nominated by the President and confirmed by the Senate, reinforcing the constitutional structure of accountability and oversight.

219.    Defendant Gleason serves as the Acting Administrator of DOGE without clear statutory or legal authority under FVRA.

220.    More egregiously, Defendant Elon Musk has assumed *de facto* authority over DOGE and, by extension, SSA decision-making, despite not being a Senate-confirmed appointee. Defendant Musk's exercise of significant government power—including mass terminations, the reduction of SSA offices, and unilateral decisions over federal agency structure—constitutes an unconstitutional assumption of executive authority in violation of the Appointments Clause and FVRA.

221.    Defendants Gleason, Musk and DOGE have implemented sweeping federal workforce reductions and agency restructuring, including the elimination of the OCREO and the Office of Transformation, without lawful authority. Under FVRA, any action taken by an official improperly serving in an acting role is legally void. 5 U.S.C. § 3348(d)(1)–(2).

222.    By stripping the Acting Commissioner of SSA of meaningful authority and transferring effective decision-making power to an unappointed and unconfirmed private actor, Defendants have circumvented the constitutional and statutory framework governing federal appointments in violation of the Appointments Clause.

223.    Based on the foregoing, Defendants' actions are not in accordance with law.

224.    Plaintiffs and other Social Security applicants and beneficiaries with disabilities have been, and will continue to be, harmed by Defendants' actions

### COUNT VII

**Violation of the Administrative Procedure Act**
Agency Action in Excess of Statutory Authority

*All Plaintiffs against All Defendants*

225.    Plaintiffs incorporate by reference the facts and allegations set forth above as if fully set forth herein.

226.    Under the APA, a reviewing court must "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right. 5 U.S.C. § 706(2)(C).

227.    OCREO was established to ensure SSA complies with federal disability rights laws, including oversight of discrimination complaints and enforcement of policies ensuring accessibility and equal treatment for individuals with disabilities. The elimination of OCREO substantially diminishes the agency's ability to investigate, address, and resolve disability discrimination complaints, thereby undermining statutory protections.

228.    Defendants have acted in excess of their statutory authority by failing to provide an equitable and accessible process for requesting reasonable accommodations or filing discrimination complaints, despite their obligations under the Rehabilitation Act, which requires

agencies to prevent discrimination and to ensure individuals with disabilities receive reasonable accommodations. By dismantling and failing to maintain processes for meeting these mandates, Defendants have exceeded their statutory authority and violated clear congressional mandates.

229.    Defendants lack authority to take actions that violate the U.S. Constitution. To the extent that Defendants' conduct infringes upon Plaintiffs' constitutional rights, their actions exceed any lawful statutory authority and are therefore invalid under the APA.

230.    Plaintiffs and other Social Security applicants and beneficiaries with disabilities have been, and will continue to be, irreparably harmed by Defendants' actions.

## **RELIEF SOUGHT**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and grant the following relief:

(1) That this Court assume jurisdiction;

(2) That this Court declare the actions of Defendants described in this Complaint to be in violation of Section 504 of the Rehabilitation Act, the Administrative Procedure Act, and the U.S. Constitution;

(3) That this Court preliminarily and permanently order Defendants to cease violating the rights of disabled Social Security beneficiaries and applicants and cease discriminating against them;

(4) That this Court preliminarily and permanently enjoin Defendants from demolishing OCREO and OT and from terminating the 7,000 staff it has already begun cutting and re-hire those it has already terminated as part of this unlawful reduction in force;

(5) That this Court preliminarily and permanently enjoin Defendants from instituting policies that prohibit identity verification at the time of application by telephone;

(6) That this Court preliminarily and permanently enjoin the policy or practice requiring in-person visits for the issuance of social security cards to noncitizens entitled to work and newly naturalized citizens;

(7) That this Court preliminarily and permanently enjoin the policy or practice of requiring in-person visits for notification of any change in banking;

(8) That this Court award Plaintiffs and/or their attorneys reasonable attorneys' fees, costs, and expenses; and

(9) That this Court award such additional or alternative relief as may be just, proper, and equitable.

Dated: April 2, 2025                                         Respectfully submitted,

                                                            Eve L. Hill (DC Bar No. 424896)
                                                            **BROWN, GOLDSTEIN & LEVY, LLP**
                                                            120 East Baltimore Street, Suite 2500
                                                            Baltimore, Maryland 21202
                                                            Tel.: (410) 962-1030
                                                            Fax: (410) 385-0869
                                                            ehill@browngold.com

                                                            Regan Bailey (DC Bar No. 465677)
                                                            **JUSTICE IN AGING**
                                                            1444 Eye Street, NW, Suite 1100
                                                            Washington, DC 20005
                                                            Tel.: (202) 289-6976
                                                            rbailey@justiceinaging.org

                                                            *Counsel for Plaintiffs*