## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

AMERICAN ASSOCIATION OF PEOPLE WITH DISABILITIES, *et al.*

      *Plaintiffs*,

    v.

LELAND DUDEK, *in his official capacity as Acting Administrator of the Social Security Administration, et al.*

      *Defendants.*

Civil Action No.

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Eve L. Hill (DC Bar No. 424896)
**BROWN, GOLDSTEIN & LEVY, LLP**
120 East Baltimore Street, Suite 2500
Baltimore, Maryland 21202
Tel.: (410) 962-1030
Fax: (410) 385-0869
ehill@browngold.com

Regan Bailey (DC Bar No. 465677)
**JUSTICE IN AGING**
1444 Eye Street, N.W., Suite 1100
Washington, DC 20005
Tel.: (202) 289-6976
rbailey@justiceinaging.org

*Counsel for Plaintiffs*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES............................................................................................ iii

INTRODUCTION .......................................................................................................... 1

BACKGROUND ............................................................................................................ 2

I.     Critical Role of Social Security Benefits for Individuals with Disabilities ........................ 2

II.    Process and Challenges of Obtaining Benefits ................................................................ 3

      A.    Application and Administrative Hearings Process .................................................. 4

      B.    Applicant and Beneficiary Support Services ........................................................... 5

      C.    The Human Cost of Delays and Service Failures .................................................... 6

III.   Defendants' Erosion of the Social Security Administration .............................................. 7

      A.    Mass Workforce Reductions and the Consequent Service Disruptions .................. 7

      B.    Recent Policies Lead to Overwhelmed Field Offices and Telephone-Based
           Services .................................................................................................................. 11

      C.    Dissolution of the Office of the Office of Civil Rights and Equal Opportunity ... 12

      D.    Elimination of the Office of Transformation .......................................................... 14

      E.    The Unconstitutional Incursion on SSA by Defendants Musk and DOGE .......... 16

LEGAL STANDARD .................................................................................................... 20

ARGUMENT ................................................................................................................. 20

I.     Plaintiffs Are Likely to Succeed on the Merits of Their Claims....................................... 20

      A.    Defendants' actions violate Section 504 of the Rehabilitation Act....................... 20

           1.    Plaintiffs are "Otherwise Qualified" Individuals with Disabilities and
                Defendants are Covered Agencies Under the Rehabilitation Act. ........... 21

           2.    Defendants' policies disparately deny Plaintiffs and other individuals with
                disabilities meaningful access to Social Security benefits........................ 22

      B.    Defendants' actions violate the Administrative Procedure Act............................. 26

           1.    Defendants' mass workforce reductions and burdensome new policies are
                arbitrary and capricious............................................................................ 26

        a.     Defendants have failed to consider reliance interests in SSA's status quo operations. .............................................................. 26

        b.     Defendants have inexplicably changed their policies without justification. .................................................................. 27

        c.     Defendants lack a genuine, contemporaneous rationale for their actions. .................................................................... 29

    2.     This Court should compel agency action unlawfully withheld and unreasonably delayed. .................................................. 32

    3.     Defendants' actions are ultra vires. ........................................ 33

II.    Plaintiffs are at Imminent Risk of Irreparable Harm ........................................ 33

III.    The Balance of Equities and Public Interest Favor Plaintiffs' Request ........................... 39

IV.    The Court should decline to require Plaintiffs to post a bond .......................................... 40

CONCLUSION ........................................................................................................ 41

# TABLE OF AUTHORITIES

**Cases**

*A Helping Hand, LLC v. Baltimore Cnty.*,
    515 F.3d 356 (4th Cir. 2008) ................................................................. 21

*Aamer v. Obama*,
    742 F.3d 1023 (D.C. Cir. 2014) ............................................................ 20

*Abdullah v. Obama*,
    753 F.3d 193 (D.C. Cir. 2014) .............................................................. 20

*Alexander v. Choate*,
    469 U.S. 287 (1985) ............................................................................... 22

*Al-Joudi v. Bush*,
    406 F. Supp. 2d 13 (D.D.C. 2005) ....................................................... 33

*Am. Council of Blind v. Mnuchin*,
    878 F.3d 360 (D.C. Cir. 2017) .............................................................. 22

*Am. Council of the Blind v. Paulson*,
    525 F.3d 1256 (D.C. Cir. 2008) ............................................................ 21

*Bailey v. Fed. Bureau of Prisons*,
    No. CV 24-1219 (PLF), 2024 WL 3219207 (D.D.C. June 28, 2024) ................ 41

*Baughman v. Walt Disney World Co.*,
    685 F.3d 1131 (9th Cir. 2012) .............................................................. 23

*Callicotte v. Carlucci*,
    698 F. Supp. 944 (D.D.C. 1988) ........................................................... 40

*Cleveland v. Ohio*,
    508 F.3d 827 (6th Cir.2007) .................................................................. 30

*Corrigan Dispatch Co. v. Casa Guzman*,
    569 F.2d 300 (5th Cir. 1978) ................................................................ 40

*Costa v. Bazron*,
    464 F. Supp. 3d 132 (D.D.C. 2020) ..................................................... 33

*Council on American-Islamic Rels. v. Gaubatz*,
    667 F. Supp. 2d 67 (D.D.C. 2009) .................................................. 40–41

*Crowder v. Kitagawa*,
    81 F.3d 1480 (9th Cir. 1996) ................................................................ 23

*Davis v. Billington,*
   76 F. Supp. 3d 59 (D.D.C. 2014) ...................................................................... 34

*Davis v. District of Columbia,*
   158 F.3d 1342 (D.C. Cir. 1998) ........................................................................ 33

*Day v. Dist. of Columbia,*
   894 F. Supp. 2d 1 (D.D.C. 2012) ...................................................................... 21

*Dep't of Commerce v. New York,*
   588 U.S. 752 (2019) ............................................................................................ 29

*Dep't of Homeland Sec. v. Regents of the Univ. of California,*
   591 U.S. 1 (2020) ................................................................................................ 29

*Dist. 50, United Mine Workers of Am.,*
   412 F.2d 165 (D.C. Cir. 1969) .......................................................................... 20

*Doe v. CVS Pharmacy, Inc.,*
   982 F.3d 1204 (9th Cir. 2020) .......................................................................... 23

*Encino Motorcars, LLC v. Navarro,*
   579 U.S. 211 (2016) ...................................................................................... 27, 27

*Friends for All Children, Inc. v. Lockheed Aircraft Corp.,*
   746 F.2d 816 (D.C. Cir. 1984) .......................................................................... 40

*Malcolm v. Reno,*
   129 F. Supp. 2d 1 (D.D.C. 2000) ...................................................................... 40

*Mills v. District of Columbia,*
   571 F.3d 1304 (D.C. Cir. 2009) ........................................................................ 34

*Nat'l Ass'n of the Deaf v. Trump,*
   486 F. Supp. 3d 45 (D.D.C. 2020) ............................................................... 22, 33

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget,*
   No. CV 25-239 (LLA), 2025 WL 597959 (D.D.C. Feb. 25, 2025) ......................... 30

*Nken v. Holder,*
   556 U.S. 418 (2009) ............................................................................................ 39

*Nw. Envt'l. Advocates v. EPA,*
   537 F.3d 1006 (9th Cir. 2008) .......................................................................... 30

*Org. Vill. of Kake v. U.S. Dep't of Agric.,*
   795 F.3d 956 (9th Cir. 2015) ............................................................................ 27

*Payan v. Los Angeles Cmty. Coll. Dist.*,
    11 F.4th 729 (9th Cir. 2021) ........................................................ 22

*Pursuing Am.'s Greatness v. Fed. Election Comm'n*,
    831 F.3d 500 (D.C. Cir. 2016) ............................................... 33–34

*Se. Cmty. Coll. v. Davis*,
    442 U.S. 397 (1979) ............................................................... 37–38

*SEC v. Chenery*,
    318 U.S. 80 (1943) ..................................................................... 29

*Simms v. D.C.*,
    872 F. Supp. 2d 90 (D.D.C. 2012) ............................................. 40

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ................................................................. 20, 39

*Wisconsin Gas Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985) .................................................... 33

**Statutes**

5 U.S.C. § 706 ............................................................................. 1, 26

29 U.S.C. § 705 ............................................................................... 21

29 U.S.C. § 794 ..................................................................... 1, 20, 21

42 U.S.C. § 12182 ........................................................................... 23

42 U.S.C. § 1381–83 ......................................................................... 4

42 U.S.C. § 401–33 ........................................................................... 4

42 U.S.C. § 902 ............................................................................... 16

**Regulations**

20 C.F.R. § 404.1740 ....................................................................... 30

28 C.F.R. § 39.103 ........................................................................... 21

45 C.F.R. § 85.21 ...................................................................... 21, 23

**Other Authorities**

Beatrice Nolan, *DOGE's plans for Social Security are a 'backdoor' way to cut payments, experts warn: 'This is the most serious threat I've ever seen to it'*, FORTUNE (Mar. 21, 2025), https://perma.cc/4JWY-C6MX ............................................................. 12, 18

Bria Overs, *Social Security Administration closes offices, cutting nearly 200 employees*, BALTIMORE BANNER (Feb. 25, 2025), https://perma.cc/8Y76-4KNE ..................................... 15

CTR. ON BUDGET & POL'Y PRIORITIES, CHART BOOK: SOC. SEC. DISABILITY INS. 17 (2024), https://perma.cc/MRF8-JQFV ...................................................................................... 3

David Dayen, *How Social Security Administration Cuts Affect You*, AM. PROSPECT (Mar. 6, 2025), https://prospect.org/health/2025-03-06-how-social-security-administration-cuts-affect-you/.............................................................................. 8, 35

DOGE, Doge.gov/savings (last visited Mar. 27, 2025) .................................................. 8

Email from Dawn Bystry, SSA, Acting Assoc. Comm'r to SSA Staff (Nov. 13, 2024), https://perma.cc/RUE2-SEN6 ..................................................................................... 11

FY 2017 BUDGET OVERVIEW 5–6 (2016), https://perma.cc/MR2V-UB9J.................................. 28

Judd Legum, *How the Social Security Administration and DOGE are gaslighting Americans*, POPULAR INFO. (Mar. 31. 2025), https://popular.info/p/how-the-social-security-administration-fff?utm_campaign=post&utm_medium=web ..................................... 8

Judd Legum, *Memo details Trump plan to sabotage the Social Security Administration*, POPULAR INFO. (Mar. 17, 2025), https://popular.info/p/exclusive-memo-details-trump-plan .................................................................................................................... 24

Judd Legum, *Secret policy shift could overwhelm Social Security offices with millions of people*, POPULAR INFO. (Mar. 20, 2025), https://perma.cc/8TGP-LMUJ ...................... 12, 36

Kathleen Romig, *Social Security Lifts More People Above the Poverty Line than Any Other Program*, CTR. ON BUDGET & POL'Y PRIORITIES (Jan. 21, 2015), https://perma.cc/9LPE-TPBQ ..................................................................................... 1, 18

Lisa Rein & Hannah Natanson, *Long waits, waves of calls, website crashes: Social Security is breaking down*, WASH. POST (Mar. 25, 2025), https://perma.cc/D8F4-PT55 ......... 15

Martha McHardy, *Social Security Announces Major Cut to 'Bloated Workforce'*, NEWSWEEK (Mar. 1, 2025), https://www.newsweek.com/social-security-administration-cuts-trump-2038198 ..................................................................................... 3, 7

Meg Kinnard, *A List of Social Security offices across the US expected to close this year*, ASSOCIATED PRESS (March 19, 2025) https://apnews.com/article/social-security-offices-closures-doge-trump-b2b1a5b2ba4fb968abc3379bf90715ff........................................................ 8

Memorandum from U.S. Gov't Accountability Off. to Sen. Comm. on the Budget and
    H.R. Subcomm. on Soc. Sec. (Feb. 15, 2025 [DA1]). https://www.gao.gov/products
    /gao-20-641r......................................................................................................................... 6–7

Michael Martin & Destinee Adams, *Former head of Social Security says Elon Musk
    and DOGE are wrong about the agency*, NPR (Mar. 24, 2025),
    https://www.npr.org/2025/03/24/nx-s1-5337999/elon-musk-doge-social-security-cuts ............ 1

Michelle Diament, *SSI Recipients Can't Afford Housing Anywhere in the U.S.*,
    DISABILITY SCOOP (Feb. 5, 2024), https://perma.cc/PY7P-VYM4 ........................................... 2

Molly Weston Williamson, *Cuts to the Social Security Administration Threaten Millions of
    Americans' Retirement and Disability Benefits*,
    CTR. FOR AM. PROGRESS (Mar. 12, 2025), https://perma.cc/YHK2-3JT9 ..................... 7, 10, 35

Monica Faird *et al.*, *Effects of Suspending In-Person Services at Social Security
    Administration Field Offices on Disability Applications and Allowances*, CTR. FOR
    RETIREMENT RSCH. B.C., 3–4 (2024) ................................................................................... 10

N.Y. TIMES, *The People Carrying Out Musk's Plans at DOGE*, (updated Mar. 26, 2025),
    https://www.nytimes.com/interactive/2025/02/27/us/politics/doge-staff-list.html.................. 17

Natalie Alms, *30,000 died in fiscal 2023 waiting for disability decisions from Social
    Security*, NEXTGOV/FCW (Apr. 17, 2024), https://www.nextgov.com/digital-
    government/2024/04/30000-died-fiscal-2023-waiting-disability-decisions-social-
    security/395796/................................................................................................................ 6, 26

Natalie Alms, *Social Security shutters its civil rights and transformation offices*,
    GOV. EXEC. (Feb. 26, 2025), https://perma.cc/8NCZ-TBHT ................................................. 15

Paul Nelson, *Social Security office in Schenectady shrinks as workers take DOGE buyouts*,
    TIMES UNION (Mar 13, 20.25), https://www.timesunion.com/news/article/schenectady-
    social-security-office-losing-staff-20217524.php.................................................................... 24

Press Release, SSA, *Correcting the Record about Social Security Office Closings*
    (Mar. 27, 2025)*,* https://www.ssa.gov/news/press/releases/2025/#2025-03-27-a ..................... 8

Press Release, SSA, *Social Security Announces Workforce and Organization Plans*,
    (Feb. 28, 2025), https://perma.cc/L7D8-APHY ................................................................. 8, 24

Press Release, SSA, *Social Security Announces Workforce and Organization Plans*,
    (Feb. 28, 2025), https://www.ssa.gov/news/press/releases/2025/#2025-02-28 ................... 8, 24

Press Release, *SSA, Social Security Dissolves Duplicative Office*, (Feb. 25, 2025)*,*
    https://perma.cc/UZL3-7C5B ...................................................................................... 13, 17, 30

Press Release, *SSA, Social Security Eliminates Wasteful Department*,
    (Feb. 24, 2025)*,* https://perma.cc/YEA8-PBG6.................................................... 14–15, 17, 32

Press Release, *SSA, Social Security Updates Recently Announced Identity Proofing Requirements*, (Mar. 26, 2025), https://perma.cc/74F5-5SPU ................................................. 11

SSA, *800 Number Performance*, https://perma.cc/GU6M-64WK ...................................... 5, 6, 36

SSA, *Administering Social Security: Challenges Yesterday and Today*, https://www.ssa.gov/policy/docs/ssb/v70n3/v70n3p27.html (last visited Apr. 1, 2025) .... 38, 39

SSA, ANN. STAT. SUPP. TO SOC. SEC. BULL. 424 (2024), https://perma.cc/7SP4-KMPK .............. 2

SSA, *Annual Data for Field Office Visitors*, (updated Mar. 8, 2024), https://www.ssa.gov/data/field-office-visitors-average-daily.html#datasetDescription .......... 35

SSA, *Appeals Process*, https://perma.cc/7ZCY-BYUG ...................................................................... 4

SSA, *Contact Social Security By Phone*, https://perma.cc/YNS8-XD5H ..................................... 5

SSA, *Disability determination processing time*, https://perma.cc/2MGD-NTS5 .......................... 3

SSA, *Fact Sheet*, https://perma.cc/V2R3-LYUT ............................................................................ 3

SSA, FY 2025 BUDGET OVERVIEW 1–2 (2024), .......................................................................... 28

FY 2021 CONGRESSIONAL JUSTIFICATION 1–2 (2021), https://perma.cc/4WWK-VV9T ............. 28

SSA, FY 2025 PRESIDENT'S BUDGET REQUEST 1 (2024), https://perma.cc/42A4-ZVPW .... *passim*

SSA, *How long does it take to get a decision after I apply for disability benefits?*, FAQs (Mar. 4, 2024), https://perma.cc/G59E-BTA4 ................................................................. 5

SSA, MONTHLY STAT. SNAPSHOT, FEB. 2025 (2024), https://perma.cc/8DCA-7B2L ....................................................................... 2

SSA, MONTHLY STAT. SNAPSHOT, JAN. 2025 (2024), https://perma.cc/KR4P-QHS5/ ................ 22

SSA, *Processing time for Retirement, Survivor, and Medicare benefits*, https://perma.cc/3YXG-BLGN ............................................................................................................................. 3

SSA, *Social Security Beneficiary Statistics*, https://perma.cc/965G-9W94 .................................. 5

SSA, *Social Security Beneficiary Statistics*, https://www.ssa.gov/oact/STATS/OASDIbenies.html (last visited Apr. 1, 2025) ........................................................................ 39

SSA, SOCIAL SECURITY'S EQUITY ACTION PLAN IN AGREEMENT WITH EO 13985 8 (2022), https://perma.cc/2L9N-CCDR ................................................................................................. 13

SSA, *SSI Federal Payment Amounts for 2025*, https://www.ssa.gov/oact/cola/SSI.html, archived at https://perma.cc/43PM-BAVJ (last visited Mar. 29, 2025) ......................................................................................................... 2

SSA, *Who can get SSI*, https://perma.cc/Apr. 1, 2025) ................................................................. 7

SSA, *Workforce Update*, https://perma.cc/3UWS-QG3U ............................................................ 7, 8

Sydney Gordon, *Employee Exodus: The Impact of Government Downsizing on
Benefit Access*, (Feb. 26, 2025) ......................................................................................... 8, 10, 35

U.S. CENSUS BUREAU, *Disability Characteristics*, https://perma.cc/7NSQ-LT4V ...................... 22

USAFACTS, *Wait times for Social Security disability benefit decisions reach new high*,
(Dec. 12, 2023), https://perma.cc/ZMN6-EJGD ......................................................................... 5

WRAL, *Fact check: Elon Musk calls Social Security a Ponzi scheme*, YOUTUBE
(Mar. 24, 2025), https://www.youtube.com/watch?v=w7hKjzwRqOM .................................... 1

Yue Li & Manasi Desphpande, *Who is Screened Out? Application Costs and Targeting
of Disability Programs*, 11(4) AM. ECON. J.: ECON. POL'Y, 213–48 (2019),
https://www.aeaweb.org/articles?id=10.1257/pol.20180076 ............................................... 9, 11

# INTRODUCTION

The unlawful dismantling of the Social Security Administration ("SSA")—a statutorily-created lifeline for over 73 million Americans—requires this Court's immediate intervention. Social Security is not a discretionary policy choice; it is a statutory entitlement that anchors the economic security of retirees, people with disabilities, and their families. Without it, an additional 22 million adults and children would be thrust into poverty. *See* Kathleen Romig, *Social Security Lifts More People Above the Poverty Line than Any Other Program*, CTR. ON BUDGET & POL'Y PRIORITIES (Jan. 21, 2015), https://perma.cc/9LPE-TPBQ. Yet, Defendants have embarked on a reckless campaign to discredit SSA in the media while eviscerating its operations from within. Defendant Musk's public attacks on the Social Security Administration have been baseless, misleading and inflammatory: false accusations of "extreme levels of fraud," *see* Michael Martin & Destinee Adams, *Former head of Social Security says Elon Musk and DOGE are wrong about the agency*, NPR (Mar. 24, 2025), https://www.npr.org/2025/03/24/nx-s1-5337999/elon-musk-doge-social-security-cuts, and comparing the bedrock social safety net for older adults and people with disabilities to a "Ponzi scheme," *see* WRAL, *Fact check: Elon Musk calls Social Security a Ponzi scheme*, YOUTUBE (Mar. 24, 2025), https://www.youtube.com/watch?v=w7hKjzwRqOM.

Plaintiffs—the American Association of People with Disabilities ("AAPD"), the National Federation of the Blind ("NFB"), Deaf Equality, the National Committee to Preserve Social Security and Medicare ("NCPSSM"), Massachusetts Senior Action Council ("MSAC"), and individual Social Security applicants and beneficiaries with disabilities—seek an injunction to halt this unlawful dismantling of the Social Security Administration. Defendants' deliberate erosion of the Social Security Administration violates the Rehabilitation Act, 29 U.S.C. § 794(a) and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A)–(C).

1

The consequences of these measures will be most acutely felt by people with disabilities. The Court must intervene to uphold the rule of law and safeguard those whose lives depend on the integrity of this indispensable program, which has stood as a cornerstone of economic security for nearly a century.

## BACKGROUND

### I.    Critical Role of Social Security Benefits for Individuals with Disabilities

Plaintiffs are or represent Social Security applicants and beneficiaries with disabilities whose livelihoods are inextricably tied to their receiving Social Security benefits. Established in 1935, the Social Security Administration stands as a lasting testament to the government's unwavering commitment to ensuring economic security and social welfare for individuals with disabilities and the elderly, adapting over time to meet the evolving needs of the American people. Social Security Old Age and Survivor beneficiaries number over 60 million people. SSA, MONTHLY STAT. SNAPSHOT, FEB. 2025 (2024), https://perma.cc/8DCA-7B2L.

More than 7 million Americans rely on Supplemental Security Income ("SSI"), with the vast majority—over 6.2 million—living with disabilities, including more than 63,000 who are blind. SSA, ANN. STAT. SUPP. TO SOC. SEC. BULL. 424, 439 (2024), https://perma.cc/7SP4-KMPK. Among those aged 65 and older, over 1.2 million are disabled. *Id.* at 424. For more than half of SSI recipients, no other financial safety net exists, rendering them fully reliant on the modest monthly benefit SSI provides. Michelle Diament, *SSI Recipients Can't Afford Housing Anywhere in the U.S.*, DISABILITY SCOOP (Feb. 5, 2024), https://perma.cc/PY7P-VYM4. In 2025, SSI beneficiaries receive $967 per month, and couples receive $1,450 per month. SSA, *SSI Federal Payment Amounts for 2025*, https://www.ssa.gov/oact/cola/SSI.html, archived at https://perma.cc/43PM-BAVJ (last visited Apr. 1, 2025).

Social Security Disability Insurance ("SSDI") plays a similarly vital role for 7.3 million Americans who can no longer work due to disability. SSDI benefits, averaging $1,538 per month, provide essential financial support. CTR. ON BUDGET & POL'Y PRIORITIES, CHART BOOK: SOC. SEC. DISABILITY INS. 17 (2024), https://perma.cc/MRF8-JQFV. The majority of SSDI beneficiaries are individuals who have spent their working lives contributing to the system through payroll taxes, with 75 percent over the age of 50 and 40 percent over 60. *Id.* at 8.

## II.    Process and Challenges of Obtaining Benefits

Social Security is the largest federal government program, serving 73 million people and facilitating over 500 million interactions with the public each year through field offices, customer service centers, and phone-based services. *Id.*; SSA, FY 2025 PRESIDENT'S BUDGET REQUEST 1 (2024), https://perma.cc/42A4-ZVPW. One in five Americans collect Social Security benefits. SSA, *Fact Sheet*, https://perma.cc/V2R3-LYUT (last visited Apr. 1, 2025). Among people over age 65, nearly nine out of ten depend on those benefits. *Id.* Between 2019 and 2024, SSA received between 6 and 7 million claims annually—a staggering volume that does not even account for the 1.1 million backlogged claims still pending. SSA, *Processing time for Retirement, Survivor, and Medicare benefits*, https://perma.cc/3YXG-BLGN (last visited Apr. 1, 2025). From March 2023 to February 2025, it processed an average of 165,000 to 220,000 initial disability claims each month. SSA, *Disability determination processing time*, https://perma.cc/2MGD-NTS5 (last visited Apr. 1, 2025).

Despite the increasing demand for services, the agency is already operating with its smallest workforce in decades, with efforts underway to reduce it even further. *See* Martha McHardy, *Social Security Announces Major Cut to 'Bloated Workforce'*, NEWSWEEK (Mar. 1, 2025), https://www.newsweek.com/social-security-administration-cuts-trump-2038198. As a result of this and recent policy changes that are further burdening operations, the agency is facing

a mounting crisis that impedes its ability to deliver on the promises of the system. For those who rely on these programs, delays and barriers to services translate to empty cupboards, unfilled prescriptions, and eviction notices. *See* Declaration of Mark Riccobono ("Riccobono Decl.") ¶¶9–10; Declaration of Maria Town ( Town Decl.") ¶¶14–17; Declaration of Anna Bitencourt ("Bitencourt Decl.") ¶¶12–14; Declaration of Governor Martin O'Malley ("O'Malley Decl.") ¶¶14, 16–17, 27–29; Declaration of Max Richtman ("Richtman Decl.") ¶¶10–11; Declaration of Wilshawn Tiller ("Tiller Decl.") ¶¶19–21; Declaration of Elizabeth Rouse ("Rouse Decl.") ¶¶8, 17; Declaration of Treva Olivero ("Olivera Decl.") ¶¶8–13, 25–26; Declaration of Martha Hazen ("Hazen Decl.") ¶¶16-17; Declaration of Merry Schoch ("Schoch Decl.") ¶28; Declaration of Deja Powell ("Powell Decl.") ¶12.

A.     Application and Administrative Hearings Process

The Social Security Administration has long operated with limited funding for administration and now has the lowest staffing in decades. In 2024, SSA received over two million disability claims, and the average processing time for these claims was 230 days—approximately eight months. FY 2025 PRESIDENT'S BUDGET REQUEST, *supra* at 17. If an initial claim is denied, applicants have the right to request reconsideration, which adds another layer of delay. *Id*. In 2024, SSA received around 618,000 reconsideration requests, with an average processing time of seven months. *Id*. If reconsideration results in another denial, applicants may request a hearing before an Administrative Law Judge ("ALJ"), with an average processing time of 345 days, nearly one year. *Id*. The Office of Disability Adjudication, responsible for holding hearings and issuing decisions, also reviews post-hearing appeals for claims under Titles II and XVI of the Social Security Act. 42 U.S.C. §§ 401–33, 1381–83f. Further appeals can proceed to the Appeals Council, and ultimately to federal court. SSA, *Appeals Process*, https://perma.cc/7ZCY-BYUG (last visited Apr. 1, 2025).

4

The volume of appeals and limited resources has led to significant delays, and underscores the challenges claimants have faced in recent years. The average wait time for an initial disability decision is eight months, and if denied, reconsideration tacks on another seven months, followed by an additional year for a hearing. SSA, *How long does it take to get a decision after I apply for disability benefits?*, FAQs (Mar. 4, 2024), https://perma.cc/G59E-BTA4; USAFACTS, *Wait times for Social Security disability benefit decisions reach new high* (Dec. 12, 2023), https://perma.cc/ZMN6-EJGD (noting that initial application wait times exceeded seven months in 2023, an 86% increase from 2019).

Beyond disability claims, SSA manages enrollment for Medicare Part A and Part B. Over 6 million new enrollees are processed for Retirement, Survivor, and Medicare programs annually. SSA, *Social Security Beneficiary Statistics*, https://perma.cc/965G-9W94 (last visited Apr. 1, 2025). The enrollment process often requires in-person visits to local SSA offices, resulting in further delays for applicants and beneficiaries.

It is in this environment that the new staffing cuts and the policies increasing workforce burdens were initiated in 2025—effectively pushing the SSA over the edge.

B.    Applicant and Beneficiary Support Services

To assist applicants and beneficiaries, the Social Security Administration operates a National 800 Number, a toll-free helpline that fields over 265,000 calls daily. SSA, *800 Number Performance*, https://perma.cc/GU6M-64WK (last visited Apr. 1, 2025). For many, particularly those with disabilities or older individuals, this phone service is the most accessible means to manage their benefits. However, the task of reaching an SSA agent is fraught with difficulty. Depending on the time of day, callers can wait over two hours for their calls to be answered, SSA, *Contact Social Security By Phone*, https://perma.cc/YNS8-XD5H (last visited Apr. 1, 2025). The 800 number has an answer rate of only 46.6 percent. *Id.* For those requiring a callback, the wait

extends to an average of 1 hour and 28 minutes, and some individuals report waiting up to 90 minutes or more. *800 Number Performance, supra. See* Tiller Decl. ¶¶14, 16; Rouse Decl. ¶13; Hazen Decl. ¶13; Plawsky Decl. ¶6; Declaration of William Weiss ("Weiss Decl.") ¶10; Declaration of Kamila Sharif ("Sharif Decl.") ¶6; Hazen Decl. ¶13; Schoch Decl. ¶20-24; Powell Decl. ¶8. These figures fail to capture the numerous calls that are dropped, when the system is unable to handle the overwhelming volume of inquiries. *800 Number Performance*, *supra*. The result is a system that, rather than offering timely assistance, exacerbates the already significant burdens faced by those in need.

Despite processing millions of calls and claims annually, SSA operates with historically low staffing levels for an agency of its scope and responsibility. FY 2025 PRESIDENT'S BUDGET REQUEST, *supra* at 1–2. Its employees, overworked and facing burnout, are tasked with processing claims and appeals amidst scarce resources. O'Malley Decl. ¶¶29–32. Current staff shortages and systemic inefficiencies leave employees stretched to their limits, struggling to keep pace with the increasing demand for essential services. *Id.* ¶32.

C.    The Human Cost of Delays and Service Failures

As the Social Security Administration struggles to meet the demand with limited resources, people needing its essential benefits are left without. In 2023, 30,000 people died while awaiting decisions on their initial disability claims. Natalie Alms, *30,000 died in fiscal 2023 waiting for disability decisions from Social Security*, NEXTGOV/FCW (Apr. 17, 2024), https://www.nextgov.com/digital-government/2024/04/30000-died-fiscal-2023-waiting-disability-decisions-social-security/395796/. For others, the toll of waiting is financial ruin. Between 2014 and 2019, 48,000 people filed for bankruptcy while awaiting a final decision on their disability appeals. Memorandum from U.S. Gov't Accountability Off. to Sen. Comm. on the

Budget and H.R. Subcomm. on Soc. Sec. (Feb. 15, 2025 [DA1]). https://www.gao.gov/products/gao-20-641r.

The strict limit of just $2,000 in assets leaves SSI recipients with no financial safety net to withstand delays in payment. SSA, *Who is Eligible for SSI?*, https://www.ssa.gov/ssi/text-eligibility-ussi.htm (last visited Apr. 1, 2025). There are no savings to lean on if checks are delayed or benefits terminated. The impact is immediate and severe—leading to eviction, hunger, and untreated medical conditions that further compromise health and well-being. *See* Molly Weston Williamson, *Cuts to the Social Security Administration Threaten Millions of Americans' Retirement and Disability Benefits*, CTR. FOR AM. PROGRESS (Mar. 12, 2025), https://perma.cc/YHK2-3JT9 ("In a January 2025 survey, 42 percent of Americans 65 and older reported 'I would not be able to afford the basics, such as food, clothing, or housing [without Social Security retirement benefits].'").

The cuts, closures, and policies of the defendants will only exacerbate an already difficult situation as the agency tries to fulfill its critical functions

## III. Defendants' Erosion of the Social Security Administration

### A. <u>Mass Workforce Reductions and the Consequent Service Disruptions</u>

Defendants' decision to cut SSA's workforce by 7,000 positions, Press Release, SSA, https://perma.cc/L7D8-APHY, comes at a time when the agency is serving a record amount of beneficiaries. *See* McHardy, *supra*. Yet, because of Defendants' downsizing efforts, a total of 2,477 SSA employees have already accepted voluntary separation incentive payments, requiring them to leave government service by April 19, 2025. SSA, *Workforce Update*, https://perma.cc/3UWS-QG3U (last visited Apr. 1, 2025). Meanwhile, SSA was required to submit a Reduction in Force ("RIF") plan by March 13, 2025, though this document remains unavailable to the public. *See id.* SSA reports that the forthcoming reduction-in-force will eliminate over 4,000 additional positions,

and that, simultaneously, SSA has implemented a hiring freeze across both its core operations and Disability Determination Services, while significantly curtailing overtime. *Id.*

Research has shown that for every individual staff member SSA loses, 8.6 people go without benefits. Sydney Gordon, *Employee Exodus: The Impact of Government Downsizing on Benefit Access* (Feb. 26, 2025) (Ph.D. dissertation, U.C. Irvine) (on file with author); David Dayen, *How Social Security Administration Cuts Affect You*, AM. PROSPECT (Mar. 6, 2025), https://prospect.org/health/2025-03-06-how-social-security-administration-cuts-affect-you/.

SSA's field offices, long the first point of contact for millions of beneficiaries, have been placed in a state of uncertainty.

DOGE touts the reduction or closure of 22 SSA offices, down from an initial tally of 47. *See* DOGE, Doge.gov/savings (last visited Apr. 1, 2025); Meg Kinnard*, A List of Social Security offices across the US expected to close this yea*r, ASSOCIATED PRESS (March 19, 2025) https://apnews.com/article/social-security-offices-closures-doge-trump-b2b1a5b2ba4fb968abc3379bf90715ff. Yet a subsequent SSA announcement says it has only shuttered one hearing office (so far) and submitted a list of hearing offices to close. Press Release, SSA, *Correcting the Record about Social Security Office Closings* (Mar. 27, 2025)*,* https://perma.cc/KTQ2-UATN. In addition, Defendant Dudek has acknowledged that regional offices would be reduced from ten to four. Declaration of John Whitelaw ("Whitelaw Decl.") ¶13; Press Release, SSA, Social Security Announces Workforce and Organization Plans (Feb. 28, 2025), https://perma.cc/L7D8-APHY. *But see Judd Legum, How the Social Security Administration and DOGE are gaslighting Americans*, POPULAR INFO. (Mar. 31. 2025), https://popular.info/p/how-the-social-security-administration-fff?utm_campaign=post&utm_medium=web. With the closure of hearing offices, claimants

needing an in-person hearing must travel greater distances for hearings, while the remaining hearing offices will be required to absorb the workload of those that have shuttered. At the same time, loss of office space combined with SSA's recent directive requiring all staff (including hearing officers) to return to in-person work only increases pressure on local offices to find space to conduct hearings, in an agency already struggling with case backlogs and delays.

These disruptions do not merely inconvenience claimants; they compromise SSA's ability to fulfill its statutory mandate. By SSA's own projections, a proposed workforce reduction of 4,500 employees would extend claim processing times by at least 20 additional days and increase the backlog by 175,000 cases. SSA FY 2025 Budget Request, *supra* at 9. By the same math, a cut of 7,000, if the relationship were linear, would push these numbers even higher—at least 31 additional days for claims and a backlog increase of 272,000 cases. *Id.* But inefficiencies do not scale in a linear fashion. As workloads exceed manageable levels, systemic delays compound, and the practical effect is likely to be far worse.

Local offices have always served a critical function, not merely processing benefit claims but assisting individuals in navigating the often-complex Social Security system—whether applying for Medicare, verifying eligibility for disability benefits, or addressing continuing disability reviews. *See* Yue Li & Manasi Desphande, *Who is Screened Out? Application Costs and Targeting of Disability Programs*, 11(4) Am. Econ. J.: Econ. Pol'y, 213–48 (2019), https://www.aeaweb.org/articles?id=10.1257/pol.20180076. SSA has long recognized the necessity of in-person visits for individuals who struggle with complex program rules, have difficulty communicating by phone, or lack reliable internet access. *Id.* Yet the ongoing reductions in staffing have rendered such visits increasingly unattainable. Already, appointments at most SSA

offices are scheduled at weeks in advance, and with the staff reductions and increased requirements for in-person identity verification, delays will only lengthen.

These burdens fall most heavily on those least able to bear them. People with disabilities, who disproportionately rely on SSA in-person services, face distinct barriers that these policies only exacerbate. Blind and low vision people cannot readily access online services in the way others can. *See* Riccobono Decl. ¶12; Town Decl. ¶20; Bitencourt Decl. ¶15. Deaf beneficiaries, who require interpreters or captioning, find that in-person services offer communication access unavailable through remote alternatives. *See* Bitencourt Decl. ¶15. Many individuals with vision and mobility disabilities lack the ability to travel long distances and rely on telephone-based assistance, which SSA has simultaneously made more difficult to access through new restrictions on identity verification. *See* Riccobono Decl. ¶12; Town Decl. ¶20.

The data on these impacts is neither speculative nor new. Studies have found that field office closures lead to a measurable decline in disability benefit receipt—cutting off essential support to those who qualify under the law but cannot overcome the barriers imposed by administrative breakdown. *See* Weston Williamson, *supra*. Past hiring freezes, which resulted in a 10 percent reduction in field office staff, left nearly 80,000 eligible individuals without benefits. Gordon, *supra*. History has shown that suspending field office activity does not simply redirect local SSA beneficiaries to seek help at surrounding field offices—it leads to dramatic declines in benefit enrollment. Monica Faird *et al.*, *Effects of Suspending In-Person Services at Social Security Administration Field Offices on Disability Applications and Allowances*, CTR. FOR RETIREMENT RSCH. B.C., 3–4 (2024). Eliminating a field office reduces the number of people receiving disability benefits nearby by 16 percent, cutting families off from lifesaving supports. *Id.*

With SSA now planning to cut its workforce by 12 percent, possibly close more than 20 offices, and increase the need for in-person assistance, these effects will multiply. Because walk-in meetings are no longer available, *see* Email from Dawn Bystry, SSA, Acting Assoc. Comm'r to SSA Staff (Nov. 13, 2024), https://perma.cc/RUE2-SEN6, beneficiaries will be forced to fight for limited slots. At this time, appointments at most SSA offices are booked out at a minimum of 30 days in advance. *See, e.g.*, O'Malley Decl. ¶59 (stating that people need to wait an average of a month for an appointment at SSA field offices); Schoch Decl. ¶20 (stating that SSA told her at the end of March 2025 there were no available appointments near her for nearly two months). These delays and congestion make it more arduous and inaccessible for beneficiaries and applicants. Declaration of Susan Plawsky ("Plawsky Decl.") ¶¶7–8; Declaration of Lori Smetanka ("Smetanka Decl.") ¶12. *See* Li & Desphpande, *supra* at 213–48.

### B.     Recent Policies Lead to Overwhelmed Field Offices and Telephone-Based Services

Recent policy changes announced by Defendant Dudek threaten to impose significant barriers to accessing Social Security benefits, exacerbating an already strained system. Effective April 14, 2025, retirees, survivors, and spouses will no longer be able to file benefit claims over the phone and all beneficiaries will be unable to update direct deposit information or make changes to their accounts over the phone—an abrupt shift that risks disrupting access for millions of beneficiaries, particularly those with disabilities who may face technological challenges, lack internet access, or live in areas with limited access to field offices. Press Release, SSA, Social Security Updates Recently Announced Identity Proofing Requirements (Mar. 26, 2025), https://perma.cc/74F5-5SPU. For those who rely on in-person assistance due to communication barriers or lack of internet access, local offices will now have a higher volume of visitors, increasing already high wait times. *See id.*

On March 19, SSA froze an intergovernmental agreement known as Enumeration Beyond Entry, which had automatically sent social security cards to newly naturalized U.S. citizens and work-authorized non-citizens. Those people will now have to visit a field office to obtain a Social Security card. There were over 3.4 million people who automatically received social security cards las fiscal year. Judd Legum, *Secret policy shift could overwhelm Social Security offices with millions of people*, POPULAR INFO. (Mar. 20, 2025), https://perma.cc/8TGP-LMUJ. This change is expected to increase weekly in-person visits by an estimated 60,000 to 75,000. *Id.* These measures only serve to further burden SSA's already overwhelmed field offices.

At a time when SSA has emphasized the importance of efficiency and accessibility, these policy shifts do the opposite. By requiring beneficiaries to either navigate a complex online system or travel—often long distances—to an already overwhelmed SSA office, these changes risk excluding individuals with disabilities who live far from SSA offices, lack internet access, or lack reliable transportation. Richtman Decl. ¶14; Bitencourt Decl. ¶15; Town Decl. ¶¶19-20; Riccobono Decl. ¶ 12; Smetanka Decl. ¶¶10-12; Hazen Decl. ¶12; Schoch Decl. ¶17. The Defendants' recent policies amount to a backdoor benefits cut, as people are blocked from accessing SSA services and essential benefits. Beatrice Nolan, *DOGE's plans for Social Security are a 'backdoor' way to cut payments, experts warn: 'This is the most serious threat I've ever seen to it'*, FORTUNE (Mar. 21, 2025), https://perma.cc/4JWY-C6MX. What is clear, however, is that these new restrictions will lead to much longer wait times, increased frustration, and additional barriers to accessing benefits.

C.    Dissolution of the Office of the Office of Civil Rights and Equal Opportunity

On February 25, 2025, Defendant Dudek eliminated OCREO, the office responsible for overseeing discrimination complaints, civil rights enforcement within SSA, reasonable accommodation requests, and ensuring equal treatment under federal law. Press Release, SSA,

*Social Security Dissolves Duplicative Office* (Feb. 25, 2025)*,* https://perma.cc/UZL3-7C5B. It consisted of:

1.      Center for Equal Employment Opportunity;

2.      Center for Complaints Resolution;

3.      Center for Accommodations and Disability Services;

4.      Center for Information Technology;

5.      Center for Harassment Prevention;

6.      Center for Regional Equal Opportunity Management; and

7.      Center for Compliance Management.

Declaration of Chris Heidelberg ("Heidelberg Decl.") ¶¶11-17; Chris Geidner, *The Social Security Administration "eliminated" its civil rights office*, LAW DORK (Feb 25, 2025), https://perma.cc/TW8A-FT3P.

No office within SSA possesses the capacity or mandate to fulfill the comprehensive role that OCREO served. Its creation and elevation to an independent office stem from the Civil Rights Movement and a broader governmental initiative to fortify antidiscrimination protections and ensure their meaningful enforcement. SSA, SOCIAL SECURITY'S EQUITY ACTION PLAN IN AGREEMENT WITH EO 13985 8 (2022), https://perma.cc/2L9N-CCDR.

For decades, OCREO managed the core functions essential to safeguarding equal access and ensuring fair treatment under the law. Heidelberg Decl. ¶7. Staffed by attorneys, paralegals, and other trained specialists, OCREO provided a structured and impartial process for investigating claims of discrimination, safeguarding due process for both employees and beneficiaries alike. *Id.* ¶¶19–20. No less essential was its role in overseeing reasonable accommodations, from administering contracts for ASL interpreters to reviewing requests for assistive technologies such as screen readers. *Id.* ¶¶13, 23. With OCREO's abrupt dissolution, these functions have been left

untended, and those who rely upon them now face procedural dead ends, unreviewed claims, and the prospect of indefinite inaction. *Id.* ¶39.

The abrupt and unstructured manner in which OCREO was disbanded casts doubt on whether any meaningful deliberation preceded a decision of such gravity. On February 24—merely four days into his tenure as Acting Commissioner—Defendant Dudek convened a meeting with SSA's deputy commissioners to discuss staffing. *Id.* ¶¶31–32, 42. The following day, OCREO managers were informed that their positions had been eliminated and were given two hours to vacate their offices. *Id.* ¶34. The lack of clarity surrounding these dismissals, the absence of any substantive justification for OCREO's elimination, and the haphazard execution of its closure all suggest an agency acting with undue haste and without regard for the foreseeable consequences. Heidelberg Decl. ¶38; Whitelaw Decl. ¶¶10–13.

In the wake of OCREO's dissolution, SSA has attempted to transfer portions of its workload to the Office of Mission Support ("OMS"). Ex. 1, E-mail from Leland Dudek, Acting Commissioner, SSA, to Senior Staff (Mar. 21, 2025). Yet OMS has proven incapable of managing OCREO's extensive responsibilities. As of March 13, 2025—less a month after OCREO's closure—the agency has failed to meet SSA's established deadlines for processing employee complaint files, and its inability to access essential components of Reports of Investigation has only deepened the backlog of EEO complaints. E-mail from Richard Couture, President of Am. Fed. of Gov't Emps. ("AFGE") Council 215, to SSA (Mar. 13, 2025, 9:29 AM EST). Those who rely on SSA's protections now find themselves without recourse, and in the absence of a coherent plan for replacement, the harm inflicted upon beneficiaries by these cuts will persist.

D.     Elimination of the Office of Transformation

On February 24, 2025, Defendant Dudek eliminated the Office of Transformation, the office was created to modernize customer service, streamline operations, and improve the claimant

experience. *See* Press Release, SSA, Social Security Eliminates Wasteful Department (Feb. 24, 2025)*,* https://perma.cc/YEA8-PBG6*;* Bria Overs, *Social Security Administration closes offices, cutting nearly 200 employees*, BALTIMORE BANNER (Feb. 25, 2025), https://perma.cc/8Y76-4KNE. It consisted of three offices: the Office of Customer Experience, which collected and analyzed customer feedback; the Office of Change Management, which ensured SSA's teams kept on pace with internal deadlines to meet their customer service improvement goals; and the Office of Experience Design, which ensured that the technical side of customer service ran smoothly, including managing SSA.gov. Declaration of Elizabeth Beaumon ("Beaumon Decl.") ¶¶13. A core aspect of its mission was working to remedy longstanding deficiencies in the agency's outdated technological systems and expand online services. Yet today, only 25 percent of SSA's services are available online—and without this office, even that limited access is at risk. *See* Natalie Alms, *Social Security shutters its civil rights and transformation offices*, GOV. EXEC. (Feb. 26, 2025), https://perma.cc/8NCZ-TBHT.

The weakening of SSA's technological workforce is one of its most perilous missteps. In the span of just ten days this March, less than a month after the office's dissolution, SSA.gov suffered four crashes, a direct result of overloaded servers, locking millions of individuals out of their accounts. Lisa Rein & Hannah Natanson, *Long waits, waves of calls, website crashes: Social Security is breaking down*, WASH. POST (Mar. 25, 2025), https://perma.cc/D8F4-PT55. Defendants' elimination of the Office of Transformation and the agency's capacity to sustain and modernize its own infrastructure has set the stage for the inevitable recurrence of these outages.

The remaining staff at SSA are not equipped to manage the full breadth of the Office of Transformation's work, which included critical tasks such as maintaining SSA.gov webpages. Beaumon Decl. ¶¶16. These pages were integral to guiding applicants on how to file claims and

navigate the benefits system. *Id.* With the loss of experienced professionals to maintain these pages, SSA leadership has effectively left beneficiaries exposed to unclear or conflicting instructions, dead ends in online services, and ongoing technical glitches.

Particularly troubling is the loss of staff fluent in Common Business Oriented Language ("COBOL")—SSA's primary coding language. As cyberattacks, including malware, become ever more frequent, the agency's ability to defend its digital infrastructure is more crucial than ever. O'Malley Decl. ¶45. Given the enormous volume of sensitive data SSA holds on virtually every American, the agency's cybersecurity is a matter of paramount importance. *Id.*

In dissolving the Office of Transformation, SSA has lost its dedicated team responsible for evaluating the impact of its cuts, leaving it without the structured oversight necessary to ensure its actions are properly assessed. The repercussions of Defendants decisions will not be borne by the agency itself, but by the individuals who depend on its services.

E.    The Unconstitutional Incursion on SSA by Defendants Musk and DOGE

The Commissioner of the Social Security Administration is appointed by the President, with the advice and consent of the Senate, as outlined in the Social Security Act. 42 U.S.C. § 902. In a government designed to function within a system of separated powers and defined accountability, the Commissioner's statutory role does not permit the intrusion of external, unelected forces wielding unilateral control over agency operations. Yet it is precisely this incursion that has transpired under Defendant Elon Musk, who, through his direction of DOGE, has asserted extraordinary influence over SSA policy and personnel, absent legal authority and beyond congressional oversight.

While Defendant Musk's official role within DOGE remains unclear, his effective control is not. The reach of his influence over SSA is manifest in Defendant Dudek, the Acting Commissioner, who, within days of assuming office, ordered the dissolution of OCREO and the

Office of Transformation, endorsed the closure of field offices, and set in motion the termination of thousands of SSA employees, all while imposing new policies destined to increase the need for staff. *See* Press Release, SSA, Social Security Eliminates Wasteful Department (Feb. 24, 2025), https://perma.cc/YEA8-PBG6, Social Security Dissolves Duplicative Office (Feb. 25, 2025), https://perma.cc/UZL3-7C5B. These sweeping changes, by his own admission, were driven not by his independent judgment as the agency's chief executive, but rather by the directive of Defendant DOGE, whose mandate to "streamline" agency functions has functioned as a pretext for dismantling essential public services. Whitelaw Decl. ¶¶9-12, 14; Declaration of Michelle Spadafore ("Spadafore Decl.") ¶¶7–9.

Reports confirm that even senior White House officials lack oversight of Defendant Musk's activities. A senior official described him as "operating with a level of autonomy that almost no one could control." Kate Conger*, Inside Musk's Aggressive Incursion Into the Federal Government*, N.Y. TIMES (Feb. 3, 2025), https://perma.cc/R7XD-3LA7. DOGE-affiliated individuals, many young, inexperienced, and unvetted, have been embedded across federal agencies, including SSA. *See* Avi Asher-Schapiro *et al.*, *Elon Musk's Demolition Crew*, PROPUBLICA, https://perma.cc/BG5M-CTAH (last visited Apr. 1, 2025). DOGE has reportedly installed at least 10 operatives within the agency, whose activities have been shrouded in secrecy. N.Y. TIMES, *The People Carrying Out Musk's Plans at DOGE*, (updated Mar. 26, 2025), https://www.nytimes.com/interactive/2025/02/27/us/politics/doge-staff-list.html. This extensive placement of DOGE personnel has granted Defendant Musk unprecedented access to governmental decision-making, sidestepping transparency and accountability.

Defendant Musk's control extends beyond personnel. His access to digital infrastructure has permitted actions of great consequence—the mass termination of employees and contractors,

the cancellation of contracts, and the rescission of leases—all undertaken without the oversight mechanisms that safeguard responsible governance. In a private recording obtained by *ProPublica*, Defendant Dudek acknowledged the destabilizing potential of DOGE-driven policies, warning that if the scale of changes imposed at SSA mirrored those seen at USAID and the Treasury Department, the consequences "would be catastrophic for the people in our country." *See* Eli Hager, *"The President Wanted It and I Did It": Recording Reveals Head of Social Security's Thoughts on DOGE and Trump*, PROPUBLICA (Mar. 12, 2025), https://perma.cc/X7R9-ZW3A. Yet, despite these admissions, he acceded to the external directive, stating, "The President has an agenda. I'm a political appointee. I need to follow that agenda." *Id.*

The consequences of these incursions are not abstract. Defendant Dudek, while professing commitment to SSA's core functions, has simultaneously endorsed policies that have debilitated them. Reports indicate that DOGE's "efficiency" initiatives have led to chronic system failures, procurement obstacles, and processing delays, exacerbating the already staggering backlog of disability claims. *Id.*

To justify this hollowing out of SSA, Defendants Musk and DOGE have relied on a strategy of deliberate misinformation, advancing exaggerated claims of fraud as a pretext for slashing services. *See* Nolan, *supra*. Defendant Musk's public statements trivializing SSA turn serious policy discussions into spectacle. His assertion that "tens of millions" of deceased individuals remain fraudulently listed as "ALIVE" distorts the truth. Empirical data establishes that the actual rate of improper payments, many of which are caused by mistakes or delays rather than fraud, is a mere 0.3 percent, with payment accuracy exceeding 99 percent. *Id. See* Romig, *supra*.

The objective of these distortions is evident: to create a manufactured crisis in order to justify the dismantling and privatization of SSA. But the numbers do not support the narrative. The

elimination of civil rights enforcement offices, the shuttering of regional offices, and the reduction of SSA's workforce are not fiscal imperatives—SSA's administrative overhead accounts for just one percent of its budget. FY 2025 PRESIDENT'S BUDGET REQUEST, *supra* at 4. Rather, these measures serve to undermine the agency's fundamental mission, depriving millions of Americans of benefits to which they are entitled under law. This is not a matter of budgetary prudence but of an unconstitutional assumption of power that subverts the very structure of governance that the Constitution was designed to preserve.

Against this backdrop, it is difficult to accept that SSA's recent staffing cuts and burdensome policies are the product of mere oversight. The cumulative effect—stripping away avenues for redress, eliminating staff charged with ensuring compliance, and making the process of seeking benefits more onerous—suggests a deliberate departure from longstanding norms and legal commitments. Whether by design or indifference, these actions undermine the very system of public support that Congress has charged SSA with administering, and they demand more than a cursory justification.

People with disabilities are disproportionately impacted by these burdensome policies and reductions because people with disabilities are also more likely to rely on the availability of in-person assistance at SSA. Blind people and others with disabilities face barriers to using the internet that people without disabilities do not. Town Decl. ¶20. Deaf beneficiaries are more likely to seek in-person services at local SSA offices because they rely on specialized communications, like sign language and captioning, for which in-person communication is more comfortable and effective than telecommunications. Bitencourt Decl. ¶15. At the same time, many people with disabilities, such as the blind and individuals with mobility disabilities, cannot travel easily, so they need telephone access. Town Decl. ¶19; Riccobono Decl. ¶¶12–13; Schoch Decl. ¶¶17–18.

And with new SSA policies prohibiting use of the telephone for some transactions, many people with and without disabilities are likely to seek in-person support over grappling with SSA's digital platforms, increasing the demand for appointments. Given the wealth of data on how these types of policies adversely impact SSA beneficiaries with disabilities, Defendants' actions are direct attacks on the longstanding, yet fragile, public system that sustains them.

## LEGAL STANDARD

A plaintiff seeking preliminary injunctive relief must show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "The primary purpose of a preliminary injunction is to preserve . . . the status quo." *Aamer v. Obama*, 742 F.3d 1023, 1043 (D.C. Cir. 2014) (internal quotation marks and citation omitted). When seeking such relief, "the movant has the burden to show that all four factors, taken together, weigh in favor of the injunction." *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014) (quotation marks and citation omitted). These factors clearly weigh in favor of returning SSA to the "last uncontested status which preceded the pending controversy" – February 24, 2025. *Dist. 50, United Mine Workers of Am.*, 412 F.2d 165, 168 (D.C. Cir. 1969) (quotation marks and citation omitted).

## ARGUMENT

## I.    Plaintiffs Are Likely to Succeed on the Merits of Their Claims

### A.    Defendants' actions violate Section 504 of the Rehabilitation Act

Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a) ("Section 504"), makes it unlawful for federal agencies, including the Social Security Administration, to discriminate on the basis of disability in their programs or activities. Section 504 states that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability,

be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any . . . program or activity conducted by any Executive agency." *Id.* To prove disability discrimination under Section 504, Plaintiffs "must show that (1) they are disabled within the meaning of the Rehabilitation Act, (2) they are otherwise qualified, (3) they were excluded from, denied the benefit of, or subject to discrimination under any program or activity" solely by reason of their disability, "and (4) the program or activity is carried out by a federal executive agency or with federal funds." *Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1266 (D.C. Cir. 2008) (citing 29 U.S.C. § 794a).

Like the Americans with Disabilities Act requirements for state and local governments, Section 504 prohibits federal agencies from "utiliz[ing] criteria or methods of administration the purpose or effect of which would (i) subject qualified individuals with [disabilities] to discrimination on the basis of [disability]; or (ii) defeat or substantially impair accomplishment of the objectives of a program or activity with respect to individuals with [disabilities]." 45 C.F.R. § 85.21(b)(3); *Day v. Dist. of Columbia*, 894 F. Supp. 2d 1, 4 (D.D.C. 2012). Thus, "courts have construed [these laws] to allow a plaintiff to pursue three distinct grounds for relief: (1) intentional discrimination or disparate treatment; (2) disparate impact; and (3) failure to make reasonable accommodations." *A Helping Hand, LLC v. Baltimore Cnty.*, 515 F.3d 356, 362 (4th Cir. 2008).

      1.     *Plaintiffs are "Otherwise Qualified" Individuals with Disabilities and Defendants are Covered Agencies Under the Rehabilitation Act.*

Individual Plaintiffs and Organizational Plaintiff members are *sui juris* disabled as defined by 29 U.S.C. § 705(20)(B). Tiller Decl. ¶7 (COPD, emphysema, PTSD, dry eye, and insomnia); Olivero Decl. ¶5 (blindness); Rouse Decl. ¶¶4, 9 (blindness); Schoch Decl. ¶5 (blindness); Hazen Decl. ¶5 (blindness); Weiss Decl. ¶3 (blindness); Powell Decl. ¶5 (blindness). Plaintiffs likewise

are "otherwise qualified" for SSI or SSDI because they meet "the essential eligibility requirements for participation in, or receipt of benefits from, that program or activity." 28 C.F.R. § 39.103.

2.  *Defendants' policies disparately deny Plaintiffs and other individuals with disabilities meaningful access to Social Security benefits.*

The policies enacted by Defendants unjustly and disproportionately deny Plaintiffs and other individuals with disabilities meaningful access to Social Security benefits. The overwhelming majority of participants in the SSI program are people with disabilities. SSA, MONTHLY STAT. SNAPSHOT, JAN. 2025 (2024), https://perma.cc/KR4P-QHS5/ (showing that 78 percent of people receive SSI benefits because of a significant disability). By definition, SSDI beneficiaries are individuals with disabilities who experience substantial limitations in major life activities, including working. Additionally, elderly individuals receiving retirement benefits overwhelmingly experience disabilities, with nearly 46 percent of Americans aged 75 and over reporting having a disability and 24 percent of those age 65 to 74 having disabilities. U.S. CENSUS BUREAU, *Disability Characteristics*, https://perma.cc/7NSQ-LT4V. The systematic weakening of SSA through program eliminations and service reductions is not only an impersonal bureaucratic shift but one that inflicts disproportionate harm on individuals with disabilities, making it a matter of fundamental legal and ethical concern.

The Rehabilitation Act mandates that individuals with disabilities must have "meaningful access" to federal government programs and activities. *See Alexander v. Choate*, 469 U.S. 287, 301 (1985); *Am. Council of Blind v. Mnuchin*, 878 F.3d 360, 363 (D.C. Cir. 2017). This principle requires that reasonable accommodations be made to ensure that disabled individuals can effectively utilize these services. *Nat'l Ass'n of the Deaf v. Trump*, 486 F. Supp. 3d 45, 57 (D.D.C. 2020). When government practices or procedures effectively deny people with disabilities meaningful access to services, causing a disparate impact, the government is obligated to make

reasonable modifications to its policies and procedures. *Payan v. Los Angeles Cmty. Coll. Dist.*, 11 F.4th 729, 738 (9th Cir. 2021). The inquiry is not limited to whether individuals with disabilities can access government programs at all, but rather whether they can do so on an equal basis with their nondisabled counterparts. 45 C.F.R. § 85.21(b)(1)(ii)–(iii); *Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1134–35 (9th Cir. 2012) (quoting 42 U.S.C. § 12182(a)).

Facial neutrality does not neutralize disparate impact. A law or policy that appears neutral on its face may nonetheless function as an instrument of discrimination when it disproportionately burdens individuals with disabilities. *In Crowder v. Kitagawa*, 81 F.3d 1480 (9th Cir. 1996), the Ninth Circuit held that a state's quarantine policy, though ostensibly neutral, imposed an unlawful burden on blind individuals who relied on guide dogs. The policy's failure to account for the unique dependency of blind individuals on service animals rendered it discriminatory in effect, if not in intent. Similarly, in *Doe v. CVS Pharmacy, Inc.*, 982 F.3d 1204 (9th Cir. 2020), the court found that a facially neutral pharmaceutical benefits plan, which restricted pharmacist review of specialty medications, disparately impacted individuals with HIV/AIDS. Because their condition necessitated continuous medication adjustments, the policy burdened them in ways not experienced by others. *Id.* at 1212. Notably, the court rejected the notion that plaintiffs must establish that a policy's disparate impact is unique to a particular disability or that the deprivation suffered is severe to constitute unlawful discrimination. *Id.*

Here, Defendants' policies function in much the same way. By systematically weakening SSA's ability to administer benefits, Defendants' policies operate as a *de facto* barrier to individuals with disabilities by systematically eroding SSA services, creating access limitations that disproportionately impact Plaintiffs and other individuals with disabilities.

The systemic delays and barriers created by SSA's workforce reductions and policies destined to overwhelm remaining staff, will prevent disabled individuals from timely receiving critical benefits, denying them meaningful access to SSA's services. Prior to the mass layoffs, average wait time for an initial disability application was eight months. FY 2025 PRESIDENT'S BUDGET REQUEST, *supra* at 17. If denied, reconsideration adds another seven months, followed by a one-year wait for a hearing. *Id*. SSA itself has admitted that losing just 4,500 employees will increase claim processing times by at least 20 additional days, and add 175,000 more cases to the backlog. *Id.* at 9. Cutting 7,000 employees will have even greater, compounding effects, adding 31 days to processing time and adding 272,000 more cases to the existing backlog.

Staff buyouts are already exacerbating low staffing levels in SSA field offices. Paul Nelson, *Social Security office in Schenectady shrinks as workers take DOGE buyouts*, TIMES UNION (Mar 13, 20.25), https://www.timesunion.com/news/article/schenectady-social-security-office-losing-staff-20217524.php; Sharif Decl. ¶11 ("While I waited in the field office, I noticed that only two of the four windows serving the public were staffed. This led me to believe that the field office does not have the help they need.").

The manner in which these cuts are being deployed demonstrates that they are not designed to limit harm. SSA has announced that it will seek staff reductions via voluntary separations and early retirement, rather than through targeted mechanisms. Press Release, SSA, Social Security Announces Workforce and Organization Plans*, supra*. At the same time, changes to procedures by SSA threaten to increase the number of people—particularly the elderly and people with disabilities who do not have internet access—by tens of thousands of in-person visitors per week. Judd Legum, *Memo details Trump plan to sabotage the Social Security Administration*, POPULAR INFO. (Mar. 17, 2025), https://popular.info/p/exclusive-memo-details-trump-plan.

New policies that effectively require beneficiaries to make appointments via telephone for everything from an in-person meeting to making a claim, to a telephone appointment to ask a simple question, have overwhelmed the capacity of the agency to respond. People with disabilities are left dangling on hold or disconnected, Weiss Decl. ¶10, or told that there are no in person appointments available for over forty days, Plawsky Decl. ¶7. *See* Morgan Music, *Virginia Lawmaker Says He Called Social Security and It Hung Up on Him: 'It's Very Concerning'*, LATIN TIMES (Mar. 29, 2025), https://www.latintimes.com/virginia-lawmaker-called-social-security-hung-him-concerning-579527.

The dissolution of OCREO and the Office of Transformation without an identifiable alternative solution eliminates key mechanisms that ensure SSA's compliance with disability rights protections—demonstrating the discriminatory impact of these decisions. The elimination of OCREO has left no discernible means by which individuals can file discrimination complaints or request necessary disability accommodations, denying them their right to redress and support. Heidelberg Decl. ¶¶39–40. Furthermore, SSA's overnight disbandment of such a critical office will inevitably lead to unnecessary delays in complaint decisions. Inexperienced staff will need to be notified of their new job responsibilities, trained on the review process, and begin taking cases, without experienced staff to help. Shifting these weighty responsibilities onto a smaller number of already overworked staff with other duties will further aggravate delays in accommodation reviews.

Meanwhile, the outright abolition of the Office of Transformation threatens to irreversibly overload SSA's systems by cutting off SSA's accountability to improve customer service. In a time of overwhelming backlogs and extended wait times, the elimination of the Office of Transformation directly undermines SSA's ability to provide timely and accessible customer

service to the millions of disabled individuals who depend on Social Security benefits for their basic survival. If SSA has no one looking to find ways to improve customer service, greater wait times will only lead to increased rates of poverty, bankruptcy, and deaths while people wait for SSA to respond. Alms, *supra*. Yet, no information has been provided as to where, if anywhere, those functions are being transferred to the remaining components of SSA. Beaumon Decl. ¶18; Heidelberg Decl. ¶¶21–22, 28–29, 40.

      B.    <u>Defendants' actions violate the Administrative Procedure Act</u>

      1.    *Defendants' mass workforce reductions and burdensome new policies are arbitrary and capricious.*

The Administrative Procedure Act ("APA") serves as a bulwark against arbitrary and capricious decision-making, demanding that agencies act within legal boundaries and provide rational justifications for their policies. The APA requires this Court to "compel agency action unlawfully withheld or unreasonably delayed" and "hold unlawful and set aside agency action, findings and conclusions" it finds to be, *inter alia* (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) contrary to constitutional right, power, privilege, or immunity; or (3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right. 5 U.S.C. § 706(1)–(2)(C). Here, SSA's actions constitute a textbook case of executive overreach, unlawfully withholding and delaying essential services, ignoring statutory mandates, and exceeding its authority.

      a.    <u>Defendants have failed to consider reliance interests in SSA's status quo operations.</u>

SSA serves as the principal source of economic security for millions of Americans, particularly individuals with disabilities who face systemic barriers to employment, healthcare, and financial stability. When an agency adopts policies that engender reliance, it cannot discard

them without due consideration of the consequences. *See Encino Motorcars, LLC v. Navarro*, 579

U.S. 211, 2126 (2016). It has failed to meet that obligation here.

Since 2023, the Office of Transformation played a vital role in ensuring that claimants—

many of whom face mobility, cognitive, or technological challenges—could access their benefits

efficiently and without unnecessary burdens. Its elimination, without an adequate replacement,

dismantles critical infrastructure that made SSA services more accessible. Likewise, dissolving

OCREO, which had existed since the 1960s, removes a key mechanism for handling discrimination

complaints, leaving those who experience bias in the benefits process without recourse. Finally,

drastic cuts to staffing, while at the same time implementing policies that increase demands on

field office staff, threatens beneficiaries' and applicants' ability to apply for, be timely considered

for, and receive benefits, undermining the system millions rely upon.

A reliance interest is not satisfied by vague assurances or piecemeal substitutes; it demands

a solution that meaningfully preserves what was lost. A diminished substitute does not suffice when

real harm falls on those most in need. SSA must either restore these offices or implement an

alternative that is concrete, comprehensive, and fully effective. Anything less deepens inequities

and fails the very people SSA is meant to serve.

> b.  <u>Defendants have inexplicably changed their policies without</u>
>     <u>justification.</u>

A federal agency cannot simply disregard its prior factual determinations without offering

a reasoned explanation, "even when reversing a policy after an election." *Org. Vill. of Kake v. U.S.*

*Dep't of Agric.*, 795 F.3d 956, 968 (9th Cir. 2015). Because SSA has made virtually no effort to

justify its policy changes, its "lack of reasoned explication for [the personnel cuts, which are]

inconsistent with the [agency's] longstanding earlier position results in a rule that cannot carry the

force of law." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 224 (2016). SSA has not met that standard.

SSA previously recognized that the OCREO was necessary to ensure compliance with disability rights laws and that the Office of Transformation played a critical role in modernizing service access. *See, e.g.*, Heidelberg Decl. ¶¶7–10 (describing OCREO's evolution from several smaller, siloed offices to one larger SSA component full of civil rights and EEO specialists); Beaumon Decl. ¶11. These offices existed not as discretionary conveniences but as responses to identified needs. The agency's own reports and statements have recognized these challenges—an expanding caseload and the need for modernization to handle the influx of new claimants, particularly those with disabilities. SSA, FY 2025 BUDGET OVERVIEW 1–2 (2024), *supra;* FY 2021 CONGRESSIONAL JUSTIFICATION 1–2 (2021), https://perma.cc/4WWK-VV9T; FY 2017 BUDGET OVERVIEW 5–6 (2016), https://perma.cc/MR2V-UB9J. The agency now takes the opposite position—that the functions they served are no longer necessary—without supplying a reasoned basis for its change in judgment.

Further, the agency, across political administrations, has long sought additional staffing to meet the overwhelming need. *See ibid*. As discussed above, the agency now has its smallest workforce in decades, while facing ever-increasing demand for its services. But SSA now reverses course, proposing to cut staff even further, with no explanation.

An agency does not act lawfully when it sets aside its own previous findings without explanation. The SSA has not accounted for the facts it once relied upon—namely, the challenges presented by the growing number of claimants and the need for modernization. By eliminating these offices and cutting staff without addressing these underlying needs, the agency has acted arbitrarily and capriciously.

c.    <u>Defendants lack a genuine, contemporaneous rationale for their actions.</u>

An agency's rationale for policy decisions must be clearly stated in the administrative record and must be genuine. *See Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 22 (2020); *Dep't of Commerce v. New York*, 588 U.S. 752, 780–81 (2019). *See also SEC v. Chenery*, 318 U.S. 80 (1943). SSA has failed to provide a legitimate, reasoned justification for effectively eliminating civil rights protections, cutting 7,000 employees, reducing offices, and implementing policies pushing thousands to the overburdened telephone system for appointments and requiring more field office visits. Absent such a clear explanation, the agency's actions stand in violation of established legal standards and are therefore unlawful.

Defendants argue that the elimination of critical offices and services promotes "efficiency." However, the evidence directly contradicts this claim, showing that these cuts are, in fact, exacerbating existing challenges. The agency's decision is leading to increased backlogs, delayed benefit approvals, and diminished access to vital services for millions of Americans. These outcomes are not consistent with the goal of improving efficiency, but rather undermine the agency's ability to fulfill its core mission.

An agency cannot rely on pretextual justifications to avoid legal or political accountability. *Id.* SSA has failed to provide a legitimate explanation for eliminating essential civil rights processes, cutting thousands of employees, and implementing policies requiring more field office visits. These actions have real and negative consequences for those who depend on SSA services, and the agency has not demonstrated that they are warranted or beneficial.

These cuts create exacerbated backlogs, delayed benefit approvals, and reduced access to essential services. Efficiency is not achieved by undermining the agency's capacity to fulfill its mission. All these negative consequences come without any actual reasoning from SSA as to why

the OCREO and Office of Transformation were targeted. SSA has vaguely stated that its focus is on "supporting President Trump's priorities, which include streamlining functions and prioritizing essential work" and "mak[ing] all of government more efficient." Press Release, SSA, Social Security Dissolves Duplicative Office, *supra*. It does not speak to what "functions" it intends to "streamlin[e]." It has not explained what "essential work" it hopes to "prioritize[e]." *See id*. It has not clarified what measure of "efficient" government it seeks to attain. *See id.* These empty assertions provide no explanation for SSA's reckless conduct.

Without a genuine, well-supported explanation, the SSA's actions are arbitrary and capricious. Therefore, these cuts must be reversed.

Defendants additionally veil their actions using the justification that slashing the workforce of SSA offices reduces the costs of running the agency. But saving government funds, alone, is an insufficient justification for SSA's actions. "The touchstone of this inquiry is rationality." *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. CV 25-239 (LLA), 2025 WL 597959, at *14 (D.D.C. Feb. 25, 2025). Issuing such a sweeping order "was not—and could never be—rational, especially when the decision was made without grappling with its catastrophic effects or the logistical nightmare of its implementation." *Id.* The same logic applies here. Defendants' policies are contrary to law.

An agency action is "not in accordance with the law" when it is in conflict with the governing statute. *Nw. Envt'l. Advocates v. EPA*, 537 F.3d 1006, 1014 (9th Cir. 2008); *accord Cleveland v. Ohio*, 508 F.3d 827, 838 (6th Cir.2007). SSA's restructuring violates several statutory mandates.

SSA is statutorily required to ensure the fair and efficient administration of benefits. *See* 20 C.F.R. § 404.1740. The elimination of key offices and the reduction in staff directly obstruct

the timely determination of benefits, thus breaching this statutory duty. Section 504 of the Rehabilitation Act mandates that federal agencies provide accessible services and enforce civil rights protections. By eliminating the OCREO—the very office responsible for enforcing these protections—SSA has effectively stripped claimants of their statutory civil rights, leaving them without essential safeguards against discrimination.

This failure to uphold statutory mandates is not just a matter of poor policy; it is a direct violation of the law. SSA cannot simply disregard its legal obligations in pursuit of an unsubstantiated claim of "efficiency." These actions contradict the clear requirements set forth by Congress, and as such, the restructuring and loss of staff must be reversed.

Defendants' actions also infringe upon fundamental constitutional protections. The elimination of OCREO deprives individuals of a critical mechanism for adjudicating discrimination that results in the deprivation of their Social Security benefits, thus violating their due process rights under the Fifth Amendment. By dismantling SSA's civil rights office and removing grievance procedures, Defendants are obstructing individuals' ability to seek redress, undermining their rights under the First Amendment.

These actions go beyond mere administrative errors; they erode core principles that require fair treatment and access to justice. When a government agency dismantles essential protections and deprives citizens of their right to seek redress, it directly impinges on the constitutional guarantees of due process and petitioning the government for a redress of grievances. *See* U.S. CONST. amends. I & V. SSA's decision to eliminate these critical safeguards, without adequate replacements, is contrary to law.

2.    *This Court should compel agency action unlawfully withheld and unreasonably delayed.*

The SSA's mass personnel cuts and policies requiring greater reliance on staff directly obstruct the agency's ability to carry out its statutory duties. The elimination of OCREO, which was responsible for processing discrimination complaints, ensuring compliance with federal civil rights laws, and overseeing reasonable accommodation requests, has unlawfully stripped beneficiaries and employees of necessary legal protections. SSA has offered no plan for how these critical functions will be reassigned or continued, effectively rendering them null.

Similarly, dismantling the Office of Transformation is certain to cause severe delays, errors, and inefficiencies in the processing of benefits. The Office of Transformation was instrumental in evaluating SSA's performance, providing data metrics, and resolving technical issues—all of which are necessary to maintain an effective benefits system. On information and belief, as of March 2025, SSA has terminated all but a few of the Office of Transformation's data analysts, web engineers, and other specialists. Press Release, SSA, Social Security Eliminates Wasteful Department, *supra*. This decision places SSA's fragile and outdated computer systems at extreme risk of failure, threatening disruptions to benefit distributions for more than 73 million Americans. The APA demands that agencies grapple with such consequences before enacting policy changes, yet SSA has entirely disregarded this obligation.

SSA's reckless personnel cuts further expose the implausibility of its justifications. In 2010, SSA had 67,000 staff members serving 60 million beneficiaries. Even with that level of staffing, 46 percent of SSA recipients had to call a field office multiple times before reaching an agent, and 51 percent of those who left a voicemail never received a call back. Under SSA's new regime, only 50,000 staff members will be responsible for serving over 73 million beneficiaries—a historic reduction in workforce that will exacerbate service delays to an unprecedented degree.

Additionally, SSA has imposed new identity verification requirements that will require more people to visit field offices. These cuts do nothing for government efficiency; they only choke SSA's ability to function.

       3.    *Defendants' actions are ultra vires.*

Federal agencies may only exercise the powers granted to them by Congress, and any actions that exceed the scope of this delegated authority are unlawful. Here, DOGE has overstepped its statutory bounds by unilaterally dismantling SSA civil rights protections, eliminating key offices, and restructuring workforce obligations—all without the necessary congressional authorization. Such actions not only violate the SSA's statutory mandate but also undermine the very framework of accountability established by Congress. Under the APA, actions that exceed an agency's authority must be set aside. DOGE has no congressional authority over SSA and its decisions to act outside the scope of SSA's congressional delegation, without proper authorization or legal justification, requires reversal.

## II.    Plaintiffs are at Imminent Risk of Irreparable Harm

"Irreparable" harm is defined as an injury that is "imminen[t]," "certain and great," "actual and not theoretical," and "beyond remediation." *Nat'l. Ass'n. of the Deaf*, 486 F. Supp. at 58 (citing *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). Courts recognize that immediate threats to constitutional rights constitute irreparable harm warranting urgent relief. *See Al-Joudi v. Bush,* 406 F. Supp. 2d 13, 20 (D.D.C. 2005) (finding irreparable harm in connection with constitutional violation); *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998) ("[A] prospective violation of a constitutional right constitutes irreparable injury."); *Costa v. Bazron*, 464 F. Supp. 3d 132, 156 (D.D.C. 2020) (finding that harm imposed by alleged Fifth Amendment violation was "itself irreparable" and granting preliminary injunction); *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016) (finding that harm imposed by alleged

First Amendment violation was "irreparable" and remanding district court's denial of a preliminary injunction). Courts in this Circuit routinely find irreparable harm where there is an alleged loss of constitutional freedoms—even if temporary. *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (finding irreparable harm in connection with alleged Fourth Amendment violation, and explaining that "it has long been established that the loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury") (citation and internal quotations omitted)). Ultimately, irreparable harm exists when a plaintiff shows she will likely suffer harm that is "beyond remediation." *Davis v. Billington*, 76 F. Supp. 3d 59, 65 (D.D.C. 2014).

Here, the immediacy and magnitude of Plaintiffs' harms are abundantly clear, considering the purpose for which recipients often apply for Social Security benefits. Receiving Social Security benefits is the difference between life and death for many Americans with disabilities. Riccobono Decl. ¶10; Town Decl. ¶¶16–17; Bitencourt Decl. ¶12; O'Malley Decl. ¶¶16–17. By definition, individuals seeking or receiving SSDI benefits cannot work and individuals seeking or receiving SSI benefits have little or no income or assets. Further, many retirees have limited incomes. In 2022, 6 to 8 million adults (10 to 14 percent) age 65 or over lived in poverty. Nancy Ochieng, *How Many Older Adults Live in Poverty*, KFF (May 11, 2024), https://www.kff.org/medicare/issue-brief/how-many-older-adults-live-in-poverty/#:~:text=About%206%20to%208%20million,in%20the%20official%20poverty%20measure.

For these individuals, receiving timely SSI and SSDI payments makes the difference between paying rent and eviction, between eating and hunger, and between paying bills or falling into debt. Riccobono Decl. ¶10; Town Decl. ¶17; Bitencourt Decl. ¶12; O'Malley Decl. ¶¶16–17;

Tiller Decl. ¶21; Olivero Decl. ¶¶11, 25; Schoch Decl. ¶28-29; Powell Decl. ¶12. Many beneficiaries' very survival depends on the timely administration of their monthly benefits. Riccobono Decl. ¶10; Town Decl. ¶17.

Defendants' actions are systematically denying Plaintiffs and other individuals with disabilities timely access to critical Social Security benefits, violating their statutory rights and causing irreparable harm.

The delays and barriers resulting from SSA's workforce reductions and policies have already strained its remaining staff and will continue to do so, directly harming claimants and beneficiaries. Local office and staff reductions put people with disabilities, including older people, in a dubious position to support themselves. Research has shown that when field offices close, the number of people receiving disability benefits nearby falls by 16 percent, cutting families off from lifesaving supports. *See* Weston Williamson, *supra*. Field offices received an average of more than 119,000 daily visits in 2023. SSA, *Annual Data for Field Office Visitors* (updated Mar. 8, 2024), https://www.ssa.gov/data/field-office-visitors-average-daily.html#datasetDescription. Drastic cuts to SSA staff and offices are likely to spark major problems, not minor changes. Research has shown that for every individual staff member SSA loses, 8.6 people go without benefits. Dayen, *supra*; Gordon, *supra*. And, based on SSA's own reports, a cut of 7,000 staff can be expected to increase processing delays by a month and increase backlogs of applications by nearly 300,000. All the while, SSA employees are burnt out from years of managing backlogs on dwindling resources. SSA's productivity is certain to dip considerably with this new dearth of employees. Defendants' slash-and-burn approach to "streamlining" SSA components is therefore certain to ignite the tinderbox SSA has embodied for the last few decades.

Other metrics illustrate the sensitivity of the SSA system. For example, SSA's average wait time before a caller connects to an agent directly correlates with SSA's policy changes. Before the COVID-19 pandemic, the average wait time for a call to the SSA was around 20 minutes, not including dropped calls or calls that receive busy signals. SSA, *800 number performance, "Average Speed of Answer"*, https://www.ssa.gov/ssa-performance/800-number-performance (last visited Apr. 1, 2025). With the lack of personnel and constantly changing policies issued during the post-pandemic years, SSA's average call wait time nearly doubled. *Id.* Only recently did the average call wait time stabilize back to near pre-pandemic levels. *Id.* But the slew of new SSA policies, terminations, and office closures are already seeing another extension of the call waiting time. *See, e.g.*, Schoch Decl. ¶¶21–24 (describing the difficulties Ms. Schoch experienced getting help from SSA over the phone in March 2025); Powell Decl. ¶8 (stating that Ms. Powell waited on hold for over five hours in February 2025).

Field offices no longer accept walk-ins and the wait time for an appointment is already over one month. Changes to identity verification procedures by SSA threaten to increase the number of visitors by tens of thousands of in-person visitors per week. Judd Legum, *Secret policy shift could overwhelm Social Security offices with millions of people*, POPULAR INFO. (Mar. 20, 2025), https://perma.cc/8TGP-LMUJ.

The dissolution of OCREO and the Office of Transformation without an identifiable alternative solution eliminates key mechanisms that ensure SSA's compliance with disability rights protections—demonstrating the discriminatory impact of these decisions. The elimination of OCREO has left no discernible means by which individuals can file discrimination complaints or request necessary accommodations, denying them their right to redress and support. Heidelberg Decl. ¶¶21–25.

In a time of overwhelming backlogs and extended wait times, the elimination of the Office of Transformation directly undermines SSA's ability to provide timely and accessible customer service to the millions of disabled individuals who depend on Social Security benefits for their basic survival. SSA applicants and beneficiaries, including the Individual Plaintiffs, are already waiting years for benefit decisions, hours in the elements waiting in line at field offices, and hours on the phone hoping someone answers. Tiller Decl. ¶¶14, 16–18; Olivero Decl. ¶¶15, 17–19, 21–24; Rouse Decl. ¶¶9–10, 13–15; Plawsky Decl. ¶6;Weiss Decl. ¶10; Sharif Decl. ¶¶8–9; Smetanka Decl. ¶¶10–12; Hazen Decl. ¶11–13; Schoch Decl. ¶17; Powell Decl. ¶8. If SSA has no one looking to find ways to improve customer service, greater wait times will only lead to increased rates of poverty, homelessness, and deaths while people wait for SSA to respond. Yet, no information has been provided as to where, if anywhere, those functions are being transferred to the remaining components of SSA.

Defendants claim they are reallocating the statutory responsibilities of OCREO, but have failed to identify where and how. Though a recent letter from SSA to the AFGE mentioned two OCREO email inboxes that would be moved to alternate SSA components, *see* Heidelberg Decl. ¶42, this limited transfer plan barely scratches the surface of the plethora of roles OCREO has played in ensuring an accessible and nondiscriminatory benefit system.

The eradication of OCREO not only does away with the office that processed discrimination complaints from SSA staff and the public, but also erodes the only pathway through which people with disabilities could seek reasonable accommodations for accessing their benefits. Without this office, beneficiaries with disabilities are left without any means to seek, modify, or supplement the accommodations they need as a recipient of Social Security benefits.

Moreover, the disappearance of OCREO's Center for Accommodations and Disability Services is particularly alarming. Federal law is clear: people with disabilities are entitled to reasonable accommodations to be able to fully access federal programs. *Se. Cmty. Coll. v. Davis*, 442 U.S. 397, 412–13 (1979). Those same federal laws require SSA to, at minimum, have *some* system to monitor and process requests for accommodations.

Without an agency component to review, adjudicate, and offer such accommodations, people with disabilities—the class of persons for whom Social Security benefits were designed—cannot access the very lifesaving benefits they are entitled and intended to receive. Despite the many instances in which SSA has touted its dismissal of OCREO staff, it has not once announced when, where, or how disabled beneficiaries and staff can request reasonable accommodations or what has happened to their pending requests.

Given the hollowing of SSA's workforce, it is impossible that OCREO and OT's functions will be fully performed by another SSA component. SSA already operates on an administrative budget of less than one percent of its annual benefit payments—an overhead level far below comparable private insurers. O'Malley Decl. ¶25. SSA lacks the workforce to timely meet existing service demands, let alone absorb the critical functions of OCREO, the Office of Transformation, and the work of 7,000 employees into other already-overburdened departments. O'Malley Decl. ¶¶31–38, 60. As such, these cuts are certain to have a disproportionate impact on people with disabilities.

Drastic reductions in force have backfired on SSA and its beneficiaries before. During the Reagan administration, SSA lost one quarter of its workforce over the course of six years, from over 84,000 workers to 66,000. SSA, *Administering Social Security: Challenges Yesterday and Today*, https://www.ssa.gov/policy/docs/ssb/v70n3/v70n3p27.html (last visited Apr. 1, 2025).

During that period of time, the highest enrollment in OASDI benefits was just over 37.6 million beneficiaries. SSA, *Social Security Beneficiary Statistics*, https://www.ssa.gov/oact/STATS/OASDIbenies.html (last visited Apr. 1, 2025). These conditions alone created "inefficient operations and ad hoc stop-gap measures to relieve problems." SSA, *Administering Social Security: Challenges Yesterday and Today*, https://www.ssa.gov/policy/docs/ssb/v70n3/v70n3p27.html (last visited Apr. 1, 2025). SSA's current plan to run the agency on 50,000 employees to serve 73 million beneficiaries defies logic.

The harms the Individual Plaintiffs, Organizational Plaintiffs and their members will suffer as a result of SSA's illegal cuts are irreparable and require urgent judicial action. Delays, disruptions, and unwarranted denials of benefits force benefit recipients to make impossible choices about which basic needs deserve their last dime. Lack of timely access to Plaintiffs' benefits and information about their benefits denies them the right to receive critical information about their income, preventing their ability to plan for the future, and breeding anxiety about their financial security.

## III.    The Balance of Equities and Public Interest Favor Plaintiffs' Request

Because Plaintiffs are likely to succeed on the merits of their claims and have demonstrated irreparable harm, this Court must next assess "the balance of equities" and the "public interest" in the injunction. *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 32 (2008). These two elements of the preliminary injunction inquiry "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Here, the balance of equities favors an injunction. The injury to Plaintiffs outweighs any purported hardship on Defendants because of the clear connection between Defendants' conduct and Plaintiffs' access to their basic needs. This harm is actual and great. Moreover, failure to issue

an injunction will allow Defendants' actions to further decimate the existing structures that keep SSA operational.

Conversely, there is little harm to Defendants in granting an injunction. The budget for SSA has already been set for the year, allowing the agency time to develop a plan to mitigate the harms from efficiency measures.

Moreover, ensuring equal, unencumbered access to Social Security benefits and antidiscrimination protections serves the public interest. One in five Americans collect Social Security benefits. Nine out of ten over age 65 depend on these benefits. Thus, a major contingent of the general public has a vested interest in preserving access to Social Security. Furthermore, courts have recognized that "the public has a strong interest in the effective enforcement of the Rehabilitation Act." *Malcolm v. Reno*, 129 F. Supp. 2d 1, 12 (D.D.C. 2000) (citing *Callicotte v. Carlucci,* 698 F. Supp. 944, 951 (D.D.C. 1988)). Granting this injunctive relief is necessary to satisfy the public interest in Social Security's stability, availability, and accessibility for today's recipients and future generations to come.

## IV.    The Court should decline to require Plaintiffs to post a bond

Finally, Plaintiffs request that they are not required to pay any cash bond. It is well settled that "the amount required as security for an injunction is a matter entrusted to the sound discretion of the trial court," *Friends for All Children, Inc. v. Lockheed Aircraft Corp.*, 746 F.2d 816, 838 n.42 (D.C. Cir. 1984) (holding that the trial court did not abuse its discretion by only requiring plaintiffs to post a $100 bond) (citing *Corrigan Dispatch Co. v. Casa Guzman*, 569 F.2d 300, 303 (5th Cir. 1978)), including the discretion to "require no bond at all," *Simms v. D.C.,* 872 F. Supp. 2d 90, 107 (D.D.C. 2012). Courts often elect to not require a bond where Defendant would not be substantially injured by the issuance of an injunction and where a plaintiff's constitutional rights are at stake. *Simms,* 872 F. Supp. 2d at 107 (imposing a "minimal security requirement" where the

plaintiff was limited in his ability to post bond and the injunction sought to protect his constitutional rights); *Council on American-Islamic Rels. v. Gaubatz*, 667 F. Supp. 2d 67, 80 (D.D.C. 2009) (requiring no bond where the defendant would not be substantially injured by issuance of the injunction); *Bailey v. Fed. Bureau of Prisons*, No. CV 24-1219 (PLF), 2024 WL 3219207, at *13 (D.D.C. June 28, 2024) (declining to require plaintiff to post bond where the government would not incur financial harm from the injunction and the alleged violations were constitutional). This Court should not require Plaintiffs to pay a bond for their claim to protect their federal and constitutional rights. Requiring such a bond would impose an undue hardship on Plaintiffs.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enter a preliminary injunction directing Defendants to halt efforts to cut staff without a plan to prevent interruptions and delays in services, to implement policies that will require more in-person visits to SSA offices, and to dissolve SSA's OCREO and the Office of Transformation.

Dated: April 2, 2025

Respectfully submitted,

Eve L. Hill (DC Bar No. 424896)
BROWN, GOLDSTEIN & LEVY, LLP
120 East Baltimore Street, Suite 2500
Baltimore, Maryland 21202
Tel.: (410) 962-1030
Fax: (410) 385-0869

Regan Bailey (DC Bar No. 465677)
JUSTICE IN AGING
1444 Eye Street, N.W. Suite 1100
Washington, DC 20005
Tel.: (202) 289-6976
rbailey@justiceinaging.org

*Counsel for Plaintiffs*