# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

AMERICAN ASSOCIATION OF PEOPLE
WITH DISABILITIES, *et al.*,

          Plaintiffs,

    v.

LELAND DUDEK, *in his official capacity as Acting Commissioner of the Social Security Administration*, *et al.*,

          Defendants.

No. 25-cv-977 (APM)

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 3

I.      General Background ................................................................................................. 3

      A.      Office of Analytics, Review, and Oversight ......................................... 4

      B.      Office of Transformation ..................................................................... 4

      C.      OCREO ................................................................................................ 5

      D.      Workforce Reduction and Consolidation of Regional Offices ............. 5

      E.      Availability of Telephone Services ...................................................... 6

      F.      Field Offices ........................................................................................ 8

II.      Plaintiffs' Claims .................................................................................................... 8

LEGAL STANDARDS ....................................................................................................... 9

ARGUMENT ....................................................................................................................... 9

I.      Plaintiffs are Unlikely to Succeed on the Merits of Their Claims. ........................ 9

      A.      Plaintiffs Cannot Show Standing ......................................................... 9

            1.      Individual Plaintiffs ................................................................ 10

            2.      Organizational Plaintiffs ........................................................ 14

                  a.      Associational Standing ................................................ 14

                  b.      Organizational Standing ............................................... 15

      B.      Federal personnel statutes divest the court of subject matter jurisdiction to consider claims concerning the employment of SSA employees ......................... 16

      C.      Plaintiffs' Rehabilitation Act Claim Fails on the Merits ...................... 21

            1.      The Rehabilitation Act does not provide for disparate-impact liability. .................................................................................. 21

            2.      Plaintiffs have not proven a disparate impact ......................... 22

            3.      Plaintiffs have not shown a lack of "material access" to any benefit ....... 23

i

4.    The SSA reforms are justified by business necessity................................. 24

5.    Plaintiffs' Sweeping Theory of Disparate Impact Would Unduly
Hamstring Any Meaningful Agency Reorganization................................. 25

6.    Because there is no private right of action under the Rehabilitation
Act, any disparate impact claim must proceed under the APA ................. 26

D.    Plaintiffs' APA Claims Fail on the Merits ............................................................. 33

1.    APA review is precluded because the SSA's administrative reforms
are committed to agency discretion ........................................................... 33

2.    Plaintiffs impermissibly seek wholesale improvement of SSA,
rather than review of discrete, final agency action ................................... 35

a.    SSA's programmatic improvements are not cognizable
agency action under the APA. ........................................................ 35

b.    Any discrete agency action was not final for APA purposes. ........ 36

3.    Plaintiffs' APA arguments fail ................................................................... 37

a.    SSA's reforms are not contrary to law ........................................... 37

b.    SSA's reforms are not arbitrary and capricious.............................. 38

(i)    There is no lack of a reasoned explanation. ....................... 38

(ii)    There was no unexplained departure from
precedent. ............................................................................ 39

(iii)    There is no merit to Plaintiffs' argument that
Defendants failed to consider reliance interests................ 40

4.    SSA's reforms are not ultra vires. ............................................................. 41

E.    Plaintiffs Fail to Show They Likely Will Suffer Irreparable Harm in the
Absence of Preliminary Relief. .............................................................................. 42

F.    The Equities Weigh Against a Preliminary Injunction........................................... 43

II.    Any Relief Should Be Narrowly Tailored.......................................................................... 44

III.    Any Injunction Should be Stayed, and Plaintiffs Should be Required to Post a
Reasonable Bond if an Injunction is Entered..................................................................... 44

CONCLUSION.................................................................................................................................. 45

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Abril-Rivera v. Johnson*,
  806 F.3d 599 (1st Cir. 2015) ................................................................. 26

*Adams v. City of Indianapolis*,
  742 F.3d 720 (7th Cir. 2014) ................................................................. 22

*AFGE v. Sec'y of the Air Force*,
  716 F.3d 633 (D.C. Cir. 2013) ............................................................... 19

*Air Transp. Ass'n of Am. v. Export-Import Bank of the U.S.*,
  840 F. Supp. 2d 327 (D.D.C. 2012) ........................................................ 46

*Alexander v. Choate*,
  469 U.S. 287 (1985) ............................................................... 21, 23, 24

*Alexander v. Sandoval*,
  532 U.S. 275 (2001) ................................................................... 28, 32

*Am. Council of the Blind v. Paulson*,
  463 F. Supp. 2d 51 (D.D.C. 2006), *aff'd*, 525 F.3d 1256 (D.C. Cir 2008) .............. 33

*Am. Council of the Blind v. Paulson*,
  525 F.3d 1256 (D.C. Cir 2008) ......................................................... 21, 33

*Am. Fed'n of Gov't Emps. v. Ezell*,
  2025 U.S. Dist. LEXIS 25269 (D. Mass. Feb. 12, 2025) ................................... 19

*Am. Fed'n of Gov't Emps. v. Trump*,
  929 F.3d 748 (D.C. Cir. 2019) ......................................................... 19, 20

*Am. Foreign Serv. Ass'n v. Trump*,
  2025 U.S. Dist. LEXIS 31748 (D.D.C. Feb. 21, 2025) ..................................... 3

*Anderson v. Duncan*,
  20 F. Supp. 3d 42 (D.D.C. 2013), *amn'd*,2013 WL 12328768 (D.D.C. Nov. 15, 2013) ... 24, 25, 26

*Bark v. U.S. Forest Serv.*,
  37 F. Supp. 3d 41 (D.D.C. 2014) .......................................................... 39

*Bennett v. Spear*,
  520 U.S. 154 (1997) ...................................................................... 40

*Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc.*,
  419 US 281 (1974) ........................................................................ 42

*Cal. Ass'n of Private Postsecondary Schs. v. Devos*,
    344 F. Supp. 3d 158 (D.D.C. 2018) ...................................................................... 46

*Califano v. Yamasaki*,
    442 U.S. 682 (1979) .......................................................................................... 48

*Changji Esquel Textile Co. v. Raimondo*,
    40 F.4th 716, (D.C. Cir. 2022) .......................................................................... 42

*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006) .......................................................................... 42

*Chicago Teachers Union, Local 1 v. Bd. of Educ. of the City of Chi.*,
    419 F. Supp. 3d 1038 (N.D. Ill. 2020) .............................................................. 25

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ............................................................................... 2, 12, 13

*Clark v. Skinner*,
    937 F.2d 123 (4th Cir. 1991) ........................................................... 31, 32, 34, 35

*Claybrook v. Slater*,
    111 F.3d 904 (D.C. Cir. 1997) .......................................................................... 37

*Cobell v. Kempthorne*,
    455 F.3d 301 (D.C. Cir. 2006) ..................................................................... 38, 39

*Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*,
    589 U.S. 327 (2020) .......................................................................................... 28

*Cousins v. Sec'y of the U.S. Dep't of Transp.*,
    880 F.2d 603 (1st Cir. 1989) ............................................................... 31, 32, 34

*DaimlerChrysler Corp. v. Cuno*,
    547 U.S. 332 (2006) .......................................................................................... 11

*Davis v. FEC*,
    554 U.S. 724 (2008) .................................................................................. 10-11, 11

*Doe v. BlueCross BlueShield of Tenn., Inc.*,
    926 F.3d 235 (6th Cir. 2019) ............................................................................ 21

*Doe v. District of Columbia*,
    796 F. Supp. 559 (D.D.C. 1992) ...................................................................... 33

*Drake v. FAA*,
    291 F.3d 59 (D.C. Cir. 2002) ............................................................................ 36

*Egbert v. Boule*,
    596 U.S. 482 (2022)................................................................................... 28

*Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*,
    878 F.3d 371 (D.C. Cir. 2017).................................................................... 10

*Elgin v. Dep't of Treasury*,
    567 U.S. 1 (2012)....................................................................................... 19

*Encino Motorcars, LLC v. Navarro*,
    579 U.S. 211 (2016)................................................................................... 45

*FCC v. Fox Television*,
    556 U.S. 502 (2009)............................................................................. 39, 40

*FCC v. Prometheus Radio Project*,
    592 U.S. 414 (2021)................................................................................... 42

*FDA v. Wages & White Lion Invs., L.L.C.*,
    2025 U.S. LEXIS 1368 (Apr. 2, 2025) ....................................................... 43

*FDA v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024)............................................................................. 12, 17

*Fed. Express Corp. v. United States DOC*,
    39 F.4th 756 (D.C. Cir. 2022) .................................................................... 45

*Florida Power & Light Co. v. Lorion*,
    470 U.S. 729 (1985)................................................................................... 43

*Food & Water Watch, Inc. v. Vilsack*,
    808 F.3d 905 (D.C. Cir. 2015).................................................................... 16

*Fund for Animals v. U.S. Bureau of Land*,
    Manag., 460 F.3d 13 (D.C. Cir. 2006) ....................................................... 38

*Garcia v. Johanns*,
    444 F.3d 625 (D.C. Cir. 2006).................................................................... 22

*Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't of Hous. & Urb. Dev.*,
    639 F.3d 1078 (D.C. Cir. 2011).................................................................. 22

*Griggs v. Duke Power Co.*,
    401 U.S. 424 (1971)................................................................................... 25

*Gulf Oil Corp. v. Brock*,
    778 F.2d 834 (D.C. Cir. 1985).................................................................... 44

*Hecate Energy LLC v. FERC*,
    126 F.4th 660 (D.C. Cir. 2025) ...............................................................................11

*Heckler v. Chaney*,
    470 U.S. 821 (1985).................................................................................... 36, 43

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977)......................................................................................... 15

*Indep. Equip. Dealers Ass'n v. EPA*,
    372 F.3d 420 (D.C. Cir. 2004)....................................................................... 38

*Int'l Bhd. of Teamsters v. United States*,
    431 U.S. 324 (1977)......................................................................................... 23

*J.L. v. Soc. Sec. Admin.*,
    971 F.2d 260 (9th Cir. 1992), *disapproved of by Lane v. Pena*, 518 U.S. 187 (1996) ............. 31

*Jesner v. Arab Bank, PLC*,
    584 U.S. 241 (2018) ................................................................................... 27, 28

*Lane v. Pena*,
    518 U.S. 187 (1996) .................................................................... 27, 30, 31, 33

*Lane v. Pena*,
    867 F. Supp. 1050 (D.D.C. 1994), *vacated in part*, 518 U.S. 187 (1996) ................................ 33

*Lincoln v. Vigil*,
    508 U.S. 191 (1993)....................................................................................... 36

*Local 2855, AFGE (AFL-CIO) v. United States*,
    602 F. 2d 574 (3d Cir 1979).......................................................................... 37

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)................................................................................. 10, 17

*Lujan v. Nat'l Wildlife Fed.*,
    497 U.S. 871 (1990)................................................................................. 38, 39

*Malcolm v. Reno*,
    129 F. Supp. 2d 1 (D.D.C. 2000) ................................................................. 49

*Maryland v. USDA*, Doc. 42, No. 25-1248 (L), at 4-5 (4th Cir. Apr. 9, 2025), *available at*
    2025 WL 1073657 ......................................................................................... 20

*Mazurek v. Armstrong*,
    520 U.S. 968 (1997)....................................................................................... 10

*Menoken v. McGettigan*,
  273 F. Supp. 3d 188 (D.D.C. 2017), *aff'd sub nom. Menoken v. Pon*, 2018 WL 2383278 (D.C. Cir. May 9, 2018) ........................................................................................................... 23

*Modderno v. King*,
  82 F.3d 1059 (D.C. Cir. 1996) ........................................................................................ 21, 22

*Moya v. U.S. Dep't of Homeland Sec.*,
  975 F.3d 120 (2d Cir. 2020) ............................................................................................ 31, 35

*Nat'l Ass'n of the Deaf v. Trump* ("*NAD*"),
  486 F. Supp. 3d 45 (D.D.C. 2020) ............................................................................ 27, 33, 34

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*,
  No. CV 25-239 (LLA), 2025 WL 597959 (D.D.C. Feb. 25, 2025) .......................................... 42

*Nat'l Taxpayers Union v. United States*,
  68 F.3d 1428 (D.C. Cir 1995) ................................................................................................. 17

*Nat'l Treasury Emps. Union v. Trump*, 2025 U.S. Dist. LEXIS 30592 (D.D.C. Feb. 20, 2025)... 20

*Nken v. Holder*,
  556 U.S. 418 (2009) ................................................................................................................ 47

*Norton v. S. Utah Wilderness Alliance*,
  542 U.S. 55 (2004) ............................................................................................................ 38, 39

*OPM v. AFGE*,
  No. 24A904 (S. Ct. Apr. 8, 2025)) ............................................................................ 2, 13, 18

*PETA v. USDA*,
  797 F.3d 1087 (D.C. Cir. 2015) ............................................................................................. 16

*Ricci v. DeStefano*,
  557 U.S. 557 (2009) ........................................................................................................ 22, 25

*Sai v. Dep't of Homeland Sec.*,
  149 F. Supp. 3d 99 (D.D.C. 2015) ............................................................................ 27, 31, 32

*Sampson v. Murray*,
  415 U.S. 61 (1974) .................................................................................................................. 46

*Smith v. City of Jackson*,
  544 U.S. 228 (2005) ................................................................................................................ 23

*Steenholdt v. FAA*,
  314 F.3d 633 (D.C. Cir. 2003) ............................................................................................... 36

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009)................................................................................................ 16

*Texas Dep't. of Housing & Community Affairs v. Inclusive Communities Project, Inc.*,
    576 U.S. 519 (2015)................................................................................................ 26

*Thunder Basin v. Coal Co. v. Reich*,
    510 U.S. 200 (1994)................................................................................................ 19

*Touche Ross & Co. v. Redington*,
    442 U.S. 560 (1979)................................................................................................ 28

*Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*,
    444 U.S. 11 (1979).................................................................................................. 30

*Twin Rivers Paper Co. LLC v. SEC*,
    924 F.3d 607 (D.C. Cir. 2019)........................................................................... 15, 16

*Webster v. Doe*,
    486 U.S. 592 (1988)................................................................................................ 37

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008).................................................................................................... 10

*Wisher v. Coverdell*,
    782 F. Supp. 703 (D. Mass. 1992) ........................................................................ 30

*Ziglar v. Abbasi*,
    582 U.S. 120 (2017)................................................................................................ 28

## **Statutes**

5 U.S.C. § 701(a)(2)............................................................................................... 35, 37

5 U.S.C. § 702........................................................................................... 29, 33, 35, 38

5 U.S.C. § 704.............................................................................................................. 38

5 U.S.C. § 706.............................................................................................................. 40

5 U.S.C. § 1204(a)....................................................................................................... 18

5 U.S.C. § 7105(a)(2)(G)............................................................................................. 18

5 U.S.C. § 7123(a)....................................................................................................... 18

5 U.S.C. § 7512............................................................................................................ 18

5 U.S.C. § 7701(g)....................................................................................................... 18

5 U.S.C. § 7703(b)(1)(A) ........................................................................................ 18

5 U.S.C. §§ 7101–35 ............................................................................................... 18

22 U.S.C. § 2504(a) ................................................................................................ 27

28 U.S.C. § 1295(a)(9) ............................................................................................ 18

29 U.S.C. § 791 ................................................................................................ 26, 27

29 U.S.C. § 794a .......................................................................................... 27, 30, 34

29 U.S.C. § 794(a) ........................................................................................... *passim*

42 U.S.C. § 902 ................................................................................................ *passim*

42 U.S.C. § 2000-2(k)(1)(A) .................................................................................... 22

50 U.S.C. § 403(c) ................................................................................................... 37

Rehabilitation, Comprehensive Services, and Developmental Disabilities Amendments of 1978
   ("Rehabilitation Act Amendments of 1978"),
   Pub. L. No. 95-602, 92 Stat. 2955 ................................................................... 27, 29

Rehabilitation Act of 1973,
   Pub. L. No. 93-112, §§ 501, 504, 87 Stat. 355, 390, 394 ....................................... 26

## **Rules**

Fed. R. Civ. P. 65(d)(1)(C) ...................................................................................... 44

## **Administrative and Executive Materials**

5 C.F.R. § 2423.22 .................................................................................................. 18

20 C.F.R. § 404.1740 ........................................................................................ 41, 42

## **Other Authorities**

Nicole Ogrysko, Federal News Network, *SSA early retirement offers attract fewer than 200
   employees* (Dec. 16, 2021),
   https://federalnewsnetwork.com/workforce/2021/12/ssa-early-retirement-offers-attract-fewer-
   than-200-employees ............................................................................................ 4

Press Release, "Correcting the Record about Social Security Direct Deposit and Telephone
   Services" (Mar. 12, 2025),
   https://www.ssa.gov/news/press/releases/2025/#2025-03-12 .................................... 7

Press Release, "Correcting the Record about Social Security Office Closings" (Mar. 27, 2025),

https://perma.cc/AV6E-RMGV ...................................................................................... 8, 12, 13

Press Release, "Social Security Administration Implements New Anti-Fraud Measures to
   Enhance Telephone Claim Processing" (Apr. 12, 2025),
   https://www.ssa.gov/news/press/releases/2025/#2025-04-12 ...........................................7,11,13

Press Release, "Social Security Announces Change to Improve Agency Operations and
   Strengthen Protections" (Feb. 21, 2025),
   https://perma.cc/9QXE-T7SA ........................................................................................ 4, 12

Press Release, "Social Security Announces Workforce and Organization Plans (Feb. 28, 2025),
   https://perma.cc/W4MD-WTDY ..................................................................5-6, 6, 24, 25, 44

Press Release, "Social Security Dissolves Duplicative Office—Action is Another Step to
   Enhance Operations" (Feb. 25, 2025),
   https://perma.cc/H3YL-PJFQ ..................................................................................... 5, 24, 41

Press Release, "Social Security Eliminates Wasteful Department—Action is Another Step to
   Enhance Operations" (Feb. 24, 2025),
   https://perma.cc/3FQ7-XMW2 ..................................................................................4-5, 5, 24

Press Release, "Social Security Updates Recently Announced Identity Proofing Requirements"
   (Mar. 26, 2025),
   https://perma.cc/H9TR-FQJ3 .......................................................................................... 7, 8

Press Release, "SSA Implements New Anti-Fraud Measures to Enhance Telephone Claim
   Processing" (Apr. 12, 2025),
   https://perma.cc/4TGD-QHSX .......................................................................................... 14

## INTRODUCTION

In late February, the Social Security Administration (SSA) began announcing plans to implement a series of administrative reforms intended to eliminate waste and increase efficiency. Chief among these is a plan to reduce the size of the agency's workforce from about 57,000 to 50,000 employees, largely through early-retirement and voluntary-separation incentives. The agency has also closed two of the dozens of offices at SSA headquarters—the Office of Civil Rights and Equal Opportunity (OCREO) and the two-year-old Office of Transformation (OT), neither of which is required by statute—and folded their essential functions into other offices. It likewise plans to consolidate some regional offices, reducing their number from ten to four. Although to prevent fraud, it had planned to require identity verification in person rather than by phone in certain circumstances, in light of new technological investments, those plans have largely been reversed. And while media reports that SSA field offices offering in-person services may close have generated widespread concern, the agency has clarified—in no uncertain terms—that these reports are false.

Plaintiffs, a group of disabled individuals and advocacy groups, challenge these reforms, with a particular focus on the workforce reductions and the closure of OCREO and OT. They complain these reforms will exacerbate longstanding customer-service issues, making it more difficult to obtain benefits, and will render the processes for filing complaints and requesting accommodations less effective—burdens that they assert will fall more heavily on disabled persons. While their complaint raises a variety of theories, their motion for preliminary relief focuses almost entirely on two, claiming violations of the Rehabilitation Act and the Administrative Procedure Act. As relief, they ask for nothing less than that the Court "return[] SSA" to its "status" as of "February 24, 2025." Pls.' Mot. for Prelim. Inj. at 20, ECF No. 2-1 ("Pls.

1

Mot."). They specify that this would include pausing "all" workforce reductions, prohibiting "any" reductions in force, barring the closure of "any [SSA] offices" except for health and safety reasons, and fully "reinstat[ing]" OCREO and OT. Pls.' Prop. Ord., ECF No. 5.

Plaintiffs' motion is flawed many times over. To start, they lack standing. None asserts an actual or imminent denial of benefits attributable to the challenged reforms. In fact, a close read of Plaintiffs' declarations reveals that they largely complain about preexisting customer-service issues that they fear will worsen, prompting greater uncertainty about their ability to obtain benefits. But this is precisely the sort of speculative injury that is insufficient to support standing. It is also far too attenuated—if these sorts of downstream injuries gave rise to standing, virtually any American could sue over administrative cuts at any federal agency. Indeed, the Supreme Court recently stayed an injunction in an analogous challenge to the termination of probationary employees that would allegedly result in diminished public services, explaining that "under established law, those allegations are presently insufficient to support the organizations' standing." *OPM v. AFGE*, No. 24A904, --- S. Ct. ---, 2025 WL 1035208 (Apr. 8, 2025).

Even if Plaintiffs had standing, their complaints about the agency's workforce reductions would face another jurisdictional hurdle. Congress has enacted comprehensive statutory schemes governing the review of federal agencies' employment decisions. Those schemes give no rights to those outside the employment relationship, like Plaintiffs here, and therefore preclude review of such claims, which must instead be channeled to administrative agencies, as multiple courts have recently held.

Jurisdiction aside, Plaintiffs' claims fail on the merits. The Rehabilitation Act provides no cause of action for disparate-impact liability. Even if it did, Plaintiffs have not in fact shown a disparate impact, much less a lack of material access to any benefit. Regardless, SSA's reforms

qualify as a business necessity precluding liability.  Indeed, if a Rehabilitation Act claim could lie on Plaintiffs' theory, it would call into question virtually any across-the-board cut that could be described as falling more harshly on disabled persons.  In prohibiting discrimination "solely on the basis of . . . disability," 29 U.S.C. 794(a), Congress surely intended no such result.

Plaintiffs' APA claims fare no better.  APA review is precluded because SSA's administrative reforms are committed to agency discretion.  Moreover, Plaintiffs impermissibly seek wholesale programmatic improvements, rather than the review of discrete, final agency action.  Even if APA review were available, SSA's reforms are adequately explained, and Plaintiffs fail to show that they are contrary to law or arbitrary and capricious.

The equities and the public interest also tilt against injunctive relief.  Plaintiffs' sweeping injunction would not only intrude on administrative prerogatives that are properly the province of the Executive Branch, but would largely upend, rather than preserve, the status quo.  The Court should decline Plaintiffs' invitation to superintend SSA's administrative reforms and deny their motion.

## BACKGROUND

### I.    General Background

Chapter 7 of the Social Security Act provides that the Commissioner of the Social Security Administration "shall be responsible for the exercise of all powers and the discharge of all duties of the Administration, and shall have authority and control over all personnel and activities thereof."  42 U.S.C. § 902(a)(4).  It likewise provides that the Commissioner "may establish, alter, consolidate, or discontinue such organizational units or components within the Administration as the Commissioner considers necessary or appropriate, except that this paragraph shall not apply with respect to any unit, component, or provision provided for by this chapter."  *Id*. § 902(a)(7).

SSA has regularly offered voluntary early retirements for certain employees, with anywhere from three to four percent of eligible employees taking advantage of such offers in 2012, 2014, 2017, and 2019. https://perma.cc/NA9V-EDCD. In late February 2025, Acting Commissioner Lee Dudek began undertaking a similar series of administrative reforms intended to eliminate waste and increase efficiency, as chronicled on SSA's website.

### A.    Office of Analytics, Review, and Oversight

On February 21, SSA announced that in accordance with President Trump's goal of "'identifying and eliminating fraud, waste, and abuse,'" it was undertaking an "an organizational realignment of the functions provided by its Office of Analytics, Review, and Oversight"—moving its functions to other parts of the agency in order to "streamline layers of management" and similar reasons. Press Release, "Social Security Announces Change to Improve Agency Operations and Strengthen Protections" (Feb. 21, 2025), *available at* https://perma.cc/9QXE-T7SA ("Feb. 21 SSA Press Release").

### B.    Office of Transformation

On February 24, SSA announced that it was closing the Office of Transformation ("OT") because it was wasteful, inefficient, and redundant. Press Release, "Social Security Eliminates Wasteful Department—Action is Another Step to Enhance Operations" (Feb. 24, 2025), *available at* https://perma.cc/3FQ7-XMW2 ("Feb. 28 SSA Press Release"). The Acting Commissioner explained, "President Trump has mandated the Federal government eliminate wasteful and inefficient offices and the Office of Transformation was a prime example . . . . This redundant office was created under the previous administration and we are righting that wrong." *Id.*

### C.    OCREO

On February 25, SSA announced that it was closing the Office of Civil Rights and Equal Opportunity ("OCREO").  Press Release, "Social Security Dissolves Duplicative Office—Action is Another Step to Enhance Operations" (Feb. 25, 2025), *available at* https://perma.cc/H3YL-PJFQ  ("Feb. 25 SSA Press Release").  The Acting Commissioner explained, "Our focus is supporting President Trump's priorities, which include streamlining functions and prioritizing essential work . . . .  Terminating the [OCREO], and reassigning statutory responsibilities performed by this office, advances the President's goal to make all of government more efficient in serving the American public."  *Id.*  The release continued, "SSA will transfer responsibility for processing Equal Employment Opportunity complaints, reasonable accommodation requests, and other statutorily required functions to other SSA components to ensure compliance with existing legal authorities."  *Id.*

### D.    Workforce Reduction and Consolidation of Regional Offices

On February 28, SSA announced that it planned to reduce its workforce and consolidate regional offices, in a continued effort" to implement efficiencies and reduce costs, with a renewed focus on mission critical work for the American people."  Press Release, "Social Security Announces Workforce and Organization Plans" (Feb. 28, 2025), *available at* https://perma.cc/W4MD-WTDY  ("Feb. 28 SSA Press Release").  Specifically, SSA "plans to reduce the size of its bloated workforce and organizational structure, with a significant focus on functions and employees who do not directly provide mission critical services," setting a "staffing target of 50,000, down from the current level of approximately 57,000 employees."  *Id.*  Much of this reduction is anticipated to "come from retirement, VSIP [voluntary separation incentive payments], and resignation," with "[a]dditional reductions . . . from reduction-in-force (RIF) actions that could include abolishment of organizations and positions."  *Id.*

SSA also announced that its "regional structure consisting of 10 offices . . . is no longer sustainable," so will be "reduce[d] . . . down to four regions," and that the organizational structure at Headquarters would likewise be modified.  *Id.*  It explained:

> These steps prioritize customer service by streamlining redundant layers of management, reducing non-mission critical work, and potential reassignment of employees to customer service positions.  Also supporting this priority is looking for efficiencies and other opportunities to reduce costs across all spending categories, including information technology and contractor spending. SSA is committed to ensure this plan has a positive effect on the delivery of Social Security services.

*Id.*

### E.     Availability of Telephone Services

Plaintiffs assert that new fraud-prevention measures will mean that two types of services can no longer be completed entirely by phone: (1) "all beneficiaries will be unable to update direct deposit information or make changes to their accounts over the phone," and (2) "retirees, survivors, and spouses will no longer be able to file benefits claims over the phone."  Pls.' Mot. at 11.  But these plans have since been modified.

On March 26, SSA explained:  "We have listened to our customers, Congress, advocates, and others, and we are updating our policy to provide better customer service to the country's most vulnerable populations."  Press Release, "Social Security Updates Recently Announced Identity Proofing Requirements" (Mar. 26, 2025), *available at* https://perma.cc/H9TR-FQJ3 (last visited Apr. 15, 2025).  "Under the updated policy," many individuals "who cannot use a personal my Social Security account can complete their claim entirely over the telephone without the need to come into an office"—namely, those "applying for Social Security Disability Insurance (SSDI), Medicare, or Supplemental Security Income (SSI)."  *Id.*  The only individuals who might "need to prove their identity at a Social Security office" were those "applying for Retirement, Survivors, or

Auxiliary (Spouse or Child) benefits"—and even then, exceptions were available in extreme situations. *Id.*

On April 12, SSA updated these plans again. Explaining that it had deployed "enhanced fraud prevention tools" that would "enable[] SSA to identify suspicious activity in telephone claims by analyzing patterns and anomalies within a person's account," the agency announced that, "[b]eginning April 14, 2025, SSA will allow individuals to complete *all claim types* via telephone." Press Release, "Social Security Administration Implements New Anti-Fraud Measures to Enhance Telephone Claim Processing" (Apr. 12, 2025), *available at* https://perma.cc/X7G3-SBGY ("Apr. 12 SSA Press Release") (emphasis added). It remains the case, however, that "[i]f someone needs to change their bank account information on SSA's record, they will need to either" (1) "Use two-factor authentication with SSA's 'my Social Security' service" online, or (2) "[v]isit a local Social Security office to prove their identity." Press Release, "Correcting the Record about Social Security Direct Deposit and Telephone Services" (Mar. 12, 2025), *available at* https://perma.cc/859N-RUCH. *Id.* As SSA explained, "[a]pproximately 40 percent of Social Security direct deposit fraud is associated with someone calling SSA to change direct deposit bank information," and the agency's "current protocol of simply asking identifying questions by telephone is no longer enough to prevent fraud." *Id.* This enhanced security protocol "align[s] with most major banks." *Id.*

### F.    Field Offices

On March 27, in response to media reports about the potential closure of SSA field offices, SSA announced:

> Recent reports in the media that the Social Security Administration (SSA) is permanently closing local field offices **are false**. Since January 1, 2025, the agency has not permanently closed or announced the permanent closure of any local field

office. . . .  The agency has announced the permanent closure of one hearing office, in White Plains, NY.

\* \* \* \*

SSA identified for the General Services Administration underutilized office space to ensure the government is spending taxpayer money as prudently as possible.  The agency provided GSA a list of sites for termination.  Most of these are small hearing rooms with no assigned employees.  Since most hearings are held virtually, SSA no longer needs these underutilized rooms.

Press Release, "Correcting the Record about Social Security Office Closings" (Mar. 27, 2025),

*available at* https://perma.cc/5NLA-G8QL ("Mar. 27 SSA Press Release").

## II.    Plaintiffs' Claims

Plaintiffs are five organizations—the American Association of People with Disabilities ("AAPD"), the National Federation of the Blind ("NFB"), Deaf Equality, the National Committee to Preserve Social Security and Medicare ("NCPSSM"), Massachusetts Senior Action Council ("MSAC")—and seven individual Social Security applicants and beneficiaries with disabilities. Although their complaint raises seven counts, their preliminary-injunction motion presses only their Rehabilitation Act, APA, and *ultra vires* claims.

Plaintiffs' motion asks the Court to "return[] SSA" to its "status" as of "February 24, 2025." Pls.' Mot. at 20.  Specifically, they seek an injunction requiring that:

(1) Defendants shall not terminate any employee of the SSA except for cause related to the specific employee's performance or conduct; nor shall Defendants issue any notice of reduction-in-force ("RIF") to any SSA employee;

(2) Defendants shall extend the deadline for leaving the agency for those who accepted the Voluntary Separation Incentive Payment and Deferred Resignation Program offers. The Defendants shall pause all impacted resignations or early retirement-based reductions in staffing and retain staffing levels in place prior to February 12, 2025 to preserve the status quo;

(3) Defendants are prohibited from further dismantling, reorganizing, diverting funding from, or otherwise interfering with the operations of the SSA's OCREO and the Office of Transformation and are enjoined to reinstate those offices;

(4) Defendants are prohibited from closing or reducing any offices during the pendency of this injunction except for cause related to the health, safety, and security of field office staff and visitors;

(5) Defendants shall re-open field offices that have been cut as part of Defendants' reduction in workforce initiative;

(6) Defendants shall stay the implementation of their new policies (a) requiring identity verification to only be done online or in person, and (b) requiring noncitizens granted work authorization and newly naturalized U.S. citizens to visit field offices to obtain social security cards.

Pls.' Prop. Order, ECF No. 5. Plaintiffs ultimately seek, among other things, to "permanently enjoin Defendants from demolishing OCREO and OT and from terminating the 7,000 staff it has already begun cutting," and to require SSA to "re-hire those it has already terminated as part of this unlawful reduction in force." Compl. ¶ 48.

## LEGAL STANDARDS

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Plaintiffs must "*by a clear showing*" establish that (1) they have a substantial likelihood of success on the merits; (2) they will suffer irreparable harm without an injunction; (3) the balance of equities tips in their favor; and (4) preliminary relief serves the public interest. *Id.*; *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted).

## ARGUMENT

**I.      Plaintiffs are Unlikely to Succeed on the Merits of Their Claims.**

**A.      Plaintiffs cannot show standing**

"A plaintiff unlikely to have standing is *ipso facto* unlikely to succeed" on the merits and, as such, is not entitled to pretrial injunctive relief. *Elec. Priv. Info. Ctr.  v. Presidential Advisory*

*Comm'n on Election Integrity*, 878 F.3d 371, 375 n.2 (D.C. Cir. 2017).  Plaintiffs' lack of standing is dispositive of their motion.

To show Article III standing, a plaintiff must establish the familiar elements of (1) an injury-in-fact that is actual or imminent, concrete, and particularized, (2) a causal connection between the injury and the conduct challenged, and (3) a likelihood that the injury suffered will be redressed by the relief sought.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).  "Standing is not dispensed in gross," *Davis v. FEC,* 554 U.S. 724, 734 (2008) (citation omitted), and Plaintiffs must demonstrate it for each claim they press and for each form of relief they seek, *id.* (citing *DaimlerChrysler Corp. v. Cuno,* 547 U.S. 332, 352 (2006)).

As the parties invoking the Court's jurisdiction, Plaintiffs unquestionably "bear[] the burden of establishing each of th[e]se elements."  *Hecate Energy LLC v. FERC*, 126 F.4th 660, 665 (D.C. Cir. 2025).  Yet their motion does not even mention the word standing—perhaps because any possible theory fails.

### 1.    Individual plaintiffs

No Plaintiff claims an actual or imminent reduction in Social Security benefits.  Rather, at its core, Plaintiffs' complaint is that workforce reductions and office closures will exacerbate preexisting customer-service issues, like telephone hold times or delays in securing office appointments, leading to "longer wait times," "increased frustration," and "uncertainty" about service levels.  Pls.' Mot. at 8, 12.  Such allegations are far too vague and speculative to give rise to a cognizable injury.

Indeed, a close read of Plaintiffs' declarations reveals that to the extent they are at all specific, they are grounded in complaints about *preexisting* customer-service issues.  Take, for example, Ms. Hazen, whose declaration focuses on the denial of her application for SSDI in

September 2024; long wait times for an in-person meeting with an agent during the surrounding months, in July, September, and October 2024; long wait times by phone as well; and complaints about the user-friendliness and accessibility of the SSA.gov website. Decl. of Martha Hazen ("Hazen Decl.") ¶¶ 9-17, ECF No. 2-4. Likewise, Mr. Olivero's declaration focuses on his December 2024 reapplication for SSDI payments, a process he complains was "long" and "confusing," with postponed and cancelled appointments, difficulty contacting his case manager, and long wait times in person and by phone. Decl. of Treva Olivero ("Olivero Decl.") ¶¶ 13-26 ECF No. 2-3. While these and the other individual Plaintiffs express concerns along the lines that "the poor service I have received over the phone and in person is only going to further deteriorate," *id.* ¶ 24, and that they "cannot imagine how much longer it could possibly take to process cases like mine," *id.* ¶ 26, such predictions are inherently speculative, relying on a "highly attenuated chain of possibilities." *Clapper*, 568 U.S. at 410. They are also essentially abstract rather than concrete, resting heavily on "uncertainty" and "frustration." Pls.' Mot. at 8, 12. Put another way, Plaintiffs' motion raises concerns about what *might happen* if general workforce reductions directly affected staff working on their cases. It also fails to account for whether these changes might be counterbalanced by any efficiencies gained through other steps, like the "$16.5 million [SSA spent] to modernize telephone services nationwide," or the enhanced technology it recently deployed to "identify suspicious activity in telephone claims by analyzing patterns and anomalies." *See* Apr. 12 SSA Press Release.

Even if Plaintiffs' claimed harms were more concrete or certain, they would be too attenuated to support standing, as they rest on a chain of unsupported and conclusory inferences—*i.e.*, that workforce reductions, administrative reorganizations, and other reforms to streamline the SSA will inevitably lead to an actual reduction in benefits downstream, rather than efficiencies. Again, it is

telling that Plaintiffs' declarations fail to make such a connection, instead focusing on customer-service issues that long predate the challenged reforms. *See, e.g.*, Hazen Decl. ¶ 12 ("Each time I have been there—including all five times that I went back in September and October [2024]—I have waited between two and three hours to meet with an agent."); *see also* Decl. of Merry Schoch ¶¶ 15-25, ECF No. 2-5 (discussing problems in October of 2024); Decl. of William Weiss ¶¶ 8-11, ECF No. 2-6 (discussing inability to be seen without an appointment in January 2025.); Decl. of Wilshawn Tiller ¶¶ 14-21, ECF No. 2-8 (discussing long wait times by phone in November 2023 up to February 2025).  These issues cannot credibly be traced to the challenged reforms—nor would they be redressed by the requested relief.

Notably, in a recent case proceeding on an analogous standing theory—*i.e.*, that the termination of probationary employees would result in diminished public services—the Supreme Court stayed the district court's injunction, explaining that "under established law, those allegations are presently insufficient to support the organizations' standing."  *OPM v. AFGE*, No. 24A904,---S. Ct.---, 2025 WL 1035208 (Apr. 8, 2025) (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013)).  So too here.

Plaintiffs cannot resuscitate their claim to standing by invoking a litany of reorganized offices or programmatic changes—none of which they have shown to cause them any particular harm.  Start with the closures of OCREO and OT, two of more than a dozen offices at SSA headquarters.  Plaintiffs intimate that without OCREO, it will be more difficult to file complaints and accommodation requests.  Pls.' Mot. at 25.  But no individual Plaintiff claims to have ever used this office before, or to have any imminent need to do so now—and in any event, SSA has explained that it transferred the office's essential functions to another office.  Likewise with OT—an office that was created only in 2023.  Plaintiffs utterly fail to connect their speculative claims of harm to any particular beneficiary.

Plaintiffs' allegations about a reduction in telephone services are partly mistaken but in any event largely moot. As explained above, *see supra* at pp. 6-7, while as an anti-fraud measure SSA had planned to require that identity verification for certain services take place in person when an individual cannot complete two-factor identification using "my Social Security" online portal, on April 12, the agency announced that, "[b]eginning April 14, 2025, SSA will allow individuals to complete *all claim types via telephone*." Apr. 12 SSA Press Release (emphasis added). While bank account information may need to be changed in person if the beneficiary cannot successfully do so online, no Plaintiff here claims such a need.

Plaintiffs' concerns about the closure of SSA field offices are even further from the mark. They speculate about the potential effects of field office closures, at one point hypothesizing the "possibl[e] clos[ure of] more than 20 field offices." Pls.' Mot. at 11. But they neglect to mention that, on March 27—in a press release cited elsewhere in their brief—SSA stated that media reports of field offices closures "are false." Mar. 27 SSA Press Release. While SSA had identified underutilized office space for the General Services Administration, most of these sites were "small hearing rooms with no assigned employees," which "SSA no longer needs" since most hearings are held virtually. *Id*. While a single hearing office in White Plains, New York, has been permanently closed, Plaintiffs allege no harm connected to it.

Lastly, Plaintiffs' passing request that the Court stay the implementation of a policy requiring noncitizens and newly naturalized citizens to visit field offices in order to obtain social security cards, Pls.' Mot. at 12, likewise fails. No Plaintiff has averred that they are a noncitizen or newly naturalized citizen directly affected by this policy, or any basis to raise the rights of third parties not present here. At bottom, Plaintiffs' inability to show standing here should not be surprising: On their theory, virtually any American could sue over administrative cuts at any

13

federal agency if they could imagine any possible downstream effect on customer service. The Court should pause before endorsing such an unbounded theory of standing.

### 2.    Organizational plaintiffs

The organizational Plaintiffs fare no better, whether suing on behalf of their members or themselves.

### a.    Associational standing

An organization has standing to bring suit on behalf of its members when (1) "its members would otherwise have standing to sue in their own right"; (2) "the interests it seeks to protect are germane to the organization's purpose"; and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Plaintiffs fail at the first step, as they fail to identify any individual member with standing in his own right.

"[I]t is not enough to aver that unidentified members have been injured." *Twin Rivers Paper Co. LLC v. SEC*, 924 F.3d 607, 613 (D.C. Cir. 2019). Rather, the "organization must provide 'individual affidavits' from 'members who have suffered the requisite harm.'" *Id.* (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009)). Here, the only organization with such declarations is the NFB, so the claims of the other organizations fail at the outset.[1] And while NFB

---

[1] AAPD failed to submit an affidavit from *any member* of the organization. Deaf Equality fares no better. They too have no declarations from *any member*, only a declaration from Ms. Bitencourt Emilio. However, her declaration fails to assert any personal injury. *See* Decl. of Anna Bitencourt Emilio, ECF No. 2-18. Similarly, the NCPSSM runs into the same problem. No declarations were submitted by *any member* either, just a declaration from the President of the organization—Max Richtman. And again, Mr. Richtman does not aver any personal injury in his statement. *See* Decl. of Max Richtman ("Richtman Decl."), ECF No. 2-12. So too with Ms. Villers, the Executive Director of MSAC. In her affidavit, Ms. Villers also does not allege personal injury, only that she is "devoting significant time with staff" discussing how to respond to recent changes at SSA. *See* Decl. of Carolyn Villers, ¶¶ 16-17, ECF No. 12.

met this threshold obligation, none of its members has standing for the reasons just explained. *See supra* at pp. 10-14. Thus, Plaintiffs' theory of associational standing fails.

### b. Organizational standing

Alternatively, an organization may show standing to sue in its own right by satisfying the traditional criteria applicable to individuals—*i.e.*, a cognizable injury in fact, causation, and redressability. To satisfy the injury-in-fact requirement, an organizational plaintiff must show "more than a frustration of purpose," since the mere hindrance to a nonprofit's mission "is the type of abstract concern that does not impart standing." *Food & Water Watch, Inc.*, 808 F.3d at 919 (cleaned up). Instead, for an organization to have standing, it must have "suffered a concrete and demonstrable injury to [its] activities." *PETA v. USDA*, 797 F.3d 1087, 1093 (D.C. Cir. 2015). It is not enough, however, if the organization merely "diverts its resources in response to a defendant's actions." *All. for Hippocratic Med.*, 602 U.S. at 395. Otherwise, "all the organizations in America would have standing to challenge almost every federal policy that they dislike." *Id.* An organization cannot "spend its way into standing" in that way. *Id.* at 394.

Here, Plaintiffs' motion again says nothing about what, exactly, their theory of organizational standing is. That alone is reason enough to reject the claim, given their burden on this point. *See Youming Jin v. Ministry of State Sec.*, 557 F. Supp. 2d 131, 144 n.9 (D.D.C. 2008) (the "court has no duty to comb through the record without direction from the parties"). And their complaint contains only the passing allegation that SSA's reforms have caused them to "field more calls and requests for assistance from members and the public, shift staff from other priorities to responding to constituents and to advocating with SSA to prevent the harms their constituents are facing, and divert other resources other [sic] from mission-critical efforts." Compl. ¶ 165.

15

Even assuming the organizations' declarations back up these assertions, they are insufficient for standing purposes. In short, these are precisely the type of "frustration of mission" and "diversion of resources" theories that are too abstract for organizational standing. *See, e.g.*, Richtman Decl. ¶ 15 (asserting that "component closures directly implicate NCPSSM's mission and purpose as an organization," and that SSA's "discriminatory conduct thus frustrates the NCPSSM's mission"). Simply put, an association's "self-serving observation that it has expended resources to educate its members and others regarding [challenged statutory provision] does not present an injury in fact." *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995). "The mere fact that an organization redirects some of its resources to litigation and legal counseling in response to actions or inactions of another party is insufficient to impart standing upon the organization." *Id.*

Thus, the inclusion of the organizations cannot save the individual Plaintiffs' lack of standing. The Court therefore lacks jurisdiction, and it need go no further to resolve Plaintiffs' motion. *See OPM v. AFGE*, 2025 WL 1035208.

**B.    Federal personnel statutes divest court of subject matter jurisdiction to consider claims concerning the employment of SSA employees**

Plaintiffs' motion largely focuses on SSA's workforce reduction plans, asking the Court to pause such reductions, including early retirements and voluntary separations, and prohibit any RIFs; indeed, Plaintiffs ultimately seek a permanent injunction requiring that already-separated employees be rehired. But Congress has precluded district-court review of such federal-employment claims, which must proceed in another forum. That is because Congress has "established a comprehensive system" that provides the "exclusive means" for reviewing challenges to the employment decisions of federal agencies. *Elgin v. Dep't of the Treasury*, 567 U.S. 1, 5, 8 (2012) (quotation marks omitted).

The Civil Service Reform Act (CSRA), together with the Federal Service Labor-Management Relations Statute (FSLMRS),[2] "creates an integrated scheme of administrative and judicial review, wherein the Congress intentionally provided—and intentionally chose not to provide—particular forums and procedures for particular kinds of claims." *Am. Fed'n of Gov't Emps. v. Sec'y of the Air Force*, 716 F.3d 633, 636 (D.C. Cir. 2023) (alterations, citation, and quotations marks omitted). Congress allowed certain individual federal employees who are affected by agency personnel decisions to challenge those decisions "by litigating their claims through the statutory scheme in the context of [a] concrete" dispute, with limitations imposed by Congress on the kinds of claims and remedies available. *See Am. Fed'n of Gov't Emps. ("AFGE") v. Trump*, 929 F.3d 748, 757 (D.C. Cir. 2019). The purpose of this statute was to "replace the haphazard arrangements for administrative and judicial review of personnel action, part of the outdated patchwork of statutes and rules built up over almost a century that was the civil service system." *United States v. Fausto*, 484 U.S. 439, 444 (1988) (quotation omitted).

When a comprehensive remedial scheme like this permits only some plaintiffs to seek review, the scheme implicitly precludes judicial review by other plaintiffs who are not authorized to bring claims. The Supreme Court recognized this in *Block v. Community Nutrition Institute*,

---

[2] The CSRA establishes the "comprehensive system for reviewing personnel action taken against federal employees." *United States v. Fausto*, 484 U.S. 439, 455 (1988). Under the CSRA, most civilian employees can appeal a major adverse personnel action to the Merit Systems Protection Board (MSPB). 5 U.S.C. §§ 7512, 7513(d), 7701. Employees subject to a RIF may also pursue relief before the MSPB. *See* 5 C.F.R. § 351.901. The CSRA empowers the MSPB to order relief, including reinstatement. 5 U.S.C. §§ 1204(a)(2), 7701(g). An employee aggrieved by a final decision of the MSPB may obtain judicial review. *Id.* § 7703(a)(1); *see also id.* § 7703(b) (providing the Federal Circuit with exclusive jurisdiction over most final MSPB decisions). In addition, the FSLMRS governs labor relations between the Executive Branch and its employees. *See* 5 U.S.C. §§ 7101-7135; *Am. Fed'n of Gov't Emps. v. Trump*, 929 F.3d 748, 752 (D.C. Cir. 2019). The Federal Labor Relations Authority (FLRA) is charged with adjudicating federal labor disputes. 5 U.S.C. § 7105(a)(2). Review of the FLRA's decisions is available in the courts of appeals. *Id.* § 7123(a).

467 U.S. 340, 347 (1984), where it considered a statute that permitted dairy *handlers* to obtain review of certain "market orders" after exhausting administrative remedies, but did not authorize review by anyone else.  *See id.* at 346 (citing 7 U.S.C. § 608c).  When a group of dairy *consumers* sought review of a marketing order, the Supreme Court explained that the statute omits a "provision for participation by consumers in any proceeding."  *Id.* at 347.  In the "complex scheme" Congress had provided, "the omission of such a provision is sufficient reason to believe that Congress intended to foreclose consumer participation in the regulatory process."  *Id.* Accordingly, the statute's "structure … indicates that Congress intended only producers and handlers, and not consumers, to ensure that the statutory objectives would be realized."  *Id.*  The "restriction of the administrative remedy to handlers strongly suggests that Congress intended a similar restriction of judicial review of market orders."  *Id.*  Any other result, the Court said, would facilitate circumvention of the comprehensive statutory scheme.  *See id.* at 348.

In *Fausto*, the Supreme Court applied the same reasoning to the CSRA itself.  The Court explained that the "exclusion" of a party "from the provisions establishing administrative and judicial review for personnel action" of the type challenged here "*prevents* [the party] from seeking review" under other provisions.  484 U.S. at 455 (emphasis added).  The Court emphasized that the CSRA's "comprehensive nature," its express provisions for different kinds of review for different kinds of plaintiffs, and its exclusion of those in the plaintiffs' position from the comprehensive scheme, reflected a "considered congressional judgment" that those employees "should not have statutory entitlement to review for" that type of personnel action covered by the CSRA.  *Id.* at 448; *see Grosdidier v. Chairman, Broad. Bd. of Governors*, 560 F.3d 494, 497 (D.C. Cir. 2009) (Kavanaugh, J.) ("[T]he CSRA is the exclusive avenue for suit even if the plaintiff cannot prevail in a claim under the CSRA.").

18

Those principles likewise foreclose this Court's exercise of subject matter jurisdiction over Plaintiffs' employment-related claims. Just as Congress "intentionally foreclosed judicial review to" certain employees under the CSRA, *see Pinar v. Dole*, 747 F.2d 899, 912 (4th Cir. 1984), it intentionally foreclosed judicial review by parties other than those whom it specifically authorized to seek relief. As in *Fausto*, it would turn the CSRA's comprehensive structure "upside down" for the Plaintiffs, who are strangers to the federal government's employment relationships, to challenge the SSA's employment actions in federal district court, "free" from any of the restrictions that would apply if the claim were brought by the SSA employees (or former SSA employees) themselves. *See* 484 U.S. at 449-50. The exclusion from the CSRA's review scheme reflects Congress's considered judgment limiting who may challenge a personnel decision and on what grounds—rather than providing carte blanche for those excluded to sue outside the CSRA's comprehensive scheme. *See Graham v. Ashcroft*, 358 F.3d 931, 935 (D.C. Cir. 2004) (Roberts, J.) (explaining that "it is the comprehensiveness of the statutory scheme involved, not the 'adequacy' of the specific remedies" that precludes jurisdiction).

The Supreme Court's more recent decisions in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), and *Axon Enterprises, Inc. v. FTC*, 598 U.S. 175, 186 (2023), reflect these same principles. Those cases underscore that where, as here, Congress has established a "comprehensive" review scheme, district courts lack subject matter jurisdiction over a claim where it is, as here, "of the type Congress intended to be reviewed within" the statutory structure. *See Axon*, 598 U.S. at 186 (quoting *Thunder Basin*, 510 U.S. at 212).

Congress did not establish an implausible scheme in which employees must litigate their employment actions through a comprehensive, integrated scheme, but others are left free to challenge those same employment actions directly in federal district court with "greater rights"

than the affected employees themselves.  *See Graham*, 358 F.3d at 934.   Instead, Congress limited review of federal employment actions to actions by affected employees themselves, in a different forum.  And as then-Judge Roberts summed up, "what you get under the CSRA is what you get." *Fornaro v. James*, 416 F.3d 63, 67 (D.C. Cir. 2005).

Multiple courts, including very recently, have declined jurisdiction on this ground.  *See, e.g.*, *AFGE v. Trump*, 929 F.3d at 752; *see also, e.g., Am. Fed. of Gov't Emps. v. Ezell*, No. 25-10276-GAO, 2025 U.S. Dist. LEXIS 25269, *7 (D. Mass. Feb. 12, 2025) (no jurisdiction to consider plaintiffs' claims to enjoin OPM from enforcing the deadline for its "Fork in the Road" offer) (citing *AGFE v. Trump*); *Nat'l Treasury Emps. Union v. Trump,* No. 25-cv-420, 2025 U.S. Dist. LEXIS 30592 (D.D.C. Feb. 20, 2025) (Cooper, J); *Am. Foreign Serv. Ass'n v. Trump*, No. 25-cv-352, 2025 U.S. Dist. LEXIS 31748 (D.D.C. Feb. 21, 2025) (Nichols, J.); *see also Maryland v. USDA*, Doc. 42, No. 25-1248 (L), at 4-5 (4th Cir. Apr. 9, 2025), *available at* 2025 WL 1073657 (ordering stay of district court's preliminary injunction and explaining that the government is likely to show that the district court lacked jurisdiction over plaintiff States' claims, where the government had argued, among other things, that the "[CSRA] provides the exclusive means for review of personnel actions taken against federal employees"—and observing that "[t]he Supreme Court has stayed a similar preliminary injunction issued by the United States District Court for the Northern District of California") (citing *OPM v AFGE*, 2025 WL 1035208).

Here, much of the relief Plaintiffs seek is at its core a challenge to SSA employment policies, including recent and prospective separations.  That Plaintiffs have framed their alleged injury under the Rehabilitation Act and the APA does not allow them to sidestep the CSRA's mandatory channeling regime.  Were their theory correct, downstream consumers of government services and benefits could always go directly to court to raise such challenges, notwithstanding

Congress's determination that federal employees must first pursue relief administratively. It would be an odd result indeed if claims that cannot be raised in district court by those most directly affected—the employees themselves—could be raised by plaintiffs whose asserted injuries are entirely derivative. The Court therefore lacks jurisdiction over these employment and termination related claims because they must be litigated in another forum.

### C.    Plaintiffs' Rehabilitation Act claim fails on the merits

Plaintiffs contend that the challenged reforms violate Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), because they disparately impact disabled persons. This claim fails on the merits for multiple reasons.

### 1.    The Rehabilitation Act does not provide for disparate-impact liability.

Section 504 provides that "[n]o otherwise qualified individual with a disability . . . shall, *solely by reason of her or his disability*, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. 794(a) (emphasis added). To prove disability discrimination under Section 504, Plaintiffs must "show that (1) they are disabled within the meaning of the Rehabilitation Act, (2) they are otherwise qualified, (3) they were excluded from, denied the benefit of, or subject to discrimination under any program or activity" solely by reason of their disability, "and (4) the program or activity is carried out by a federal executive agency or with federal funds." *Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1266 (D.C. Cir 2008).

In *Alexander v. Choate*, 469 U.S. 287 (1985), the Supreme Court considered whether Section 504 "reaches only purposeful discrimination." *Id.* at 292. It "assume[d] without deciding" that Section 504 "reach[es] some claims of disparate-impact discrimination," but held that such claims would be limited to disparate impacts so significant that "an otherwise qualified

handicapped individual" was not "provided with meaningful access to the benefit that the grantee offers." *Id*. at 299, 301, 309. While many circuits have since allowed disparate-impact claims falling within these contours to go forward, in 2019 the Sixth Circuit "resolve[d] what *Choate* did not and conclude[d] that § 504 does not prohibit disparate-impact discrimination." *Doe v. BlueCross BlueShield of Tenn., Inc.*, 926 F.3d 235, 241 (6th Cir. 2019). As Judge Sutton explained, the statutory text—namely, the phrase "solely by reason of her or his disability"—"does not encompass actions taken for nondiscriminatory reasons," as a "comparison to other antidiscrimination statutes," including Title VII, confirms. *Id*. at 241, 242.

This Court should follow the Sixth Circuit's lead, notwithstanding the assumptions of other circuits. While the D.C. Circuit has not directly addressed this issue, in *Modderno v. King*, 82 F.3d 1059 (D.C. Cir. 1996), it held that a plaintiff cannot state a disparate impact claim under Section 504 based "on the terms of an insurance plan." *Id.* at 1061 n. 1. As Judge Ginsburg stated in concurrence: "As long as the [plan] offers the same coverage to all insureds, regardless of disability, it cannot be said to discriminate on the basis of disability." *Id.* at 1066 (Ginsburg, J., concurring). That is an apt description of the challenged SSA reforms here.

### 2.    Plaintiffs have not proven a disparate impact

Assuming arguendo that a disparate-impact claim is available under Section 504, Plaintiffs have shown no evidence of such an impact. While they repeatedly assert in general terms that the effects of the challenged reforms will fall more heavily on disabled persons, they do not actually allege a statistically significant disparate impact, much less provide evidence of one.

When presenting a disparate impact claim, a plaintiff must generally "demonstrate with statistical evidence that the practice or policy has an adverse effect on the protected group." *Greater New Orleans Fair Hous. Action Ctr. v. HUD*, 639 F.3d 1078, 1085–86 (D.C. Cir. 2011)

(quoting *Garcia v. Johanns*, 444 F.3d 625, 633 (D.C. Cir. 2006)); *see also Adams v. City of Indianapolis*, 742 F.3d 720, 733 (7th Cir. 2014) (while "basic" "statistical methods and comparisons" may suffice for disparate-impact complaint to survive motion to dismiss, the statistics must "move the disparate-impact claims over the plausibility threshold"). Here, Plaintiffs fail to sufficiently establish any such "statistical methods" or appropriate "comparisons." While they state in conclusory fashion that the reforms will disproportionately affect disabled persons, Pls.' Mot. at 22, they never compare the supposed effects on that group to a similarly situated group of non-disabled persons. *See Ricci v. DeStefano*, 557 U.S. 557, 578 (2009) (citing 42 U.S.C. § 2000e–2(k)(1)(A)); *see also Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977) (discussing "employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity").

It is "not enough to simply allege that there is a disparate impact on workers, or point to a generalized policy that leads to such an impact." *Menoken v. McGettigan*, 273 F. Supp. 3d 188, 199 (D.D.C. 2017) (quoting *Smith v. City of Jackson*, 544 U.S. 228, 241 (2005)), *aff'd sub nom. Menoken v. Pon*, No. 17-5228, 2018 WL 2383278 (D.C. Cir. May 9, 2018). To obtain preliminary relief, Plaintiffs must come forward with reliable evidence on this score. Their failure to do so is fatal to their Rehabilitation Act claim.

### 3.    Plaintiffs have not shown a lack of "material access" to any benefit

Even if Plaintiffs had established a disparate impact, that would not be enough, as the Supreme Court in *Choate* "reject[ed] the boundless notion that all disparate-impact showings constitute prima facie cases under § 504." *See* 469 U.S. at 299. There, assuming the viability of a disparate impact theory, the Court ultimately found no prima facie violation of Section 504: The

challenged rule was neutral on its face, was not alleged to rest on a discriminatory motive, and did not deny access to handicapped individuals of Medicaid services. *Id.* at 287. So too here. The SSA reforms are neutral on their face and are not alleged to rest on such a discriminatory motive, instead being carried out to improve efficiency.[3]

Nor do Plaintiffs contend that they have been deprived of "meaningful access" to any benefit within the meaning of *Choate*. "Meaningful access" does not mean "equal results," but requires only that the disabled be provided an equal opportunity to obtain the same result or benefit. *Choate*, 469 U.S. at 304-06. The across-the-board SSA reforms do just that.

### 4.    The SSA reforms are justified by business necessity

Assuming Plaintiffs could make out a prima facie case of disparate impact, the "business necessity" defense would defeat liability. A case in point is *Anderson v. Duncan*, 20 F. Supp. 3d 42 (D.D.C. 2013), *amended*, No. 06-1565 (RMC), 2013 WL 12328768 (D.D.C. Nov. 15, 2013). There, while Judge Collyer found that a disparate impact theory was available under the Rehabilitation Act, she concluded a high-level reshuffling of the agency could not lead to liability absent a showing of pretext or something more. *Id.* at 53-56. She explained: "[T]he Court concludes that the decision to defund RSA regional offices was a 'business necessity' that served the federal government's objectives in a reasonable way, and could not have achieved those objectives in a manner that would have had less impact on disabled employees in the regional

---

[3]  In a blog post titled "Social Security Dissolves Duplicative Office[,]" the SSA stated that in eliminating OCREO and "streamlining functions[,]" that SSA "will transfer responsibility for processing Equal Employment Opportunity complaints, reasonable accommodation requests, and other statutorily required functions to other SSA components to ensure compliance with existing legal authorities." https://perma.cc/EA8T-ZGB8. And it stated in another post that the Office of Transformation would be eliminated as it is redundant, and would aid to eliminate "wasteful and inefficient offices." https://perma.cc/9B98-S83R. Moreover, the cuts to the workforce were aimed at reducing the "size of its bloated workforce and organizational structure[.]" https://perma.cc/LY9L-ZQEA.

offices." *Id.* at 58.  Indeed, "the 'touchstone' for disparate-impact liability is the lack of 'business

necessity'" supporting the challenged practice.  *Ricci*, 557 U.S at 578 (2009) (quoting *Griggs v.

Duke Power Co.*, 401 U.S. 424,431 (1971)).

Here, the SSA reforms are justified by business necessity.  Much as in *Anderson*, the

workforce was seen as bloated and inefficient, and reductions were made in service of the policy

priority to cut costs and move personnel to other roles.  *Anderson*, 20 F.3d at 56-59;  *see* Feb. 28

SSA Press Release.  Thus, like in *Anderson*, where there was a decision to trim funding for regional

offices and reduce employment through RIFs and buyouts, the administrative reorganization here

is a permissible business necessity.  *See id.* at 57-58(as the "decision was driven by a policy

judgment on how to conduct the business of the federal government . . . the Court concludes that

the decision to defund the RSA regional offices was a 'business necessity' that served the federal

government's objectives in a reasonable way"); *see also Chicago Teachers Union, Local 1 v. Bd.

of Educ. of the City of Chicago*, 419 F. Supp. 3d 1038, 1050-51 (N.D. Ill. 2020) (concluding that

a RIF was a permissible part of a policy to staff each Chicago public school "with the number of

teachers and paraprofessionals reasonably necessary to serve the needs of the school's students").

### 5.    Plaintiffs' sweeping theory of disparate impact would unduly hamstring any meaningful agency reorganization

Finally, as a practical matter, Plaintiffs' theory of disparate impact under Section 504

sweeps far too broadly.  Such a challenge to large programmatic changes would inappropriately

hamstring agency administration, as any budget cut could be portrayed as disproportionately

affecting disabled persons.  Such a theory threatens to invite challenges to virtually any attempt to

trim costs—a prospect that is especially problematic for the government.  *Cf., e.g.*, *Abril-Rivera v.

Johnson*, 806 F.3d 599, 606 (1st Cir. 2015) (stating that, in the RIF context, disparate-impact

liability "must . . . be limited as applied to government entities so as to avoid 'inject[ing] racial

considerations into every [agency] decision'" (quoting *Tex. Dept. of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 532 (2015)); *Anderson*, 20 F. Supp. at 56 (business necessity test has different contours in the context of a government versus private-sector RIF).

6. **Because there is no private right of action under the Rehabilitation Act, any disparate impact claim must proceed under the APA**

In all events, because there is no private right of action under the Rehabilitation Act, to the extent Plaintiffs have a viable disparate-impact claim, it can proceed only under the APA and subject to that Act's limitations, including the final-agency-action requirement.

The Rehabilitation Act prohibits discrimination (1) by federal agencies in their capacity as employers, 29 U.S.C. § 791; (2) by recipients of federal funds and federal agencies in their capacity as funders, *id.* § 794(a); and (3) by federal agencies in their capacity as the operators of their own "program[s] or activit[ies]." *Id.*[4]    Congress provided express remedies, including private rights of action, to enforce the first two prohibitions, but not the third.    *Id.* § 794a.[5]    Particularly when viewed in light of the Supreme Court's guidance regarding implied private rights of action, *see, e.g.*, *Jesner v. Arab Bank, PLC*, 584 U.S. 241, 264–65 (2018), that omission strongly suggests that no private right of action exists, even though the D.C. Circuit has not decided whether the Rehabilitation Act contains an implied right of action in this circumstance and courts in this district are split on the question.    *Compare Nat'l Ass'n of the Deaf v. Trump ("NAD")*, 486 F. Supp. 3d 45, 55–56 (D.D.C. 2020) (Boasberg, J.) (finding an implied a private right of action against federal

---

[4] 29 U.S.C. § 791 codifies Section 501 of the Rehabilitation Act, as amended, and is often referred to as "Section 501"; 29 U.S.C. § 794(a) codifies Section 504 of the Rehabilitation Act, as amended, and is often referred to as "Section 504." *See* Rehabilitation Act of 1973, Pub. L. No. 93-112, §§ 501, 504, 87 Stat. 355, 390, 394.

[5] 29 U.S.C. § 794a codifies Section 505 of the Rehabilitation Act, as amended, and is often referred to as "Section 505." Section 505 was added to the Rehabilitation Act in 1978. *See* Rehabilitation, Comprehensive Services, and Developmental Disabilities Amendments of 1978 ("Rehabilitation Act Amendments of 1978"), Pub. L. No. 95-602, § 120(a), 92 Stat. 2955, 2982.

programs and activities), *with Sai v. Dep't of Homeland Sec.*, 149 F. Supp. 3d 99, 113 (D.D.C. 2015) (Moss, J.) (concluding that "the cause of action for a substantive claim of disability discrimination in a federal program or activity arises . . . under the APA," not the Rehabilitation Act).   Given the express causes of action otherwise outlined in 29 U.S.C. § 794a, the Court should follow *Sai*, the weight of circuit court authority, and related Supreme Court case law by holding that the Rehabilitation Act does not include an implied right of action to sue a federal agency in its capacity as operator of a federal program or activity.

The Supreme Court has clarified that "when deciding whether to recognize an implied cause of action, the 'determinative' question is one of statutory intent."   *Ziglar v. Abbasi*, 582 U.S. 120, 133 (2017) (quoting *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001)).   The judicial task is "limited solely to determining whether Congress intended to create the private right of action asserted."   *Id.* (quoting *Touche Ross & Co. v. Redington*, 442 U.S. 560, 568 (1979)).   "If the statute does not itself so provide, a private cause of action will not be created through judicial mandate."   *Id.*   The Supreme Court's jurisprudence in this respect has changed over time.   In the 1970s and 1980s, "the Court often assumed it to be a proper judicial function to provide such remedies as are necessary to make effective a statute's purpose."   *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 589 U.S. 327, 334 (2020) (cleaned up).   But "[w]ith the passage of time," the Court has "come to appreciate that like substantive federal law itself, private rights of action to enforce federal law must be created by Congress and raising up causes of action where a statute has not created them may be a proper function for common-law courts, but not for federal tribunals."   *Id.* (cleaned up).   The Supreme Court has more "recently and repeatedly said that a decision to create a private right of action is one better left to legislative judgment in the great majority of cases."   *Jesner*, 584 U.S. at 264 (citation omitted);

*see also Egbert v. Boule*, 596 U.S. 482, 491 (2022) ("At bottom, creating a cause of action is a legislative endeavor.").

Section 504 of the Rehabilitation Act originally applied only to recipients of federal funds. Congress amended the statute in 1978 to apply to a federal agency acting in its programmatic capacity. The 1978 amendments added the following language to the prohibition on disability discrimination in Section 504:

> or under any program or activity conducted by any Executive agency or by the United States Postal Service. The head of each such agency shall promulgate such regulations as may be necessary to carry out the amendments to this section made by the Rehabilitation, Comprehensive Services, and Developmental Disabilities Act of 1978. Copies of any proposed regulation shall be submitted to appropriate authorizing committees of the Congress, and such regulation may take effect no earlier than the thirtieth day after the date on which such regulation is so submitted to such committees.

*See* Rehabilitation Act Amendments of 1978, § 119, 92 Stat. at 2982. Congress did not include an express cause of action to enforce this provision. To enforce Section 504 rights against a federal program, an aggrieved person can seek a remedy through the administrative pathway that Congress directed agencies to create and then, if necessary, seek judicial review through the APA. *See id.*; 5 U.S.C. § 702.

At the same time Congress amended Section 504, it also created limited, express causes of action in Section 505 of the Rehabilitation Act that did not include an express private right of action regarding the non-funding, non-employment activities of federal agencies. *See* Rehabilitation Act Amendments of 1978, § 120(a), 92 Stat. at 2982–83 (adding Section 505 to the Rehabilitation Act of 1973). Notably, while the new Section 505 authorizes specific remedies through direct cause of action for any Section 504 violation committed by a *non-federal* recipient of federal funds or by a federal agency that provides such funds, it does not create such remedies for disability discrimination under any programs or activities conducted by a federal agency. Congress knows how to create a

28

private right of action, and while it directed agencies to "promulgate such regulations as may be necessary to carry out the amendments" to Section 504, it created a private right of action only for employment issues and federal agencies' funding activities. 29 U.S.C. §§ 794(a), 794a(a). It is "an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." *Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 19 (1979). Congress provided that Section 504 would apply to non-funding activities of the federal government, and agencies would need to promulgate regulations, but Congress affirmatively chose to create a cause of action for violations of the Rehabilitation Act only for employees and persons aggrieved by recipients of federal assistance or a federal provider of such assistance. It follows that Congress intended challenges to non-funding activities of the federal government to be brought through the administrative pathway. *See Wisher v. Coverdell*, 782 F. Supp. 703, 707 (D. Mass. 1992) ("[T]here was no need for Congress to create a private right of action because a means of review [under the APA] already existed.").

Indeed, when the Supreme Court was confronted with the Rehabilitation Act's statutory language in a different context, it found it "telling" that Section 505 "makes no mention whatsoever of 'program[s] or activit[ies] conducted by any Executive agency[.]'" *Lane*, 518 U.S. at 192–93 (1996) (addressing the question of whether the government had waived sovereign immunity for money damages for a violation of Section 504 of the Rehabilitation Act) (citation omitted). In *Lane*, the Supreme Court held that Congress, in amending the Rehabilitation Act to cover federal programs and activities, did not intend to waive the United States's sovereign immunity for suits for money damages. *See id.* at 189, 200.

The question at issue here—whether the cause of action for a substantive claim of disability discrimination in a federal program or activity arises under the Rehabilitation Act or under the

APA—was not addressed in *Lane*.    That is "because, as the Solicitor General noted in his brief [in *Lane*], 'resolution of the source of the cause of action, be it under Section 504(a) directly or the APA, would . . . not [have] alter[ed] the outcome of [that] case' as long as Section 504(a) was not read to waive sovereign immunity for monetary damages.'"    *Sai*, 149 F. 3d at 113 (quoting Br. for the Resp'ts, *Lane v. Pena*, No. 95–365, 1996 WL 115795, at \*27 n. 17 (S. Ct. Mar. 15, 1996)).

Although the D.C. Circuit has not directly addressed the question, the weight of circuit authority supports the lack of a private cause of action under Section 504 for federal programs or activities.    Three circuits have adopted that view, including the *en banc* First Circuit in an opinion by then-Judge Breyer.    *See Moya v. U.S. Dep't of Homeland Sec.*, 975 F.3d 120, 128 (2d Cir. 2020); *Clark v. Skinner*, 937 F.2d 123, 126 (4th Cir. 1991); *Cousins v. Sec'y of the U.S. Dep't of Transp.*, 880 F.2d 603, 610 (1st Cir. 1989) (en banc) (Breyer, J.) ("[t]here is no reason to strain to find an implied right of action against federal agencies under § 504" because "the APA's review procedures" are available).    Only the Ninth Circuit has disagreed, and it did so based on the premise—inconsistent with the Supreme Court's later decision in *Lane*—that a right of action under Section 504 was needed to ensure that plaintiffs could secure "money damages." *J.L. v. Soc. Sec. Admin.*, 971 F.2d 260, 268 (9th Cir. 1992), *disapproved of by Lane*, 518 U.S. at 191.

Courts in this district are split on the question.    In *Sai*, Judge Moss concluded that there is no cause of action under the Rehabilitation Act for discrimination in federal programs and activities, and that Congress intended for the rights created by Section 504 to be enforceable through judicial review of agency action under the APA.    149 F. Supp. 3d at 113.    First, the court noted that the Supreme Court "has repeatedly cautioned courts not to imply causes of action in the absence of evidence that Congress intended 'to create not just a private right but also a private remedy.'"    *Id.* (quoting *Sandoval*, 532 U.S. at 286).    In considering the statutory text and structure, the court found

"relatively little evidence that Congress intended to create a private cause of action under the Rehabilitation Act to enforce" the substantive rights regarding federal programs and activities contained therein. *Id.* Judge Moss observed that Section 505 expressly specifies the remedies available to some persons aggrieved under Section 504 but "says nothing about the remedies available to a person aggrieved by discrimination in a 'program or activity conducted by an[ ] Executive agency.'" *Id.* (quoting 29 U.S.C. § 794(a)). Second, Judge Moss reasoned that Congress has "no need to provide for a cause of action that is independent of the APA" "when it intends to permit only declaratory and injunctive relief" to enforce a statute. *Id.* at 114. Third, Judge Moss court found the First Circuit's and Fourth Circuit's opinions in *Cousins* and *Clark* persuasive. *Id.* at 114–15 (discussing *Cousins*, 880 F.2d at 605–08; *Clark*, 937 F.2d at 125–26). On these bases, *Sai* concluded "that the Rehabilitation Act does not provide an implied cause of action for discrimination in federal programs and activities (or for failure to comply with administrative procedures), but that the APA provides a cause of action to challenge final agency action that is not in accordance with the Rehabilitation Act." *Id.* at 115. Judge Moss's reasoning should be followed here.

In *NAD*, Judge Boasberg reached a contrary conclusion and found that Section 504 includes an implied cause of action to sue Executive branch agencies for federal programs and activities. *NAD*, 486 F.3d at 54. Judge Boasberg reasoned that Congress did not expressly "direct[ ] those plaintiffs who seek relief from Executive agencies' violations of Section 504 to rely on the Administrative Procedure Act." *Id.* But the court did not explain why it would have been necessary (or even important) for Congress to do so. *See id.* The APA itself provides that anyone "adversely affected or aggrieved by agency action within the meaning of a relevant statute" can obtain review of "agency action" pursuant to the APA. 5 U.S.C. § 702. Given the APA's general cause of action, it would have been unnecessary for Congress to additionally specify in the Rehabilitation Act that

31

plaintiffs challenging the federal government's compliance with Section 504 in the government's non-funding activities could bring suit under the APA.[6]    Additionally, Judge Boasberg's *NAD* decision relied on several cases in this district analyzing whether the Rehabilitation Act waives the government's sovereign immunity, or standing for the proposition that declaratory and injunctive relief was available, but those cases did not address the separate question of whether the available cause of action lies within the Rehabilitation Act itself or the APA.  486 F. Supp. 3d at 55–56 (citing *Paulson*, 463 F.2d at 57–58, *aff'd*, 525 F.3d 1256 (D.C. Cir. 2008); *Lane v. Pena*, 867 F. Supp. 1050, 1053 (D.D.C. 1994), *vacated in part*, 518 U.S. 187, 190–91 (1996); and *Doe v. Dist. of Columbia*, 796 F. Supp. 559, 573 (D.D.C. 1992)).   Finally, *NAD* distinguished the First Circuit's and Fourth Circuit's opinions in *Cousins* and *Clark* on the dubious basis that those cases "dealt with Executive agencies' acting as a *regulator*, as opposed to in a substantive capacity."    486 F.3d at 56 (emphasis in original).   But *Cousins* and *Clark* made clear that their holdings apply to "any program or activity conducted by any Executive agency," 29 U.S.C. § 794(a); *Cousins*, 88 F.2d at 604-05; *Clark*, 937 F.2d at 125.    Indeed, the Rehabilitation Act does not distinguish among federal programs and activities based on whether they are "regulatory" or "substantive" in nature.  *See id.* § 794(a).

The conclusion that the Rehabilitation Act does not imply a private right of action for the government's non-funding, non-employment activities is "buttressed by the fact that Congress expressly provided two alternative mechanisms to enforce the prohibition against discriminatory agency action."  *Moya*, 975 F.3d at 128.   First, Section 504(a) directs agency heads to "'promulgate such regulations as may be necessary to carry out the'" prohibition against discrimination in programs and activities conducted by the agency.  *Id.* (quoting 29 U.S.C. § 794(a)).  Second, the APA

---

[6]  The plaintiffs in *NAD* did not have a judicial remedy available to them under the APA, as Judge Boasberg noted, because the defendants in that case, which included the White House, were not "agencies" subject to the APA.   486 F.3d at 57.

provides an express cause of action for plaintiffs who wish to sue an executive agency for violating the Rehabilitation Act. "The availability of these alternative mechanisms to enforce the Rehabilitation Act strongly suggests that Congress did not intend to imply a superfluous private right of action." *Id.*; *see also Clark*, 937 F.2d at 126 ("[T]he APA was intended to provide a single uniform method for review of agency action and . . . an implied private right of action to enforce a federal statute against a federal regulatory agency is unnecessary.").

Thus, to the extent Plaintiffs have a viable disparate impact claim, it can proceed only under the APA and subject to that Act's limitations.

### D.    Plaintiffs' APA claims fail on the merits

#### 1.    APA review is precluded because the SSA's administrative reforms are committed to agency discretion

The APA grants a cause of action to "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. But it withdraws that cause of action "to the extent that . . . agency action is committed to agency discretion by law." *Id.* § 701(a). "Agency action is committed to agency discretion by law when 'the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" *Steenholdt v. FAA*, 314 F.3d 633, 638 (D.C. Cir. 2003) (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)).

As noted above, the Court lacks jurisdiction over challenges to SSA's workforce reductions, which Congress has channeled to other forums. *See supra* pp. 16-21. The balance of Plaintiffs' motion largely challenges various plans to administratively reorganize the agency. But Congress vested the Commissioner of Social Security with broad, unreviewable discretion to make such decisions. It stated: "[t]he Commissioner *may* establish, alter, consolidate, or discontinue such organizational units or components within the Administration *as the Commissioner considers necessary or appropriate*, except that this paragraph shall not apply with respect to any unit, component, or provision provided for by this chapter." 42 U.S.C. § 902(a)(6) (emphasis added).

33

"In determining whether a matter has been committed solely to agency discretion, [courts] consider both [1] the nature of the administration action at issue and [2] the language and the structure of the statute that applies the applicable legal standards for reviewing that action." *Drake v. FAA*, 291 F.3d 59, 70 (D.C. Cir. 2002). First, staffing and organizational decisions are squarely in the realm of actions that courts have traditionally found committed to agency discretion. *See e.g.*, *Lincoln v. Vigil*, 508 U.S. 191, 193 (1993) (holding that the Indian Health Service's 1985 decision to "reallocate the [Indian Children's] Program's resources from "handicapped Indian children in the Southwest," who had been served since the late 1970s and early 1980s, to a "nationwide effort to assist such children" was "committed to agency discretion by law" and "therefore not subject to judicial review under the Administrative Procedure Act, 5 U.S.C. § 701(a)(2)"); *Local 2855, AFGE (AFL-CIO) v. United States*, 602 F. 2d 574, 579 (3d Cir. 1979) ("The existence of broad discretionary power in an agency often suggests that the challenged decision is the product of political, military, economic, or managerial choices that are not really susceptible to judicial review."). Second, Congress's choice of the deferential word "may," coupled with the formulation "as the Commissioner *considers* necessary and appropriate"— demonstrates that Congress committed the exercise of this authority to the agency's broad discretion.

The Supreme Court recognized the discretion inherent in an analogous formulation in *Webster v. Doe*, 486 U.S. 592, 600 (1988), where the statute authorized the CIA to terminate employees "whenever the Director 'shall deem such termination necessary or advisable in the interests of the United States.'" *Id*. (quoting 50 U.S.C. § 403(c)) (emphasis in original). Stressing that the statute did not limit termination to "when the dismissal *is* necessary or advisable to those interests," the Court found that given Congress's use of the word "deem" the statutory "standard fairly exudes deference to the Director" and "foreclose[s] the application of any meaningful judicial standard of review." *Id*. (emphasis in original); *see also Claybrook v. Slater*, 111 F.3d 904, 909 (D.C. Cir. 1997) (noting that *Webster* gave "weight to [the] fact that [a] statute authorizes termination when [the] agency head 'shall deem [it] necessary or advisable' rather than when it

34

'is' necessary or advisable" (alteration in original)). Thus, the statute's implementation was committed to agency discretion, and APA review was precluded. *Webster*, 486 U.S. at 600-01. Because "considers" is not meaningfully different than "deems," the same result obtains here.

Tellingly, Plaintiffs point to no statute limiting the agency's inherent discretion to reorganize. They nowhere claim that any of the closed offices was "provided for by this chapter," 42 U.S.C. 706(a)(6), or required by any other statute. And they offer no judicially manageable standard for the Court to second-guess the Commissioner's judgment about what staffing levels or office structure are the "right" ones to best accomplish the agency's policy priorities. Those decisions therefore are not subject to APA review.

### 2. Plaintiffs impermissibly seek wholesale improvement of SSA, rather than review of discrete, final agency action

"The federal courts are not authorized to review agency policy choices in the abstract.*" Fund for Animals v. U.S. Bureau of Land Manag.*, 460 F.3d 13 (D.C. Cir. 2006). Rather, the APA "provides a generic cause of action to '[a] person suffering legal wrong because of *agency action,* or adversely affected or aggrieved by *agency action.*'" *Id.* (quoting 5 U.S.C. § 702 (emphasis added)). Review under the APA is further limited to "*final agency action* for which there is no other adequate remedy in a court." 5 U.S.C. § 704 (emphasis added). Plaintiffs' motion addresses neither of these threshold requirements, and they fail to satisfy either of them.

### a. SSA's programmatic improvements are not cognizable agency action under the APA

The APA's definition of "action" is "not so all-encompassing as to authorize [courts] to exercise judicial review [over] everything done by an administrative agency." *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004) (Roberts, J.). Rather, the "agency action" limitation prevents plaintiffs from "seek[ing] wholesale improvement of [a] program by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made." *Lujan*, 497 U.S. at 891. That is, "[u]nder the terms of the APA, [Plaintiffs] must direct [their] attack against some particular 'agency action' that causes

[them] harm." *Id.* at 891. And that agency action must be "circumscribed" and "discrete[.]" *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 62 (2004). "Because 'an on-going program or policy is not, in itself, a final agency action under the APA,' [a court's] jurisdiction does not extend to reviewing generalized complaints about agency behavior." *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006) (citation omitted).

Here, Plaintiffs' APA claims amount to impermissible wholesale challenges, *i.e.*, the sort of "broad programmatic attack" rejected in *Lujan*, rather than a challenge to discrete final agency action. Plaintiffs challenge a collection of past, ongoing, and future actions—the closure or reorganization of various offices, reductions of staff, redirection of priorities, transfer of functions, and so on. *See, e.g.*, Pls.' Mot. at 1 (the "illegal dismantling of the [SSA]"); *id.* ("Defendants' deliberate erosion of the [SSA]"); *id.* at 7 ("[t]he cuts, closures, and policies of defendants"); *id.* at 12 (Defendants' "policy shifts"). In *Lujan*, the Supreme Court dispelled any notion that such a programmatic challenge can proceed under the APA:

> [I]t is at least entirely certain that the flaws in the entire "program"—consisting *principally of the many individual actions referenced in the complaint, and presumably actions yet to be taken as well*—cannot be laid before the courts for wholesale correction under the APA, simply because one of them is ripe for review and adversely affects [a plaintiff].

497 U.S. at 892-93 (emphasis added); *see also Bark*, 37 F.3d at 50 (rejecting plaintiffs' attempt to "attach[] a 'policy' label to their own amorphous description of the [agency's] practices" because "a final agency action requires more"). Indeed, the purpose of the APA's discrete agency action requirement is "to protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." *Norton*, 542 U.S. at 62. That describes this case to a T.

### b.    Any discrete agency action was not final for APA purposes

For an agency action to be "final" within the meaning of the APA, two considerations must be met. "First, the action must mark the 'consummation' of the agency's decision-making process—[i]t must not be of a merely tentative or interlocutory nature." *Bennett v. Spear*, 520 U.S.

154, 177-78 (1997) (internal citation omitted).  "[S]econd, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow[.]'" *Id.* at 178 (citation omitted).

Here, Plaintiffs identify only a single alleged "final agency action": "Defendants' elimination of OCREO and its staff."  Compl. ¶ 199.  Plaintiffs' motion does not identify any other "final agency action," much less address the applicable test.  But neither the closure of OCREO nor the other SSA reforms qualify.

For starters, many of the reforms have been subject to revision, evidencing their interlocutory nature.  For example, while Plaintiffs complain about "new SSA policies prohibiting use of the telephone for some transactions," Pls.' Mot. at 20, SSA recently announced that beginning April 14, it "will allow individuals to complete all claim types via telephone, supported by new anti-fraud capabilities."  *See* April 12 SSA Press Release.  Likewise, while Plaintiffs' motion challenges feared "field office closures," Pls.' Mot. at 10, SSA has clarified that it is not, in fact, closing any field offices.  *See* March 27 SSA Press Release.  Other challenged steps may similarly prove to be tentative, or merely based on misapprehensions.

Moreover, Plaintiffs identify no way in which the challenged reforms have any concrete effect on their "rights or obligations."  Plaintiffs do not show that these administrative reforms have "legal consequences" in and of themselves, such as by changing the benefits to which they are entitled.  And SSA has made clear that despite the closure of OCREO, the agency will continue "processing Equal Employment Opportunity complaints, reasonable accommodation requests, and other statutorily required functions," duties that will be transferred to other offices.  *See* Feb. 25 SSA Press Release.  Plaintiffs' chief complaint is essentially that the reforms will degrade customer service and result in inconvenience.  They therefore fail to identify a cognizable final agency action.

### 3.    Plaintiffs' APA arguments fail

Even if Plaintiffs could satisfy the APA's threshold requirements, their claims would fail.

### a.    SSA's reforms are not contrary to law

Over the span of about a page, Plaintiffs make passing claims that SSA's reforms violate various laws. Pls.' Mot. at 30. They are wrong at each turn.

First, there is no violation of the Rehabilitation Act, as explained above. *See supra* at pp. 21-26. Second, while Plaintiffs claim that the "elimination of key offices and the reduction in staff" are unlawful, the Commissioner wields broad "authority and control over all personnel and activities thereof," 42 U.S.C. § 902(a)(4), and discretion to "establish, alter, consolidate, or discontinue such organizational units or components . . . as the Commissioner considers necessary or appropriate," *id*. § 902(a)(6). While Plaintiffs suggest a not-fully-explained tension with 20 C.F.R. § 404.1740, that regulation does not govern the Commissioner; it instead provides "rules of conduct and standards of responsibility for representatives"—*i.e.*, "attorneys or other persons acting on behalf of a party seeking a statutory right or benefit" *from* SSA, who must, "in their dealings *with us* [SSA]," "conduct [themselves] in a manner that furthers the efficient, fair, and orderly conduct of the administrative decision-making process." 20 C.F.R. § 404.1740(a)(1), (3). Finally, Plaintiffs refer in passing to infringements of "fundamental constitutional protections," Pls.' Mot. at 31, but fail to develop these arguments, which are devoid of any citation to authority, and are therefore forfeited. *See Momenian v. Davidson*, No. 1:15-cv-00828 (APM), 2020 U.S. Dist. LEXIS 34851, at *22 (D.D.C. Mar. 1, 2020) (Mehta, J.) ("Plaintiffs have forfeited these arguments by failing to even remotely develop them in their briefing.").

### b. SSA's reforms are not arbitrary and capricious

### (i) There is no lack of a reasoned explanation

Plaintiffs argue that "SSA has failed to provide a legitimate, reasoned justification for effectively eliminating civil rights protections, cutting 7,000 employees, reducing offices, and implementing policies pushing thousands to the overburdened telephone system for appointments and requiring more field office visits." Pls.' Mot. at 29. Plaintiffs mistake the standard of review.

"Under the 'arbitrary and capricious' standard the scope of review is a narrow one." *Bowman Transp., Inc. v. Ark.-Best Freight System, Inc.*, 419 US 281, 286 (1974). Even "a decision

of less than ideal clarity" will be upheld so long as "the agency's path may reasonably be discerned." *Id.* Put differently, the agency need only "a 'rational connection between the facts found and the choice made,'" *id.* (quotation omitted), acting within a wide "zone of reasonableness." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).[7]

SSA's reforms amply clear this bar. Plaintiffs themselves acknowledge that the reforms are intended to "support[] President Trump's priorities, which include streamlining functions and prioritizing essential work" and "mak[ing] all of government more efficient." *See id.* at 30. And the fact that SSA's own press releases largely form the basis for Plaintiffs' papers, allowing them to draft a 48-page complaint, 41-page motion, and 19 declarations describing those plans in significant detail, belies any suggestion that the agency's path in this reorganization cannot "reasonably be discerned."[8]

### (ii)    There was no unexplained departure from precedent

Plaintiffs also argue that SSA impermissibly changed its policies without reasonable explanation. Not so. Under the change-in-position doctrine, "[a]gencies are free to change their existing policies as long as they provide a reasoned explanation for the change, display awareness that [they are] changing position, and consider serious reliance interests." *FDA v. Wages & White Lion Invs., L.L.C.*, 2025 U.S. LEXIS 1368, at *6 (Apr. 2, 2025) (citing *FCC v. Fox Television*, 556 U. S. 502, 515 (2009)).

At the outset, Plaintiffs are mistaken to assume that the "policies" they fault here—in contrast to the more formal policies at issue in *Wages* and *Fox Television*—are subject to this doctrine at all. After all, it cannot be the case that any time an agency changes its mind about anything, regardless of any concrete effect on relevant parties, an obligation to defend against an

---

[7] Plaintiffs rely upon a misplaced analogy to *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget,* No. CV 25-239 (LLA), 2025 WL 597959, at *14 (D.D.C. Feb. 25, 2025) (Pls.' Mot. at 30), but the "freeze [of] all federal financial assistance—with less than twenty-four-hours' notice" at issue there bears little resemblance to the agency restructuring here.

[8] Even if, hypothetically, this Court were to conclude that the explanation provided is insufficient for judicial review, that would not justify the preliminary injunction. Rather, "the proper course" would be "to remand to the agency for additional . . . explanation," not any type of injunction. *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).

APA challenge arises.  In any event, SSA met any such requirement as to the two "policy changes" Plaintiffs identify.

First, Plaintiffs contend that "SSA previously recognized that OCREO was necessary to ensure compliance with disability rights laws and that the Office of Transformation played a critical role in modernizing service access."  Pls.' Mot. at 28 (citing Decl. of Chris Heidelberg ¶¶ 7-10; Decl. of Elizabeth Beaumon ¶ 11).  But the cited declarations say no such thing, perhaps explaining Plaintiffs' use of a "*see, e.g.*" citation.  In the absence of a prior SSA policy clearly asserting, for instance, that these offices are indispensable to the agency's discharge of statutorily required duties, it is difficult to fathom how there has been a "policy" change here at all.  And if the thrust of Plaintiffs' argument is that SSA has not sufficiently explained why the closure of these offices better suits its current priorities, the response is that the agency's press releases lay out its reasoning quite clearly—and that it is black-letter law that an agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates."  *Fox Television*, 556 U.S. at 515 (emphasis in original).

Second, Plaintiffs complain that SSA "long has sought additional staffing to meet the overwhelming need," and "now reverses course, proposing to cut staff even further, with no explanation."  Pls.' Mot. at 28.  But again, the SSA *did* explain this:  Its February 28 press release, among the others, detailed that, consistent with President Trump's executive orders, the agency "will continue to implement efficiencies and reduce costs, with a renewed focus on *mission critical work*"—and that the SSA "plans to reduce the size of its bloated workforce and organizational structure, with a significant focus on functions and employees *who do not directly provide mission critical services*."  *See* Feb. 28 Press Release (emphasis added).

> **(iii)      There is no merit to Plaintiffs' argument that Defendants failed to consider reliance interests.**

Plaintiffs also argue that SSA failed to adequately consider reliance interests when eliminating OCREO and the Office of Transformation. But not all asserted reliance interests are created equal, and the APA requires the weighing of only those interests that are "legitimate" and "serious." *See, e.g., Whitman-Walker Clinic, Inc. v. United States HHS*, 485 F. Supp. 3d 1, 49 (D.D.C. 2020). Plaintiffs cannot reasonably claim such an interest in a certain level of customer service, much less in the perpetual operation of particular offices at SSA headquarters.

Regardless, reliance does not overwhelm good reasons for a policy change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016) (Ginsburg, J., concurring). Here, SSA identified the Office of Transformation as a "redundant office"—one it viewed as "wrong" to have been created in the first place. *See* Feb. 24 Press Release. And as for the closure of OCREO, SSA explained that it "will transfer responsibility for processing Equal Employment Opportunity complaints, reasonable accommodation requests, and other statutorily required functions to other SSA components to ensure compliance with existing legal authorities." *See* Feb. 25 Press Release. The SSA thus concluded that both closures would "enhance operations," *id.*—a reason sufficient to overcome any cognizable reliance interest.

### 4.    SSA's reforms are not *ultra vires*

Last, Plaintiffs assert an "*ultra vires*" argument, claiming that the agency "overstepped its statutory bounds by unilaterally dismantling SSA civil rights protections, eliminating key offices, and restructuring workforce obligation—without the necessary Congressional authorization." Pls.' Mot. at 33. This last-ditch effort fails.

*Ultra vires* claims are available only where an "agency action go[es] beyond mere legal or factual error and amount[s] to a 'clear departure by the [agency] from its statutory mandate' or [is] 'blatantly lawless.'" *Fed. Express Corp. v. United States DOC*, 39 F.4th 756, 764 (D.C. Cir. 2022). In short, "[g]arden-variety errors of law or fact are not enough." *Id.* "*Ultra vires* review looks first at whether the agency contravened a 'clear and specific statutory mandate,' and then, if applicable, whether the agency's statutory construction is 'utterly unreasonable.'" *Id.* To satisfy

this demanding test, Plaintiffs must show that "the agency has plainly and openly crossed a congressionally drawn line in the sand." *Id.* at 765.

Here, this "Hail Mary pass," *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722, (D.C. Cir. 2022), fails for reasons already explained, as the Social Security Act authorized the Commissioner to make the changes at issue. *See supra* at pp. 33-35.[9]

### E.    Plaintiffs fail to show they likely will suffer irreparable harm in the absence of preliminary relief

Even if Plaintiffs could show a likelihood of success on the merits, they cannot meet the "high standard" to show irreparable harm, *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)—an independent bar to their request for injunctive relief. "A prospective injury that is sufficient to establish standing . . . does not necessarily satisfy the more demanding burden of demonstrating irreparable injury." *Cal. Ass'n of Private Postsecondary Schs. v. Devos*, 344 F.3d 158, 170 (D.D.C. 2018).  The moving party must instead demonstrate an injury "both certain and great" and "of such *imminence* that there is a 'clear and present' need for equitable relief in order to prevent irreparable harm." *Id.*  The injury must also "be beyond remediation," meaning that the possibility of corrective relief "at a later date . . . weighs heavily against a claim of irreparable harm." *Id.* at 297-98.  "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough." *Sampson v. Murray*, 415 U.S. 61, 90 (1974).

Plaintiffs fall well short of this standard.  As explained above, the individual Plaintiffs do not claim any actual loss of benefits attributable to the challenged reforms, which itself would constitute only monetary harm, but instead invoke speculation about lengthier waiting times and

---

[9]  Plaintiffs also briefly suggest that "the Court should compel agency action unlawfully withheld and unreasonably delayed." Pls.' Mot. at 32 (emphasis omitted).  But Plaintiffs never identify what agency action has been "unlawfully withheld" or "unreasonably delayed," cite no statute imposing a specific, unequivocal command, and identify no relevant case law.  To the extent the argument is even developed enough to be preserved, Plaintiffs fall well short of their heavy burden to show a right to mandamus-like relief under 5 U.S.C. § 706(1).  *See, e.g.*, *In re Core Communications, Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008) ("The central question in evaluating a claim for unreasonable delay is whether the agency's delay is so egregious as to warrant mandamus.").

other customer service inconveniences.  And the organizational Plaintiffs, for their part, appear to rest on "frustration of mission" and "diversion of resources" theories that essentially describe increased expenditures "in terms of money, time and energy."  *See id*.  These, by definition, are not harms that rise to the level of being irreparable.

### F.    The equities weigh against a preliminary injunction

The third and fourth requirements for issuance of a preliminary injunction—the balance of harms and whether the requested injunction will disserve the public interest—"merge when the Government is the opposing party," *Nken v. Holder*, 556 U.S. 418, 435 (2009), and tilt against a grant of preliminary relief here for at least four reasons.

First, the public has a strong interest in permitting the President to take decisive action when it comes to setting his policy priorities for SSA.  A preliminary injunction would displace and frustrate the President's decision about how to best address those issues, and the Court should give deference to the Executive Branch in this regard.  *Heckler*, 470 U.S. at 831-32.  Eliminating waste and inefficiency—the stated goals underlying the steps at issue—is manifestly in the public interest.  Second, the agency has continued to update and refine its approach to the restructuring, expressly taking into account public feedback.  For example, over the course of March and April, the agency refined its position on the availability of telephone services, largely mooting this issue. An injunction would stymie this iterative process, unnecessarily injecting the judiciary into agency management.  Third, as noted above, if this injunction were allowed, it would invite similar emergency litigation any time an agency undertakes a restructuring or similar programmatic change with virtually any potential downstream effects on customer service.  Encouraging such challenges is not in the public interest.  Fourth, Plaintiffs' proposed remedy would not only intrude on Executive Branch prerogatives to manage the workforce but also threaten tremendous confusion for employees.  As just one example, Plaintiffs seek a court-ordered "pause" on all impacted resignations or early retirement-based reductions in staffing—but these were, of course, voluntary decisions of individual employees, in some cases incentivized by bonus payments, the

status of which would become uncertain.  Meanwhile, this sort of relief would impose exorbitant costs on the agency that could not be recouped.

## II.    Any Relief Should Be Narrowly Tailored

For all the foregoing reasons, it would be inappropriate for the Court to issue relief in any form.  However, should the Court conclude otherwise, "an injunction must be narrowly tailored to remedy the harm shown."  *Gulf Oil Corp. v. Brock*, 778 F.2d 834, 842 (D.C. Cir. 1985).  Here, Plaintiffs' requested orders go far beyond that principle.  Not only do they fail to "describe in reasonable detail . . . the act or acts restrained or required," Fed. R. Civ. P. 65(d)(1)(C), they also are not tailored to remedying any particular harm shown.

At most, Plaintiffs have attempted to show injury from workplace reorganizations that could hypothetically lead to the separation of certain (unidentified) employees who perform certain (vaguely identified) functions in offices that Plaintiffs may (or may not) use.  It is a bedrock principle of equity that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."  *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).  Thus, the Court should limit any relief to a prohibition on the separation of employees performing specific statutory functions where Plaintiffs have shown specific, irreparable harm.

## III.    Any Injunction Should be Stayed, and Plaintiffs Should be Required to Post a Reasonable Bond if an Injunction is Entered.

Particularly in light of the extraordinary breadth of Plaintiffs' motion, to the extent the Court issues injunctive relief, the United States respectfully requests that such relief be stayed pending the disposition of any appeal that is authorized, or at a minimum that such relief be administratively stayed for a period of seven days to allow the United States to seek an emergency, expedited stay from the Court of Appeals if an appeal is authorized.

Last, the Court should reject Plaintiffs' argument that they should not be required to post a bond. "In deciding on an appropriate [bond] amount, relevant considerations include the hardship the posting of security would impose on the applicant, the public interest in the litigation, and the likelihood of success on the merits, at least where it is extraordinarily high." *Malcolm v. Reno*, 129 F. 2d 1, 11-12 (D.D.C. 2000). Here Plaintiffs include large organizations that could post security. The likelihood of success on the merits is low, as explained above. Meanwhile, the proposed injunction has the potential to impose enormous costs on the United States, and apart from the bond posted under Rule 65(c), the government will not be able to recover that money if it later prevails at judgment. Finally, Plaintiffs argue their approach is appropriate where "constitutional rights" are at stake, but as noted above, Plaintiffs' moving papers include only passing reference to constitutional claims, with no developed argument, and those claims are thus forfeited for present purposes.

## CONCLUSION

The Court should deny Plaintiffs' motion for a preliminary injunction.

DATED: April 16, 2025     Respectfully submitted,

          YAAKOV M. ROTH
          Acting Assistant Attorney General

          ERIC BECKENHAUER
          Assistant Director, Federal Programs Branch

          */s/ Steven M. Chasin*
          STEVEN M. CHASIN
          PIERCE J. ANON (N.Y. Bar # 6184303)
          Trial Attorneys
          United States Department of Justice
          Civil Division, Federal Programs Branch
          1100 L Street, N.W.
          Washington, DC 20005

          *Counsel for Defendants*