**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN ASSOCIATION OF PEOPLE WITH DISABILITIES *et al.*,<br><br>    *Plaintiffs*,<br><br><br>  v.<br><br>LELAND DUDEK, *in his official capacity as Acting Administrator of the Social Security Administration, et al.*,<br><br>    *Defendants.* | Civil Action No.: 1:25-cv-00977-APM |

**PLAINTIFFS' REPLY IN SUPPORT OF
<u>MOTION FOR A PRELIMINARY INJUNCTION</u>**

Dated: April 21, 2025

Eve L. Hill (DC Bar No. 424896)
Anthony J. May*
**BROWN, GOLDSTEIN & LEVY, LLP**
120 East Baltimore Street, Suite 2500
Baltimore, Maryland 21202
Tel.: (410) 962-1030
Fax: (410) 385-0869
ehill@browngold.com
amay@browngold.com

Regan Bailey (DC Bar No. 465677)
Liam McGivern*
**JUSTICE IN AGING**
1444 Eye Street, N.W., Suite 1100
Washington, DC 20005
Tel.: (202) 289-6976
rbailey@justiceinaging.org
lmcgivern@justiceinaging.org

*Admitted *Pro Hac Vice*

*Counsel for Plaintiffs*

## INTRODUCTION

Defendants offer no evidence of widespread fraud to justify their sweeping and destructive overhaul of the Social Security Administration ("SSA"). *See generally* ECF No. 28, Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. ("Opp'n"). They provide no data to support the claim that SSA's workforce is "bloated," much less to rationalize slashing it to just 50,000 employees, *id.* at 5, at a time when the agency is serving a record number of beneficiaries, *see* ECF No. 2-1 at 7. They offer no support for their assertion that the Office of Transformation ("OT") was "wasteful and inefficient," Opp'n 24, to justify its elimination, effectively keeping SSA's technical functions in the stone age, *see* ECF No. 2-1 at 15–17, 25–28, 32, 36–38. Despite repeated claims that they have "transferred" the Office of Civil Rights and Equal Opportunity's ("OCREO") "essential functions to another office," *see* Opp'n 5, 12, 24 n.3, 36, 37, 41, they do not identify any office presently bearing those responsibilities. *See, e.g.*, Declaration of Hannah Demeritt ("Demeritt Decl.") ¶14. Meanwhile, the agency continues to slash staff and offices, even as this litigation proceeds, now proposing to cut 30 to 50 percent of the staff of its Chief Information Officer. Tami Luhby, *Social Security targets tech team for cuts at a time when systems are under strain*, CNN (Apr. 4, 2025) https://www.cnn.com/2025/04/04/politics/social-security-tech-team-layoffs/index.html.

Yet Defendants ask this Court to sanction a "reform" strategy that shoots first and asks questions later, leaving vulnerable people as collateral damage. Plaintiffs have shown that they, their members, and the communities they serve face actual, imminent, and irreparable harms. Because they are likely to prevail on their Rehabilitation Act and Administrative Procedure Act ("APA") claims, this Court should grant their request for a preliminary injunction and return the SSA to the status quo pending litigation of Plaintiffs' claims.

**ARGUMENT**

I.   **Defendants' Flawed Arguments Regarding the Law and Facts Demonstrate that Plaintiffs are Likely to Succeed on the Merits.**

A.   **Plaintiffs have standing to bring suit.**

Article III standing is available where a plaintiff can prove three key elements: (1) an injury in fact; (2) traceability between the injury and conduct complained of; and (3) redressability of the injury by the relief sought. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

1.   **Plaintiffs Have Demonstrated Actual and Imminent Injuries.**

a.   **Defendants' actions put Plaintiffs at imminent risk of harm.**

Because of staff cuts, elimination of key offices without any demonstrated plan to transfer those services elsewhere, and the imposition of new administrative barriers, Defendants have effectively shut Plaintiffs and their members out of their access to SSA benefits and services.[1] Defendants' nationwide staff reduction has slashed personnel at 40 local field offices by 25 percent or greater. *See* Declaration of Liam McGivern ("McGivern Decl.") ¶¶3–6; Lisa Rein, *Social Security faces thousands more job cuts even with service in tailspin*, WASH. POST (Apr. 4, 2025), https://www.washingtonpost.com/politics/2025/04/04/social-security-layoffs-trump-musk/. Declaration of Rebecca Ladd ("Ladd Decl.") ¶¶7–11. These cuts exacerbate the problems associated with SSA's historic low staffing levels. ECF No. 2–17, O'Malley Decl. ¶¶31–32; Declaration of Teresa Ghilarducci ("Ghilarducci Decl.") ¶¶11–30.

Since 2010, the number of SSA beneficiaries has grown by 28 percent, while the number of staff has fallen by 15 percent. Jacob Leibenluft *et al.*, *Trump Administration, DOGE Activities*

---

[1] Defendants assert that they have retracted some of their proposed policies. Opp'n 7. A "defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 189 (2000) (citation omitted). Furthermore, Defendants concede that some transactions remain unavailable by phone under the new policies. Opp'n 7.

*Risk SSA Operations and Security of Personal Data*, CTR. ON BUDGET & POL'Y PRIORITIES (Apr. 1, 2025), https://www.cbpp.org/research/social-security/trump-administration-doge-activities-risk-ssa-operations-and-security-of. With Defendants' additional cuts set to take effect in the coming days, staffing will fall to 26 percent below 2010 levels. *Id.*

The results of such drastic reductions are far from hypothetical. Reductions in SSA's staff in the 1980s—when SSA had more staff and was serving fewer people than it does now—resulted in "inefficient operations," and system failures. ECF No. 2-1 at 38–39. Those cuts happened over the course of a decade. *Id.* Defendants are carrying out their cuts in weeks. The nearly one third of people with disabilities living in poverty, who need an estimated 28 percent *more* income to maintain the same standard of living as people without disabilities, cannot wait while the predictable effects of Defendants' actions threaten their lives. U.S. Sen. Bernie Sanders, Minority Staff Report, U.S. Sen. Subcomm. On Soc. Sec., Pensions, and Family Policy, Musk's Social Security Administration Cuts: Longer Wait Times, More People Will Die Waiting for Disability Benefits 1 (Mar. 26, 2025), https://perma.cc/4H3B-KLMD (hereinafter "Minority Staff Rep.").

The average wait time for a Social Security Disability Insurance ("SSDI") initial determination was 217 days in 2023, not including the time required to endure the appeals process. Minority Staff Rep., *supra*, at 1. At that rate in 2023, 30,000 people died while awaiting decisions on their initial disability claims. Natalie Alms, *30,000 died in fiscal 2023 waiting for disability decisions from Social Security*, NEXTGOV/FCW (Apr. 17, 2024), https://www.nextgov.com/digital-government/2024/04/30000-died-fiscal-2023-waiting-disability-decisions-socialsecurity/395796. Wait time for an initial SSI or SSDI decision increased to 236 days in February 2025. Minority Staff Rep., *supra*, at 1. That figure is likely to surpass the

one-year mark as a direct and proximate result of Defendants' actions—resulting in a 412-day average determination rate just for an initial decision. *Id.* at 2.

SSA and the Department of Government Efficiency's ("DOGE") staff cuts, resulting in undue delay in processing benefits, mean that a projected 67,000 people will die while they wait for disability benefit determinations in 2025. *Id.* That is, for every day tacked onto the already unrelenting wait time, an estimated 188.7 people will die waiting for benefits. *Id.* For every SSA staff member cut, an expected 8.6 eligible people will go without the benefits they have need—and many already are. ECF No. 2-1 at 35; *see also* Demeritt Decl. ¶¶7–13; Declaration of Daniella Kaiserman ("Kaiserman Decl.") ¶¶5–14; Declaration of Emilia Sicilia ("Sicilia Decl.") ¶¶7–18.

When benefits are delayed, people are forced to ration their medication, ECF No. 2–12, Richtman Decl. ¶11, incur crushing medical bills, Declaration of Jeanne Barbi ("Barbi Decl.") ¶¶13–20, and forego other essential needs, *see id.*; *see also* ECF No. 2-16, Riccobono Decl. ¶10; Declaration of Maria Town ("Town Decl.") ¶17; ECF No. 2-18, Bitencourt Decl. ¶12; ECF No. 12, Villers Decl. ¶19; O'Malley Decl. ¶¶16–17; Declaration of Jacqueline Brewington ("Brewington Decl.") ¶¶4–13. These are the excruciating, sometimes fatal, decisions that claimants must make while SSA insists that they remain patient. *See ibid.*

Many Plaintiffs are among the millions of people waiting for benefit determinations and appeals. Defendants' new policies have created a statistical certainty that those benefits will be delayed, at minimum, six months, demonstrating "direct, real, and palpable" injuries. *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 914 (D.C. Cir. 2015) (citation omitted). Other Plaintiffs are currently receiving benefits but need assistance from SSA to adjust or maintain them. Their access to that assistance is being and will predictably be delayed or even denied by Defendants' cuts. *See* SSA 800 Number Performance, https://www.ssa.gov/ssa-performance/800-

number-performance (showing monthly Agent Busy Rate increasing from near zero in December 2024 to 28.4 percent in March 2025 and Percentage of Callers Who Reach an Agent plummeting from 55 percent in November 2024 to 39 percent in March 2025).

### b. Individual Plaintiffs have and continue to suffer concrete harms.

In just a matter of weeks, Defendants' actions have taken SSA's condition from bad to worse. The Individual Plaintiffs bear the brunt of this decline. Wilshawn Tiller has already waited 17 months for a decision on his SSDI and, after waiting 15 months for a decision on his SSDI application, is now waiting for SSA to process his appeal from a denial of benefits. ECF No. 2–8, Tiller Decl. ¶¶14, 18. Mr. Tiller has been unemployed for over a year and, without SSA benefits, is "not just living paycheck to paycheck," he and his family are "making it work one day at a time." *Id.* ¶21.

Merry Schoch has spent hours waiting on the phone, traveling to and from her local field office, and attempting to navigate SSA's glitchy online platforms to get her SSDI benefits reinstated. ECF No. 2–5, Shoch Decl. ¶¶15–27. Over two days in March 2025, she spent hours trying to schedule an appointment with SSA to get help filling out a required questionnaire. *Id.* ¶¶21–25. SSA told her she would have to wait another two months before her appointment could be scheduled. *Id.* ¶22. By enacting policies that make it impossible for Ms. Schoch to get the help she needs, Defendants have denied her meaningful access to the SSA's programs and benefits, threatening whether Ms. Schoch and her family can "put[] food on the table [or] not." *Id.* ¶28.

Treva Olivero, Deja Powell, Martha Hazen, and William Weiss are also stuck without income or healthcare while SSA's actions bar them from a timely appeal process. ECF No. 2–3, Olivero Decl. ¶¶11–14, 25–26; ECF No. 2–7, Powell Decl. ¶¶6–12, 7; ECF No. 2–4, Hazen Decl. ¶¶8–14, 17; ECF No. 2-6, Weiss Decl. ¶¶7–11. Elizabeth Rouse's inability to access SSA's services in recent days amounts to an outright denial. ECF No. 2–2, Rouse Decl. ¶¶ 9–10, 12–14.

### 2. Organizational Plaintiffs Have Standing

A plaintiff organization can satisfy the standing requirements of Article III by either "claim[ing] that it suffered an injury in its own right, or, alternatively, it can assert 'standing solely as the representative of its members.'" *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975)). The former route is known as "organizational standing," whereas the latter is known as "associational standing." *See Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Dep't of Lab.*, No. CV 25-339 (JDB), 2025 WL 1129227, at *5–11 (D.D.C. Apr. 16, 2025); *see also Abigail All. for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 132 (D.C. Cir. 2006).

#### a. NFB, NCPSSM, and MSAC have associational standing.[2]

A plaintiff establishes associational standing if "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

NFB's purpose includes "ensuring that blind and visually impaired people have full and equal access to all services, programs, and activities," including the SSA. Riccobono Decl. ¶¶6–9. NFB's members who are parties to this lawsuit have standing in their own right based on the actual and imminent harm explained above. *See supra* Arg. § I.A; *see also* Riccobono Decl. ¶¶10–12. Likewise, NCPSSM and MSAC have identified members who are experiencing or imminently anticipate harm as a result of Defendants' actions. Where "all the members of the organization are

---

[2] Unlike NFB, NCPSSM, and MSAC, Plaintiffs AAPD and Deaf Equality are not membership organizations and do not allege that they have associational standing.

affected by the challenged activity," courts dispense with the requirement to name affected members. *Summers v. Earth Island Inst.*, 555 U.S. 488, 498–99 (2009) (citation omitted); ECF No. 12, Villers Decl. ¶8 ("Virtually all of MSAC members receive benefits through the Social Security Administration"); ECF No. 2-12, Richtman Decl. ¶9 ("All of our members and supporters contributed to Social Security during their working lives. The vast majority . . . receive [SSA] benefits . . . Nearly all of them are covered by Medicare."). Plaintiffs need only show one member has suffered an injury to confer standing. *See Ranchers-Cattlemen Action Legal Fund, United Stockgrowers of Am. v. United States Dep't of Agric.*, 573 F. Supp. 3d 324, 336 (D.D.C. 2021).

Various NCPSSM members have vocalized their concerns with SSA's recent staff cuts, inability to secure in-person appointments, delays in benefit payments, and closures of OCREO and OT. Richtman Decl. ¶¶10–14; *see also* Supplemental Declaration of Max Richtman ("Supp. Richtman Decl.") ¶¶6–7. MSAC's members have experienced roadblocks that SSA's new policies have put in their way. For example, one member's diligent efforts to obtain a Social Security card have been thwarted by SSA's stagnant operations. Supplemental Declaration of Carolyn Villers ("Supp. Villers Decl.") ¶10. Other members of MSAC's Boston Chapter Board met with Ms. Villers in late March 2025 to express their inability to obtain SSA services by telephone, online, and in person. Villers Decl. ¶¶12–13. Their anonymity does not hinder MSAC's standing. *Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.,* 41 F.4th 586, 594 (D.C. Cir. 2022) ("To be sure, we do not know the names of the [individual members of the plaintiff union] in the survey, but anonymity is no barrier to standing on this record.") (collecting cases).

### b.  All Organizational Plaintiffs have organizational standing.

Organizational standing requires a plaintiff to allege a "concrete and demonstrable" injury connected to Defendants' wrongful actions. *People for the Ethical Treatment of Animals* ("*PETA*") *v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1093 (D.C. Cir. 2015). To decide whether an organization's

injury is "concrete and demonstrable," the court first determines "whether the agency's action or omission to act 'injured the organization's interest' and, second, whether the organization 'used its resources to counteract that harm.'" *Id.* at 1094 (citation omitted). Courts further distinguish "between organizations that allege that their activities have been impeded from those that merely allege that their mission has been compromised." *Abigail All.*, 469 F. 3d at 133; *Food & Drug Admin. v. All. for Hippocratic Med.* ("*Alliance*"), 602 U.S. 367, 395 (2024).

Plaintiffs' missions each aim to bring about a more equal, just, and inclusive world for people with disabilities. Town Decl. ¶6; Bitencourt Decl. ¶¶4–5; Riccobono Decl. ¶¶5–9; Richtman Decl. ¶¶5–8; Villers Decl. ¶¶5–10. Defendants' newly enacted policies have incited fear and confusion among claimants and recipients of SSA benefits, including Plaintiffs' members and constituents. Town Decl. ¶¶10, 14–15, 21; Bitencourt Decl. ¶¶12–17; Riccobono Decl. ¶¶10–13; Richtman Decl. ¶¶10–11; Villers Decl. ¶¶11–13, 19; Supp. Villers Decl. ¶¶14–15. Without OCREO and OT, and Defendants' inability to specify where those offices' responsibilities have been "transferred," *see* Opp'n 5, 12, 24 n.3, 36, 37, 41, Plaintiffs' members and constituents are left without means for recourse or reasonable accommodations when needed. Town Decl. ¶18; Bitencourt Decl. ¶¶7, 13; Riccobono Decl. ¶¶10-11, 18; Richtman Decl. ¶¶10, 12, 20; Demeritt Decl. ¶14; Declaration of Elizabeth Beaumon ("Beaumon Decl.") ¶18. Defendants' gutting of experienced staff and accessible customer services have directly impaired Organizational Plaintiffs' respective missions. *See ibid.*; *see also* ECF No. 23, Amicus Br. of Ctr. for Medicare Advocacy and Medicare Rts. Ctr. at 4, 8–12.

Moreover, while each Organizational Plaintiff advocates for better policies, programs, and benefits of SSA, the recent changes at SSA have required them to take on wholly new efforts to support members. *Accord Am. Fed'n of Lab. & Cong. of Indus. Orgs.*, 2025 WL 1129227, at *10–

11; Town Decl. ¶¶7–8; Bitencourt Decl. *Id.* ¶¶6–11; Riccobono Decl. ¶¶16–17; Richtman Decl. ¶¶18–19; Villers Decl. ¶¶14–15. In the wake of SSA's recent changes, AAPD has dedicated additional staff to help manage the deluge of callers concerned about SSA benefits. Town Decl. ¶10. Further diversions of resources will detract from AAPD's core business activities outside of its SSA advocacy. *Id.* ¶¶9, 11–13. Deaf Equality's services previously focused on removing barriers for Deaf people within the private sector and state governments. Bitencourt Decl. ¶8. In the last three months, Deaf Equality has shifted its services to dedicating 50 percent of its work to restoring access and equity for its constituents within SSA. Bitencourt Decl. ¶¶6–9. NFB, NCPSSM, and MSAC have similarly been forced to pivot from their normal course because of Defendants' actions. Riccobono Decl. ¶¶15–19; Richtman Decl. 17–21; Villers Decl. ¶¶14–18.

Beyond resource diversion, SSA's policies stall and obstruct Organizational Plaintiffs' members' access to SSA's program and benefits. *Am. Fed'n of Lab. & Cong. of Indus. Orgs.*, 2025 WL 1129227, at *10–11. NFB provides consultant services to its members to navigate the SSA benefit application process. *See* Rouse Decl. ¶16; Olivero Decl. ¶14; Hazen Decl. ¶10. NFB cannot adequately meet the needs of its members when SSA's benefit application and management systems are understaffed and unduly delayed. NCPSSM cannot adequately advise its members about how to navigate SSA systems—a failure to deliver on a key promise of its membership— because Defendants have eliminated staff and key offices that provide meaningful access to those programs. Richtman Decl. ¶¶16, 22–23; Supp. Richtman Decl. ¶¶9–10. Today, MSAC's staff is so overrun with concerns from its members about their SSA benefits that it cannot adequately dedicate time to its duties as an advocate for housing access and food insecurity. Villers Decl. ¶15; Supp. Villers Decl. ¶¶11–15. AAPD's and Deaf Equality's programs and services have similarly suffered. Town Decl. ¶¶11–13; Bitencourt Decl. ¶¶10–11.

In *Havens Realty Corp. v. Coleman*, the organization alleged a direct injury because it "not only was an issue-advocacy organization, but also operated a housing counseling service," and defendants' conduct "directly affected and interfered with [its] core business activities." *Alliance*, 602 U.S. at 395 (citing *Havens Realty Corp.*, 455 U.S. 368). This Court "has applied *Havens Realty* to justify organizational standing in a wide range of circumstances." *Abigail All.*, 469 F.3d at 133 (collecting cases). In *PETA*, the plaintiff organization established standing when two of its mission-based activities were substantially impaired by the defendant federal agency's actions. 797 F.3d at 1091, 1094–95. This Court found standing because the organization had to "expend resources to seek relief through other, less efficient and effective means." *Id.*

Organizational Plaintiffs' injuries here are analogous to those presented in *Havens* and *PETA*. Each organization has established, beyond an impairment of its interests, that their "discrete programmatic concerns are being directly and adversely affected by [Defendants'] actions." *Am. Legal Found. v. FCC*, 808 F.2d 84, 92 (D.C. Cir. 1987). Each organization has expressed an inability to educate or advise its members accurately and effectively about SSA's policies or systems due to the constant rollout and retraction of major agency changes. *Accord United Spinal Ass'n, Inc. v. O'Malley*, 20-CV-2236 (TSC), 2024 WL 3400259, at *7 (D.D.C. July 11, 2024), *appeal dismissed*, 24-5208, 2024 WL 4631680 (D.C. Cir. Oct. 29, 2024). And as in *PETA*, the elimination of OCREO and OT bars Organizational Plaintiffs and their members/constituents, from seeking redress and reasonable accommodations through agency channels.

Defendants analogize Plaintiffs' case to *OPM v. AFGE*, No. 24A904, 2025 WL 1035208, at *1 (U.S. Apr. 8, 2025), which relies exclusively on *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013). In *OPM v. AFGE*, the Supreme Court granted a stay of a preliminary injunction where standing for the organizational plaintiffs was based on "insufficient" allegations. 2025 WL

1035208, at *1. Those plaintiffs' allegations come with none of the historical context, pervasiveness, or gravity of Plaintiffs allegations here. Unlike *Clapper*, which took a five-part "chain of contingencies" to arrive at the plaintiff's harm from defendants' actions, 568 U.S. at 410–11, Plaintiffs' theory is direct: Low staff, high administrative barriers, and no accountability leaves Plaintiffs without equal or meaningful access to SSA's programs and benefits. *See supra*, Arg. § I.A; O'Malley Decl. ¶11; *contra Clapper*, 568 U.S. at 417.

Plaintiffs seek to prevent Defendants from continuing to create "'obstacle[s],' solely because of their disabilities, 'that impede[] their access to [SSA's] government benefit or program[.]" *Mathis v. United States Parole Comm'n*, 749 F. Supp. 3d 8, 16 (D.D.C. 2024); *see also Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1267 (D.C. Cir. 2008). "Such a declaration or injunction is 'substantially likely' to result in the SSA [ending its policies] in these situations." *United Spinal Ass'n, Inc.*, 2024 WL 3400259, at *7.

### B.    Defendants' Attempt to Divest this Court of Jurisdiction Under the Guise of Administrative Channeling Should be Rejected.

Courts "begin with the strong presumption that Congress intends judicial review of agency action." *Bowen v. Mich. Acad. Fam. Physicians*, 476 U.S. 667, 670 (1986) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967)). Defendants invoke the Civil Service Reform Act ("CSRA") and mischaracterize Plaintiffs' claims as a challenge to SSA "employment policies" to divest this Court of jurisdiction. Opp'n 16–21. But Plaintiffs do not seek to stand in the shoes of terminated federal employees—they seek to protect their personal rights to have timely, meaningful, and equal access to SSA's programs, benefits, and services.

"From the beginning, 'our cases [have established] that judicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress.'" *Bowen*, 476 U.S. at 670 (citation omitted). While Defendants

cite CSRA, it does not follow that *every person* is barred from bringing *any claim* that implicates federal staffing levels.[3] Instead, to determine whether the "particular claims brought were 'of the type Congress intended to be reviewed within this statutory structure,'" *Axon Enterprise, Inc. v. FCC*, 598 U.S. 175, 186 (1975) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 208 (1994)), the Supreme Court identified three considerations:

> First, could precluding district court jurisdiction "foreclose all meaningful judicial review" of the claim? Next, is the claim "wholly collateral to [the] statute's review provisions"? And last, is the claim "outside the agency's expertise"? When the answer to all three questions is yes, "we presume that Congress does not intend to limit jurisdiction."

*Axon Enter., Inc.*, 598 U.S. at 186 (cleaned up).

As to the first *Thunder Basin* factor, in *Axon*, the Court found that where forcing an administrative process would result in "[j]udicial review of" a plaintiff's substantive claims at a point "too late to be meaningful," then the first factor weighs in favor of exercising judicial review now. 598 U.S. at 191. Similarly here, waiting for federal employees to challenge their termination through CSRA would foreclose Plaintiffs from obtaining meaningful relief on their present claims of harm under the Rehabilitation Act and APA. On the second factor, Plaintiffs' claims under the Rehabilitation Act and APA challenging SSA's ability to deny Plaintiffs' meaningful and equal access to SSA's programs is "wholly collateral to" CSRA's administrative employment appeal process. *See id.* at 193 (holding judicial review appropriate where plaintiff challenged "the Commissions' power generally"). Finally, Plaintiffs' disability-related claims under the Rehabilitation Act are completely divorced from the Office of Management and Budget's

---

[3] Indeed, this Court very recently found otherwise. *See Nat'l Treasury Emp.'s Union v. Russell Vought*, No. 25-cv-0381, 2025 WL 942772 (D. D.C. March 28, 2025).

expertise. *See id.* at 195 (citation omitted).[4] Thus, Plaintiffs have established judicially redressable claims for SSA's failure to administer its statutorily-mandated benefits through "a system" that "must be fair—and it must work." *Richardson v. Perales*, 402 U.S. 389, 399 (1971).

C.    **Plaintiffs' Have Proven Their Viable Disparate Impact Claims.**

1.    **Plaintiffs Have a Private Right of Action to Bring Disparate Impact Claims Under the Rehabilitation Act.**

Defendants incorrectly argue the Rehabilitation Act neither (1) confers a private right of action, Opp'n 26–33, nor (2) allows for liability under a disparate impact theory, *id.* at 21–22.

Regarding the former, in *National Ass'n of the Deaf ("NAD") v. Trump*, 486 F. Supp. 3d 45, 53–54 (D.D.C. 2020), this Court examined Section 504's plain language, legislative history, and structure and found that a private right of action exists. Defendants' reliance on *Sai v. Department of Homeland Security*, 149 F. Supp. 3d 99, 113 (D.D.C. 2015), Opp'n 27, 30–31, ignores the critical distinctions this Court drew in *NAD*. *Id.* at 57 (citations omitted). If this Court were to find that no private right of action exists and that Defendants' actions are not subject to the APA (they are—*see infra* Arg. § I.D), then "following *Sai* . . . would leave Plaintiffs without a judicial remedy." *NAD*, 486 F. Supp. 3d. at 57; *but see Mathis*, 749 F. Supp. 3d at 22–24 (granting preliminary injunction because "[c]ourts possess inherent equitable power to enjoin the Government from violating the" Rehabilitation Act's program-conductor provision).

Regarding the latter, Defendants concede that this Court has "found that a disparate impact theory was available under the Rehabilitation Act[.]" Opp'n 24 (citing *Anderson v. Duncan*, 20 F. Supp. 3d 42 (D.D.C. 2013); *accord Dickerson v. Grant Leading Tech., LLC*, No. CV 23-867

---

[4] Because Plaintiffs do not assert any claims under CSRA, Defendants' reliance on *Block v. Community Nutrition Institute*, 467 U.S. 340 (1984), and *United States v. Fausto*, 484 U.S. 439 (1988), Opp'n 17–19, is wholly irrelevant.

(RDM), 2024 WL 4803920, at *4 (D.D.C. Nov. 15, 2024); *Drasek v. Burwell*, 121 F. Supp. 3d 143, 153–54 (D.D.C. 2015); *see also Payan v. L.A. Cmty. Coll. Dist.*, 11 F.4th 729 (9th Cir. 2021) (holding that a private right of action exists to enforce disparate impact discrimination regulations under Title II of the ADA and Section 504).

### 2. Plaintiffs' Statistical Citations and Declarations Sufficiently Prove They Are Likely to Succeed on Their Rehabilitation Act Claim.

While not required, Plaintiffs provide ample statistical evidence supporting their likelihood of success. *See, e.g.*, *Thomas v. Washington Cty. Sch. Bd.*, 915 F.2d 922, 926 (4th Cir. 1990) ("[A]lthough disparate impact cases usually focus on statistics, they are neither the exclusive nor a necessary means of proof." (citation omitted)); *see also Mitchell v. Bd. of Trustees*, 599 F.2d 582, 585–86 (4th Cir. 1979); *Oross v. Kutztown Univ.*, No. CV 21-5032, 2024 WL 83506, at *2 (E.D. Pa. Jan. 8, 2024); *Brasier v. Union Pac. R.R. Co.*, No. CV2100065TUCJGZMSA, 2023 WL 2754007, at *10 (D. Ariz. Mar. 31, 2023); *E.E.O.C. v. Dolgencorp, LLC*, 2022 WL 2959569, at *4–14 (N.D. Ala. 2022). Where the disparate effect of Defendants' policies are "obvious," *Lau v. Nichols*, 414 U.S. 563, 568 (1974), abrogated on other grounds by *Alexander v. Sandoval*, 532 U.S. 275 (2001), no further statistical analysis is necessary.

Nevertheless, Plaintiffs have shown that despite serving 68.5 million people in 2024, SSA currently intends to employ a workforce equivalent to 1 staff member for every 1,460 beneficiaries. O'Malley Decl. ¶¶23–24. Because 6.2 million of the 7 million individuals relying on SSI are individuals with disabilities, SSA, ANN. STAT. SUPP. TO SOC. SEC. BULL. 424, 439 (2024), https://perma.cc/7SP4-KMPK, and almost 27 percent of people with disabilities live in poverty, "[i]f SSA cuts 50 percent of employees making disability determinations, this will result in" 89 percent of the "nearly 67,000 people" with disabilities "dying waiting for an initial decision on SSI or SSDI in 2025." Minority Staff Rep., *supra* at 1–2. It is, therefore, "obvious," *Lau*, 414 U.S.

at 568, that when a protected class of individuals receives benefits from and participates in a government program, when the Government erects obstacles that deny those individuals access to the program's benefits and services, that class of individuals will be disparately impacted.

Defendants' argument that Plaintiffs are required to show denial of "material access" misses the mark. Opp'n 23–24. As in *Mathis*, Plaintiffs "have shown that they face 'obstacle[s],' solely because of their disabilities, 'that impede[] their access to a government benefit or program," 749 F. Supp. 3d at 16, that is, their ability to meaningfully access SSA services, *see Am. Council of the Blind*, 525 F.3d at 1267. Without OCREO, Opp'n 5, SSA has erected "obstacles" that prevent Plaintiffs and their members/constituents from meaningfully accessing their benefits. Ironically, Defendants erroneously claim that Plaintiffs must "seek a remedy through the administrative pathway that Congress directed agencies to create and then, if necessary, seek judicial review through the APA," Opp'n 28, yet they've eliminated the very office (OCREO) that would field such a claim if it were necessary.[5]

### 3. Defendants' Business Necessity Defense Fails.

Defendants seek to incorporate a defense to employment discrimination into the context of discrimination in government services. *Anderson v. Duncan*, 20 F. Supp. 3d 42 (D.D.C. 2013), the only case Defendants rely on, Opp'n 24–25, was an employment discrimination case governed by different Rehabilitation Act statutory and regulatory provisions than those applicable here. *Anderson* applied Section 501 of the Rehabilitation Act, which covers employment, not Section 504, which covers access to government programs. *See* 20 F. Supp. 3d at 53. Section 501 incorporates by reference the standards of Title I of the Americans with Disabilities Act ("ADA"),

---

[5] Contrary to Defendants' assertion, Plaintiffs do not attempt to "hamstring any meaningful agency reorganization," Opp'n 25–26; rather, they seek to prevent Defendants from eliminating the very offices designed to ensure Plaintiffs equal, meaningful access to SSA's programs and activities.

which include a "business necessity" defense. *See* 29 U.S.C. § 791(f); 42 U.S.C. § 12113(a). Section 504, on the other hand, provides no such defense. 29 U.S.C. § 794; 45 C.F.R. Part 85.

Even if such a defense were available, Defendants proffer no evidence to support it. *See generally* Opp'n. (lacking any declarations or factual evidence to support false claims of workforce "bloat" or "fraud"); *see also* ECF No. 27, Amicus Br. of States and D.C. at 9–13. Thus, Defendants' business necessity defense, like their other arguments, must fail. *Cf. Anderson*, 20 F. Supp. 3d at 57 ("To be sure, the Court's analysis would change if the Executive had articulated arbitrary or pretextual reasons for centralizing RSA regional offices.").

**D.    Plaintiffs Are Likely to Succeed on Their APA Claims.**

**1.    Defendants Cannot Hide Unlawful Harm Behind the Veil of Agency "Discretion."**

Defendants' invocation of 5 U.S.C. § 701(a)(2)'s, *see* Opp'n 33, is an effort to repackage the wholesale dismantling of statutory rights as routine administrative housekeeping. But the APA does not permit agencies to shield final, rights-altering decisions from review merely by rebranding them as internal affairs.

**a.    Judicially manageable standards exist.**

The Supreme Court has long held that Section 701(a)(2) is a "very narrow exception," reserved for only those "rare instances where statutes are drawn in such broad terms that . . . there is no law to apply." *Webster v. Doe*, 486 U.S. 592, 599 (1988) (citations omitted). Here, Section 504 guarantees "meaningful access" to disabled people, *Alexander v. Choate*, 469 U.S. 287, 301 (1985), while the APA demands reasoned, non-arbitrary decision-making, *Balt. Gas and Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 104 (1983). Courts routinely assess whether agencies have respected meaningful access, *see Rodde v. Bonta*, 357 F.3d 988 (9th Cir. 2004); considered reliance interests, *see Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016); or adhered to

16

rational decision-making, *see Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29 (1983); *Dep't of Homeland Sec. v. Regents of the U. of Cal.*, 591 U.S. 1 (2020).

Defendants reach for *Steenholdt v. F.A.A.*, 314 F.3d 633 (D.C. Cir. 2003), and its passing citation to *Heckler v. Chaney*, 470 U.S. 821 (1985), but fail to recognize that *Heckler* addressed an agency's decision *not* to enforce. Here, Defendants took affirmative steps to terminate services, close offices, and dismantle access infrastructure without adequate explanation or consideration of those most affected. *See, infra,* Arg. § I.D.3.b.ii.

### b. Section 902 does not preclude judicial review where rights or protections are affected.

Defendants wave Section 902(a)(6) like a sovereign get-out-of-review-free card to argue that the Commissioner's authority to "establish, alter, consolidate, or discontinue" components of the agency "as [they] consider[] necessary or appropriate" grants carte blanche to restructure without regard to the law. Opp'n 33. Discretion to manage an agency is not discretion to disregard statutory mandates or civil rights protections. *See* ECF No. 27 at 2–4 (outlining SSA's statutory obligations). The APA does not vanish at the mere mention of the word "may."

Defendants' reliance on *Webster* underscores their overreach. Opp'n 34–35. The *Webster* Court held that APA review was barred under Section 701(a)(2) for certain employment decisions by the CIA Director while reaffirming that constitutional claims are always reviewable unless Congress expressly precludes them. 486 U.S. at 603.[6] Nothing in Section 902(a)(6) precludes judicial review of Plaintiffs' APA or Section 504 claims. Unlike the national security context in *Webster*, SSA's reorganization decisions are not insulated by concerns of secrecy or executive prerogative because it manages a public benefits system—with routine, administrative decisions

---

[6] Defendants' assertion that Plaintiffs have forfeited their constitutional claims is without merit. *See* Compl. ¶¶181–96; ECF No. 2-1 at 31, 33–34.

that are subject to judicial review. *See Alexander*, 469 U.S. 287; *State Farm*, 463 U.S. 29; *Regents*, 591 U.S. 1; *Encino Motorcars*, 579 U.S. 211.

Put plainly: broad statutory discretion does not nullify other statutory commands. *See Drake v. F.A.A.*, 291 F.3d 59, 70 (D.C. Cir. 2002). "May" and "declares" may confer latitude in normal operations—but they do not immunize agency action from procedural review or civil rights compliance. *See id.*; *Webster*, 486 U.S. at 601. Because this Court can apply the standards in *Alexander*, *State Farm, Regents*, and *Encino Motorcars*, Defendants' position falls flat.

### c. Plaintiffs challenge the elimination of access and legal protections, not ordinary management decisions.

Continuing to mischaracterize Plaintiffs' claims and relief, Defendants wield *Drake* as another pretext for evading judicial review. *See* Opp'n 34. But *Drake* directs courts to examine both the nature of agency action and the structure of the governing statute—both of which compel review here. Plaintiffs challenge the categorical dismantling of accessibility infrastructure, the hollowing out of civil rights enforcement, and the erasure of communication channels essential to people with disabilities—final agency actions with sweeping legal and human consequences. *See Bennett v. Spear*, 520 U.S. 154, 178 (1997). Defendants cite *Lincoln v. Vigil*, 508 U.S. 191 (1993), to suggest that resource-allocation decisions are categorically unreviewable. *See* Opp'n 34. *Lincoln* considered the reallocation of discretionary funding, not the wholesale elimination of access mandated by law. As the *Lincoln* Court explained, when agency action infringes statutory rights or violates procedural norms, judicial review remains available. 508 U.S. at 200–01. That is because Section 701(a)(2) is not a refuge for abdicated duty; rather, it guards against intrusion into lawful discretion—not silent retrenchment.

### 2. SSA's Workforce and Office Reduction Scheme Constitutes Final Agency Action Under the APA.

APA finality is not contingent on whether the agency's actions are changeable. *See Abbot Labs.*, 387 U.S. at 149. Rather, it requires that action (1) mark the consummation of the agency's decision-making process and (2) produce legal consequences. *Bennett*, 520 U.S. at 177–78.

### a. Consummation of the decision-making process.

The elimination of OCREO and OT, creating new policies that overburden SSA's telephone system, and targeting 7,000 staff cuts were all announced by press release, and are being implemented. Staff were reassigned or let go. Leases were terminated. Entire statutory functions—Section 504 enforcement, language access coordination, and oversight of programmatic accessibility—were purportedly redistributed, diminished, or dissolved. ECF 2-11, Heidelberg Decl. ¶¶6–7, 13, 18, 23, 37; Beaumon Decl. ¶17. These are consummated decisions. *Reliable Automatic Sprinkler Co., Inc. v. Consumer Product Safety Com'n*, 324 F. 3d 726, 731 (D.C. Cir. 2003) (citing *F.T.C. v. Standard Oil Col. of California*, 449 U.S. 232, 239 (1980)).

### b. Immediate and severe legal consequences.

"[L]egal consequences" include changes to rights, obligations, and regulatory burdens. *See U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 598 (2016). Defendants dismantled OCREO without identifying where its statutorily mandated functions have been "transferred." *See, e.g.,* Opp'n 12; Dermeritt Decl. ¶14. Defendants shuttered OT, destabilizing the digital infrastructure that millions of beneficiaries depend upon, the fallout of which has been immediate and far-reaching. *See e.g.*, Jason Ma, *Millions of Social Security recipients got erroneous messages that their payments stopped as computer systems keep glitching*, FORTUNE (April 7, 2025), https://www.fortune.com/2025/04/07/social-security-payments-stopped-error-message-ssi-computer-system-crashes/; Gregory Korte *et al.*, *Social Security website crashes as agency pushes*

*users online*, FORTUNE (Mar. 31, 2025), https:// www.fortune.com/2025/03/31/social-security-website-crash-myssa-portal-outage-doge-cuts-users-online/; Ryan Mueller, *Software Failures Tied to Musk's DOGE Reforms Crash Social Security Website, Delay Payments Nationwide*, BUSINESS TIMES, (April 8, 2025), https://www.btimesonline.com/articles/173647/20250408/software-failures-tied-to-musk-s-doge-reforms-crash-social-security-website-delay-payments-nationwide.htm. Defendants' changes reshape access to legal entitlements, displace avenues of redress, and strip away the tools Congress designed to safeguard against discrimination. That is the very essence of legal consequence constituting final agency action.

### 3. Defendants' Conduct Violates the APA.

#### a. Defendants' actions are contrary to law.

The elimination of OCREO, closure of field offices, and rollout of restrictive identification procedures without sufficient staff to process them undermine SSA's statutory duty to ensure meaningful access to disability benefits under Section 504. *See Alexander*, 469 U.S. at 301. "Poor, disabled, and otherwise disadvantaged [people] should not require luck, perseverance, or zealous lawyering to receive . . . benefits they are entitled to under the law." *A.M.C. v. Smith*, 2024 WL 3956315 *1 (M.D. Tenn. August 26, 2024) (finding violations of the Due Process Clause of the Fourteenth Amendment, the Americans with Disabilities Act, and the Medicaid Act). Defendants strain to evade 20 C.F.R. § 404.1740 by arguing that it governs only claimant representatives, not the agency itself. Opp'n 38. But Section 404.1740(a)(3) presumes a functioning system that retains the infrastructure necessary to ensure an "efficient, fair, and orderly" decision-making process. Dismantling that infrastructure undermines the conditions the regulation presupposes. That is not reasoned decision making—it is institutional abdication.

### b. Defendants' actions are arbitrary, capricious, and entirely unmoored from the SSA's statutory purpose.

The APA requires agencies to provide contemporaneous reasoning, weigh reliance interests, and assess foreseeable harms—especially when their actions impact the rights of a protected class. *See Lone Mtn. Processing, Inc. v. Sec'y of Lab.*, 709 F.3d 1161, 1164 (D.C. Cir. 2013); *United Mun. Distribs. Grp. v. FERC*, 732 F.2d 202, 210 (D.C. Cir. 1984); *see also Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017). That obligation is not satisfied by post hoc rationales or generalized invocations of "efficiency."

### i. No contemporaneous justification

Relying on SSA press releases, Defendants claim that their restructuring decisions were adequately reasoned. The APA requires agencies to provide more than "conclusory statements" to explain their decisions. *Gresham v. Azar*, 950 F.3d 93, 103 (D.C. Cir. 2020), *vacated and remanded on other grounds*, 142 S.Ct. 1665 (2022) (per curiam). Defendants provide no sworn testimony, internal analysis, staff memoranda, stakeholder consultation, formal agency statements of policy, specific factual findings, competing policy options, or even any suggestion that their structural changes will improve disability access or service delivery. *See generally* Opp'n; *see also* ECF No. 27, Amicus Br. at 9–13. Defendants' feigned "fraud prevention" rationale underscores its arbitrariness. According to the SSA's inspector general, only 0.3 percent of payments are improper (which can be both overpayments and underpayments), and most of those are due to mistakes or delay by SSA, not fraud. ECF No. 2-1 at 18 (citation omitted). A bare assertion that a policy will promote "efficiency" or "streamlining," without analysis or evidence, does not constitute reasoned decision making. *See United States Telecom Ass'n v. FCC*, 825 F.3d 674, 707 (D.C. Cir. 2016).

### ii.    Defendants did not consider reliance interests.

Defendants eliminated the very office charged with safeguarding equitable access (OCREO), terminated its modernization arm (OT), and imposed new procedural barriers—yet failed to assess how these changes would affect claimants with disabilities. *See Encino Motorcars*, 579 U.S. at 221–22. This is true despite Section 504 requiring Defendants to ensure meaningful access. *See Alexander*, 469 U.S. 287.

Plaintiffs and similarly situated individuals had strong and reasonable expectations that SSA would maintain the infrastructure necessary to ensure equal access. Richtman Decl. ¶9; ECF 2-13, Smetanka Decl. ¶¶10-13; Riccobono Decl. ¶10; Demeritt Decl. ¶14. Organizational Plaintiffs structured outreach, advocacy, and assistance programs around SSA's established service model, including telephone access, accommodation procedures, and civil rights reporting pathways. Richtman Decl. ¶¶10, 16; Smetanka Decl. ¶¶10–12; Riccobono Decl. ¶14. Individual claimants relied on those mechanisms to request accommodations, file complaints, and obtain timely assistance. Riccobono Decl. ¶11; Bitencourt Decl. ¶13; Demeritt Decl. ¶14. Neither SSA's public statements nor its litigation filings reflect any effort to acknowledge or mitigate the harm caused by its reversals, demonstrating SSA's failure to be cognizant that its longstanding policies may have engendered serious reliance interests that must be taken into account. *Encino Motorcars*, 579 U.S. at 222.

### 4.    Defendants' Actions Exceed Their Statutory Jurisdiction and Authority.

Defendants dismiss Plaintiffs' *ultra vires* argument as a "last-ditch effort"—a curious characterization of a claim grounded squarely in the APA, the structural limits of agency authority, and SSA's statutory obligations to ensure nondiscriminatory access to federal benefits. *See* ECF No. 2-1 at 2–7. Courts set aside agency action taken "in excess of statutory jurisdiction [or] authority," 5 U.S.C. § 706(2)(C), including actions that directly contravene "clear and specific

statutory mandate[s]" or rely on statutory interpretations that are "utterly unreasonable," *Fed. Express Corp. v. United States Dep't of Comm.*, 39 F.4th 756, 764–65 (D.C. Cir. 2022). Such actions are especially subject to challenge when they are mandated by individuals and entities, such as DOGE and its officials, who have no statutory authority and have not been duly appointed and confirmed by Congress. SSA, at the behest of DOGE, abolished the very office tasked with ensuring compliance with Section 504 of the Rehabilitation Act, terminated accessibility modernization efforts, and imposed new procedural barriers for disability claimants—steps taken in direct conflict with SSA's governing purpose and without congressionally-approved authority.

Defendants argue 42 U.S.C. § 902(a)(6) allows the Commission to "consolidate or discontinue" organizational components, but that provision does not authorize the agency to dismantle mechanisms required by congressional mandate. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 485 (2001); *accord FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 161 (2000). Nor does it permit outside entities, without congressional vetting or authorization, to mandate such action. Here, Plaintiffs do not challenge the Commissioner's discretion to manage staff or workflows; they challenge DOGE's attempt to extinguish SSA's enforcement and accessibility infrastructure wholesale—an open repudiation of Congress's clear mandates.

## II.    Plaintiffs Are Suffering Irreparable Harm, and Will Continue to do so, Absent this Court's Intervention.

Plaintiffs' declarations detail the concrete harms Defendants have caused: longer wait times, obstacles to traveling for new in-person requirements, lost access to telephone-based services, and the disappearance of clear processes for requesting accommodations. *See, supra,* Arg. § I.A. "The 'denial of equal treatment' *itself* counts as an injury" warranting a preliminary injunction. *Mathis*, 749 F. Supp. 3d at 2. When a plaintiff "is so poor that he would be harmed in the interim by the loss of the monetary benefits," those economic losses are also enough to

establish irreparable harm. *Lee v. Christian Coal. of Am., Inc.*, 160 F. Supp. 2d 14, 31 (D.D.C. 2001). And courts have long recognized the harm disabled beneficiaries experience when their benefits are threatened. *Ford v. Shalala*, 87 F. Supp.2d 163, 177 (E.D.N.Y 1999) ("[N]otices create 'tremendous emotional upheaval' because they jeopardize 'the only source of income' for persons 'who are extremely frail and are surviving at a level of income that is below the poverty level.'" (citation omitted)); *accord* ECF No. 27 at 16–25.

### III.    The Equities and Public Interest Weigh in Favor of a Preliminary Injunction.

When an agency action threatens to dismantle the very infrastructure that ensures civil rights compliance and equitable access, the Court's role is not marginal—it is essential. *Cf. Marbury v. Madison*, 5 U.S. 137, 177–78 (1803). "[T]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). To the contrary, "there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Id.* (citation omitted). When federal agencies cast aside their legal obligation to ensure meaningful access under the subterfuge of administrative efficiency, the public interest lies not in deference, but in restoring the law.[7]

### IV.    The Court Should Decline the Government's Request to Force Non-Profit, Disability Rights Organizations to Post a Bond.

A bond "is not necessary where requiring [one] would have the effect of denying the plaintiffs their right to judicial review of administrative action." *Nat. Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167, 168 (D.D.C. 1971) (collecting cases). On one hand, Plaintiffs demonstrate that Defendants have unlawfully imperiled their access to benefits to which they are

---

[7] Contrary to Defendants' argument, Opp'n 44, because Plaintiffs' do not seek any relief "more burdensome to [Defendants] than necessary to provide [them] complete relief," *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979), the scope of their relief is narrowly tailored.

statutorily entitled; on the other, Defendants identify no reason why Plaintiffs' requested injunction would cause them any harm, nor do they support why Plaintiffs should post bond solely because they include organizations. Such an imbalance of power between the parties would "defy logic—and contravene the very basis of this opinion—to hold Plaintiffs hostage for the resulting harm." *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. CV 25-239 (LLA), 2025 WL 597959, at *19 (D.D.C. Feb. 25, 2025).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant their Motion for Preliminary Injunction.


Dated: April 21, 2025                        Respectfully submitted,


                                             /s/ Eve L. Hill
                                             Eve L. Hill (DC Bar No. 424896)
                                             Anthony J. May (Admitted *Pro Hac Vice*)
                                             **BROWN, GOLDSTEIN & LEVY, LLP**
                                             120 East Baltimore Street, Suite 2500
                                             Baltimore, Maryland 21202
                                             Tel.: (410) 962-1030
                                             Fax: (410) 385-0869
                                             ehill@browngold.com
                                             amay@browngold.com


                                             Regan Bailey (DC Bar No. 465677)
                                             Liam McGivern (Admitted *Pro Hac Vice*)
                                             **JUSTICE IN AGING**
                                             1444 Eye Street, N.W., Suite 1100
                                             Washington, DC 20005
                                             Tel.: (202) 289-6976
                                             rbailey@justiceinaging.org
                                             lmcgivern@justiceinaging.org

                                             *Counsel for Plaintiffs*