**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| AMERICAN ASSOCIATION OF PEOPLE WITH DISABILITIES, *et al.*, | |
| Plaintiffs, | |
| v. | No. 25-cv-977 (APM) |
| FRANK BISIGNANO, *in his official capacity as Commissioner of the Social Security Administration*, *et al.*, | |
| Defendants. | |

**DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' COMPLAINT**

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 2

I.      Factual Background ................................................................................................... 2

        A.      Closure of Office of Transformation ............................................................ 3

        B.      Closure of Office of Civil Rights and Equal Opportunity ........................... 3

        C.      Workforce Reduction and Consolidation of Regional Offices ..................... 4

        D.      Availability of Telephone Services ............................................................... 5

        E.      Clarification Regarding SSA Field Offices .................................................. 5

II.     Social Security ........................................................................................................... 6

III.    This Case .................................................................................................................... 7

LEGAL STANDARDS ......................................................................................................... 9

ARGUMENT ........................................................................................................................ 9

I.      The Court Lacks Jurisdiction ..................................................................................... 9

        A.      Plaintiffs Lack Article III Standing ............................................................... 9

                1.      Individual Plaintiffs ........................................................................ 10

                2.      Organizational Plaintiffs ................................................................. 13

                        a.      Associational standing ......................................................... 13

                        b.      Organizational standing ....................................................... 14

        B.      Federal personnel statutes divest court of subject matter jurisdiction to
                consider claims concerning the employment of SSA employees ................. 16

II.     Plaintiffs Fail to State a Claim ................................................................................. 21

        A.      Procedural Due Process (Count II) .............................................................. 21

        B.      Petition Clause (Count III) ........................................................................... 23

        C.      Administrative Procedure Act (Counts IV–VII) .......................................... 25

                1.      APA review is precluded because SSA's administrative reforms
                        are committed to agency discretion .................................................. 25

2.     Plaintiffs impermissibly seek wholesale improvement of SSA, rather than review of discrete, final agency action ................................... 27

      a.     SSA's programmatic reforms are not discrete agency action subject to APA review ................................................................ 27

      b.     Any discrete agency action is not final for APA purposes ........... 28

3.     Plaintiffs' APA claims fail............................................................. 29

      a.     In Excess of Statutory Authority (Count VII).............................. 29

      b.     Unlawfully Withheld or Unreasonably Delayed (Count IV)........ 30

      c.     Arbitrary and Capricious (Count V) ............................................ 32

      d.     Not in Accordance with Law or Contrary to Constitutional Right (Count VI) ......................................................................... 34

D.     Rehabilitation Act (Count I) ................................................................. 38

    1.     The Rehabilitation Act does not provide for disparate-impact liability ............................................................................................ 38

    2.     Plaintiffs have not shown a disparate impact............................................ 39

    3.     Plaintiffs have not shown a lack of "material access" to any benefit ....... 40

    4.     Plaintiffs' sweeping theory of disparate impact would unduly hamstring any meaningful agency reorganization ................................... 40

    5.     Because there is no private right of action under the Rehabilitation Act, any disparate impact claim could proceed only under the APA ....... 41

CONCLUSION.................................................................................................... 45

# TABLE OF AUTHORITIES

**Cases**

*Abril-Rivera v. Johnson*,
  806 F.3d 599 (1st Cir. 2015) ............................................................................ 40-41

*Adams v. City of Indianapolis*,
  742 F.3d 720 (7th Cir. 2014) ................................................................................. 39

*Alexander v. Choate*,
  469 U.S. 287 (1985) ................................................................................... 38, 39, 40

*Alexander v. Sandoval*,
  532 U.S. 275 (2001) .......................................................................................... 41, 44

*Am. Council of Blind v. Paulson*,
  463 F. Supp. 2d 51, 57–58 (D.D.C. 2006), *aff'd*, 525 F.3d 1256 (D.C. Cir. 2008) ............... 45

*Am. Farm Bureau v. EPA*,
  121 F. Supp. 2d 84 (D.D.C. 2000) .......................................................................... 32

*Am. Fed. of Gov't Emps. v. Ezell*,
  2025 WL 470459 (D. Mass. Feb. 12, 2025) ........................................................... 19

*Am. Fed'n of Gov't Emps. v. Sec'y of the Air Force*,
  716 F.3d 633 (D.C. Cir. 2023) ............................................................................... 17

*Am. Fed'n of Gov't Emps. v. Trump*,
  929 F.3d 748 (D.C. Cir. 2019) ......................................................................... 17, 19

*Am. Foreign Serv. Ass'n v. Trump*,
  768 F. Supp. 3d 6 (D.D.C. Feb. 21, 2025) ............................................................. 20

*Andrade v. Regnery*,
  824 F.2d 1253 (D.C. Cir. 1987) ............................................................................. 38

*Ashcroft v. Iqbal*,
  556 U.S. 662 ........................................................................................................... 9

*Axon Enterprises, Inc. v. FTC*,
  598 U.S. 175 (2023) ............................................................................................... 19

*Bd. of Regents of State Colls. v. Roth*,
  408 U.S. 564 (1972) ............................................................................................... 22

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ...................................................................................... *passim*

*Bennett v. Spear*,
  520 U.S. 154 (1997) ........................................................................................ 28, 29

*Block v. Community Nutrition Institute*,
  467 U.S. 340 (1984) ................................................................................... 17, 18

*Borough of Duryea v. Guarnieri*,
  564 U.S. 386 (2011) ............................................................................................ 24

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*,
  419 U.S. 281 (1974) ..................................................................................... 32, 33

*Citizens for Resp. & Ethics in Wash. v. SEC*,
  916 F. Supp. 2d 141 (D.D.C. 2013) ..................................................................... 31

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398–09 (2013) ............................................................................... 10, 12

*Clark v. Skinner*,
  937 F.2d 123 (4th Cir. 1991) ...................................................................... 43, 44, 45

*Claybrook v. Slater*,
  111 F.3d 904 (D.C. Cir. 1997) ........................................................................... 26

*Cobell v. Kempthorne*,
  455 F.3d 301 (D.C. Cir. 2006) ........................................................................... 27

*Commissioned Officers Ass'n of the U.S. Pub. Health Serv. v. Bunch*
  2022 U.S. Dist. LEXIS 58706 (D.D.C. Mar. 30, 2022) ..................................... 13

*Cousins v. Sec'y of the U.S. Dep't of Transp.*,
  880 F.2d 603 (1st Cir. 1989) (en banc) ..................................................... 43, 44, 45

*Davis v. FEC*,
  554 U.S. 724 (2008) ......................................................................................... 9, 10

*Doe v. BlueCross BlueShield of Tenn., Inc.*,
  926 F.3d 235 (6th Cir. 2019) ............................................................................. 39

*Doe v. Dist. of Columbia*,
  796 F. Supp. 559 (D.D.C. 1992) ......................................................................... 45

*Does 1-26 v. Musk*,
  No. 25-1273, 2025 WL 1020995 (4th Cir. Mar. 28, 2025) ............................... 36, 38

*Drake v. FAA*,
  291 F.3d 59 (D.C. Cir. 2002) ............................................................................. 25

*Egbert v. Boule*,
  596 U.S. 482 (2022) ......................................................................................... 41

*Elec. Priv. Info. Ctr. ("EPIC") v. FAA*,
  892 F.3d 1249 (D.C. Cir. 2018) ..................................................................... 14, 16

*Elgin v. Dep't of the Treasury*,
    567 U.S. 1 (2012) ........................................................................... 17

*Encino Motorcars, LLC v. Navarro*,
    579 U.S. 211 (2016) ......................................................................... 34

*FCC v. Fox TV Stations, Inc.*,
    556 U.S. 502 (2009) ......................................................................... 33

*FCC v. Prometheus Radio Project*,
    592 U.S. 414 (2021) .................................................................... 32-33

*FDA v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024) .................................................................. 10, 14

*FDA v. Wages & White Lion Invs.*,
    145 S. Ct. 898 (2025) ................................................................ 33, 34

*Fla. Power & Light Co. v. Lorion*,
    470 U.S. 729 (1985) ......................................................................... 33

*Food & Water Watch, Inc. v. Vilsack*,
    808 F.3d 905 (D.C. Cir. 2015)......................................................... 14

*Fornaro v. James*,
    416 F.3d 63 (D.C. Cir. 2005) ........................................................... 19

*Friends of the Earth, Bluewater Network Civ. v. U.S. Dep't of Interior*,
    478 F. Supp. 2d 11 (D.D.C. 2007) .................................................. 32

*Garcia v. Johanns*,
    444 F.3d 625 (D.C. Cir. 2006) ......................................................... 39

*Graham v. Ashcroft*,
    358 F.3d 931 (D.C. Cir. 2004) ......................................................... 19

*Greater New Orleans Fair Hous. Action Ctr. v. HUD*,
    639 F.3d 1078–86 (D.C. Cir. 2011) ................................................. 39

*Grosdidier v. Chairman, Broad. Bd. of Governors*,
    560 F.3d 494 (D.C. Cir. 2009) ......................................................... 18

*Heckler v. Chaney*,
    470 U.S. 821 (1985) ......................................................................... 25

*Heckler v. Day*,
    467 U.S. 104–06 (1984) ........................................................ *passim*

*Heckler v. Ringer*,
    466 U.S. 602 (1984) ......................................................................... 21

*Hunt v. Wash. State Apple Advert. Comm'n,*
    432 U.S. 333 (1977) ................................................................................ 13

*Indep. Equip. Dealers Ass'n v. EPA,*
    372 F.3d 420 (D.C. Cir. 2004) ............................................................... 27

*J.L. v. SSA,*
    971 F.2d 260 (9th Cir. 1992) ................................................................. 43

*Jaskot v. Principi,*
    58 F. App'x 839 (Fed. Cir. 2002) .......................................................... 22

*Jesner v. Arab Bank, PLC,*
    584 U.S. 241–65 (2018) ......................................................................... 41

*Kareem v. Haspel,*
    986 F.3d 859 (D.C. Cir. 2021) ................................................................. 9

*Landry v. FDIC,*
    204 F.3d 1125 (D.C. Cir. 2000) ............................................................. 36

*Lane v. Pena,*
    518 U.S. 187 (1996) .............................................................. 42, 43, 45

*Lane v. Pena,*
    867 F. Supp. 1050 (D.D.C. 1994) .......................................................... 45

*Lincoln v. Vigil,*
    508 U.S. 182 (1993) .............................................................................. 26

*Local 2855, AFGE v. United States,*
    602 F. 2d 574 (3d Cir. 1979) ................................................................. 26

*Long Term Care Pharm. All. v. Leavitt,*
    530 F. Supp. 2d 173 (D.D.C. 2008) ...................................................... 32

*Lucia v. SEC,*
    585 U.S. 237 (2018) ........................................................................ 36, 37

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ................................................................................ 9

*Lujan v. Nat'l Wildlife Fed'n,*
    497 U.S. 871 (1990) ......................................................................... 27, 28

*Lyng v. Payne,*
    476 U.S. 926 (1986) .............................................................................. 22

*Maryland v. USDA,*
    Dkt. 42, No. 25-1248 (L), 2025 WL 1073657 (4th Cir. Apr. 9, 2025) ................... 20

*Mathews v. Eldridge*,
   424 U.S. 319 (1976) ................................................................................................ 7, 22, 23

*McDonald v. Smith*,
   472 U.S. 479 (1985) ....................................................................................................... 23

*Menoken v. McGettigan*,
   273 F. Supp. 3d 188 (D.D.C. 2017) ............................................................................... 40

*Minn. State Bd. for Cmty. Colls. v. Knight*,
   465 U.S. 271 (1984) ....................................................................................................... 24

*Modderno v. King*,
   82 F.3d 1059 (D.C. Cir. 1996) ....................................................................................... 39

*Morrison v. Olson*,
   487 U.S. 654 (1988) ....................................................................................................... 37

*Moya v. U.S. Dep't of Homeland Sec.*,
   975 F.3d 120 (2d Cir. 2020) ..................................................................................... 43, 45

*National Ass'n of the Deaf ("NAD") v. Trump*,
   486 F. Supp. 3d 45 (D.D.C. 2020) ........................................................................... 44, 45

*Nat'l Treasury Emps. Union v. Trump*,
   770 F. Supp. 3d 1  (D.D.C. 2025) .............................................................................. 19-20

*NB ex rel. Peacock v. Dist. of Columbia*,
   794 F.3d 31 (D.C. Cir. 2015) ......................................................................................... 22

*Neuro. Surgery Practice of Long Island, PLLC v. HHS*,
   682 F. Supp. 3d 249 (E.D.N.Y. 2023) ...................................................................... 31, 32

*New Mexico v. Musk*, 2025 WL 1502747, *16, -- F.Supp.3d -- (D.D.C. May 27, 2025).............36

*Norton v. S. Utah Wilderness All.*,
   542 U.S. 55 (2004) .............................................................................................. 27, 28, 31

*Olim v. Wakinekona*,
   461 U.S. 238 (1983) ....................................................................................................... 23

*OPM v. AFGE*,
   221 L. Ed. 2d 654, 2025 U.S. LEXIS 1451 (2025) .................................................. 12, 20

*Pinar v. Dole*,
   747 F.2d 899 (4th Cir. 1984) ......................................................................................... 18

*Ricci v. DeStefano*,
   557 U.S. 557 (2009) ....................................................................................................... 40

*RICU LLC v. HHS*,
   22 F.4th 1031 (D.C. Cir. 2022) ...................................................................................... 21

*Sai v. DHS*,
    149 F. Supp. 3d 99 (D.D.C. 2015) ..............................................................43, 44

*Smith v. Ark. State Hwy. Emps., Local 1315*,
    441 U.S. 456 (1979) ................................................................................ 24

*Smith v. City of Jackson*,
    544 U.S. 228 (2005) ................................................................................ 40

*Steenholdt v. FAA*,
    314 F.3d 633 (D.C. Cir. 2003) ................................................................ 25

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007) ................................................................................. 9

*Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*,
    576 U.S. 519 (2015) ................................................................................ 41

*Thunder Basin Coal Co. v. Reich*,
    510 U.S. 200 (1994) ................................................................................ 19

*Town of Castle Rock v. Gonzales*,
    545 U.S. 748 (2005) ................................................................................ 23

*Transamerica Mortg. Advisors, Inc. v. Lewis*,
    444 U.S. 11 (1979) ................................................................................. 43

*Twin Rivers Paper Co. v. SEC*,
    934 F.3d 607 (D.C. Cir. 2019) ................................................................ 13

*United States v. Fausto*,
    484 U.S. 439 (1988) .................................................................... 17, 18, 19

*United States v. Hartwell*,
    73 U.S. (6 Wall.) 385 (1867) ................................................................. 36

*United States v. Maurice*,
    26 F. Cas. 1211, 1214 (C.C.D. Va. 1823) (No. 15,747)........................ 37

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
    435 U.S. 519 (1978) ................................................................................ 33

*We the People Found., Inc. v. United States*,
    485 F.3d 140 (D.C. Cir. 2007) .......................................................... 24, 25

*Webster v. Doe*,
    486 U.S. 592 (1988) ................................................................................ 26

*Weinberger v. Salfi*,
    422 U.S. 749 (1975) ................................................................................ 21

*Wisher v. Coverdell,*
   782 F. Supp. 703 (D. Mass. 1992) ...................................................... 43

*WorldCom, Inc. v. FCC,*
   238 F.3d 449 (D.C. Cir. 2001) ........................................................ 31

*Ziglar v. Abbasi,*
   582 U.S. 120 (2017) ................................................................... 41

**Constitutional Provisions**

U.S. Const. amend. I ...................................................................... 23

U.S. Const. amend. V ..................................................................... 21

U.S. Const. art. II, § 2, cl. 2 ........................................................... 36

**Statutes**

5 U.S.C. § 701 ...................................................................... 25, 26

5 U.S.C. § 702 .................................................................. 25, 42, 44

5 U.S.C. § 704 ......................................................................... 27

5 U.S.C. § 706 ...................................................................... *passim*

5 U.S.C. § 1204 ........................................................................ 17

5 U.S.C. § 7105 ........................................................................ 17

5 U.S.C. § 7123 ........................................................................ 17

5 U.S.C. § 7512 ........................................................................ 17

5 U.S.C. §7513 ......................................................................... 17

5 U.S.C. § 7701 ........................................................................ 17

5 U.S.C. § 7703 ........................................................................ 17

5 U.S.C. §§ 7101-7135 .................................................................. 17

7 U.S.C. § 608c ........................................................................ 18

18 U.S.C. § 202 ........................................................................ 36

28 U.S.C. § 1331 .................................................................... 2, 21

28 U.S.C. § 1346 ....................................................................... 21

29 U.S.C. § 791 ........................................................................ 41

29 U.S.C. § 794 .................................................................... *passim*

29 U.S.C. § 794a ........................................................ 37, 38, 41, 42

42 U.S.C. § 402 ......................................................................... 6

42 U.S.C. § 405 .................................................................. 7, 20, 21

42 U.S.C. § 423 ......................................................................... 6

42 U.S.C. § 702 ........................................................................................... 35

42 U.S.C. § 902 ...................................................................................... *passim*

42 U.S.C. § 1382 ........................................................................................... 6

50 U.S.C. § 403 ......................................................................................... 26

Rehabilitation Act Amendments of 1978, 92 Stat. 2955 .................................42

**Rules**

Fed. R. Civ. P. 12 ........................................................................................ 9

Fed. R. Civ. P. 25 ........................................................................................ 7

**Regulations**

5 C.F.R. § 351.901 ...................................................................................... 17

20 C.F.R. § 404.1503 ................................................................................. 6, 7

20 C.F.R. § 416.1400 *et seq.* ...................................................................... 6

20 C.F.R. §§ 404.907–404.921 ..................................................................... 7

20 C.F.R. §§ 404.967–404.983 ..................................................................... 7

**Other Authorities**

*Br. for the Resp'ts, Lane v. Pena,*
  No. 95–365, 1996 WL 115795 ................................................................ 43

H.R. Rep. No. 97-588 (1982).........................................................................7

James Madison, 1 Annals of Cong. 738 (1789)............................................23

Nicole Ogrysko, Federal News Network, SSA early retirement offers attract fewer than 200
  employees (Dec. 16, 2021), https://perma.cc/NA9V-EDCD ................................... 3

NPR, *Why there's an unexpected surge in people claiming Social Security* (June 12, 2025),
  https://perma.cc/W3ZG-X2FD.................................................................. 12

Press Release, Social Security Announces Change to Improve Agency Operations and
  Strengthen Protections (Feb. 21, 2025), https://perma.cc/9QXE-T7SA ("Feb. 21 Press
  Release") ........................................................................................ 3, 35

Press Release, Social Security Announces Workforce and Organization Plans
  (Feb. 28, 2025), https://perma.cc/W4MD-WTDY ("Feb. 28 Press Release").................. 4, 33

Press Release, Social Security Dissolves Duplicative Office—Action is Another Step to
  Enhance Operations (Feb. 25, 2025), https://perma.cc/H3YL-PJFQ
  ("Feb. 25 Press Release")....................................................................3, 34

Press Release, Social Security Continues to Provide Ways for the Public to Request
Accommodations and File Civil Rights (Program Discrimination) Complaints
(May 30, 2025), https://perma.cc/AB83-63JB  ("May 30 Press Release")............................. 4

Press Release, "Correcting the Record about Social Security Office Closings"
(Mar. 27, 2025), https://perma.cc/5NLA-G8QL  ("Mar. 27 Press Release") ................... 5, 28

Press Release, Social Security Eliminates Wasteful Department—Action is Another Step to
Enhance Operations (Feb. 24, 2025), https://perma.cc/3FQ7-XMW2  ("Feb. 24 Press
Release") ....................................................................................................................... 3, 34

Press Release, Social Security Updates Recently Announced Identity Proofing Requirements
(Mar. 26, 2025), https://perma.cc/H9TR-FQJ3  ........................................................................5

*Special Government Employee Serving as Paid Consultant to Saudi Co.*,
40 Op. O.L.C. 1–9 (2016)  ......................................................................................... 37

SSA, Annual Statistical Supplement, 2024,
https://perma.cc/XPW5-E49C  ...............................................................................................5

SSA, Disability Benefits,
https://perma.cc/E8U6-8CR5 ..................................................................................................6

SSA, Monthly Statistical Snapshot (May 2025),
https://perma.cc/GX67-MZ49 ................................................................................................ 6

White House, President Trump participating in a press conference with departing
DOGE adviser Elon Musk, https://perma.cc/M4LQ-3HN8 ....................................................37

## INTRODUCTION

Plaintiffs, a coalition of disabled individuals and advocacy groups, challenge a "host of changes" the Social Security Administration ("SSA") has announced in recent months, including a 12% reduction in the size of the workforce and the closure of two headquarters offices, the Office of Civil Rights and Equal Opportunity ("OCREO") and the Office of Transformation.  Mem. Op. & Order (Op.) at 1 (May 6, 2025), ECF No. 34.  Plaintiffs allege, in substance, that these reforms will cause benefits to be improperly denied or delayed, and accommodation requests and discrimination complaints to go unresolved.  *Id.* at 2–3.  The Court denied preliminary relief, concluding that Plaintiffs "have failed to establish irreparable harm."  *Id*. at 1.  For much the same reasons, Plaintiffs have failed to show standing, and this case should be dismissed.

The Individual Plaintiffs "largely complain about matters," like backlogs and customer-service issues, "that predate the administrative actions at issue."  *Id*. at 3. None actually "assert[s] any termination or diminution of benefits."  *Id.* at 4.  Nor do they "describe[] any injury arising from the dissolution of OCREO or the Office of Transformation," or even "claim[] to have recently tried to file a discrimination complaint or request an accommodation from the SSA."  *Id*. at 5.  The Organizational Plaintiffs, for their part, "fare no better," offering "no specifics that would permit the court to find 'perceptible impairment'" of their programming or a "'direct conflict'" with their missions.  *Id.* at 5–6 (citation omitted).

While Plaintiffs fear that the reforms could have downstream effects on customer service, like increased wait times, they do not show that service has materially worsened.  Nor do they show that any degradation was caused by the reforms, rather than other factors—much less that there has been any concrete effect on the receipt of benefits.  Indeed, on Plaintiffs' theory, a single Social Security applicant who waited on hold for longer in March than in January could sue to enjoin all of the reforms at issue.  But in a program that serves over 74 million Americans, such anecdotal frustrations are not cognizable—the federal courts do not sit to resolve one-off customer-service complaints, and the Court should decline to endorse such a boundless theory of standing.

1

Even if Plaintiffs had standing, they face a pair of other jurisdictional hurdles. First, their challenges to the workforce reductions are precluded. Congress has enacted comprehensive statutory schemes governing the review of federal employment decisions, requiring any challenges to those decisions to be channeled to administrative agencies before judicial review. Those schemes provide no rights to those outside the employment relationship, like Plaintiffs, and therefore bar review here.

Second, given that the crux of Plaintiffs' complaint is that the challenged reforms will cause their Social Security benefits to be delayed or denied, their claims "arise under" the Social Security Act. That statute limits judicial review to "final decisions" of the Commissioner issued after an applicant has exhausted administrative remedies, which no Plaintiff claims to have done—and, at the same time, precludes jurisdiction over claims brought under 28 U.S.C. § 1331, like Plaintiffs' here.

Jurisdiction aside, each of Plaintiffs' claims also fails on the merits, for reasons explained in detail below. The Court should decline Plaintiffs' invitation to superintend the administrative reforms at SSA and dismiss this case.

## BACKGROUND

### I.    Factual Background

Chapter 7 of the Social Security Act provides that the Commissioner of the Social Security Administration "shall be responsible for the exercise of all powers and the discharge of all duties of the Administration, and shall have authority and control over all personnel and activities thereof." 42 U.S.C. § 902(a)(4). It likewise provides that the Commissioner "may establish, alter, consolidate, or discontinue such organizational units or components within the Administration as the Commissioner considers necessary or appropriate, except that this paragraph shall not apply with respect to any unit, component, or provision provided for by this chapter." *Id*. § 902(a)(6). Thus, SSA has regularly offered voluntary early retirements for certain employees, with anywhere

from three to four percent of eligible employees taking advantage of such offers in 2012, 2014, 2017, and 2019.[1]

In February 2025, Acting Commissioner Lee Dudek began announcing a similar series of administrative reforms intended to eliminate waste and increase efficiency, based in part on "recommendations that DOGE team members provide the agency,"[2] as chronicled on the agency's website and below.

### A.    Closure of Office of Transformation

On February 24, SSA announced the closure of the Office of Transformation ("OT"),[3] which had opened just two years earlier and is not required by any statute. The Acting Commissioner explained: "President Trump has mandated the Federal government eliminate wasteful and inefficient offices and the Office of Transformation was a prime example . . . . This redundant office was created under the previous administration and we are righting that wrong." *Id.*

### B.    Closure of Office of Civil Rights and Equal Opportunity

On February 25, SSA announced the closure of OCREO,[4] which is likewise not required by any statute.  The Acting Commissioner stated:  "Our focus is supporting President Trump's priorities, which include streamlining functions and prioritizing essential work . . . .  Terminating [OCREO], and reassigning statutory responsibilities performed by this office, advances the President's goal to make all of government more efficient in serving the American public."  *Id.* The agency noted that it "will transfer responsibility for processing Equal Employment Opportunity complaints, reasonable accommodation requests, and other statutorily required functions to other SSA components to ensure compliance with existing legal authorities."  *Id.*

---

[1] Nicole Ogrysko, Federal News Network, SSA early retirement offers attract fewer than 200 employees (Dec. 16, 2021), https://perma.cc/NA9V-EDCD

[2] Press Release, Social Security Announces Change to Improve Agency Operations and Strengthen Protections (Feb. 21, 2025), https://perma.cc/9QXE-T7SA  ("Feb. 21 Press Release").

[3] Press Release, Social Security Eliminates Wasteful Department—Action is Another Step to Enhance Operations (Feb. 24, 2025), https://perma.cc/3FQ7-XMW2  ("Feb. 24 Press Release").

[4] Press Release, Social Security Dissolves Duplicative Office—Action is Another Step to Enhance Operations (Feb. 25, 2025), https://perma.cc/H3YL-PJFQ  ("Feb. 25 Press Release").

Portions of OCREO's workload were transferred to the Office of Mission Support, Compl. (ECF No. 1) ¶ 98, and on May 30, SSA issued a press release providing additional clarity on how accommodation requests and discrimination complaints may be submitted. Accommodation requests may be made by phone (1-800-772-1213), email (Section.504.public.inquiry@ssa.gov), or in person at any SSA field office or hearing office.[5] Discrimination complaints may be made by phone (1-866-574-0374), email (civil.rights.program.complaint.intake@ssa.gov), or through submission of a standard form (www.ssa.gov/forms/ssa-437.pdf) or a letter containing the same information. *Id.*

### C.    Workforce Reduction and Consolidation of Regional Offices

On February 28, SSA announced that it planned to reduce its workforce and consolidate regional offices, in a continued effort "to implement efficiencies and reduce costs, with a renewed focus on mission critical work for the American people."[6] Specifically, SSA restructuring plans "focus on functions and employees who do not directly provide mission critical services," setting a "staffing target of 50,000, down from the current level of approximately 57,000 employees." *Id.* Much of this reduction is anticipated to "come from retirement, VSIP [voluntary separation incentive payments], and resignation[,]" with "[a]dditional reductions . . . from reduction-in-force (RIF) actions that could include abolishment of organizations and positions." *Id.*

SSA also announced that its "regional structure consisting of 10 offices . . . is no longer sustainable," so will be "reduce[d] . . . down to four regions[,]" and that the organizational structure at Headquarters would likewise be modified. *Id.* It explained that, together, these steps would, among other things, "prioritize customer service by streamlining redundant layers of management, reducing non-mission critical work, and potential reassign[ing] employees to customer service positions." *Id.*

---

[5] Press Release, Social Security Continues to Provide Ways for the Public to Request Accommodations and File Civil Rights (Program Discrimination) Complaints (May 30, 2025), https://perma.cc/AB83-63JB   ("May 30 Press Release").

[6] Press Release, Social Security Announces Workforce and Organization Plans (Feb. 28, 2025), https://perma.cc/W4MD-WTDY   ("Feb. 28 Press Release").

**D.     Availability of Telephone Services**

On March 26, SSA announced an update to its identity-proofing policy.[7]  "Under the updated policy," many individuals "who cannot use a personal my Social Security account [i.e., SSA's online portal] can [still] complete their claim entirely over the telephone without the need to come into an office"—namely, those "applying for Social Security Disability Insurance (SSDI), Medicare, or Supplemental Security Income (SSI)."  *Id.*  Under the new policy, some customers would "need to prove their identity at a Social Security office" including some applicants "for Retirement, Survivors, or Auxiliary (Spouse or Child) benefits"—and even then, exceptions were available in extreme situations.  *Id.*

The new policy continued to develop with "enhanced fraud prevention tools" that would "enable[] SSA to identify suspicious activity in telephone claims by analyzing patterns and anomalies within a person's account."[8]

**E.     Clarification Regarding SSA Field Offices**

On March 27, in response to media reports about the potential closure of some of SSA's 1,231 field offices,[9] SSA announced: "Recent reports in the media that [SSA] is permanently closing local field offices **are false**. Since January 1, 2025, the agency has not permanently closed or announced the permanent closure of any local field office," and has announced the permanent closure of just "one hearing office, in White Plains, NY."[10]  SSA explained that while it provided the General Services Administration with list of "underutilized office space" for potential termination, "[m]ost of these are small hearing rooms with no assigned employees," and because "most hearings are held virtually, SSA no longer needs these underutilized rooms."  *Id.*

---

[7] Press Release, Social Security Updates Recently Announced Identity Proofing Requirements (Mar. 26, 2025), https://perma.cc/H9TR-FQJ3
[8] Press Release, Social Security Administration Implements New Anti-Fraud Measures to Enhance Telephone Claim Processing (Apr. 12, 2025), https://perma.cc/X7G3-SBGY ("Apr. 12 Press Release").
[9] SSA, Annual Statistical Supplement, 2024, https://perma.cc/XPW5-E49C
[10] Press Release, "Correcting the Record about Social Security Office Closings" (Mar. 27, 2025), https://perma.cc/5NLA-G8QL ("Mar. 27 Press Release").

## II.    Social Security

More than 74 million Americans receive Social Security benefits of some kind.[11]  Some 55 million receive retirement benefits, generally available starting at age 62 to those who worked and paid Social Security taxes for at least 10 years.  42 U.S.C. § 402(a).  Nearly 6 million receive survivor benefits, available to certain relatives of deceased workers who paid Social Security taxes.  *Id*. § 402(b)–(h).  About 8 million receive disability insurance (SSDI) benefits, available to workers who have paid Social Security taxes but "whose disability prevents them from pursuing gainful employment."  *Heckler v. Day*, 467 U.S. 104,105–06 (1984) (citing 42 U.S.C. § 423).  And about 7 million receive supplemental security income (SSI), available to certain low-income aged, blind, and disabled persons without regard to work history.  42 U.S.C. § 1382.  Although Plaintiffs' complaint refers to each type of benefit at least in passing, they focus on SSDI.  *See* Compl. ¶¶ 116–64 (explaining that each of the six Individual Plaintiffs is either receiving, applying for, or appealing the denial of SSDI).[12]

Given this number of beneficiaries, the "disability programs administered [by SSA] are of a size and extent difficult to comprehend."  *Day*, 467 U.S. at 106 (quotation omitted).  To "facilitate the[ir] orderly and sympathetic administration," Congress and the Commissioner "have established an unusually protective four-step process for the review and adjudication of disputed claims."  *Id*.

- First, after SSA confirms that certain threshold eligibility requirements are met, an application is referred to a state agency, known as the Disability Determination Service (DDS), for an initial determination of "whether the claimant has a disability" that prevents gainful employment and when "the disability began."  *Id*. at 106 (citing 20 C.F.R. § 404.1503).  This process may be quite involved, as the agency will obtain medical records and other information related to the claimant's impairments and ability to work, and may require a special medical examination.[13]

- "Second, if the claimant is dissatisfied with that determination, he may request reconsideration," which "involves a de novo" review "by the state agency, and in some

---

[11] SSA, Monthly Statistical Snapshot (May 2025), https://perma.cc/GX67-MZ49
[12] One Plaintiff (Wilshawn Tiller) also alleges that he is appealing the denial of an application for SSI, Compl. ¶¶ 158, 162, which has an administrative appeal and exhaustion scheme analogous to SSDI, *see Day*, 467 U.S. at 106; 20 C.F.R. § 416.1400 *et seq.*
[13] SSA, Disability Benefits, at 2, https://perma.cc/E8U6-8CR5

cases a full evidentiary hearing" with "[a]dditional evidence." *Id*. at 106–07 (citing 20 C.F.R. §§ 404.907–404.921).

- "Third, if the claimant receives an adverse reconsideration determination, he is entitled by statute to an evidentiary hearing and to a de novo review by an Administrative Law Judge (ALJ)." *Id*. at 107 (citing 42 U.S.C. § 405(b); 20 C.F.R. §§ 404.929–404.961 (1983)).

- Fourth, "if the claimant is dissatisfied with the decision of the ALJ, he may take an appeal to the Appeals Council." *Id*. (citing 20 C.F.R. §§ 404.967–404.983).

"These four steps exhaust the claimant's administrative remedies. Thereafter, he may seek judicial review in federal district court." *Id*. (citing 42 U.S.C. § 405(g)).

The Supreme Court has held that these "administrative procedures fully comport with due process." *Mathews v. Eldridge*, 424 U.S. 319, 349 (1976) (rejecting a claim that due process required "that an evidentiary hearing" be provided "prior to the termination of [Social Security] disability benefits"). It has also held that "it would be an unwarranted judicial intrusion into this pervasively regulated area for federal courts to issue injunctions imposing deadlines with respect to future disability claims." *Day*, 467 U.S. at 119. "[D]elays" in this process "are not a recent development," and date back to the 1970s. *Id*. at 111 n.16. But "Congress repeatedly has been made aware of the long delays associated with resolution of disputed disability claims," yet "repeatedly has considered and rejected suggestions that mandatory deadlines be imposed to cure that problem," *id*. at 111, wary that "strict time limits . . . could result in incorrect determinations because time was not available to . . . reach well-reasoned decisions in difficult cases," *id*. at 115 (quoting H.R. Rep. No. 97-588, at 19–20 (1982)). Thus, it is not for "courts . . . to impose the very deadlines [Congress] repeatedly has rejected." *Id*. at 118.

## III. This Case

Plaintiffs are five advocacy groups and six individuals[14] either receiving SSDI benefits or at various stages of the application or appeals process.

Receiving Benefits:

- Elizabeth Rouse "receives SSDI" benefits "[t]oday," but alleges that "[m]anaging [these] benefits" is a "challenge." Compl. ¶¶ 117–18.

---

[14] Plaintiff Treva Olivero passed away on May 25. Pl.'s Statement Noting the Death of Treva Olivero at 1, ECF No. 36 (stating that this action proceeds "'only to or against the remaining parties'" (quoting Fed. R. Civ. P. 25(a)(2)).

Pending Applications:

- Deja Powell "applied for SSDI benefits in August 2024." *Id*. ¶ 152. Her application is "in the disability determination phase" before the state agency. *Id*. ¶ 157.

- Merry Schoch lost SSDI benefits in "August 2024" "because she had been working full-time," a decision she does not allege was erroneous. *Id*. ¶ 133. She reapplied in December 2024, "work[ing] with her granddaughter to complete the paperwork." *Id*. ¶ 135. But she alleges that she has "no way to complete" a "questionnaire about her blindness, a required part of her SSDI application," on her own, and must "wait for her granddaughter's help." *Id*. ¶¶ 139, 142.

Pending Administrative Appeals:

- Martha Hazen lost SSDI benefits in 2023, when she obtained full-time employment, a decision she does not allege was erroneous. *Id*. ¶ 127. She "reapplied for SSDI" "in February 2024," was "denied in September [2024]," and is "navigat[ing] the appeals process." *Id*.

- William Weiss lost SSDI benefits in "February 2024" due to "excess earnings from his part-time job." *Id*. ¶ 146. His appeal of that decision is pending. *See id*. ¶ 148.

- Wilshawn Tiller "applied for SSI and SSDI" in "November 2023." *Id*. ¶ 158. He was "told his SSI application was denied" during a "February 2025" interview. *Id*. ¶ 162. He does not indicate the status of his application for SSDI, but states that he has "no recourse but to appeal." *Id*. ¶ 162.

Plaintiffs allege that, in 2024, before the challenged reforms were announced, the average processing time was 230 days for initial disability determinations, 7 months for reconsideration requests, and 345 days for ALJ hearings. Compl. ¶¶ 39–41. No Plaintiff claims that they have been denied benefits since the challenged reforms were announced, or that they have submitted an accommodation request or discrimination complaint.

Plaintiffs bring seven claims, alleging that the SSA reforms violate the Rehabilitation Act, the Due Process Clause, the Petition Clause, and the Administrative Procedure Act. *Id*. ¶¶ 166–230. As relief, they seek an injunction requiring Defendants to cease "demolishing OCREO and OT," stop "terminating the 7,000 staff it has already begun cutting," and "re-hire those it has already terminated." Compl., Prayer for Relief ¶ 4. They also seek an injunction barring a variety of SSA policies—namely, any that "prohibit identity verification at the time of application by telephone," *id*. ¶ 5, "requir[e] in-person visits for the issuance of social security cards to noncitizens entitled to work and newly naturalized citizens," *id*. ¶ 6, or "requir[e] in-person visits

for notification of any change in banking," *id.* ¶ 7.  In essence, Plaintiffs ask the Court to "return[] SSA" to its "status" on "February 24, 2025," Pls.' Prelim. Inj. Mot. at 20, ECF No. 2, before the announced reforms began.

## LEGAL STANDARDS

A motion to dismiss under Rule 12(b)(1) challenges the Court's subject matter jurisdiction. The plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992), and in making this determination the Court "may consider material outside the pleadings," *Kareem v. Haspel*, 986 F.3d 859, 866 n.7 (D.C. Cir. 2021).

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  The court considers "the complaint in its entirety, as well as . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007).  While the Court accepts well-pleaded factual allegations as true, "mere conclusory statements" and "'legal conclusion[s] couched as . . . factual allegation[s]'" are "disentitle[d] . . . to th[is] presumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 681 (2009) (citation omitted).

## ARGUMENT

### I.    The Court Lacks Jurisdiction

### A.    Plaintiffs Lack Article III Standing

Plaintiffs' lack of standing resolves this case at the start, as no Plaintiff alleges a cognizable harm caused by the challenged reforms.  *See Lujan*, 504 U.S. at 560.  The Court's conclusions at the preliminary injunction stage confirm as much.

Based on a careful review of the declarations timely submitted by the named Plaintiffs,[15] the Court explained that the Individual Plaintiffs "largely complain about matters," like backlogs

---

[15] The Court noted that "the declarations from persons who are not named . . . Plaintiffs . . . cannot establish irreparable harm because '[t]he *party* seeking a preliminary injunction must'" establish

and customer-service issues, "that predate the administrative actions at issue." Op. at 3. None actually "assert[s] any termination or diminution of benefits." *Id.* at 4. Nor do they "describe[] any injury arising from the dissolution of OCREO or the Office of Transformation," or "claim[] to have recently tried to file a discrimination complaint or request an accommodation from the SSA." *Id*. at 5. And the Organizational Plaintiffs "fare no better," offering "no specifics that would permit the court to find 'perceptible impairment'" of their programming or a "'direct conflict'" with their missions. *Id.* at 5–6. These conclusions, though reached in the context of determining whether any claimed harm was irreparable, show that Plaintiffs have not sufficiently alleged any cognizable harm caused by SSA's reforms at all.

"No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 397 (2024) (quotation omitted). And standing is of course a central component of the case-or-controversy requirement. "In keeping with the purpose of [standing] doctrine"—"which is built on separation-of-powers principles, [and] serves to prevent the judicial process from being used to usurp the powers of the political branches"—the standing inquiry is "especially rigorous" where, as here, the Court faces claims that the Executive Branch has acted unconstitutionally. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408–09 (2013) (citation omitted).

"Standing is not dispensed in gross," and "a plaintiff must demonstrate" it "for each claim he seeks to press" and "for each form of relief" sought. *Davis,* 554 U.S. at 734. No Plaintiff shows it for any claim or form of relief sought here.

### 1.    Individual Plaintiffs

A review of the prayer for relief reveals that no Plaintiff alleges concrete harm caused by the various reforms they seek to enjoin. The Court has already concluded as much with respect to Plaintiffs' request that it "enjoin Defendants from demolishing OCREO and OT." Compl., Prayer

---

such harm. Op. at 4 n.3. The same is true for standing. *See Davis v. FEC,* 554 U.S. 724, 734 (2008).

for Relief ¶ 4; *see* Op. at 5 (holding that no Plaintiff "describe[s] any injury arising from the dissolution" of these offices).  The same is true for the other relief sought:

- Plaintiffs seek to enjoin any "policies that prohibit identity verification at the time of application by telephone."  Compl., Prayer for Relief ¶ 5.  But each has already applied for SSDI, *see supra* pp. 7-8, and none claims to have been subject to such a policy.

- Plaintiffs seek to enjoin "the policy or practice requiring in-person visits for the issuance of social security cards to noncitizens entitled to work and newly naturalized citizens."  *Id.* ¶ 6.  But none claims to be a noncitizen or newly naturalized citizen.

- Plaintiffs seek to enjoin "the policy or practice of requiring in-person visits for notification of any change in banking."  *Id.* ¶ 7.  But, again, none claims to have been subjected to such a policy, or to have any need to change their banking information.

To be sure, in denying preliminary relief, the Court stated that Plaintiffs had shown no "great" harm, Op. at 4, not necessarily no harm at all.  But it identified no harm cognizable here.  Importantly, it found no Plaintiff "asserting any termination or diminution of benefits."  *Id.*  And it emphasized that the bulk of Plaintiffs' complaints focus on customer-service issues that "predate the administrative actions at issue."  *Id.* at 3.  The Court found only two Plaintiffs alleging "more recent" issues.  One, Ms. Powell, complains of a "five-and-a-half-hour wait time for [a] phone call."  *Id.* at 4.  But she claims that this call took place in "February 2025," without specifying a precise date.  Powell Decl. ¶ 8, ECF No. 2-7.  It is hard to see how this could have been caused by the challenged reforms, which only began to be announced at the *end* of that month.  *See supra* pp. 3-5.

That leaves the claims of a single Plaintiff, Ms. Schoch, who complains about an "unsuccessful March 2025 phone call to SSA's 800-number" and a "lack of available appointments until May 2025."  Op. at 4.  Specifically, she states that she "called SSA's 800-number on or around March 24" and used the automated system to request a return call, but "did not receive a call back that day."  Schoch Decl. ¶ 21, ECF No. 2-5.  So, the "next day," she called "the national SSA phone line," "waited an hour on the phone before someone answered," and was told there were no "appointments available until May 20—nearly two months away."  *Id.* ¶ 22.

Plaintiffs do not show that Ms. Schoch's experience was caused by the challenged reforms.  To start, they point to facts showing that a one-hour wait time by phone, or a two-month wait time

for an appointment, is unusual. On the contrary, another Plaintiff, Ms. Rouse, explains that she "call[s] SSA several times per year" and sometimes "wait[s] on the phone for an hour or 90 minutes before giving up," with her calls "only answered by an agent between 60 or 70 percent of the time." Rouse Decl. ¶¶ 12–14, ECF No. 2-2. Plaintiffs also offer nothing besides conjecture to suggest that any new delay was caused by the reforms they challenge—a prediction that not only relies on a "highly attenuated chain of possibilities," *Clapper*, 568 U.S. at 410, but disregards "obvious alternative explanation[s]," *Twombly*, 550 U.S. at 567, such as the 18% surge in Social Security claims during the first half of this year.[16]  And they likewise cannot show that the requested relief would redress their alleged injuries—particularly when, for example, none alleges that they have submitted an accommodation request or discrimination complaint.

In any event, the anecdotal customer-service complaints of a single beneficiary would be an exceedingly thin reed upon which to rest the sweeping injunctive relief that Plaintiffs seek.  In a program that serves more than 74 million Americans, where Congress has repeatedly declined to require that applications be resolved on a particular time frame, *see Day*, 467 U.S. at 119, common frustrations arising from routine customer-service issues do not amount to cognizable harm. That is particularly so in the absence of any concrete denial of benefits—a denial that would itself be subject to administrative appeal and judicial review.

Indeed, on Plaintiffs' theory, virtually any American could sue over administrative cuts at any federal agency if they could imagine any possible downstream effect on customer service. The Supreme Court recently rejected a similarly attenuated theory of standing.  *See OPM v. AFGE*, 221 L. Ed. 2d 654, 2025 U.S. LEXIS 1451 (2025) (staying injunction granted on the theory that nonprofit organizations suffered downstream injury from RIFs affecting public services).  So too here.

---

[16] NPR, *Why there's an unexpected surge in people claiming Social Security* (June 12, 2025) ("In a statement to NPR, the Social Security Administration wrote that it had identified 'three key reasons' that people are filing claims now: a peak of retiring Baby Boomers; a rule change that increases Social Security benefits for some people with pensions; and a bump in people who had been collecting spousal benefits re-filing to claim a higher benefit based on their own records."), https://perma.cc/W3ZG-X2FD

## 2.    Organizational Plaintiffs

The Organizational Plaintiffs "fare no better."  Op. at 5.  To the extent they sue on behalf of their members, they do not identify any with standing, for the reasons set out above.  And to the extent they sue on their own behalf, they show no "perceptible impair[ment]" to their programs or "direct conflict" with their mission, as the Court has found.  Op. at 6.

### a.  Associational standing

An organization has standing to sue on behalf of its members when (1) "its members would otherwise have standing to sue in their own right"; (2) "the interests it seeks to protect are germane to the organization's purpose"; and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).  Three Organizational Plaintiffs—NFB, NCPSSM, and MSAC—claim associational standing,[17] but each fails at the first step, as they fail to identify any individual member with standing in his own right.

"[I]t is not enough to aver that unidentified members have been injured."  *Twin Rivers Paper Co. v. SEC*, 934 F.3d 607, 613 (D.C. Cir. 2019) (quotation omitted).  Rather, the "organization must provide individual affidavits from members who have suffered the requisite harm."  *Id*. (quotation omitted); *see also, e.g.*, *Commissioned Officers Ass'n of the U.S. Pub. Health Serv. v. Bunch,* 2022 U.S. Dist. LEXIS 58706, *11-12 (D.D.C. Mar. 30, 2022).  Here, the only organization offering such declarations is NFB, so the claims of the other organizations fail at the outset.[18]  And while NFB met this threshold obligation, none of its members has standing for the

---

[17] Plaintiffs note that "AAPD and Deaf Equality are not membership organizations, so they do not allege associational standing."  ECF No. 29 at 6.

[18] For NCPSSM, no declarations were submitted by any member, just a declaration from the President of the organization, Max Richtman, who does not aver any personal injury.  *See* Decl. of Max Richtman, ECF No. 2-12.  So too with MSAC, whose Executive Director, Ms. Villers, alleges no personal injury, only that she is "devoting significant time with staff" discussing how to respond to recent changes at SSA.  *See* Decl. of Carolyn Villers, ¶¶ 16-17, ECF No. 12.  The same is true of the second declarations submitted by Mr. Richtman and Ms. Villers.  *See* ECF Nos. 29-8, 29-11.

reasons just explained.  *See supra* at pp. 10-12.  Thus, Plaintiffs' theory of associational standing fails.

### b. Organizational standing

Plaintiffs' organizational standing theory is equally flawed, as the Court concluded after careful review of the timely submitted declarations of the named Organizational Plaintiffs.  *See* Op. at 5 (considering even the declarations "uncited" in Plaintiffs' preliminary injunction papers). As the Court explained, while NFB, for example, alleges a "diver[sion] of resources," it "provides no specifics that would permit the court to find 'perceptible impairment'" of the organization's programs or a "'direct conflict'" with its mission.  *Id*. at 6.  And NCPSSM and Deaf Equality's "declarations are similarly lacking in detail and support."  *Id*.  (AAPD and MSAC "did not submit declarations with Plaintiffs' opening [preliminary injunction] brief."  *Id*. at 6 n.4.)

The Court of course "decline[d] to consider" at the preliminary injunction stage "any declaration submitted by Plaintiffs for the first time with their reply."  *Id*. at 3 n.2.  But the four declarations belatedly submitted by NFB, AAPD, and MSAC do not change the analysis.

The D.C. Circuit has held that, to "establish organizational standing, a party must show that it suffers [1] 'a concrete and demonstrable injury to its activities,' distinct from 'a mere setback to the organization's abstract social interests,'" and that there is "[2] a direct conflict between the defendant's conduct and the organization's mission.'"  *Elec. Priv. Info. Ctr. ("EPIC") v. FAA*, 892 F.3d 1249, 1255 (D.C. Cir. 2018) (citation and emphasis omitted); *see also* Op. at 5.  With respect to the first prong, to show the requisite injury, "an organization must allege that the defendant's conduct perceptibly impaired the organization's ability to provide services."  *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) (quotation omitted).  And, as the Supreme Court recently clarified, the notion that "standing exists when an organization diverts its resources in response to a defendant's actions . . . is incorrect."  *All. for Hippocratic Med*., 602 U.S. at 395.  Otherwise, "all the organizations in America would have standing to challenge almost every federal policy that they dislike."  *Id*.  An organization cannot "spend its way into standing" in that way.  *Id*. at 394.

Plaintiffs' belated declarations fall short of these standards for the same reasons as their earlier ones. Take, for example, the declaration of Maria Town, for AAPD. This largely seems to repurpose passages (at times verbatim) from the Riccobono declaration, for NFB, which the Court has already found insufficient, largely for alleging a mere "diver[sion of] resources" without providing "specifics," Op. at 6. *Compare* Town Decl. (ECF No. 29-10) ¶ 7 *to* Riccobono Decl. (ECF No. 2-16) ¶ 16; *compare same* ¶ 8 *to* ¶ 17; ¶ 9 *to* ¶ 18; ¶ 11 *to* ¶ 19; ¶ 12 *to* ¶ 20; ¶ 13 *to* ¶ 21; ¶ 14 (second sentence onwards) *to* ¶ 10; ¶ 17 *to* ¶ 10; ¶ 18 (first three sentences) *to* ¶ 11; ¶ 19 (second sentence onwards) *to* ¶12; ¶ 21 *to* ¶ 21. The Town declaration provides no firmer basis for standing. It generically asserts that the reforms will "frustrate AAPD's mission" and "directly interfere with its core business activities," including "[i]nformation and referrals" and "[a]dvocacy and communication efforts." Town Decl. ¶ 12. But these sorts of conclusory assertions, devoid of specifics, are insufficient. *See* Op. at 6 (faulting declarations "lacking in detail and support"). And AAPD's attempt to rely on hearsay accounts of the supposed effect of the challenged reforms on unnamed members, *e.g.*, Town Decl. ¶¶ 14–15, 18–19, should not be credited.

The declarations of Carolyn Villers, for MSAC, are similarly flawed. To start, she acknowledges that MSAC's focus is on Medicare—it has only "limited capacity" with respect to Social Security, Villers Decl. ¶ 10, ECF No. 12, and does not "formally track[] Social Security related inquiries," *id.* ¶ 18—and her statements should be read in that light. In any event, her first declaration essentially relies upon the "diversion of resources" theory already found insufficient. *Compare* Villers Decl. ¶¶ 14, 15, *with* Riccobono Decl. ¶¶ 15, 19. And while she asserts that she has "noticed an increase," "in the past two months, we've gotten approximately twenty call[s] or inquiries," Villers Decl. ¶ 18, she does not explain how this number of calls—about 1 every 3 days—could have "perceptibly impaired" the organization, much less created a "direct conflict."

Ms. Villers's second declaration does not cure these defects. There, she essentially asserts that calls to SSA have recently taken longer, so MSAC has been able to help fewer Social Security applicants. 2d Villers Decl. ¶ 13, ECF No. 29-11. Notably, she claims that this began in February 2025, *id.*, before the reforms were announced, casting doubt on whether they could have been the

15

cause. Regardless, this shows neither perceptible impairment nor a direct conflict. Indeed, helping applicants navigate the application process is MSAC's *raison d'être*, and nothing about the challenged reforms interferes with the organization's ability to do so, even if it were true that more clients were now seeking their assistance. And as with AAPD, MSAC's hearsay accounts of the experiences of unnamed members, who are not even alleged to have sought MSAC's help, cannot establish its standing. *Id.* ¶¶ 10–11.

Finally, the second declaration of Max Richtman, for NCPSSM, shares these key faults. His central claim is that recent SSA policy changes have meant that "the information and advice we have given to our members previously about how best to interact with the agency and receive services is no longer accurate and effective." 2d Richtman Decl. ¶ 9, ECF No. 29-8. So, NCPSSM has "found it necessary to spend time and resources to develop written materials for our members suggesting ways they might protect themselves, which will need to be monitored and updated regularly." *Id.* ¶ 12. But, again, it is NCPSSM's very mission to provide guidance to applicants. Nothing in Mr. Richtman's second declaration shows that the reforms are at "loggerheads" with that mission or impair the organization's programming in any way. This is, instead, a disagreement over policy, dressed up as a mission conflict—prototypical "pure issue-advocacy that cannot establish standing." *EPIC*, 892 F.3d at 1255 (quotation omitted).

Thus, the Organizational Plaintiffs cannot remedy the Individual Plaintiffs' lack of standing. The Court therefore lacks jurisdiction, and it need go no further to dismiss the complaint.

### B.  Federal personnel statutes divest court of subject matter jurisdiction to consider claims concerning the employment of SSA employees

Even if Plaintiffs had standing, they face another jurisdictional hurdle. The Complaint largely focuses on SSA's workforce reduction plans, asking the Court to permanently enjoin Defendants "from terminating the 7,000 staff it has already begun cutting," and to issue a permanent injunction requiring that already-separated employees be rehired. *See* Compl., Prayer for Relief ¶4. But Congress has precluded district-court review of such federal-employment claims, which must proceed in another forum. That is because Congress has "established a

comprehensive system" that provides the "exclusive means" for reviewing challenges to the employment decisions of federal agencies. *Elgin v. Dep't of the Treasury*, 567 U.S. 1, 5, 8 (2012) (quotation marks omitted).

The Civil Service Reform Act (CSRA), together with the Federal Service Labor-Management Relations Statute (FSLMRS),[19] "creates an integrated scheme of administrative and judicial review, wherein the Congress intentionally provided—and intentionally chose not to provide—particular forums and procedures for particular kinds of claims." *Am. Fed'n of Gov't Emps. v. Sec'y of the Air Force*, 716 F.3d 633, 636 (D.C. Cir. 2023) (alterations, citation, and quotations marks omitted). Congress allowed certain individual federal employees who are affected by agency personnel decisions to challenge those decisions "by litigating their claims through the statutory scheme in the context of [a] concrete" dispute, with limitations imposed by Congress on the kinds of claims and remedies available. *See Am. Fed'n of Gov't Emps. ("AFGE") v. Trump*, 929 F.3d 748, 757 (D.C. Cir. 2019). The purpose of this statute was to "replace the haphazard arrangements for administrative and judicial review of personnel action, part of the outdated patchwork of statutes and rules built up over almost a century that was the civil service system." *United States v. Fausto*, 484 U.S. 439, 444 (1988) (quotation omitted).

When a comprehensive remedial scheme like this permits only some plaintiffs to seek review, the scheme implicitly precludes judicial review by other plaintiffs who are not authorized to bring claims. The Supreme Court recognized this in *Block v. Community Nutrition Institute*,

---

[19] The CSRA establishes the "comprehensive system for reviewing personnel action taken against federal employees." *United States v. Fausto*, 484 U.S. 439, 455 (1988). Under the CSRA, most civilian employees can appeal a major adverse personnel action to the Merit Systems Protection Board (MSPB). 5 U.S.C. §§ 7512, 7513(d), 7701. Employees subject to a RIF may also pursue relief before the MSPB. *See* 5 C.F.R. § 351.901. The CSRA empowers the MSPB to order relief, including reinstatement. 5 U.S.C. §§ 1204(a)(2), 7701(g). An employee aggrieved by a final decision of the MSPB may obtain judicial review. *Id.* § 7703(a)(1); *see also id.* § 7703(b) (providing the Federal Circuit with exclusive jurisdiction over most final MSPB decisions). In addition, the FSLMRS governs labor relations between the Executive Branch and its employees. *See* 5 U.S.C. §§ 7101-7135; *Am. Fed'n of Gov't Emps. v. Trump*, 929 F.3d 748, 752 (D.C. Cir. 2019). The Federal Labor Relations Authority (FLRA) is charged with adjudicating federal labor disputes. 5 U.S.C. § 7105(a)(2). Review of the FLRA's decisions is available in the courts of appeals. *Id.* § 7123(a).

467 U.S. 340, 347 (1984), where it considered a statute that permitted dairy *handlers* to obtain review of certain "market orders" after exhausting administrative remedies, but did not authorize review by anyone else. *See id.* at 346 (citing 7 U.S.C. § 608c). When a group of dairy *consumers* sought review of a marketing order, the Supreme Court explained that the statute omits a "provision for participation by consumers in any proceeding." *Id.* at 347. In the "complex scheme" Congress had provided, "the omission of such a provision is sufficient reason to believe that Congress intended to foreclose consumer participation in the regulatory process." *Id.* Accordingly, the statute's "structure … indicates that Congress intended only producers and handlers, and not consumers, to ensure that the statutory objectives would be realized." *Id.* The "restriction of the administrative remedy to handlers strongly suggests that Congress intended a similar restriction of judicial review of market orders." *Id.* Any other result, the Court said, would facilitate circumvention of the comprehensive statutory scheme. *See id.* at 348.

In *Fausto*, the Supreme Court applied the same reasoning to the CSRA itself. The Court explained that the "exclusion" of a party "from the provisions establishing administrative and judicial review for personnel action" of the type challenged here "*prevents* [the party] from seeking review" under other provisions. 484 U.S. at 455 (emphasis added). The Court emphasized that the CSRA's "comprehensive nature," its express provisions for different kinds of review for different kinds of plaintiffs, and its exclusion of those in the plaintiffs' position from the comprehensive scheme, reflected a "considered congressional judgment" that those employees "should not have statutory entitlement to review for" that type of personnel action covered by the CSRA. *Id.* at 448; *see Grosdidier v. Chairman, Broad. Bd. of Governors*, 560 F.3d 494, 497 (D.C. Cir. 2009) (Kavanaugh, J.) ("[T]he CSRA is the exclusive avenue for suit even if the plaintiff cannot prevail in a claim under the CSRA.").

Those principles likewise foreclose this Court's exercise of subject matter jurisdiction over Plaintiffs' employment-related claims. Just as Congress "intentionally foreclosed judicial review to" certain employees under the CSRA, *see Pinar v. Dole*, 747 F.2d 899, 912 (4th Cir. 1984), it intentionally foreclosed judicial review by parties other than those whom it specifically authorized

18

to seek relief.  As in *Fausto*, it would turn the CSRA's comprehensive structure "upside down" for the Plaintiffs, who are strangers to the federal government's employment relationships, to challenge the SSA's employment actions in federal district court, "free" from any of the restrictions that would apply if the claim were brought by the SSA employees (or former SSA employees) themselves.  *See* 484 U.S. at 449-50.  The exclusion from the CSRA's review scheme reflects Congress's considered judgment limiting who may challenge a personnel decision and on what grounds—rather than providing carte blanche for those excluded to sue outside the CSRA's comprehensive scheme.  *See Graham v. Ashcroft*, 358 F.3d 931, 935 (D.C. Cir. 2004) (Roberts, J.) (explaining that "it is the comprehensiveness of the statutory scheme involved, not the 'adequacy' of the specific remedies" that precludes jurisdiction).

The Supreme Court's more recent decisions in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), and *Axon Enterprises, Inc. v. FTC*, 598 U.S. 175, 186 (2023), reflect these same principles.  Those cases underscore that where, as here, Congress has established a "comprehensive" review scheme, district courts lack subject matter jurisdiction over a claim where it is, as here, "of the type Congress intended to be reviewed within" the statutory structure.  *See Axon*, 598 U.S. at 186 (quoting *Thunder Basin*, 510 U.S. at 212).

Congress did not establish an implausible scheme in which employees must litigate their employment actions through a comprehensive, integrated scheme, but others are left free to challenge those same employment actions directly in federal district court with "greater rights" than the affected employees themselves.  *See Graham*, 358 F.3d at 934.  Instead, Congress limited review of federal employment actions to actions by affected employees themselves, in a different forum.  And as then-Judge Roberts summed up, "what you get under the CSRA is what you get." *Fornaro v. James*, 416 F.3d 63, 67 (D.C. Cir. 2005).

Multiple courts, including very recently, have declined jurisdiction on this ground.  *See, e.g.*, *AFGE v. Trump*, 929 F.3d at 752; *see also, e.g., Am. Fed. of Gov't Emps. v. Ezell*, 2025 WL 470459, at *1 (D. Mass. Feb. 12, 2025) (no jurisdiction to consider plaintiffs' claims to enjoin OPM from enforcing the deadline for its "Fork in the Road" offer) (citing *AGFE v. Trump*); *Nat'l*

*Treasury Emps. Union v. Trump,* 770 F. Supp. 3d 1 (D.D.C. 2025) (Cooper, J); *Am. Foreign Serv. Ass'n v. Trump*, 768 F. Supp. 3d 6 (D.D.C. Feb. 21, 2025) (Nichols, J.); *see also Maryland v. USDA*, Dkt. 42, No. 25-1248 (L), 2025 WL 1073657, at *1 (4th Cir. Apr. 9, 2025) (ordering stay of district court's preliminary injunction and explaining that the government is likely to show that the district court lacked jurisdiction over plaintiff States' claims, where the government had argued, among other things, that the "[CSRA] provides the exclusive means for review of personnel actions taken against federal employees"—and observing that "[t]he Supreme Court has stayed a similar preliminary injunction issued by the United States District Court for the Northern District of California") (citing *OPM v. AFGE*, 221 L. Ed. 2d 654).

Here, much of the relief Plaintiffs seek is at its core a challenge to SSA employment policies, including recent and prospective separations.  That Plaintiffs have framed their alleged injury under the Rehabilitation Act and the APA does not allow them to sidestep the CSRA's mandatory channeling regime.  Were their theory correct, downstream consumers of government services and benefits could always go directly to court to raise such challenges, notwithstanding Congress's determination that federal employees must first pursue relief administratively.  It would be an odd result indeed if claims that cannot be raised in district court by those most directly affected—the employees themselves—could be raised by plaintiffs whose asserted injuries are entirely derivative.  The Court therefore lacks jurisdiction over these employment and termination related claims because they must be litigated in another forum.

### C.    The Social Security Act Precludes General Federal Question Jurisdiction

The Social Security Act "establishe[s] an unusually protective four-step process for the review . . . of disputed claims."  *Day*, 467 U.S. at 106.  It permits judicial review only after "exhaust[ion of] . . . administrative remedies," *id*. at 107, produces a "final decision of the Commissioner . . . made after a hearing," 42 U.S.C. § 405(g).  And it deprives courts of federal question jurisdiction to hear other suits "arising under" the Act.  *Id*. § 405(h).

This jurisdiction-stripping provision is "more than a codified requirement of administrative exhaustion"; rather, its "sweeping and direct" language makes "plain" that "*no* action shall be

20

brought under § 1331," not merely that unexhausted actions are precluded. *Weinberger v. Salfi*, 422 U.S. 749, 757 (1975) (emphasis added). This bar extends to procedural claims, *Heckler v. Ringer*, 466 U.S. 602, 615 (1984) ("federal-question jurisdiction is barred by 42 U.S.C. § 405(h) even in a case where [the] claimant is challenging the administrative procedures used to terminate welfare benefits"), as well as constitutional ones, *id.* at 622 ("we held in *Salfi* that the constitutional claim was nonetheless barred by § 405(h)"). This scheme "assures the [Commissioner] the opportunity prior to constitutional litigation to ascertain, for example, that the particular claims involved are neither invalid for other reasons nor allowable under other provisions of the Social Security Act." *Salfi*, 422 U.S. at 762. Thus, it is settled that, "[b]y its plain terms . . . 42 U.S.C. § 405(h) . . . strips the court of jurisdiction under 28 U.S.C. § 1331 and § 1346 over 'any claim arising under'" the Act. *RICU LLC v. HHS*, 22 F.4th 1031, 1035 (D.C. Cir. 2022).

Plaintiffs' claims "arise under" the Social Security Act. The core of their complaint is that the challenged reforms will cause their benefits to be delayed or denied. That readily qualifies under the "broad" construction the Supreme Court has given to the "arising under" language, which reaches "any claims in which 'both the standing and the substantive basis for the presentation' is the Social Security Act." *Ringer*, 466 U.S. at 615 (quoting *Salfi*, 422 U.S. at 760-61). Indeed, to "contend that such an action does not arise under the Act whose benefits are sought is to ignore both the language and the substance of the complaint." *Salfi*, 422 U.S. at 761.

Plaintiffs must therefore channel their complaints through the administrative process. In the meantime, their claims relying on 28 U.S.C. § 1331, *see* Compl. ¶ 10, should be dismissed, and any claim they may wish to pursue under the Act should be dismissed as unexhausted.

## II.    Plaintiffs Fail to State a Claim

Jurisdiction aside, each of Plaintiffs' claims fails on the merits.

### A.    Procedural Due Process (Count II)

The Fifth Amendment's Due Process Clause provides that "No person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. To state a due process claim, a plaintiff must first allege that he has been deprived of a protected property interest.

*See, e.g.*, *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). It is well settled that a plaintiff receiving government benefits may have a protected property interest in their continued receipt, such that he cannot be deprived of them without due process. But the Supreme Court "has never held that applicants for benefits, as distinct from those already receiving them, have a legitimate claim of entitlement protected by the Due Process Clause of the Fifth . . . Amendment." *Lyng v. Payne*, 476 U.S. 926, 942 (1986); *see also Jaskot v. Principi*, 58 F. App'x 839, 841 (Fed. Cir. 2002) ("A mere application for benefits does not establish a protected property interest in benefits sought."). Assuming they do, however, *see NB ex rel. Peacock v. Dist. of Columbia*, 794 F.3d 31 (D.C. Cir. 2015), Plaintiffs fail to state a due process claim.

Take, for example, Mr. Weiss—who, as the only Plaintiff contesting a termination of benefits, *see supra* p. 8, has perhaps the strongest claim to procedural protections. His claim is currently on administrative appeal, wending its way through the "unusually protective four-step process for the review and adjudication of disputed claims." *Day*, 467 U.S. at 106. And the Supreme Court has unequivocally held that those extensive procedures "fully comport with due process," *Eldridge*, 424 U.S. at 349, in a case rejecting a claim "that an evidentiary hearing" must be provided "prior to the termination of [Social Security] disability benefits," *id*. That forecloses not only the claim that more process is due to Mr. Weiss, but *a fortiori* that more process is due to the other Individual Plaintiffs as applicants. *See Lyng*, 476 U.S. at 942. And Ms. Rouse, who "receives SSDI" "[t]oday," *see supra* p. 7, has of course not been deprived of any property interest at all. Thus, no Plaintiff states a due process claim.

Plaintiffs' argument to the contrary rests on the premise that they have a protected interest not in property, but in process itself. They claim an entitlement to "fair and timely decision-making *processes*," Compl. ¶ 183 (emphasis added), and allege that the "elimination of OCREO and key grievance *procedures*," in particular, "strips claimants of a vital means to challenge discrimination," *id*. ¶ 184 (emphasis added). But the Constitution does not protect process for its own sake. To be clear, the core procedures for the adjudication of Social Security applications remain intact: Plaintiffs do not contend that the four-stage process endorsed by the Supreme Court

in *Mathews v. Eldridge* has changed in any meaningful way, and their suggestion that applicants are no longer able to file accommodation requests or discrimination complaints is at odds with the public record and undeserving of deference. Regardless, it is well established that "an entitlement to nothing but procedure" cannot "be the basis for a property interest." *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 764 (2005); *see also Olim v. Wakinekona*, 461 U.S. 238, 250 (1983) ("Process is not an end in itself. Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement."). And Plaintiffs' suggestion that due process requires Social Security determinations to be made on a particular timetable, despite Congress's views otherwise, simply cannot be squared with Supreme Court precedent. *See Day*, 467 U.S. at 119 ("[I]t would be an unwarranted judicial intrusion into this pervasively regulated area for federal courts to issue injunctions imposing deadlines with respect to future disability claims."). Plaintiffs' due process claim thus fails.

Even assuming a protected property interest, however, Plaintiffs' claim would fail. The Supreme Court has already determined that the baseline four-stage process provides sufficient protections against the risk of erroneous deprivation. *Eldridge*, 424 U.S. at 344–47. And "the constitutionalizing of government procedures" not only imposes "cost in terms of money and administrative burden," but risks encroaching on the discretion properly afforded to those charged with administering government programs. *Id*. at 347–49. The Court should not upset that balance.

## B.    Petition Clause (Count III)

The First Amendment's Petition Clause provides that "Congress shall make no law . . . abridging . . . the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. amend. I. The right secured by the Petition Clause is an important but nevertheless limited one: the right of the people to "'communicate their will' through direct petitions to the legislature and government officials." *McDonald v. Smith*, 472 U.S. 479, 482 (1985) (quoting James Madison, 1 Annals of Cong. 738 (1789)). This right "is cut from the same cloth as the other guarantees of [the First] Amendment, and is an assurance of a particular freedom of expression." *Id*. Thus, "the rights of speech and petition share substantial common ground," and are often

described as "cognate rights." *Borough of Duryea v. Guarnieri*, 564 U.S. 386, 388 (2011). Petition Clause rights are impaired when the government imposes "a general prohibition against certain forms of advocacy" or when it imposes "sanctions for the expression of particular views it opposes" because such action limits expression directed to the government. *Smith v. Ark. State Hwy. Emps., Local 1315*, 441 U.S. 456, 464 (1979).

But a freedom to express one's view does not entail a right to anything in return. Thus, while the Petition Clause protects the people's right to communicate with their government, it "does not impose any affirmative obligation on the government to listen [or] to respond to" the communication. *Id.* at 465; *see Minn. State Bd. for Cmty. Colls. v. Knight*, 465 U.S. 271, 285 (1984) ("Nothing in the First Amendment or in this Court's case law interpreting it suggests that the rights to speak, associate, and petition require government policymakers to listen or respond to individuals' communications on public issues."). Indeed, the Petition Clause does not provide a right to a response from the government even where the petitioner seeks redress for a claimed violation of a constitutional right. *We the People Found., Inc. v. United States*, 485 F.3d 140, 143-44 (D.C. Cir. 2007) (Kavanaugh, J.) ("In both [*Knight* and *Smith*], the Supreme Court flatly stated that the First Amendment . . . does not provide a right to a response to" or even "official consideration of a petition."). Simply put, the Petition Clause creates a right to petition for redress of grievances, not a substantive right to have grievances heard or redressed.

Against this backdrop, Plaintiffs' Petition Clause claim fails. They do not allege that the reforms restrict their speech in any way, or bar them from sharing whatever grievances they may have with the agency. Indeed, they acknowledge that "Defendants' restructuring of SSA" has placed OCREO's "essential responsibilities under OMS," Compl. ¶ 192, and they cannot reasonably deny that they may still submit accommodation requests and discrimination complaints to the agency, either by phone, email, or hard copy, *see supra* p. 4. Their complaint, rather, is that this supposed "shift in autonomy," from OCREO to OMS, "compromises SSA's ability to *address* complaints impartially." Compl. ¶ 192 (emphasis added). But there is simply no such obligation under the Petition Clause, which "does not provide a right to a response to" or even "official

consideration of a petition," *We the People Foundation*, 485 F.3d at 143–44, entrusting "Executive and Legislative responses to and consideration of petitions to the discretion of those Branches," *id*. at 144–45. Plaintiffs thus fail to state a Petition Clause claim.

### C.    Administrative Procedure Act (Counts IV–VII)

Plaintiffs assert four APA claims. Each fails.

### 1.    APA review is precluded because SSA's administrative reforms are committed to agency discretion

The APA grants a cause of action to "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. But it withdraws that cause of action "to the extent that . . . agency action is committed to agency discretion by law." *Id*. § 701(a). "Agency action is committed to agency discretion by law when 'the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" *Steenholdt v. FAA*, 314 F.3d 633, 638 (D.C. Cir. 2003) (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)).

As noted above, the Court lacks jurisdiction over challenges to the workforce reductions, which Congress has channeled to other forums. *See supra* pp. 16-20. The balance of the complaint largely challenges various plans to administratively reorganize the agency. But Congress vested the Commissioner of Social Security with broad, unreviewable discretion to make such decisions, providing that the "[t]he Commissioner *may* establish, alter, consolidate, or discontinue such organizational units or components within the Administration *as the Commissioner considers necessary or appropriate*, except that this paragraph shall not apply with respect to any unit, component, or provision provided for by this chapter." 42 U.S.C. § 902(a)(6) (emphasis added).

"In determining whether a matter has been committed solely to agency discretion, [courts] consider both [1] the nature of the administrative action at issue and [2] the language and the structure of the statute that supplies the applicable legal standards for reviewing that action." *Drake v. FAA*, 291 F.3d 59, 70 (D.C. Cir. 2002). First, staffing and organizational decisions fall

squarely in the realm of actions that courts have traditionally found committed to agency discretion. *See, e.g.*, *Lincoln v. Vigil*, 508 U.S. 182, 184, 191, 193 (1993) (holding that the Indian Health Service's 1985 decision to "reallocate the [Indian Children's] Program's resources from "handicapped Indian children in the Southwest," who had been served since the late 1970s and early 1980s, to a "nationwide effort to assist such children" was "committed to agency discretion by law" and "therefore not subject to judicial review under the Administrative Procedure Act, 5 U.S.C. § 701(a)(2)"); *Local 2855, AFGE v. United States*, 602 F. 2d 574, 579 (3d Cir. 1979) ("The existence of broad discretionary power in an agency often suggests that the challenged decision is the product of political, military, economic, or managerial choices that are not really susceptible to judicial review."). Second, Congress's choice of the deferential word "may," coupled with the formulation "as the Commissioner considers necessary and appropriate"—demonstrates that Congress committed the exercise of this authority to the agency's broad discretion.

The Supreme Court recognized the discretion inherent in an analogous formulation in *Webster v. Doe*, 486 U.S. 592, 600 (1988), where the statute authorized the CIA to terminate employees "whenever the Director 'shall *deem* such termination necessary or advisable in the interests of the United States.'" *Id*. (quoting 50 U.S.C. § 403(c)). Stressing that the statute did not limit termination to "when the dismissal *is* necessary or advisable to those interests," the Court found that, given Congress's use of the word "deem," the statutory "standard fairly exudes deference to the Director" and "foreclose[s] the application of any meaningful judicial standard of review." *Id*. (emphasis in original); *see also Claybrook v. Slater*, 111 F.3d 904, 909 (D.C. Cir. 1997) (noting that *Webster* gave "weight to [the] fact that [a] statute authorizes termination when [the] agency head 'shall deem [it] necessary or advisable' rather than when it 'is' necessary or advisable" (alteration in original)). Thus, the statute's implementation was committed to agency discretion, and APA review was precluded. *Webster*, 486 U.S. at 600-01. Because "considers" is not meaningfully different than "deems," the same result obtains here.

Plaintiffs point to no statute limiting the agency's inherent discretion to reorganize. They nowhere claim that any of the closed offices was "provided for by this chapter," 42 U.S.C.

26

§ 902(a)(6), or required by any other statute. And they offer no judicially manageable standard for the Court to apply in second-guessing the Commissioner's judgment about what staffing levels or office structure are the "right" ones to best accomplish the agency's policy priorities. Those decisions therefore are not subject to APA review.

### 2. Plaintiffs impermissibly seek wholesale improvement of SSA, rather than review of discrete, final agency action

Even if APA review is not precluded, it is limited to (a) discrete "agency action" that is (b) "final." 5 U.S.C. § 704. Plaintiffs' scattershot challenges to a grab-bag of evolving agency policies fail on both counts.

### a. SSA's programmatic reforms are not discrete agency action subject to APA review

The APA's definition of "agency action" is "not so all-encompassing as to authorize [courts] to exercise judicial review [over] everything done by an administrative agency." *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004) (Roberts, J.) (citation omitted). Rather, the "agency action" limitation prevents plaintiffs from "seek[ing] wholesale improvement of [a] program by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990). That is, "[u]nder the terms of the APA, [Plaintiffs] must direct [their] attack against some particular 'agency action' that causes [them] harm." *Id*. at 891. And that agency action must be "circumscribed" and "discrete[.]" *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004). "Because 'an on-going program or policy is not, in itself, a final agency action under the APA,' [a court's] jurisdiction does not extend to reviewing generalized complaints about agency behavior." *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006) (citation omitted).

Here, Plaintiffs' APA claims amount to impermissible wholesale challenges, *i.e.*, the sort of "broad programmatic attack" rejected in *Lujan*, rather than challenges to discrete final agency action. Plaintiffs challenge a collection of past, ongoing, and future actions—the closure or reorganization of various offices, reductions of staff, redirection of priorities, transfer of functions, and so on. *See, e.g.*, Compl. ¶ 2 (alleging "sweeping and destabilizing policy changes" resulting

in "systematic dismantling of SSA's core functions").  In *Lujan*, the Supreme Court dispelled any notion that such a programmatic challenge can proceed under the APA:

> [I]t is at least entirely certain that the flaws in the entire "program"—consisting *principally of the many individual actions referenced in the complaint, and presumably actions yet to be taken as well*—cannot be laid before the courts for wholesale correction under the APA, simply because one of them is ripe for review and adversely affects [a plaintiff].

497 U.S. at 892-93 (emphasis added).  Indeed, the purpose of the APA's discrete agency action requirement is "to protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve."  *Norton*, 542 U.S. at 62.  That describes this case to a T.

### b.    Any discrete agency action is not final for APA purposes

For an agency action to be "final" within the meaning of the APA, two considerations must be met.  "First, the action must mark the 'consummation' of the agency's decisionmaking process—[i]t must not be of a merely tentative or interlocutory nature."  *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal citation omitted).  "[S]econd, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow[.]'"  *Id.* at 178 (citation omitted).  Here, it is telling that Plaintiffs' complaint does not allege that any of the challenged agency actions is "final," save one—"Defendants' elimination of OCREO and its staff."  Compl. ¶ 199.  Neither the closure of OCREO nor the other reforms qualify.

First, many of the reforms have been subject to revision, evidencing their interlocutory nature.  For example, while Plaintiffs purport to challenge feared closures of SSA field offices, Compl. ¶¶ 66, 78, they state that "[t]he state of SSA's field offices is unclear," *id.* ¶ 74.  (SSA has clarified that it is not, in fact, closing any field offices.  *See* Mar. 27 Press Release.)  Similarly, although Plaintiffs complain about "slashing telephone-based services," Compl. ¶¶ 2, 84, SSA announced that, beginning April 14, it "will allow individuals to complete all claim types via telephone, supported by new anti-fraud capabilities," *see* Apr. 12 Press Release.  And Plaintiffs complain that "no announcement has been made regarding the transfer of functions related to reasonable accommodation or public disability discrimination complaints," Compl. ¶ 71, but they

acknowledge that many OCREO functions were transferred to OMS, *id.* ¶¶ 98, 192, and SSA has since clarified that accommodation requests or discrimination complaints may continue to be submitted by phone, email, or hard copy, *see supra* p. 4.  Other challenged actions may similarly prove to be tentative, or merely based on misapprehensions.

Second, Plaintiffs identify no way in which the challenged reforms have any concrete effect on their "rights or obligations." *Bennett*, 520 U.S. at 178.  As the Court has observed, no Plaintiff actually "assert[s] any termination or diminution of benefits," Op. at 4, or "describes any injury arising from the dissolution of OCREO or the Office of Transformation," *id.* at 5.  Plaintiffs therefore fail to show that the reforms have "legal consequences" in and of themselves, *Bennett*, 520 U.S. at 178, and thus constitute "final" agency action subject to APA review.

### 3.    Plaintiffs' APA claims fail

Even if Plaintiffs could satisfy the APA's threshold requirements, they still fail to state a claim.

### a.    In Excess of Statutory Authority (Count VII)

In Count VII, Plaintiffs allege that the "elimination of OCREO" exceeded SSA's statutory authority.  Compl. ¶ 227; *see id.* ¶ 226 (citing 5 U.S.C. § 706(2)(C) (authorizing courts to "set aside" agency action "in excess of statutory . . . authority")).  But they do not meaningfully explain how.  As explained above, the Social Security Act authorizes the Commissioner to "discontinue such organizational units or components within the Administration as the Commissioner considers necessary or appropriate," unless the unit or component is "provided for by this chapter."  42 U.S.C. § 902(a)(6).  Plaintiffs nowhere allege that OCREO is required by "this chapter" or any other statute.  And they "do not identify" any other "specific statutory right that has been violated" either.  Op. at 4.

The only mention in this count of any particular statute is a generic reference to the Rehabilitation Act, as part of a vague assertion that Defendants "acted in excess of their statutory authority" by "failing to provide an equitable and accessible process for requesting reasonable accommodations or filing discrimination complaints."  Compl. ¶ 228.  But it is unclear how

Defendants could have "acted" in excess of their authority under 5 U.S.C. § 706(2)(C) by "failing" to act. Claims to address failures to act are generally brought under 5 U.S.C. § 706(1), which authorizes courts to "compel agency action unlawfully withheld," and Plaintiffs indeed bring a separate such claim here, *see infra* Part II.C.3.b, as well as a separate Rehabilitation Act claim, *see infra* Part II.D.[20] Regardless, Plaintiffs must offer "more than labels and conclusions" or "a formulaic recitation" of legal elements to state a claim for relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). By failing to identify any specific statutory authority that Defendants' actions allegedly exceeded, Plaintiffs have failed to do even that.[21]

### b.    Unlawfully Withheld or Unreasonably Delayed (Count IV)

In Count IV, Plaintiffs allege that the "elimination of OCREO" constitutes "unlawfully withheld" agency action. Compl. ¶¶ 199–200; *see* 5 U.S.C. § 706(1) (authorizing courts to "compel agency action unlawfully withheld or unreasonably delayed"). Their theory appears to be that SSA has a "statutory obligation" to "maintain mechanisms" for the submission of accommodation requests and discrimination complaints, Compl. ¶¶ 201–02; that OCREO previously performed this duty, but there has been no "clear replacement," *id.* ¶ 202; so this duty has been "abandoned" and OCREO must be reinstated, *id.* ¶ 204.

At the outset, it bears repeating that no Plaintiff "claims to have recently tried to file a discrimination complaint or request an accommodation from the SSA" or "describes any injury arising from the dissolution of OCREO." Op. at 5. In addition, Plaintiffs' theory rests on the flawed premise—contradicted by the public record and Plaintiffs' own allegations—that the public is no longer able to submit such grievances. Plaintiffs themselves explain that OCREO's functions were transferred to OMS, effectively pleading themselves out of this claim. *See* Compl. ¶¶ 191–

---

[20] It is likewise unclear what relevance an alleged *constitutional* violation could have to an "in excess of *statutory* . . . authority" claim, 5 U.S.C. § 706(2)(C) (emphasis added), but Plaintiffs' "bald[] assert[ion of] an infringement of 'constitutional rights,'" Op. at 5 (quoting Compl. ¶ 229)—citing no particular constitutional provision—cannot save it.

[21] Plaintiffs may conceive of this as an *ultra vires* claim. *See* Pls.' Prelim. Inj. Mot. at 33. But an *ultra vires* claim is a nonstatutory claim, not an APA one, and no such claim is raised in the complaint, which does not mention the phrase "*ultra vires*."

92 ("OCREO served as SSA's grievance system, processing and adjudicating discrimination complaints and handling reasonable accommodation requests. . . . Defendants' restructuring of SSA . . . places these essential responsibilities under OMS . . . ."). And SSA has clarified that grievances may continue to be submitted by phone, email, and hard copy. *See supra* p. 4.

In any event, Plaintiffs fall well short of their high burden to state a claim that agency action has been unlawfully withheld. Typically, review under the APA is "deferential" and "presume[s] the validity of agency action." *WorldCom, Inc. v. FCC*, 238 F.3d 449, 457 (D.C. Cir. 2001) (citation omitted). But review of "an agency's inaction" under 5 U.S.C. § 706(1) "is still more limited." *Citizens for Resp. & Ethics in Wash. v. SEC*, 916 F. Supp. 2d 141, 145 (D.D.C. 2013) (emphasis added). This section of the APA "carried forward the traditional practice . . . of writs of mandamus," which allowed "enforcement of a *specific, unequivocal command* . . . of a precise definite act about which an official had *no discretion whatever*." *Norton*, 542 U.S. at 63 (emphasis added). Thus, Section 706(1) empowers a court to compel only a "discrete agency action" that is "required by law." *Id.* at 64.

Plaintiffs' failure to identify a "specific, unequivocal" statutory command about which SSA lacks any "discretion whatever," *id.* at 63, is fatal to this claim. While Plaintiffs make vague references to the agency's "statutory obligation[s]," Compl. ¶ 201; *see id.* ¶¶ 202–04, they do not actually cite any statute or quote any statutory text. And, as discussed, no statute mandates that OCREO even exist, much less be the office that processes grievances. *See, e.g., Neuro. Surgery Practice of Long Island, PLLC v. HHS*, 682 F. Supp. 3d 249, 261 (E.D.N.Y. 2023) (concluding that, "[o]nce again, plaintiff fails to identify an unambiguous statutory requirement that the defendants have skirted" to support a § 706(1) claim).

Moreover, 5 U.S.C. § 706(1) "empowers a court only to compel an agency to perform a ministerial or non-discretionary act, or to take action upon a matter, *without directing how it shall act*." *Norton*, 542 U.S. at 64 (citation omitted) (emphasis added). But Plaintiffs seek just that, in contending that the appropriate remedy for this claim would be an injunction reinstating OCREO, *see* Compl., Prayer for Relief ¶ 4, rather than ordering the performance of any (unidentified)

31

statutory command.  Indeed, SSA indisputably *has* acted to ensure that grievances may continue to be submitted.  Plaintiffs' dislike of the means SSA has chosen cannot support an "unlawfully withheld" claim.  *See Long Term Care Pharm. All. v. Leavitt*, 530 F. Supp. 2d 173, 186 (D.D.C. 2008) ("[P]laintiffs are not truly challenging agency inaction at all, for, indisputably, CMS *has* acted to provide a process . . .  as required by the [statute].  Plaintiffs simply object to the efficacy of the process CMS has adopted"); *Neuro. Surgery*, 682 F. Supp. 3d at 260 ("Defendants have undisputedly established [the required] process—it's just not one that plaintiff thinks . . . is effective.  But this is not enough to support a claim under § 706(1)."); *Am. Farm Bureau v. EPA*, 121 F. Supp. 2d 84, 103 (D.D.C. 2000) ("[Plaintiffs' APA § 706(1) claim] does not allege that EPA has failed to promulgate regulations for establishing tolerances; it merely claims that those regulations lack specificity.").

At base, Plaintiffs' "unlawfully withheld" claim is essentially a challenge to the sufficiency of agency action, "dressed up" as a "failure to act."  *Friends of the Earth, Bluewater Network Div. v. U.S. Dep't of Interior*, 478 F. Supp. 2d 11, 25 (D.D.C. 2007) (quotation omitted).  But "[a]lmost any objection to an agency action can be dressed up" in this way "as an agency's failure to act." *Id*. at 27-28 (quotation omitted).  Plaintiffs' attempt to "recast[] a disagreement with what the agency has done as a 'failure to act,'" *Am. Farm Bureau,* 121 F. Supp. 2d at 103, should be rejected.

### c.    Arbitrary and Capricious (Count V)

In Count V, Plaintiffs claim that SSA's "eliminat[ion] of OCREO and OT" and "staff eliminations" were arbitrary and capricious.  Compl. ¶ 210; *see* 5 U.S.C. § 706(2)(A) (authorizing courts to set aside "arbitrary" or "capricious" agency action).  They mistake the standard of review, and each of their theories fails.

First, Plaintiffs allege that SSA "failed to articulate a reasoned or non-pretextual basis" for these reforms.  *Id*.  But "[u]nder the 'arbitrary and capricious' standard the scope of review is a narrow one."  *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974).  The agency need only "a rational connection between the facts found and the choice made," *id.* (quotation omitted), acting within a wide "zone of reasonableness," *FCC v. Prometheus Radio*

*Project*, 592 U.S. 414, 423 (2021). Even "a decision of less than ideal clarity" will be upheld so long as "the agency's path may reasonably be discerned." *Bowman*, 419 U.S. at 286. SSA amply clears this bar. The agency's press releases clearly set out the reasons for the reforms—explaining, for example, that SSA plans to reduce its workforce size and organizational structure," and "will continue to implement efficiencies and reduce costs, with a renewed focus on mission critical work." Feb. 28 Press Release; *see also supra* pp. 3-5. And the complaint itself acknowledges that the reforms are aimed at "streamlining operations and 'prioritizing essential work.'" Compl. ¶ 3.[22]

Second, Plaintiffs fault SSA for not conducting a "formal analysis" to either "evaluate the impact of OCREO's elimination on individuals with disabilities," Compl. ¶ 212, or "ensure continuity of services," *id.* ¶ 211. But they point to no requirement, in the APA or elsewhere, for such a "formal analysis"—least of all in the context of an administrative restructuring. On the contrary, it is "absolutely clear" that, "[a]bsent constitutional constraints or extremely compelling circumstances," agencies are "free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties.'" *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 543 (1978). And here, Congress vested the Commissioner with discretion to "discontinue" such offices as he "considers . . . appropriate." 42 U.S.C. § 902(a)(6).

Third, Plaintiffs claim that SSA failed to sufficiently consider the "reliance interests implicated by the closures and cuts." Compl. ¶ 213. But while the "change-in-position" doctrine requires an agency to account for "serious reliance interests" when changing a formal policy, *see FDA v. Wages & White Lion Invs.*, 145 S. Ct. 898, 917 (2025), here Plaintiffs' complaint identifies no particular change in position—much less a change to the sort of formal policy the doctrine has been held to apply to, *see, e.g.*, *FCC v. Fox TV Stations, Inc.*, 556 U.S. 502 (2009)—so the doctrine

---

[22] Even if, hypothetically, the Court were ultimately to conclude that the explanation provided is insufficient for judicial review, that would not justify the injunctive relief sought in the complaint. Rather, "the proper course" would be "to remand to the agency for additional . . . explanation," not any type of injunction. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).

has no application, *see Wages*, 145 S. Ct. at 918 n.5 (noting that "[w]e have traditionally applied the change-in-position doctrine when an agency shifts from a position expressed in a more formal setting").

Regardless, the doctrine requires consideration of only sufficiently "serious" reliance interests—a "high[] bar," typically "requiring, for example, decades of industry reliance on [an agency's] prior policy." *Wages,* 145 S. Ct. at 927. Plaintiffs cannot reasonably claim such an interest in the perpetual operation of particular offices at SSA headquarters—indeed, OT was created just two years ago—or in a certain level of customer service. In any event, "reliance does not overwhelm good reasons for a policy change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 226 (2016) (Ginsburg, J., concurring). Here, SSA identified OT as a "redundant office"— one it viewed as "wrong" to have been created in the first place. *See* Feb. 24 Press Release. And as for OCREO, SSA explained that it "will transfer responsibility for processing Equal Employment Opportunity complaints, reasonable accommodation requests, and other statutorily required functions to other SSA components to ensure compliance with existing legal authorities." *See* Feb. 25 Press Release. SSA thus concluded that both closures would "enhance operations," *id.*—a reason sufficient to overcome any cognizable reliance interest.[23]

### d.    Not in Accordance with Law or Contrary to Constitutional Right (Count VI)

In Count VI, Plaintiffs allege that SSA's "workforce reductions and agency restructuring, including the elimination of OCREO and the Office of Transformation," were implemented "without lawful authority," Compl. ¶ 221, constituting agency action either "[n]ot in [a]ccordance with [l]aw," *id.* at 45 (subheading to Count VI); *see* 5 U.S.C. § 706(2)(A), or "contrary to constitutional right," Compl. ¶ 217 (citing 5 U.S.C. § 706(2)(B)). Their theory is not entirely clear, but it seems to be that these reforms were "implemented" by "Defendants Gleason, Musk, and

---

[23] Plaintiffs also make the passing claim that "Defendants' eliminations directly impede the agency's ability to meet its statutory obligations and contradict clear evidence that these cuts will decrease agency efficiency and efficacy." Compl. ¶ 214. These threadbare allegations, which identify no particular "statutory obligations" or any "evidence" at all, fall well short of stating a claim. *See Twombly*, 550 U.S. at 555.

DOGE," Compl. ¶ 221, but Ms. Gleason and Mr. Musk were not properly appointed under the Federal Vacancies Reform Act (FVRA) and Appointments Clause, respectively, *see id.* ¶¶ 219–20, so the reforms are "legally void" and should be set aside, *id.* ¶ 221.

This theory is flawed many times over. But the Court need not reach the FVRA and Appointments Clause issues, because the claim fails for a simple, threshold reason: The complaint sets forth no factual material plausibly alleging that the reforms were implemented by anyone other than Acting Commissioner Dudek, or that he lacked the authority to do so. Again, it is the Commissioner that Congress charged with "the exercise of all powers and the discharge of all duties of the Administration," including "control over all personnel," 42 U.S.C. § 902(a)(4), and the power to "establish, alter, consolidate, or discontinue [its] organizational units," *id.* at § 902(a)(6). Plaintiffs themselves allege that Mr. Dudek was the duly "named . . . Acting Commissioner," "responsible for the exercise of all powers and the discharge of all duties" of the agency. Compl. ¶ 27 (citing 42 U.S.C. § 702). The complaint acknowledges time and time again that it was Acting Commissioner Dudek who implemented the reforms. *See* Compl. ¶ 66 ("Defendant Dudek has announced a plan to eliminate . . . employees"); *id.* ¶ 68 ("Defendant Dudek has also announced a series of policy changes"); *id.* ¶ 72 ("Defendant Dudek announced plans to reduce the workforce"). And the public record reflects the same, with SSA's press releases repeatedly stating that Acting Commissioner Dudek authorized the reforms. *See supra* pp. 3–5.

To be sure, Acting Commissioner Dudek acknowledged that "DOGE personnel . . . are now working at Social Security," Feb. 19 Press Release, and that he expected to make "improvements [that] will build on recommendations that DOGE team members provide the agency," Feb. 21 Press Release. But Plaintiffs' own allegations and the public record show that the Acting Commissioner was properly appointed, and that he implemented the challenged reforms in his own name. Plaintiffs thus offer no basis under the APA to "void" those decisions as being "taken" by an "improperly serving" official. Compl. ¶ 221.

While the Court need go no further to reject this claim, it fails for other reasons too. To start, Plaintiffs' theory depends on the premise that Ms. Gleason's appointment violated the

FVRA. But they make no attempt whatsoever to explain why, offering only the vague allegation that "Defendant Gleason serves as the Acting Administrator of DOGE without clear statutory or legal authority under FVRA." Compl. ¶ 219. That sort of naked legal conclusion, missing even a "formulaic recitation of the elements of a cause of action," plainly "will not do" to state a claim. *Twombly*, 550 U.S. at 555.

The other linchpin of Plaintiffs' theory—that Mr. Musk's appointment violated the Appointments Clause—is equally flawed. The Appointments Clause prescribes the method for appointing officers of the United States. U.S. Const. art. II, § 2, cl. 2. Individuals are officers, and must receive a constitutional appointment, when they occupy (i) "a continuing position established by law" that is (ii) vested with "significant authority pursuant to the laws of the United States." *Lucia v. SEC*, 585 U.S. 237, 245 (2018). A Fourth Circuit panel recently concluded that "it appears that Musk's role satisfies neither criterion," *Does 1-26 v. Musk*, No. 25-1273, 2025 WL 1020995, at *4 (4th Cir. Mar. 28, 2025),[24] and Plaintiffs fail to plausibly allege facts showing otherwise.

**1.** Plaintiffs do not allege that Mr. Musk holds a specific "position established by law"— the "threshold trigger for the Appointments Clause." *Landry v. FDIC*, 204 F.3d 1125, 133 (D.C. Cir. 2000). Without naming such an office, there can be no focus for the inquiry, which turns on whether that office is "continuing," and whether it is vested with "significant" authority "pursuant to law." *Lucia*, 585 U.S. at 245. Here, Plaintiffs do not allege that Mr. Musk holds any office or has any formal legal authority at all, claiming that his "status within DOGE remain[s] murky," Compl. ¶ 61, and that he possesses only "*de facto*" power, *id.* ¶ 220. This alone dooms their claim.

**2.** Even if their complaint were read to accept that Mr. Musk is a Special Government Employee (SGE), *see* Compl. ¶ 61, Plaintiffs allege no facts showing that his position is a "continuing" one. *Lucia*, 585 U.S. at 245; *see United States v. Hartwell*, 73 U.S. (6 Wall.) 385, 393 (1867) (explaining the term "office" "embraces the ideas of tenure, duration, emolument, and duties"). Plaintiffs themselves acknowledge that an SGE is by definition a "temporary" worker, "typically employed for up to 130 days." Compl. ¶ 61; *see* 18 U.S.C. § 202. This stands in contrast

---

[24] *But see New Mexico v. Musk*, 2025 WL 1502747, *16, -- F.Supp.3d -- (D.D.C. May 27, 2025).

36

to the administrative law judges in *Lucia*, for example, who "receive[d] a career appointment." 585 U.S. at 248 (citation omitted). While some nonpermanent positions can qualify as offices, *see Morrison v. Olson*, 487 U.S. 654, 671 n.12 (1988), the limited duration of Mr. Musk's SGE status indicates that his position was not a continuing one. *Cf. Special Government Employee Serving as Paid Consultant to Saudi Co.*, 40 Op. O.L.C. 1, 8–9 (2016) (SGE "d[id] not appear to hold the essential features of a federal office—in particular, 'tenure,' 'duration,' and 'continuous duties'" (citation omitted)). Indeed, he left the government in late May.[25]

Plaintiffs do not allege that Mr. Musk's role will outlast his departure, and there is no indication that it has. *See United States v. Maurice*, 26 F. Cas. 1211, 1214 (C.C.D. Va. 1823) (No. 15,747) (Marshall, Circuit Justice) (explaining that an office has "duties [that] continue, though the person be changed"). Indeed, the complaint alleges in effect that Musk held a special status, particular to him alone. *See* Compl. ¶ 63 ("Musk reports directly to President Trump"); *id.* ¶ 64 ("President Trump has repeatedly extolled Defendant Musk as 'a very talented individual'" and "exercises direct oversight of Defendant Musk's actions"). Presidents have long selected advisors based on their unique identity—people who simply "cannot be replaced"—precisely because they depend on those advisors' special advice and judgment. But those advisors—including Mr. Musk—occupy definitionally personal positions, not continuing ones.

**3.** Nor do Plaintiffs allege facts plausibly establishing *Lucia*'s second prong—that Mr. Musk's office was vested with "significant" authority "pursuant to law." *Lucia*, 585 U.S. at 245. Quite the opposite: As noted, they allege that Mr. Musk "assumed *de facto* authority" alone. Compl. ¶ 220. In other words, they allege that he "exercise[s] . . . significant government power," *id.*, that is *not* vested "pursuant to the law of the United States" in the position he occupied, *Lucia*, 585 U.S. at 245. That is not only fatal under *Lucia*, but accords with common sense. Nobody thinks, for instance, that the White House Chief of Staff or White House Counsel are *officers* in any fashion, despite the fact they may exercise *tremendous* influence across the government. This

---

[25] *See* White House, President Trump participating in a press conference with departing DOGE adviser Elon Musk, https://perma.cc/M4LQ-3HN8

is because they do not occupy a position that is equipped with any formal authority. And without that, there is nothing that implicates the Appointments Clause.

**4.** Finally, Plaintiffs' allegation that Mr. Musk "direct[ed]" others to wield their own power, *e.g.*, Compl. ¶ 4, is immaterial, as such a theory is foreclosed by D.C. Circuit precedent. In *Andrade v. Regnery*, 824 F.2d 1253 (D.C. Cir. 1987), the plaintiffs argued that an official not validly appointed as an officer "had complete responsibility for crafting and executing" their terminations—that he was effectively pulling the strings behind the scenes. *Id*. at 1257. The court found that irrelevant: "it does not offend the Appointments Clause so long as the duly appointed official has final authority over the implementation of the governmental action." *Id*. Thus, here, even assuming Mr. Musk "conceive[d of] and even carr[ied] out policies" to which Plaintiffs object, there is no Appointments Clause issue, because Acting Commissioner Dudek, as the duly appointed agency head, ultimately "take[s] official responsibility" for those actions. *Id*.; *see Does 1-26*, 2025 WL 1020995, at *3 (DOGE-initiated "reductions in force [that] were either approved or ratified by USAID officials . . . provide no basis for [an] injunction in connection with plaintiffs' Appointments Clause claim because those individuals possessed the requisite authority").

### D.    Rehabilitation Act (Count I)

Plaintiffs' claim that the reforms violate Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), because they disparately impact disabled persons, fails for multiple reasons.

#### 1.    The Rehabilitation Act does not provide for disparate-impact liability

Section 504 provides that "[n]o otherwise qualified individual with a disability . . . shall, *solely by reason of her or his disability*, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a) (emphasis added). In *Alexander v. Choate*, 469 U.S. 287 (1985), the Supreme Court considered whether Section 504 "reaches only purposeful discrimination." *Id*. at 292. It "assume[d] without deciding" that Section 504 "reach[es] some claims of disparate-impact discrimination," but held that such claims would be limited to disparate

impacts so significant that "an otherwise qualified handicapped individual" was not "provided with meaningful access to the benefit that the grantee offers." *Id*. at 299, 301, 309.

While several circuits have since allowed disparate-impact claims falling within these contours to go forward, the Sixth Circuit in 2019 "resolve[d] what *Choate* did not and conclude[d] that § 504 does not prohibit disparate-impact discrimination." *Doe v. BlueCross BlueShield of Tenn., Inc.*, 926 F.3d 235, 241 (6th Cir. 2019). As Judge Sutton explained, the statutory text— namely, the phrase "solely by reason of her or his disability"—"does not encompass actions taken for nondiscriminatory reasons," as a "comparison to other antidiscrimination statutes," including Title VII, confirms. *Id*.

This Court should follow the Sixth Circuit's lead, notwithstanding the assumptions of other circuits. While the D.C. Circuit has not directly addressed this issue, in *Modderno v. King*, 82 F.3d 1059 (D.C. Cir. 1996), it held that a plaintiff cannot state a disparate impact claim under Section 504 based "on the terms of an insurance plan." *Id.* at 1061 n.1. As Judge Ginsburg stated in concurrence: "As long as the [plan] offers the same coverage to all insureds, regardless of disability, it cannot be said to discriminate on the basis of disability." *Id.* at 1066 (Ginsburg, J., concurring). That is an apt description of the challenged SSA reforms here.

### 2. Plaintiffs have not shown a disparate impact

Assuming arguendo that a disparate-impact claim is available under Section 504, Plaintiffs have not plausibly alleged such an impact, instead asserting in only general terms that the effects of the challenged reforms will fall more heavily on disabled persons.

To state a disparate impact claim, a plaintiff must generally point to "statistical evidence that the practice or policy has an adverse effect on the protected group." *Greater New Orleans Fair Hous. Action Ctr. v. HUD*, 639 F.3d 1078, 1085–86 (D.C. Cir. 2011) (quoting *Garcia v. Johanns*, 444 F.3d 625, 633 (D.C. Cir. 2006)); *see also Adams v. City of Indianapolis*, 742 F.3d 720, 733 (7th Cir. 2014) ("statistical methods and comparisons," if "basic," must "move the disparate-impact claims over the plausibility threshold"). Here, Plaintiffs merely state in conclusory fashion that the reforms will disproportionately affect disabled persons, never

39

comparing the supposed effects on that group to a similarly situated group of non-disabled persons. *Cf., e.g.*, *Ricci v. DeStefano*, 557 U.S. 557, 578 (2009).

It is "not enough to simply allege that there is a disparate impact on workers, or point to a generalized policy that leads to such an impact." *Menoken v. McGettigan*, 273 F. Supp. 3d 188, 199 (D.D.C. 2017) (quoting *Smith v. City of Jackson*, 544 U.S. 228, 241 (2005)), *aff'd sub nom. Menoken v. Pon*, No. 17-5228, 2018 WL 2383278 (D.C. Cir. May 9, 2018). Plaintiffs' failure to do more is fatal to their Rehabilitation Act claim.

### 3. Plaintiffs have not shown a lack of "material access" to any benefit

Even if Plaintiffs had plausibly alleged disparate impact, that would not be enough to state a Rehabilitation Act claim, as the Supreme Court in *Choate* "reject[ed] the boundless notion that all disparate-impact showings constitute prima facie cases under § 504." *See* 469 U.S. at 299. There, assuming the viability of a disparate impact theory, the Court ultimately found no prima facie violation of Section 504: The challenged rule was neutral on its face, was not alleged to rest on a discriminatory motive, and did not deny access to handicapped individuals of Medicaid services. *Id.* at 287. So too here. The SSA reforms are neutral on their face and are not alleged to rest on such a discriminatory motive, instead being carried out to improve efficiency.

Nor do Plaintiffs contend that they have been deprived of "meaningful access" to any benefit within the meaning of *Choate*. "Meaningful access" does not mean "equal results," but requires only that the disabled be provided an equal opportunity to obtain the same result or benefit. *Choate*, 469 U.S. at 304-06. The across-the-board SSA reforms do just that.

### 4. Plaintiffs' sweeping theory of disparate impact would unduly hamstring any meaningful agency reorganization

Finally, as a practical matter, Plaintiffs' theory of disparate impact under Section 504 sweeps far too broadly. Such a challenge to large programmatic changes would inappropriately hamstring agency administration, as any budget cut could be portrayed as disproportionately affecting disabled persons. Such a theory threatens to invite challenges to virtually any attempt to trim costs—a prospect that is especially problematic for the government. *Cf., e.g.*, *Abril-Rivera v.*

*Johnson*, 806 F.3d 599, 606 (1st Cir. 2015) (stating that, in the RIF context, disparate-impact liability "must . . . be limited as applied to government entities so as to avoid 'inject[ing] racial considerations into every [agency] decision'" (quoting *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 532 (2015)).

**5.**     **Because there is no private right of action under the Rehabilitation Act, any disparate impact claim could proceed only under the APA**

In any event, because there is no private right of action under the Rehabilitation Act, to the extent Plaintiffs have a viable disparate-impact claim, it could proceed only under the APA and subject to that Act's limitations, including the final-agency-action requirement.

The Rehabilitation Act prohibits discrimination (1) by federal agencies in their capacity as employers, 29 U.S.C. § 791; (2) by recipients of federal funds and federal agencies in their capacity as funders, *id.* § 794(a); and (3) by federal agencies in their capacity as the operators of their own "program[s] or activit[ies]." *Id.* Congress provided express remedies, including private rights of action, to enforce the first two prohibitions, but not the third. *Id.* § 794a. Particularly when viewed in light of the Supreme Court's guidance regarding implied private rights of action, *see, e.g.*, *Jesner v. Arab Bank, PLC*, 584 U.S. 241, 264–65 (2018), that omission strongly suggests that no private right of action exists.

"[W]hen deciding whether to recognize an implied cause of action, the 'determinative' question is one of statutory intent." *Ziglar v. Abbasi*, 582 U.S. 120, 133 (2017) (quoting *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001)). "If the statute does not itself so provide, a private cause of action will not be created through judicial mandate." *Id.* While a more flexible approach was once *en vogue*, the Supreme Court has "recently and repeatedly said that a decision to create a private right of action is one better left to legislative judgment in the great majority of cases." *Jesner*, 584 U.S. at 264 (citation omitted); *see also Egbert v. Boule*, 596 U.S. 482, 491 (2022) ("At bottom, creating a cause of action is a legislative endeavor.").

Section 504 of the Rehabilitation Act originally applied only to recipients of federal funds. Congress amended the statute in 1978 to apply to a federal agency acting in its programmatic capacity, adding the following language to Section 504:

> or under any program or activity conducted by any Executive agency or by the United States Postal Service. The head of each such agency shall promulgate such regulations as may be necessary to carry out the amendments to this section made by the Rehabilitation, Comprehensive Services, and Developmental Disabilities Act of 1978. Copies of any proposed regulation shall be submitted to appropriate authorizing committees of the Congress, and such regulation may take effect no earlier than the thirtieth day after the date on which such regulation is so submitted to such committees.

*See* Rehabilitation Act Amendments of 1978, § 119, 92 Stat. at 2982. Congress did not include an express cause of action to enforce this provision, leaving an aggrieved person to seek a remedy through the administrative pathway that Congress directed agencies to create and then, if necessary, judicial review via the APA. *See id.*; 5 U.S.C. § 702.

At the same time it amended Section 504, Congress amended Section 505 to create a limited, express cause that did not include an express private right of action regarding the non-funding, non-employment activities of federal agencies. *See* Rehabilitation Act Amendments of 1978, § 120(a), 92 Stat. at 2982–83 (adding Section 505 to the Rehabilitation Act of 1973). Notably, while the new Section 505 authorizes specific remedies through a direct cause of action for any Section 504 violation committed by a *non-federal* recipient of federal funds or by a federal agency that provides such funds, it does not create such remedies for disability discrimination under any programs or activities conducted by a federal agency. Congress knows how to create a private right of action, and while it directed agencies to "promulgate such regulations as may be necessary to carry out the amendments" to Section 504, it created a private right of action only for employment issues and federal agencies' funding activities. 29 U.S.C. §§ 794(a), 794a(a). Indeed, in another context, the Supreme Court found it "telling" that Section 505 "makes no mention whatsoever of 'program[s] or activit[ies] conducted by any Executive agency[.]'" *Lane v. Pena*, 518 U.S. 187, 192–93 (1996) (addressing the question of whether the government had waived sovereign immunity for money damages for a violation of Section 504 of the Rehabilitation Act)

42

(citation omitted).[26]  It follows that Congress intended challenges to non-funding activities of the federal government to be brought through the administrative pathway.  *See Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 19 (1979) (It is "an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it."); *Wisher v. Coverdell*, 782 F. Supp. 703, 707 (D. Mass. 1992) ("[T]here was no need for Congress to create a private right of action because a means of review [under the APA] already existed.").

Although the D.C. Circuit has not directly addressed the question, the weight of circuit authority supports the lack of a private cause of action under Section 504 for federal programs or activities.  Three circuits have adopted that view, including the *en banc* First Circuit in an opinion by then-Judge Breyer.  *See Moya v. U.S. Dep't of Homeland Sec.*, 975 F.3d 120, 128 (2d Cir. 2020); *Clark v. Skinner*, 937 F.2d 123, 126 (4th Cir. 1991); *Cousins v. Sec'y of the U.S. Dep't of Transp.*, 880 F.2d 603, 610 (1st Cir. 1989) (en banc) (Breyer, J.) ("[t]here is no reason to strain to find an implied right of action against federal agencies under § 504" because "the APA's review procedures" are available).  Only the Ninth Circuit has disagreed, and it did so based on the premise—inconsistent with the Supreme Court's later decision in *Lane*—that a right of action under Section 504 was needed to ensure that plaintiffs could secure "money damages."  *J.L. v. SSA*, 971 F.2d 260, 268 (9th Cir. 1992), *disapproved of by Lane*, 518 U.S. at 191.

Courts in this district are split on the question.  In *Sai v. DHS*, Judge Moss concluded that there is no cause of action under the Rehabilitation Act for discrimination in federal programs and activities, and that Congress intended for the rights created by Section 504 to be enforceable

---

[26] In *Lane*, the Supreme Court held that Congress, in amending the Rehabilitation Act to cover federal programs and activities, did not intend to waive the United States's sovereign immunity for suits for money damages. *See id.* at 189, 200.  The question at issue here—whether the cause of action for a substantive claim of disability discrimination in a federal program or activity arises under the Rehabilitation Act or under the APA—was not addressed in *Lane*.  That is "because, as the Solicitor General noted in his brief [in *Lane*], 'resolution of the source of the cause of action, be it under Section 504(a) directly or the APA, would . . . not [have] alter[ed] the outcome of [that] case' as long as Section 504(a) was not read to waive sovereign immunity for monetary damages.'" *Sai*, 149 F. 3d at 113 (quoting *Br. for the Resp'ts, Lane v. Pena*, No. 95–365, 1996 WL 115795, at *27 n.17 (S. Ct. Mar. 15, 1996)).

through judicial review of agency action under the APA.  149 F. Supp. 3d 99, 113 (D.D.C. 2015).
First, the court noted that the Supreme Court "has repeatedly cautioned courts not to imply causes
of action in the absence of evidence that Congress intended 'to create not just a private right but
also a private remedy.'"  *Id.* (quoting *Sandoval*, 532 U.S. at 286).  In considering the statutory text
and structure, the court found "relatively little evidence that Congress intended to create a private
cause of action under the Rehabilitation Act to enforce" the substantive rights regarding federal
programs and activities contained therein.  *Id.*  Judge Moss observed that Section 505 expressly
specifies the remedies available to some persons aggrieved under Section 504 but "says nothing
about the remedies available to a person aggrieved by discrimination in a 'program or activity
conducted by an[ ] Executive agency.'"  *Id.* (quoting 29 U.S.C. § 794(a)).  Second, Judge Moss
reasoned that Congress has "no need to provide for a cause of action that is independent of the
APA" "when it intends to permit only declaratory and injunctive relief" to enforce a statute.  *Id.* at
114.  Third, Judge Moss court found the First Circuit's and Fourth Circuit's opinions in *Cousins*
and *Clark* persuasive.  *Id.* at 114–15 (discussing *Cousins*, 880 F.2d at 605–08; *Clark*, 937 F.2d at
125–26).  On these bases, *Sai* concluded "that the Rehabilitation Act does not provide an implied
cause of action for discrimination in federal programs and activities (or for failure to comply with
administrative procedures), but that the APA provides a cause of action to challenge final agency
action that is not in accordance with the Rehabilitation Act."  *Id.* at 115.  Judge Moss's reasoning
should be followed here.[27]

---

[27] In *NAD v. Trump*, Judge Boasberg reached a contrary conclusion and found that Section 504
includes an implied cause of action to sue Executive branch agencies for federal programs and
activities.  *NAD*, 486 F.3d 45, 54 (D.D.C. 2020).  Judge Boasberg reasoned that Congress did not
expressly "direct[ ] those plaintiffs who seek relief from Executive agencies' violations of Section
504 to rely on the Administrative Procedure Act."  *Id.*  But the court did not explain why it would
have been necessary (or even important) for Congress to do so.  *See id.*  The APA itself provides
that anyone "adversely affected or aggrieved by agency action within the meaning of a relevant
statute" can obtain review of "agency action" pursuant to the APA.  5 U.S.C. § 702.  Given the
APA's general cause of action, it would have been unnecessary for Congress to additionally
specify in the Rehabilitation Act that plaintiffs challenging the federal government's compliance
with Section 504 in the government's non-funding activities could bring suit under the APA.  (The
plaintiffs in *NAD* did not have a judicial remedy available to them under the APA, as Judge

The conclusion that the Rehabilitation Act does not imply a private right of action for the government's non-funding, non-employment activities is "buttressed by the fact that Congress expressly provided two alternative mechanisms to enforce the prohibition against discriminatory agency action." *Moya*, 975 F.3d at 128. First, Section 504(a) directs agency heads to "'promulgate such regulations as may be necessary to carry out the'" prohibition against discrimination in programs and activities conducted by the agency. *Id.* (quoting 29 U.S.C. § 794(a)). Second, the APA provides an express cause of action for plaintiffs who wish to sue an executive agency for violating the Rehabilitation Act. "The availability of these alternative mechanisms to enforce the Rehabilitation Act strongly suggests that Congress did not intend to imply a superfluous private right of action." *Id.*; *see also Clark*, 937 F.2d at 126 ("[T]he APA was intended to provide a single uniform method for review of agency action and . . . an implied private right of action to enforce a federal statute against a federal regulatory agency is unnecessary.").

Of course, the Court need not address this issue, because Plaintiffs lack a viable disparate impact claim for other reasons. But to the extent the Court concludes otherwise, this claim could at most proceed only under the APA and subject to that Act's limitations.

## CONCLUSION

The complaint should be dismissed.

---

Boasberg noted, because the defendants in that case, which included the White House, were not "agencies" subject to the APA. 486 F.3d at 57.) Additionally, Judge Boasberg's *NAD* decision relied on several cases in this district analyzing whether the Rehabilitation Act waives the government's sovereign immunity, or standing for the proposition that declaratory and injunctive relief was available, but those cases did not address the separate question of whether the available cause of action lies within the Rehabilitation Act itself or the APA. 486 F. Supp. 3d at 55–56 (citing *Am. Council of Blind v. Paulson*, 463 F. Supp. 2d 51, 57–58 (D.D.C. 2006), *aff'd*, 525 F.3d 1256 (D.C. Cir. 2008); *Lane v. Pena*, 867 F. Supp. 1050, 1053 (D.D.C. 1994), *vacated in part*, 518 U.S. 187, 190–91 (1996); and *Doe v. Dist. of Columbia*, 796 F. Supp. 559, 573 (D.D.C. 1992)). Finally, *NAD* distinguished the First Circuit's and Fourth Circuit's opinions in *Cousins* and *Clark* on the basis that those cases "dealt with Executive agencies acting as a *regulator*, as opposed to in a substantive capacity." 486 F.3d at 56 (emphasis in original). But *Cousins* and *Clark* made clear that their holdings apply to "any program or activity conducted by any Executive agency," 29 U.S.C. § 794(a); *Cousins*, 880 F.2d at 604-05; *Clark*, 937 F.2d at 125. Indeed, the Rehabilitation Act does not distinguish among federal programs and activities based on whether they are "regulatory" or "substantive" in nature. *See* 29 U.S.C. § 794(a).

DATED: June 20, 2025           Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ERIC BECKENHAUER
Assistant Branch Director

*/s/ Steven M. Chasin*
STEVEN M. CHASIN
PIERCE J. ANON (N.Y. Bar No. 6184303)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005

*Counsel for Defendants*

46