**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

AMERICAN ASSOCIATION OF PEOPLE WITH
DISABILITIES,
1030 15th Street, NW, Suite 500E
Washington, DC 20005,

DEAF EQUALITY,
180 North LaSalle Street, Suite 3650
Chicago, Illinois 60601,

MASSACHUSETTS SENIOR ACTION COUNCIL,
108 Myrtle Street, Suite 112
Quincy, Massachusetts 02171,

NATIONAL FEDERATION OF THE BLIND,
201 East Wells Street at Jernigan Place
Baltimore, Maryland 21230,

NATIONAL COMMITTEE TO PRESERVE
SOCIAL SECURITY AND MEDICARE,
777 North Capitol Street, NE, Suite 805
Washington, DC 20002,

ELIZABETH ROUSE,


MARTHA WILLINGHAM HAZEN,


MARNI GARVEY,


MERRY SCHOCH,

WILLIAM WEISS,


DEJA POWELL,



,

and

WILSHAWN TILLER,

,

        *Plaintiffs*,

    v.

FRANK BISIGNANO,
*in his official capacity as*
Commissioner of the Social Security Administration,
6401 Security Boulevard
Baltimore, Maryland 21235,

and

SOCIAL SECURITY ADMINISTRATION,
6401 Security Boulevard
Baltimore, Maryland 21235,

        *Defendants.*

Civil Action No. 1:25-cv-00977-APM

## FIRST AMENDED COMPLAINT

## NATURE OF THE CASE

1.    In recent months, the Social Security Administration ("SSA"), through unprecedented and arbitrary staff reductions, combined with significant policy changes, has stretched beyond the breaking point its capacity to serve people with disabilities, millions of whom rely on Social Security benefits to afford food, shelter, and other basic necessities. Plaintiffs—people with disabilities and the organizations that serve them—bring this action to remedy the

profound harm caused by those actions and restore access for people with disabilities to SSA's vital programs.

2.      SSA provides monthly benefit payments to more than 70 million Americans each year—over one in five people nationwide. For many, Social Security benefits are a matter of survival, paying for food, housing, medical care, and other basic necessities. But Social Security's benefit programs are complex, and their purpose is defeated when people cannot effectively navigate SSA's systems to apply for benefits, maintain eligibility for benefits, or ensure payment of the correct amount.

3.      For years, SSA itself and public interest organizations have warned Congress of the severe consequences of chronic underfunding, workforce attrition, and rising public demand for SSA's services. *See, e.g.*, SSA, FY 2024 AGENCY FINANCIAL REPORT 163, 164 (Mar. 11, 2024), (requesting "funding to restore staffing" to "improve service delivery, including reducing the National 800 Number ("800 Number") wait times and disability claims processing delays"), https://perma.cc/RUP6-AEHM; Kathleen Romig, *SSA Staffing Shortage Hurts Hard-Working Americans*, CTR. ON BUDGET & POL'Y PRIORITIES (Aug. 29, 2018), https://www.cbpp.org/blog/ssa-staffing-shortage-hurts-hard-working-americans.

4.      Despite ample evidence that a more robust SSA staff is necessary to meet the needs of the American public, SSA recently performed an abrupt about face. SSA now insists, without evidence, that its workforce is bloated and inefficient, and announced the elimination of thousands of staff.

5.      Just weeks after SSA submitted its January 2025 budget request, in which SSA urged Congress to provide additional funding for increased staff, President Trump issued an Executive Order directing federal agencies—including SSA—to implement sweeping "reductions

in force" and "reorganization plans" to eliminate so-called "waste, bloat, and insularity." E.O. 14,210, 90 Fed. Reg. 9669 (Feb. 11, 2025), https://www.govinfo.gov/content/pkg/FR-2025-02-14/pdf/2025-02762.pdf.

6.      Sixteen days after that directive, SSA announced a theretofore unplanned agency-wide restructuring. Under that plan, SSA will eliminate twelve percent of its workforce, cutting 7,000 employees from its already-depleted staff of 56,000. *See* Press Release, SSA, Social Security Eliminates Wasteful Department (Feb. 24, 2025), https://www.ssa.gov/news/press/releases/2025/#2025-02-24; Press Release, SSA, Social Security Dissolves Duplicative Office (Feb. 25, 2025), https://www.ssa.gov/news/press/releases/2025/#2025-02-25. Over half of those 7,000 employees have already been cut.

7.      These cuts have been carried out through Voluntary Separation Incentive Payments ("VSIP"), with planned future cuts coming from reduction-in-force ("RIF") programs. *See* Press Release, SSA, Social Security Announces Options to its Workforce (Feb. 27, 2025), https://www.ssa.gov/news/press/releases/2025/#2025-02-27. SSA used the VSIP program and the threat of impending RIF programs to push thousands of employees—experienced and dedicated public servants, including many in frontline positions critical to serving people with disabilities—to leave the agency or be reassigned to other offices.

8.      SSA took these actions without any assessment of the service delivery needs of the more than 70 million people whom the agency serves, particularly those with disabilities, and without regard, too, for SSA's legal obligations to ensure accessible and equitable service.

9.      The result is an access crisis measured in closed doors at local offices, hours-long telephone hold times, unanswered telephone calls, lengthy delays in receiving services and benefits, and unmet needs. For individuals with disabilities who rely on in-person appointments,

accessible formats, and face-to-face assistance navigating the agency's complex systems, SSA has become unreachable. People with disabilities have been left behind—not because they lack the ability to engage, but because SSA has stripped away the tools and support the law requires it to provide to support their engagement.

10.     Section 504 of the Rehabilitation Act of 1973 ("Section 504") obligates the SSA, *inter alia*, to provide in-person and telephone service for individuals who cannot access or effectively use its online systems. These obligations are not aspirational—they are legal mandates. Moreover, some transactions must be done in person or by phone. Yet SSA's actions deprive beneficiaries and applicants of these vital agency access points.

11.     SSA's programs are vast and indispensable. They must be administered both fairly and efficiently. *See Richardson v. Perales*, 402 U.S. 389, 399 (1971) ("Such a system must be fair—and it must work."). Today, the agency is neither fair nor efficient. Defendants have hollowed out the agency, dismantled its workforce and community presence, and impeded its ability to conduct the face-to-face and telephone interactions the law requires. SSA no longer performs its core duty: the just and timely administration of Social Security benefits.

12.     Plaintiffs seek declaratory and injunctive relief to halt SSA's gutting of its workforce, and to compel the SSA to restore equal access to its services as the law demands.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under federal law.

14.     The declaratory and injunctive relief requested herein is proper under 28 U.S.C. §§ 2201–02, 5 U.S.C. §§ 702–06, and the inherent equitable powers of this Court.

15.     Venue is proper pursuant to 28 U.S.C. §§ 1391(b)(2) and (e)(1). Defendants are agencies of the United States and officers or employees of those federal agencies with offices in this District who are sued in their official capacity. Further, a substantial part of the events giving rise to this action occurred in the District of Columbia. In addition, the National Federation of the Blind, the American Association of People with Disabilities, and the National Committee to Preserve Social Security and Medicare are incorporated in this District.

**PARTIES**

**I.    Plaintiffs**[1]

16.     The **American Association of People with Disabilities** ("AAPD") is a national cross-disability rights organization dedicated to securing full recognition of the rights of more than 60 million Americans with disabilities and enhancing their political and economic power.

17.     **Deaf Equality** is a nonprofit disability rights organization committed to achieving equality for more than 48 million deaf and hard-of-hearing individuals across the United States by advocating for full accessibility and dismantling oppressive attitudes and systems.

18.     **Massachusetts Senior Action Council** ("MSAC") is a state-wide nonprofit that empowers its members to use their voices to address key public policy and community issues that affect their health and well-being. MSAC is dedicated to protecting and strengthening the systems its members depend on for economic and health security.

---

[1] In their original Complaint, ECF No. 1, Plaintiffs included Treva Olivero, a 47-year-old member of the National Federation of the Blind and a long-time recipient of Social Security benefits and Medicare. Plaintiffs are saddened to report that Ms. Olivero passed away on May 25, 2025. *See* ECF No. 36. In March, SSA abruptly terminated her Social Security, leaving her wholly without income or health insurance. On information and belief, Ms. Olivero remained entangled in the agency's reinstatement process at the time of her death.

6

19.    The **National Federation of the Blind** ("NFB") is a membership organization comprising over 50,000 blind and low vision individuals. Recognized by the public, Congress, executive agencies, and the courts, the NFB serves as a collective and representative voice for blind and low vison Americans and their families.

20.    The **National Committee to Preserve Social Security and Medicare** ("NCPSSM") is a membership organization of over 500,000, dedicated to protecting the financial security, health, and well-being of current and future generations of maturing Americans.

21.    **Elizabeth Rouse** is a blind ▮-year-old resident of ▮ and is *sui juris* disabled as defined by 29 U.S.C. § 705(20)(B). An active member of NFB since 2016, Ms. Rouse has long relied on the organization as a vital resource.

22.    **Martha Willingham Hazen** is a blind ▮-year-old resident of ▮ and is *sui juris* disabled as defined by 29 U.S.C. § 705(20)(B). An active member of NFB since 2006, Ms. Hazen has long relied on the organization as a vital resource.

23.    **Marni Garvey** is a ▮-year-old resident of ▮ and is *sui juris* disabled as defined by 29 U.S.C. § 705(20)(B).

24.    **Merry Schoch** is a blind ▮-year-old resident of ▮ and is *sui juris* disabled as defined by 29 U.S.C. § 705(20)(B). An active member of NFB since 2000, Ms. Schoch has long relied on the organization as a vital resource.

25.    **William Weiss** is a ▮-year-old blind resident of ▮ and is *sui juris* disabled as defined by 29 U.S.C. § 705(20)(B).

26.    **Deja Powell** is a ▮-year-old resident of ▮ and is *sui juris* disabled as defined by 29 U.S.C. § 705(20)(B).

27.    **Wilshawn Tiller** is a ▮-year-old resident of ▮▮▮ and is *sui juris* disabled as defined by 29 U.S.C. § 705(20)(B).

**II.    Defendants**

28.    The **U.S. Social Security Administration** ("SSA") was first established by Congress in the Social Security Act of 1935 and was known at that time as the Social Security Board. 42 U.S.C. § 901 *et seq.*

29.    **Frank Bisignano** is named in his official capacity as the Commissioner of the Social Security Administration. Defendant Bisignano is responsible for the exercise of all powers and the discharge of all duties of the Administration. *Id.* § 902.

## BACKGROUND

**I.    Role and Scope of the Social Security Administration**

30.    For nearly ninety years, SSA has been the backbone of America's commitment to economic security for individuals with disabilities and older adults. Congress established the agency during the depths of the Great Depression and tasked it with administering monthly benefits to ensure a baseline of financial stability for those unable to work due to age or disability.

31.    Established under Title II of the Social Security Act, Social Security benefits are funded primarily through two federal trust funds: the Old-Age and Survivors Insurance Trust Fund, which pays retirement and survivors benefits, and the Disability Insurance Trust Fund, which supports individuals with long-term disabilities through monthly Social Security Disability Insurance ("SSDI") payments. 42 U.S.C. § 401. These programs are funded largely through payroll withholding and are treated as mandatory federal spending, reflecting the government's binding obligation to beneficiaries under the law.

32.     SSDI currently serves over 7.3 million people, providing essential income to those who are no longer able to work due to disability. Monthly benefits typically range from $800 to $1,800, with a maximum benefit of $4,018. Most beneficiaries are older: 74 percent are over the age of 50, and 41 percent are over age 60—reflecting the critical role SSDI plays in protecting older workers as they age into disability. CTR. ON BUDGET & POL'Y PRIORITIES, CHART BOOK: SOC. SEC. DISABILITY INS. 8 (2024), https://www.cbpp.org/sites/default/files/7-21-14socsec-chartbook.pdf.

33.     SSA's retirement program supports approximately 56 million people aged 65 and older. Disability is common within this population: roughly 46 percent of individuals over age 75 report having at least one disability. U.S. CENSUS BUREAU, Disability Characteristics, https://perma.cc/7NSQ-LT4V (last visited June 30, 2025). For many, Social Security is not merely supplemental—it is foundational. An estimated 40 percent of older Americans rely solely on Social Security for their retirement income. *See* Nat'l Inst. on Retirement Sec., Press Release, New Report: 40% of Older Americans Rely Solely on Social Security for Retirement Income (Jan. 13, 2020), https://www.nirsonline.org/2020/01/new-report-40-of-older-americans-rely-solely-on-social-security-for-retirement-income/.

34.     In 1972, recognizing that many people with disabilities lack sufficient work history to qualify for SSDI, Congress established Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. SSI is a needs-based program funded by general tax revenue, designed to support low-income elderly, blind, and otherwise disabled individuals.

35.     Today, over 7.4 million Americans rely on SSI. The vast majority—more than 6.2 million—live with disabilities, and nearly 64,000 are classified as blind. Among SSI recipients age 65 and older, over 1.2 million are disabled and more than 13,000 are blind. SSA, SSI MONTHLY

STATISTICS (May 2025), https://www.ssa.gov/policy/docs/statcomps/ssi_monthly/2025-05/table01.html. Overall, 83 percent of SSI recipients qualify based on disability. *Id.*

36.     SSI benefits represent the only source of income for more than half of all SSI recipients. In 2025, the maximum monthly benefit is $967 for individuals and $1,450 for couples. SSA, SSI Federal Payment Amounts for 2025, https://perma.cc/43PM-BAVJ (last visited July 7, 2025). These modest payments often fall far below the cost of basic living expenses. *See* Michelle Diament, *SSI Recipients Can't Afford Housing Anywhere in the U.S.*, DISABILITY SCOOP (Feb. 5, 2024), https://perma.cc/PY7P-VYM4 (noting that, as of 2023, the 4.1 million working-age adults with disabilities receiving SSI could not afford housing in any U.S. market without additional support).

## II.     Mechanisms for Social Security Benefit Access and Support

37.     SSA administers benefits through three primary access channels: in-person service at local field offices, telephone support via local offices and teleservice centers, and online systems. Each channel plays a distinct role in ensuring that applicants and beneficiaries—particularly people with disabilities—can access, maintain, and understand the benefits to which they are legally entitled.

38.     In total, SSA administers benefits to more than 70 million people and facilitates over 500 million interactions with the public annually through field offices, customer service centers, and phone-based services. SSA, MESSAGE FROM THE COMMISSIONER 1 (May 30, 2025), https://www.ssa.gov/budget/assets/materials/2026/2026BO.pdf.

### A.  In-Person Access Through Field Offices

39.     Field offices are the most critical point of contact for many beneficiaries. Some types of applications—such as SSI claims for children, older adults, married individuals, or those

with prior SSI history, and applications for survivors or dependent benefits—can only be submitted in person at a local field office. While other processes can be initiated or even completed online, in-person service remains indispensable for many claimants, particularly those with disabilities.

40.     Since its inception, SSA has recognized that in-person access is foundational to the system's integrity. In 1935, the newly formed Social Security Board assembled a committee to identify optimal field office locations, understanding that "administration, particularly in the field, will either make or defeat the entire program." IN THE FIELD: THE HISTORY OF FIELD OFFICES (SSA 2015), https://perma.cc/C5V3-QCVC.

41.     By 1936, SSA had established a national network of 606 offices—guided not only by administrative efficiency, but by public accessibility. Location decisions were driven by population, regional infrastructure, economic activity, and proximity to wage earners. That model persists today. In 2024, SSA operated 1,230 field offices and 10 regional offices, handling over 40 million in-person visits annually—approximately 119,000 per day. SSA, ANN. DATA FOR FIELD OFF. VISITORS, https://www.ssa.gov/data/field-office-visitors-average-daily.html#dataset Description (last visited July 7, 2025).

42.     Field offices are statutorily required to accept and assist with applications, provide required forms, collect supporting documentation, and offer interviews and personal conferences. *See* 20 C.F.R. §§ 404.506(d), 404.614, 404.909(a)(2), 416.325, 416.557, 416.1409(a). Same-day, in-person service is required when a claimant faces a time-sensitive deadline—such as responding to an overpayment notice, loss of benefits, or disability redetermination. *See* 42 U.S.C. §§ 405(t), 1383(e)(6).

43.     SSA's own Program Operations Manual System ("POMS") emphasizes field offices' proactive responsibilities. Field office staff must not only accept applications, but also

explain the advantages and disadvantages of filing, assess potential entitlement to alternate benefits, and assist beneficiaries in understanding notices and requests. *See* POMS GN 00201.005, 00204.020.

44.    Field offices are expressly prohibited from delaying or denying applications for internal convenience, performance metrics, or case complexity. *Id.* Staff are instructed to take applications promptly and provide individualized support, particularly for vulnerable or high-need applicants. *See* Dawn Bystry, Associate Commissioner, SSA Dear Colleague Letter, https://medicareadvocacy.org/wp-content/uploads/2024/11/Changes-to-Accessing-In-Person-Services.pdf (last visited July 7, 2025) (reaffirming that SSA field offices must provide in-person service to individuals who cannot or do not schedule appointments and emphasizing that staff are not permitted to turn away walk-ins—particularly those who may require individualized support to access services).

45.    SSA recognizes that individuals with disabilities may face challenges navigating correspondence, completing forms, or responding to agency requests. *See* POMS SI 02301.200, https://secure.ssa.gov/apps10/poms.nsf/lnx/0502301200. Employees are therefore required to assist all SSI beneficiaries who need help understanding or responding to agency communications—and to provide adequate time for compliance. *Id.*

46.    Beyond application intake, field office staff provide essential services such as Social Security card issuance, benefit continuance reviews, and direct response to beneficiary concerns. Historically, SSA has encouraged in-person visits for individuals who struggle with telephone communication or digital systems, recognizing the complexity of its programs and the need for personalized, face-to-face support. Soc. Sec. Advisory Bd., Decisions Regarding

FIELD OFFICE CLOSURES 4 (June 2020), https://s3-us-gov-west-1.amazonaws.com/cg-778536a2-e58c-44f1-9173-29749804ec54/uploads/2020/05/2020-06SSABServicePaperClosures.pdf.

47.     SSA also handles Medicare enrollment, which can require in person visits to local field offices in certain cases. For example, very low-income beneficiaries must utilize local field offices to submit "Part A conditional applications," which are required for the coordination of Medicare benefits with those available under state Medicaid programs. *See* POMS HI 00801.140.

48.     With its array of benefit programs, complex eligibility criteria, and individualized payment calculations, SSA cannot fulfill its statutory mission without engaging directly with the public. *See* Manasi Deshpande and Yue Li, *Who is Screened Out? Application Costs and the Targeting of Disability Programs*, Am. Econ. J. Econ. Pol'y, 11(4) 213, 215 (2019)*;* Kathleen Romig, *Abruptly Eliminating Social Security Phone Services Threatens Access to Benefits*, Ctr. on Budget & Pol'y Priorities (Apr. 8, 2025), https://www.cbpp.org/research/social-security/abruptly-eliminating-social-security-phone-services-threatens-access-to.. Field office staff perform that vital function. Their role is not merely operational—it is statutorily required and, for millions of Americans, indispensable.

49.     Yet, SSA's arbitrary workforce reduction policy, described in detail in Part III, *infra*, has decimated field office capacity. Nearly 40 field offices nationwide have lost 25 percent or more of their staff. Several offices have lost more than 50 percent of their staff. These cuts are inexplicable, and SSA has not even attempted to state a rational case for its unprecedented staff cuts in a time when beneficiary need is on the rise.

50.     The impact is especially acute for individuals with disabilities, who disproportionately lack home internet connection, struggle to use inaccessible digital media, and

cannot navigate SSA's overstressed phone systems. SSA's failure to maintain effective field office services denies these individuals meaningful access to critical benefits.

### B. Remote Access Through Online Services

51.     SSA is statutorily required to accept and process applications for benefits, changes in status, and requests for agency determinations. *See* 42 U.S.C. §§ 423(a)(1)–(2) (requiring SSA to process disability insurance applications "filed" under the statute), 1383(c) (requiring SSA to provide "reasonable notice and opportunity for a hearing" and process applications and changed circumstances); 20 C.F.R. § 404.620 (requiring SSA to treat any application as pending from the date it is "filed"—regardless of the method of submission). In practice, these obligations require SSA to maintain accessible systems—including remote and internet-based mechanisms—through which individuals can apply for and manage benefits.

52.     SSA's online portal, *mySocialSecurity*, was designed to reduce the need for in-person contact by offering users digital access to earnings records, benefit estimates, notices, appeals, and replacement documents. *See* Lila Rabinovich & Francisco Perez-Arce, *Mixed-Methods Study to Understand Public Use of Social Security's Online Platform*, 83 Soc. Sec. Bull. 4 (2023), https://www.ssa.gov/policy/docs/ssb/v83n4/v83n4p1.pdf. However, since SSA's mass workforce reduction resulted in the dissolution of the Office of Transformation—which housed many of the personnel responsible for overseeing and maintaining SSA's digital infrastructure—the reliability of the agency's online platform has deteriorated to the point where beneficiaries cannot reliably access their account information. Aimee Picchi, *Social Security wrongly told disabled people, and some seniors their benefits ended, causing alarm*, CBS NEWS (Apr. 8, 2025), https://www.cbsnews.com/news/social-security-doge-ssi-error-message-currently-not-receiving-payments/.

53.    From March through May 2025, SSA experienced a pattern of severe digital outages affecting core public-facing systems. On at least four separate days—March 25, March 30, April 1, and April 5—SSA experienced full systems outages, during which claimants were unable to access any digital services, including *mySocialSecurity*. On information and belief, during this three-month period, other critical internal agency systems went offline more than 40 times—often for several hours or longer—including the wage reporting system, appointment scheduling tools, the benefit verification portal, identity verification services, and SSI claims intake systems.

54.    These outages—more than forty documented disruptions in under ten weeks—have had cascading effects across SSA's operations. Claimants have been unable to file new claims, report income, contest overpayments, verify benefits, or even log into their accounts. These disruptions occurred with no warning, no public notification protocol, and no accessible alternatives to managing their accounts.

55.    The impact of these disruptions is especially significant for individuals with disabilities, who disproportionately lack home internet connection and, therefore, have to access SSA online from public internet sites such as libraries, and cannot navigate SSA's overstressed phone systems or physically access local field offices. SSA's failure to maintain even minimally reliable online access systems in the last few months—a predictable result of its severe understaffing—denies these individuals meaningful access to critical benefits.

## C. Remote Access Through Telephonic Services

56.    For millions of individuals—including those without internet access, digital literacy, or the ability to travel to a field office—SSA's telephone systems are the only practical means of accessing benefits, updating eligibility information, or resolving overpayments. This

reliance is particularly acute among individuals with disabilities: as of 2023, 38 percent of disabled adults did not have a home computer, and internet adoption among people with disabilities (63.8%) significantly lagged that of nondisabled adults (83.4%). *Digital Inclusion for People with Disabilities,* COMM. TECH. NETWORK (July 14, 2023), https://perma.cc/94XV-PE67.

57.     SSA's primary telephonic infrastructure includes the National 800 Number and call centers embedded in field offices. These systems are supposed to offer real-time support for individuals applying for retirement, disability, SSI, Medicare, and other benefits.

58.     In fiscal year 2024, the 800 Number processed over 28 million calls, and local field offices answered an additional 23 million. SSA, FY 2024 AGENCY FINANCIAL REPORT 10 (Nov. 13, 2024), https://www.ssa.gov/finance/2024/Full%20FY%202024%20AFR.pdf. Nearly 40 percent of all Social Security claims are now processed entirely by phone. Hannah Natanson, *et al.*, *Social Security scraps far-reaching cuts to phone services after Post report*, WASH. POST (Mar. 12, 2025), https://www.washingtonpost.com/politics/2025/03/12/social-security-phone-doge-elderly-disabled/.

59.     Despite this critical role, SSA's telephone systems are increasingly unable to meet public demand. In 2025, demand has continued and risen, even as SSA continues to redirect more claimants into telephonic access through policies requiring mandatory appointment scheduling, reducing in-person assistance, and limiting walk-in services. SSA's failure to maintain functional, adequately staffed, and accessible telephone systems—while simultaneously forcing more people to use those systems—constitutes a denial of meaningful program access.

## III.    Mass Workforce Reductions

60.     In 2016, SSA had 63,159 full-time workers to meet the needs of approximately 66 million beneficiaries: one employee for every 1,045 beneficiaries. In subsequent years, SSA has

requested specific staffing levels from Congress based on "work task time" studies, which measure how much time each case-processing task takes an average SSA employee to complete. For fiscal year 2018, SSA sought funding for 61,265 workers to meet its duty to serve the public. *See* SSA, FY 2018 Congressional Justification (May 23, 2017) https://www.ssa.gov/budget/assets/materials/2018/2018JEAC.pdf. In fiscal year 2019 it sought 61,034. *See* SSA, FY 2019 Congressional Justification (Feb. 12, 2018) https://www.ssa.gov/budget/assets/materials/2019/2019CJ.pdf. In fiscal year 2020, it sought 62,745—each year seeking a minimum of 61,000 employees to meet the needs of the growing eligible public. *See* SSA, FY 2020 Budget Overview (Mar. 2019) https://www.ssa.gov/budget/assets/materials/2020/2020BO_1.pdf.[2]

61.    In February 2025, SSA announced its plans to *reduce* agency staffing by more than 7,000 employees. In his fiscal year 2026 budget request, Defendant Bisignano seeks funding for just 50,278 full-time workers. SSA, FY 2026 PRESIDENT'S BUDGET KEY TABLES 1, https://www.ssa.gov/budget/assets/materials/2026/2026BST.pdf. This request conspicuously falls short of previous funding requests SSA has made to Congress by thousands of workers. On information and belief, Defendant Bisignano did not rely on a work task time study to generate his FY 2026 staff funding request to Congress. Despite the continued growth of SSA-eligible populations, Defendants are implementing—and are well on their way to accomplishing—a 12 percent reduction in agency staff. *Id.*

---

[2] These increases reflect the steady growth in the number of eligible beneficiaries each year. During the COVID-19 pandemic, SSA experienced substantial staffing losses, dropping to a workforce of 56,907 in 2022. in fiscal year 2022. SSA, ANNUAL STATISTICAL SUPPLEMENT 2.F1-2.F3 (2022), https://www.ssa.gov/policy/docs/statcomps/supplement/2022/2f1-2f3.html. In its fiscal year 2023 budget request, the agency sought to restore staffing levels to 62,768. SSA, FY 2023 CONGRESSIONAL JUSTIFICATION 8 (Mar. 2022),. https://www.ssa.gov/budget/assets/materials/2023/FY23-JEAC.pdf.

62.    The demand for SSA's services has only increased, driven in part by the increased number of persons eligible for retirement benefits in the "baby boomer" generation.[3] From the approximately 66 million beneficiaries reported in 2016, the demand on the agency had grown to a reported 73.1 million beneficiaries in payment status in fiscal 2022, and that increased again to 74 million in May 2025. SSA, MONTHLY STATISTICAL SNAPSHOT T1 (May 2025) https://www.ssa.gov/policy/docs/quickfacts/stat_snapshot/index.html?qs#table1.

63.    The ratio of SSA staff to beneficiaries has increased significantly over time. Whereas 2016 figures show one employee for every 1,045 beneficiaries, 2024 figures show one employee for every 1,491 beneficiaries—an increase of approximately 43 percent more work per employee. It is this growing population of beneficiaries and their needs that has driven every SSA Commissioner for the past 10 years to seek funding for over 60,000 workers. Reducing staff to 50,000 workers is diametrically opposed to the evidence of beneficiaries' growing needs.

64.    SSA's workforce reduction policy was announced on February 28, 2025, when then-Acting Commissioner Leland Dudek released a sweeping plan to eliminate at least 7,000 SSA employees—over 12 percent of the agency's total workforce—through buyouts, early retirements, deferred resignations, and involuntary reductions in force. SSA, Press Release, Social Security Announces Workforce and Organization Plans (Feb. 28, 2025), https://perma.cc/L7D8-APHY. Voluntary separation offers were extended across the agency's 57,000-person staff, including frontline field office and teleservice workers. The plan also proposed reducing SSA's ten regional

---

[3] As of 2020, the U.S. Census Bureau estimated that approximately 73 million individuals belonged to the "baby boomer" generation, defined as those born between 1946 and 1964. U.S. CENSUS BUREAU, *By 2030, All Baby Boomers Will Be Age 65 or Older* (Dec. 10, 2019), https://www.census.gov/library/stories/2019/12/by-2030-all-baby-boomers-will-be-age-65-or-older.html.

offices to four, closing additional field offices and hearing centers, and outsourcing customer service. *Id.*

65.     By March 18, 2025, SSA reported that 2,477 eligible employees had taken the VSIP were from the network of approximately 1,200 community-based offices—plus another 345 staff via deferred resignation. SSA, Workforce Update: The Social Security Administration's Workforce Update, https://web.archive.org/web/20250318181051/https://www.ssa.gov/news/workforce/ (last visited Mar. 18, 2025). More recently, SSA documents indicate it has lost 4,147 staff since October 1, 2024, and plans to lose an additional 3,573 by fiscal year 2026. SSA, FY 2026 PRESIDENT'S BUDGET KEY TABLES, *supra* at 1.

66.     SSA's staffing levels, already near a 50-year low, fell to 54,782 by April 2025—down from nearly 60,000 in fiscal year 2019. *SSA Weekly Operational Report Meeting*, YOUTUBE (Apr. 25, 2025), https://www.youtube.com/watch?v=92eMtfnuNCo (at 55:10) (video removed by uploader). The number of direct-service employees dropped to 47,926. *Id.*

67.     This unprecedented reduction in force was not tailored to beneficiary need, workload demands, or equitable geographic distribution. Field offices experienced widely disparate staffing losses with no apparent coordination or assessment of impact. For example, the Wisconsin Rapids, Wisconsin field office lost 58 percent of its workforce. SSA has offered no public explanation for the uneven cuts beyond vague references to reducing "waste" or "redundancy" and has not disclosed any analysis of how affected offices are expected to meet statutory service obligations with a decimated staff.

68.     These actions violate federal requirements governing workforce restructuring. Agencies implementing VSIP programs must submit detailed plans specifying which positions and functions will be eliminated and explaining how the agency will maintain operations without them.

*See* 5 U.S.C. § 3522. SSA has neither disclosed such a plan nor demonstrated how it will continue to fulfill its statutory service obligations following the loss of thousands of experienced personnel.

69.     SSA claimed to mitigate the impact of the loss of staff by reassigning employees who "do not directly provide mission critical services" into field offices and teleservice centers. Press Release, SSA, Social Security Announces Workforce and Organization Plans, April 18, 2025, https://blog.ssa.gov/social-security-announces-workforce-and-organization-plans/. As of April, approximately 2,000 employees had been reassigned. Press Release, SSA, Social Security Administration Highlights Key Accomplishments in the First 100 Days of the Trump Administration, April 29, 2025, https://www.ssa.gov/news/press/releases/2025/?utm_medium= email&utm_source=govdelivery#2025-04-29. But these workers lack the training and experience necessary for direct service, placing additional strain on existing staff and further degrading public service capacity.

70.     Despite these recent reassignments, SSA released a new policy in early July 2025 that would further shuffle the employees at field offices and teleservice centers. In light of the agency's devastating understaffing and the increasing demand for its services, SSA needs more employees staffing the 800 Number phone lines. Instead of hiring or rehiring trained SSA employees to fill the gap, SSA announced to regional field office leaders that it is in the process of reassigning hundreds of field office employees to answer phones for its 800 Number calls. This policy not only strips field offices of valuable agents to provide much-needed in-person services, but also threatens to stall SSA's core operations even longer while the agency adjusts to its new historic low staffing levels.

71.     The result of this mass reduction in staff is a hollowed-out agency, unable to deliver timely, accessible, and equitable services to the millions of Americans who rely on it. Kathleen

Romig & Devin O'Connor, *Reassignment Won't Fix the Largest Ever Social Security Staffing Cut*, CTR. ON BUDGET & POL'Y PRIORITIES, June 23, 2025, https://www.cbpp.org/research/social-security/reassignment-wont-fix-the-largest-ever-social-security-staffing-cut/.

## IV.    Disparate Impact on People with Disabilities and Supporting Organizations

72. SSA has gutted its capacity to ensure that its vital programs are accessible to people with disabilities. These failures fall hardest on those already at the margins: individuals with disabilities who also face poverty, accessibility barriers, and digital exclusion. The burden is borne daily by people unable to file appeals, complete paperwork, or respond to adverse actions. As a result of SSA's actions, people entitled to SSA benefits do not receive them, cannot get answers to their questions, and cannot correct errors in their applications and appeals.

### A.  Harm to Beneficiaries and Applicants with Disabilities

#### 1. *Elizabeth Rouse*

73.    Elizabeth Rouse is a ███-year-old ███ resident who has been legally blind since birth. She is a member of NFB and holds two part-time jobs—working as an elementary school paraprofessional and as an advocate assisting families in navigating special education, Medicaid, and Medicare. Despite her professional expertise in public systems, Ms. Rouse has recently encountered persistent, escalating barriers when attempting to access her own Social Security benefits.

74.    Ms. Rouse currently receives SSDI and Medicare. Her monthly SSDI benefit is approximately $1,000 after deductions for Medicare premiums. These benefits are critical to her ability to maintain basic living expenses and pursue her goal of living independently. She first began receiving SSI in 2016 and transitioned to SSDI and Medicare thereafter.

75.     Since February 2025—the date SSA began implementing the challenged workforce reductions and restructuring policies—Ms. Rouse's efforts to access services have been substantially impaired. The nearest SSA field office is a 20- to 25-minute drive from her home, but due to her blindness, she cannot drive. She must rely on family members, who must rearrange work schedules to transport her. Once there, she has encountered long waits, often 40 minutes to over an hour, due to chronic understaffing. The office rarely has more than two window agents available, despite steady traffic of 10 to 15 people waiting at any given time.

76.     The understaffing of the local field office, combined with SSA's increasing reliance on in-person transactions, has made it difficult for Ms. Rouse to meet SSA's procedural demands, including income verification and redeterminations. On Friday, June 13, 2025, Ms. Rouse attempted to make an appointment online with her local field office for a time-sensitive income verification task. The website directed her to call her local field office. She attempted to find an appointment-making mechanism in her *mySocialSecurity* portal, but the automated response tool produced little to no helpful information to do so.

77.     On Wednesday, June 18, 2025, Ms. Rouse called SSA with questions about two proof of employment forms she needed to submit to manage her benefits. After waiting for 25 minutes, an agent answered the phone, but promptly placed her on hold. After the agent returned to the phone and placed her on hold three times, Ms. Rouse gave up and decided to call back later. That afternoon, she spent over an hour over the phone waiting for, and eventually speaking to a representative, who could not answer her questions, but made an appointment for Ms. Rouse so she could have her questions answered in person at her local field office. Without the proper training to support Ms. Rouse's needs, the representative delayed a process that, if mishandled, would jeopardize her benefits.

78.     Defendants' policy changes and restructuring have eliminated the minimal flexibility Ms. Rouse once relied on, forcing her to navigate a collapsing service infrastructure that neither accommodates her disability nor provides the timely support required by law.

2.  *Marni Garvey*

79.     Ms. Marnie Garvey is a ███ -year-old resident of ███ . She is disabled due to her combination of medical conditions, including ████████████████████████ ████████████████████████ .

80.     On April 22, 2025, Ms. Garvey received a notice from SSA dated April 15, 2025, alleging that she is no longer eligible for SSDI benefits retroactive to 2016, and charging her with over $100,000 in overpayment. Ms. Garvey does not agree that she is not eligible for SSDI benefits, and she disagrees that she should be charged an overpayment.

81.     Upon receipt of the April 15 notice from SSA, Ms. Garvey called SSA for assistance. Ms. Garvey called the 800 Number at 8:44 a.m., and waited on hold for about 45-minutes before she was disconnected. She called back at 9:31 a.m., and waited on hold about three hours before speaking with an SSA representative. The telephone representative told Ms. Garvey that she would not receive her May disability benefit check, and that her Medicare coverage would stop effective May 1, 2025, as a result of SSA's decision. The telephone representative told Ms. Garvey what paperwork to complete to appeal SSA's decision.

82.     Ms. Garvey immediately completed the paperwork as advised by the SSA telephone representative, and visited her local SSA field office on April 22 to provide SSA with the documents. However, a security guard prevented Ms. Garvey from entering the office because she had not made an appointment in advance. The security guard instructed Ms. Garvey to make an appointment by calling the 800 Number that had advised her that morning to complete the

23

paperwork she now sought to provide. Ms. Garvey explained that she only wanted to speak to SSA staff about the April 22, 2025 notice, and provide the requested appeal paperwork, but the security guard denied her request. Ms. Garvey felt intimidated when confronted by security and left.

83.    On June 4, at 5:20 p.m., Ms. Garvey called the 800 Number to ask about the status of her appeal. She waited on hold four hours before the call was disconnected. On June 5, Ms. Garvey called SSA twice, at 2:38 p.m. and 5:54 p.m., and waiting on hold for hours without ever reaching an SSA agent.

84.    On June 9, Ms. Garvey again visited the SSA local office. Ms. Garvey explained to the security guard that she was not receiving benefits, and that she should be able to speak to SSA staff about her problem per SSA policy. The security guard allowed Ms. Garvey to enter the office, where she met with an SSA staff member. However, the staff member was unable to provide Ms. Garvey with any assistance beyond telling her that a different SSA staff member was handling her case. The staff member with whom Ms. Garvey spoke would not share the name or contact information of the person handling her case. The staff member explained to Ms. Garvey that the staff member handling her case recently took on the work of two other SSA staff members, resulting in a backlog of their work.

85.    On June 17, 2025, at 2:50 p.m., Ms. Garvey again called the 800 Number to ask about the status of her appeal. Rather than waiting on hold, Ms. Garvey requested a call back. SSA called her back at 6:48 p.m., but the call immediately disconnected before Ms. Garvey could speak to an SSA representative.

86.    For Ms. Garvey, the loss of SSDI benefits has had devastating consequences. Because she is unable to pay her rent without her SSDI benefits, she has already made arrangements with her landlord to vacate the home in August 2025 (after using the last month's

rent she paid when she moved in). Ms. Garvey plans to move her belongings into storage and stay temporarily with her mother. Due to resident restrictions at her mother's home, however, her stay will be limited to a few weeks or perhaps days. After that, Ms. Garvey does not know where she will live.

87.    Without her Medicare health insurance and SSDI benefits, Ms. Garvey has already been forced to ration her access to healthcare. Ms. Garvey has forgone two previously scheduled medical appointments, one with her neurologist and one with her cardiologist, due to her inability to pay for the appointments. Ms. Garvey is now unable to pay for her medications, which cost hundreds of dollars per month. Ms. Garvey is using her limited funds from part-time work to pay the approximately $500 per month cost for blood testing to ensure proper medication dosage related to her mechanical heart valve.

3.   *Merry Schoch*

88.    Merry Schoch is a blind, ██-year-old ████████ resident and a long-standing member of NFB. She and her husband, also blind, rely on SSDI to meet their basic needs. When full-time work became impossible due to her disability and mounting medical complications, SSDI became her only path to financial stability.

89.    Despite her disability, Ms. Schoch maintains part-time work. After she reported her earnings to SSA, the agency terminated her benefits and charged her with an overpayment. SSA also advised her that she would need to reapply for SSDI.

90.    Ms. Schoch submitted a new application for SSDI benefits, which requires her to provide information and documents to SSA when the agency requests. The reapplication process has been marked by systemic failures exacerbated by Defendants' restructuring and staffing cuts.

91.     SSA's telephone services are increasingly difficult to reach. Ms. Schoch often waits more than an hour on hold before reaching an agent. In one instance, she remained on the line for nearly two hours. These delays have lengthened since early 2025, reflecting the agency's sharply diminished capacity.

92.     In late March 2025, Ms. Schoch called SSA seeking help completing a vision impairment questionnaire required for her SSDI application. After following the voicemail prompts to request a callback, the phone disconnected before she could leave a message. She called again the next morning when the office opened, waited on hold for over an hour, and was told no appointments were available until May 20—nearly two months later.

93.     When telephone and in-person assistance would not help her with this time-sensitive issue, Ms. Schoch attempted to use SSA's online services. She encountered an error message that prevented her from using her online account, and her husband—on a separate device—experienced the same technical glitches on SSA.gov. She found the digital systems completely unusable.

94.     By spring 2025, all points of access had effectively closed for Ms. Schoch. SSA field offices were overburdened; telephone wait times were untenable; and digital systems were non-functional. Lacking any reliable channel to complete her application, Ms. Schoch has been forced rely upon the assistance of others, hoping that her granddaughter will be available to help her, delaying her ability to complete the reapplication process, and leaving her without essential benefits.

95.     For Ms. Schoch, SSDI is the difference between having enough money to ensure she can pay her mortgage, keep up with high medical costs, and keep the lights on, or not.

4.  *Martha Willingham Hazen*

96.    Martha Willingham Hazen is a blind, ██-year-old ████████ resident and member of the NFB. She has long depended on SSDI benefits to support herself and her family, including covering the cost of paratransit transportation needed to maintain her two part-time jobs.

97.    Phone-based support is not a reliable mechanism for Ms. Hazen to secure help in managing her SSA benefits. Ms. Hazen frequently spends over 90 minutes on hold, only to be disconnected or routed through a confusing set of voicemail prompts. While she has left multiple messages requesting callbacks as directed, SSA has only returned her call once.

98.    In mid-June 2025, Ms. Hazen learned that the name on her SSA account did not match her legal name. Though she was married in ████████ and legally changed her name and Social Security card information in ████, her account still registered her with her maiden name. Fearing that the discrepancy could interfere with her benefits, she called SSA to handle the situation.

99.    On or around June 16, Ms. Hazen called the 800 Number to confirm and ensure her account reflected her legal name. She called first thing in the morning when the line opened and still waited three hours before a representative answered. The representative who picked up could not answer her question, put her back on hold, and transferred her to someone else, who suggested that the change would be easy to make. The next day, Ms. Hazen called back to verify that her name was correct in SSA's systems. She waited 85 minutes on the phone for someone to pick up. The first person to answer told her that changing her name was not simple, and that it could take up to 240 days to complete. She was understandably frustrated by the disparate answers she received from two different SSA representatives on two consecutive days. Ms. Hazen asked to

speak to a supervisor to ensure that she received the correct information. The supervisor provided a third answer: her name change could be processed in about three weeks.

100.    Ms. Hazen's customer service experiences demonstrate the effects of SSA's dramatic cuts in personnel: longer wait times, less experience to share, and more confusion for beneficiaries.

5.  *William Weiss*

101.    William Weiss, a ▮-year-old ▮▮▮▮▮ resident, has been legally blind since childhood. He began receiving Social Security Survivor benefits as a child following his father's death, SSDI benefits at age 19, and Medicare as an adult.

102.    For years, Mr. Weiss relied on his Social Security benefits, supplemented by part-time work at a sandwich shop. Always mindful of the rules around earned income, Mr. Weiss made sure his earnings did not exceed the limit for people with blindness.

103.    Around February 2024, Mr. Weiss received a notice from Social Security stating that he had allegedly been overpaid approximately $35,000 in SSDI benefits due to excess earnings from his part-time job. Later, he discovered an additional overpayment claim of approximately $25,000 related to his Survivor benefits. Mr. Weiss disputes the assertion that he was overpaid.

104.    After receiving the overpayment notice, Mr. Weiss's monthly Social Security benefits were abruptly halted. Forced to cover his Medicare premiums out of pocket, he had to dip into his already meager savings. Without his benefits, he has been left relying on others for food, housing, and basic necessities.

105.    For the past year, Mr. Weiss has worked tirelessly to resolve his overpayment issue and have his benefits reinstated. However, recent SSA policies have made it increasingly difficult—if not impossible—for him to reach Social Security.

106.    In January 2025, Mr. Weiss visited his local SSA office to check on the status of his benefits and was told that he could not be seen without an appointment.

107.    Mr. Weiss then made numerous unsuccessful attempts to contact Social Security to schedule an appointment at his local office. On one occasion, after waiting nearly five hours, he finally received a call from an agent. More often, however, he waits on hold only for the call to disconnect before he can speak to anyone. The automated phone system has informed him that his estimated wait time exceeds four hours. Yet, despite his willingness to endure these long waits, he is unable to reach anyone for assistance.

108.    Finally, on April 9, 2025, after four unsuccessful attempts to reach SSA by phone on that day alone, and waiting on hold for about 45 minutes, Mr. Weiss was able to speak with a telephone representative. The telephone representative could not provide Mr. Weiss with information about the status of his benefits. The telephone representative scheduled an appointment for Mr. Weiss at his local office for the following day, April 10, 2025.

109.    Mr. Weiss attended his April 10, 2025 appointment with SSA, but the representative with whom he met was unable to provide him with any information concerning the status of his benefits. Mr. Weiss attempted to provide the representative with medical records to support his claim for benefits, but the representative refused to scan or copy his original documents. Mr. Weiss came to his appointment prepared with questions, but the representative was unable to spend enough time with Mr. Weiss to answer his questions. After about ten minutes, the SSA representative told him that his "time is up," and ended the meeting.

110.    In May 2025, SSA reinstated Mr. Weiss's monthly benefits at a reduced amount, and reduced, but did not eliminate, his overpayments. Mr. Weiss does not agree with SSA's

decision because he believes he should receive his full benefit amount and should not be subject to any overpayment.

111.    With the assistance of a local legal aid office, Mr. Weiss spoke with an SSA representative in June 2025 concerning his benefits and the status of his appeal. The SSA representative was unable to answer questions related to the substance of SSA's decision and the status of Mr. Weiss's appeal. After six minutes on the call, the SSA representative told Mr. Weiss that they were ending the call due to a policy of limiting calls to no more than six minutes. The SSA representative told Mr. Weiss and his advocate that if he had more questions or needed more information, he would need to call back for another six-minute meeting.

   6.  *Deja Powell*

112.    Deja Powell is a blind, ███-year-old ███ resident and member of the NFB. She has spent her career advancing the rights of people with disabilities and previously directed multiple disability-related programs before her worsening condition left her unable to continue working.

113.    In December 2024, Ms. Powell unexpectedly received a direct deposit from SSA. She assumed it represented approval of her pending SSDI application. A second payment followed in January 2025, reinforcing that belief.

114.    However, in February 2025, Ms. Powell did not receive a payment.

115.    Concerned, she contacted the 800 Number to inquire about the abrupt cessation of benefits. Ms. Powell was forced to wait on hold for five and a half hours before finally reaching a representative.

116.    The SSA representative informed Ms. Powell that the prior payments had been "provisional benefits," not formal approval of her application. But the agent could not explain why they had been issued or what triggered their discontinuation.

117.    As of June 2025—more than ten months after she filed—Ms. Powell's SSDI application is still in the disability determination phase, with no final adjudication and no meaningful communication from SSA.

118.    The process has been opaque and disorienting. SSA's failure to provide accessible, timely, and consistent communication has caused Ms. Powell deep uncertainty and financial insecurity.

119.    Ms. Powell cannot navigate SSA's online platform without consistent and reliable screen-reader compatibility. She has been unable to access SSA services to provide her with a meaningful explanation of the status of her benefits. She has effectively been cut off from any viable channel to resolve her application status or correct agency errors.

120.    SSA's failure to provide Ms. Powell with a reliable channel for engagement with SSA has left her in financial limbo, unable to plan, budget, or access the benefits she is legally entitled to pursue.

7.  *Wilshawn Tiller*

121.    A veteran and ██-year-old ████ resident, Wilshawn Tiller has service-related disabilities, with a 90 percent disability rating from the Veterans Affairs Administration. ████
████████████████████████████████████████████████████████
████████████████████████████████████████ These disabilities affect his daily life. In November 2023, he applied for both SSI and SSDI benefits.

122.    In February 2025 Mr. Tiller was scheduled for an interview to determine his eligibility for benefits. The SSA staff with whom Mr. Tiller met informed him that his application for SSI benefits would be denied, but that his application for SSDI benefits would continue to be processed.

123.    Mr. Tiller did not wait for an official decision on his SSI application before submitting an appeal. He received a formal denial letter in May 2025. On June 16, 2025, he attempted numerous times to confirm that SSA had received and is processing his appeal paperwork. The SSA online system did not include any updated information in his account. When he tried to reach SSA on the 800 Number, it rang, unanswered. When he called the Number listed for his caseworker, SSA's automated phone system disconnected once he navigated the automated prompts. After repeated dropped calls, unanswered hotlines, and failed attempts to reach a live person, Mr. Tiller gave up.

124.    As of June 2025, Mr. Tiller has no confirmation that his appeal was received or is being processed.

**B. Harm to Organizations and Their Members with Disabilities**

1.    *American Association of People with Disabilities*

125.    Defendants' unlawful actions have perceptibly impaired AAPD's ability to carry out its core functions and forced it to divert significant organizational resources to mitigate the fallout from the SSA's staff and service reductions.

126.    AAPD is a national cross-disability rights organization committed to increasing the political and economic power of more than 60 million Americans with disabilities. Its core organizational functions include federal policy and regulatory advocacy; educating the public about disability rights and benefits; leadership development and employment programs; civic engagement campaigns; and capacity building across the disability community. In addition, AAPD employs one staff member full time to assist and provide referrals to people with disabilities who contact the organization with problems accessing housing, services, and public benefits.

127.    SSA's recent staff reductions, degraded call systems, and inaccessible digital platforms have created systemic barriers to access and substantially increased the burden on AAPD in carrying out its core functions.

128.    As a result, AAPD has been forced to divert staff and operational resources in the following ways:

a.    Responding to a marked increase in emergency outreach from individuals with disabilities facing benefit terminations, payment delays, and procedural denials;

b.    Redirecting policy and communications staff to triage constituent inquiries and assist with SSA system navigation;

c.    Deferring or canceling civic programming and educational initiatives due to reallocation of capacity to respond to crisis; and

d.    Suspending elements of its longstanding partnership with SSA, including the Disability Mentoring Day initiative, which historically depended on SSA field office support and designated liaisons.

129.    A favorable ruling—enjoining unlawful SSA policies and requiring restoration of equitable access—would materially reduce the strain on AAPD and allow it to resume its core mission activities.

2.    *Deaf Equality*

130.    SSA's recent policy changes, staffing cuts, and office reductions have directly affected Deaf Equality's core mission and its mission-based activities and forced Deaf Equality to divert resources from its other central functions to cope with SSA's structural and programmatic changes.

131.    Deaf Equality's purpose includes achieving true equality for Deaf, DeafBlind, DeafDisabled, Hard of Hearing, and Late Deafened people from all communities, ensuring full accommodated access to all aspects of life, and dismantling oppressive attitudes and systems.

132.    Approximately 50 percent of the work done by staff at Deaf Equality over the last five months has been dedicated to responding to SSA's recent policy changes. This ratio of Deaf Equality's work differs significantly from the organization's projected organizational priorities for 2025.

133.    In addition, Deaf Equality's direct services have been hampered by SSA's lack of available staff. Since February 2025, Deaf Equality and its community partners have received at least twenty contacts from SSA beneficiaries and applicants who have had trouble accessing services in their local field offices because of a lack of ASL interpreters. Prior to SSA's mass reduction of staff, Deaf Equality had designated staff at SSA headquarters who reliably worked with the organization and ensured its constituents got the interpreting services they needed. Now, the phone number Deaf Equality used to call for help is out of order. As a result of SSA's drop in staffing, Deaf Equality has faced significant delays and, at times, an inability to resolve the interpreting issues its constituents have raised.

134.    Deaf Equality's public education work has also felt the negative impacts of SSA's new policies. Deaf Equality regularly provides "train the advocate" trainings, presents at conferences, and consults with individual organizations. The organization also creates digital materials and resources, which it shares on its website and social media, to help educate its constituents on pressing issues. These opportunities allow Deaf Equality to support individuals and advocacy organizations alike as they navigate and fight for more accessible public services

and private systems. Chief among the public services that are the subject of Deaf Equality's educational efforts are the application, management, and appeals processes within SSA.

135.    But educating individuals and organizations on SSA's processes has never been more challenging. As SSA has slashed its staffing levels, its previously predictable systems have become entirely unpredictable. Deaf Equality's constituents report that wait times to get help in person and over the phone have risen, making it more difficult to access and manage their benefits, applications, and appeals. Without the certainty of how SSA's processes are supposed to work under this new regime, Deaf Equality's education about those systems and advice on how to navigate them is futile. Deaf Equality cannot provide the same accuracy, depth, and breadth of information about SSA's systems to its constituents.

   3.  *Massachusetts Senior Action Council*

136.    SSA's recent policy changes, staffing cuts, and office reductions have directly affected MSAC 's core mission and its mission-based activities and forced MSAC to divert resources from its other central functions to cope with SSA's structural and programmatic changes.

137.    MSAC is a nonprofit membership organization based in Quincy, MA. MSAC is a statewide, grassroots, senior-run organization that empowers its members to collectively address key public policy and community issues that affect their health and well-being. MSAC has 1,288 members across the Commonwealth. Members rely on MSAC to answer benefit related questions, including how to obtain replacement Social Security cards, and for assistance in applying for other SSA-related benefits, such as Medicare.

138.    Most MSAC members have disabilities, including mobility challenges, hearing or visual impairments, and chronic health conditions that are disabling. Virtually all MSAC members receive benefits through SSA.

139.    MSAC members with disabilities face unique barriers when trying to conduct business with SSA and secure their benefits. Members have been able to work through these barriers at SSA in the past. MSAC did not get many complaints about long telephone wait times or difficulty securing an appointment in a field office until March of this year following the partial implementation of SSA's workforce reduction policy.

140.    Historically, MSAC members reported relatively good experiences engaging with SSA offices. However, since March, members have increasingly reported a lack of responsiveness and difficulty getting through to SSA over the telephone and difficulty securing in-person appointments. Recently members have reported needing a replacement Social Security card, had questions regarding the Social Security Fairness Act, or needed documents from SSA. Members report having great difficulty reaching SSA or getting appointments to resolve these issues. When MSAC staff have attempted to assist members in contacting SSA, they have experienced the same problems. At times, MSAC staff have been on hold for 3 or 4 hours trying to reach SSA on behalf of a member.

141.    Since the end of February, MSAC has experienced difficulty reaching SSA. Because it is now so time consuming to reach SSA, MSAC can no longer regularly take the time to assist individual members in securing benefits or in navigating the complex web of applications and supporting documents required. MSAC has begun to partner with other advocacy partners in Massachusetts to identify ways to respond to reduced capacity at SSA and find ways help older adults access the benefits they are entitled to receive.

142.    Massachusetts is instituting a new requirement that people on Medicaid who are also eligible for Medicare apply for Medicare in order to avoid loss of Medicaid coverage. This process is time sensitive and requires people to secure an appointment at SSA within 60 days of

notice. Many MSAC members and other community members are enrolled in the Medicaid program and will be impacted by this new requirement. Because of the staff reductions at SSA and resulting inability to secure appointments, for the past two months MSAC has had to change its advocacy plan to identify ways it can help the impacted community. This includes ensuring people have correct information and developing coalitions across organizations to build capacity within the advocacy community to assist impacted people through the process. Thus, while MSAC has been preparing to educate its members and expand its staff in light of state-driven SSA changes, the challenges in MSAC's efforts have been compounded by Defendants' staff reductions.

143.    MSAC's primary function is to work with members to act collectively to promote the rights and wellbeing of all people, particularly vulnerable seniors. Much of MSAC's work is systemic advocacy including educating the state legislature, public education, commenting on proposed rules (mostly state but sometimes federal) impacting older adults. MSAC's time available for these other areas of advocacy has been reduced because of the recent increase in its members' demand for assistance with SSA access issues.

    4.  *National Federation of the Blind*

144.    NFB is the largest nationwide organization of blind Americans. Its mission is to ensure that blind and low-vision individuals have full and equal access to public programs, services, and civic life, including equal access to federal benefits and agencies.

145.    A core element of NFB's organizational work is assisting blind people in navigating the Social Security system, accessing public disability and insurance benefits, and obtaining accurate and accessible information regarding their entitlements.

146.    To further this work, NFB provides direct assistance to its members who are encountering difficulties in accessing SSA benefits and services. It also conducts robust public education and outreach on SSA policies, including, but not limited to:

    a.    Annual trainings at its national convention reaching at least 100 members on SSA policies and processes;

    b.    Articles in The Braille Monitor, its national monthly publication;

    c.    Ongoing affiliate and leadership training throughout the year.

147.    SSA's workforce reduction has required NFB to divert institutional resources, including reassigning staff and increasing its budget for individualized member assistance for SSA-related issues. As a result, NFB has scaled back other mission-critical initiatives to respond to SSA's systemic failures.

148.    The NFB's consultant referral program—which supports members managing SSA-related issues—has seen a measurable spike. Between January 27 and May 30, 2025, NFB's referral rate increased 20 percent, and consultant costs increased 56 percent.

149.    The harm NFB faces flows from a dismantled federal system that now shifts essential navigation and accommodation burdens onto advocacy organizations.

150.    In addition to its own harms, NFB's members have experienced unlawful discrimination and denial of access to SSA services and benefits as a result of Defendants' actions.

151.    In addition to the Individual Plaintiffs who are NFB members, many non-plaintiffs have felt the effects of SSA's staff cuts. One such NFB member, ███████, was instructed by SSA to appear in person at the ██████████ field office in May 2025, to submit documentation and request a change in his overpayment recovery rate. SSA was informed in advance that ██████ would require assistance completing the form because he is blind. Upon

arrival, SSA staff refused to assist ███████ with the form, citing a lack of capacity and insufficient staff. He was instructed to ask a stranger in the waiting room to help him complete the form. After complaining to a manager, ███████ was still unable to obtain the help he needed.

152.    ███████ experience reflects not only an individual rights violation but also a broader pattern of exclusion and institutional failure: SSA's abandonment of frontline accessibility, failure to accommodate, and refusal to provide meaningful options for blind applicants and beneficiaries.

153.    Another NFB member, ███████, was scheduled to receive a call from SSA at 1:00 p.m. on April 11, 2025. As of May 30, 2025, he had not received that call. This failure to follow through on basic communications reflects a breakdown in customer service that disproportionately harms blind people, and specifically harmed ███████, who cannot rely on mailed forms or inaccessible web portals.

154.    These experiences are representative of widespread harms among blind SSA beneficiaries—harms that NFB is uniquely positioned to represent, given the interests of its members and its national scope, community trust, and long-standing history of assisting people with disabilities in navigating federal benefits systems.

5.  *National Committee to Preserve Social Security and Medicare*

155.    The National Committee to Preserve Social Security and Medicare (NCPSSM) is a nonprofit membership organization based in Washington D.C. NCPSSM's mission includes educating members and the public on Social Security benefits, including how best to access and maintain monthly benefit payments. NCPSSM's mission additionally includes educating members and the public on healthcare issues, advocating for the continuation and improvement of the Social Security and Medicare systems, including by promoting the adoption or rejection of legislation,

regulations, and by direct communication with public officials. NCPSSM thus serves its members through advocacy, education, services, media relations, grassroots efforts, and the leadership of the Board of Directors and professional staff.

156.    NCPSSM has about half a million dues paying members nationwide. All of NCPSSM's members contributed to Social Security during their working lives. The vast majority of NCPSSM's members receive monthly benefits from SSA. Nearly all of them are covered by Medicare. Many have disabilities.

157.    After SSA began implementing the workforce reduction policy in late February 2025, NCPSSM members reported experiencing increased telephone hold times, dropped calls, and busy signals when contacting SSA to schedule appointments. Members report that when they were able to secure an appointment, it was for many weeks down the road. Members report that they are not allowed to visit local SSA offices without an appointment.

158.    SSA's workforce reduction policy has led to further degradation of SSA services provided to NCPSSM's members, particularly those with disabilities. SSA's recent workforce reduction policy significantly impacts NCPSSM's mission and purpose as an organization by requiring the organization to shift its resources and attention to addressing members' inability to access SSA staff. Services provided to members include an "Ask Us" program where NCPSSM answers benefit questions regarding SSA. Members and others who are SSA beneficiaries or applicants contact NCPSSM by email, telephone and via a link on the NCPSSM website. Since February 27, 2025, these inquiries have increased, leading NCPSSM to develop a Fact Sheet, updated regularly on its website, detailing changes impacting beneficiaries and access to SSA services and related recommendations.

159.    NCPSSM members have experienced substantial, disruptive problems with accessing their Social Security benefits. Members have experienced barriers to reaching SSA representatives on the telephone and have struggled to obtain field office assistance. SSA's internet-based services do not meet the needs of many NCPSSM members due to their limited access to, and fluency with, the internet, obstructing or delaying their access to SSA services or even receipt of benefits.

160.    NCPSSM has limited resources and budget to assist people with Social Security benefit issues. As SSA makes it more difficult to access services, members increasingly rely on NCPSSM for guidance. NCPSSM has shifted resources to meet this need, leading to reduced resources in other core services areas. This diversion of resources detracts from NCPSSM's ability to fight for other critical issues affecting its constituents, such as Medicare and Medicaid benefits, long-term care, prescription drug prices, Older Americans Act programs, wage and employment equity, and payroll taxes.

161.    Meanwhile, NCPSSM's administrative advocacy as to the workforce reductions policy has also been stymied by SSA's failure to use notice and comment rule making or seek public input when instituting its workforce reduction policy. NCPSSM engages in administrative advocacy, such as commenting on proposed rules impacting Social Security and Medicare. NCPSSM regularly provides comments to proposed rules, most recently providing comments on proposed rules related to the calculation of income in the SSI program. Had NCPSSM been provided the opportunity for comment on SSA's workforce reduction, the organization would have provided comments.

162.    NCPSSM has tracked SSA funding and staffing across administrations. For years, NCPSSM has sent letters to Congress to urge increased funding for SSA to ensure sufficient

staffing to meet the needs of its members and the public. NCPSSM could not similarly advocate this way regarding the workforce reduction policy because SSA did not present it to Congress or provide the public with an opportunity to comment on its impact on people with disabilities and older adults.

163.    NCPSSM has four full time employees and two consultants dedicated to working on SSA issues. Their time working to address recent service degradation at SSA and related impacts on members has increased from 15 percent of their time to 45 percent after the workforce changes were implemented. This results in reduction in their time dedicated to other core priorities of the organization.

164.    While instituting its workforce policy, SSA also imposed additional policies that require identity verification and other action to be taken either in-person or online, increasing the need for SSA field offices to be able to provide these services. Because NCPSSM's members are overwhelmingly older adults and people with disabilities who have less access to, and fluency with, the internet, they must now rely on these overburdened field offices.

165.    SSA's workforce reduction policy was undertaken without regard to the reliance interests of its members, both negatively impacting NCPSSM's membership and impeding the organization's ability to carry out its mission and purpose.

### CLAIMS FOR RELIEF

**COUNT I**
**Violation of Section 504 of the Rehabilitation Act of 1973**
**Disparate Impact Discrimination**

*All Plaintiffs Against All Defendants*

166.    Plaintiffs incorporate by reference the facts and allegations set forth above as if fully set forth herein.

167.    Section 504 of the Rehabilitation Act ("Section 504") and its implementing regulations provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity . . . conducted by any Executive agency." 29 U.S.C. § 794(a); 45 C.F.R. § 85.21(a).

168.    Federal regulations further prohibit agencies from adopting "[c]riteria or methods of administration the purpose or effect of which would (i) subject qualified individuals with [disabilities] to discrimination . . . or (ii) defeat or substantially impair accomplishment of the objectives of a program or activity with respect to individuals with [disabilities]." 45 C.F.R. § 85.21(b)(3).

169.    SSA is an executive agency and must operate its programs—including SSDI and SSI—in compliance with Section 504 and its implementing regulations.

170.    Organizational Plaintiffs bring this action on their own behalf based on concrete injuries to their missions, operations, and resource allocations resulting from Defendants' discriminatory policies and practices. These organizations are not suing solely as representatives of affected individuals, but because Defendants' actions have forced them to divert staff, restructure programming, and expend resources to respond to newly erected systemic barriers at SSA.

171.    NFB, MSAC, and NCPSSM also assert associational standing on behalf of their members who are qualified individuals with disabilities and current or prospective beneficiaries of SSA-administered programs.

172.    Individual Plaintiffs are *sui juris* disabled as defined by 29 U.S.C. § 705(20)(B) and have experienced discrimination in accessing SSA services and benefits.

173.    SSA's services are indispensable. They offer life-sustaining income, access to medical care, and basic economic security to millions of people with disabilities. However, meaningful access to these benefits requires real-time interaction with the agency—via field offices, responsive phone services, and accessible digital platforms—all of which are mandated by federal law when necessary to accommodate disability-related needs.

174.    Defendants' actions—including the elimination of thousands of staff, with plans to eliminate over 7,000 agency staff in total, degradation of customer service infrastructure, and lack of accessible alternatives—have created systemic access barriers that disproportionately burden individuals with disabilities, including Plaintiffs and their members.

175.    These barriers are not incidental or speculative. They are concrete, resulting in extended delays, benefit disruptions, procedural denials, and the breakdown of accommodation systems required to ensure legal compliance with Section 504.

176.    On information and belief, Defendants failed to consider whether their restructuring would impede disability access, and adopted methods of administration that, in practice, exclude qualified individuals from participating in or benefiting from SSA programs on an equal basis.

177.    Defendants' conduct has caused and will continue to cause severe, disparate harm to individuals with disabilities—including missed deadlines, benefit interruptions, inability to obtain assistance, and denial of accommodations.

178.    Absent injunctive relief, Plaintiffs and those similarly situated will continue to face irreparable harm—including, loss of income, food, shelter, medical treatment, and basic economic security—resulting from Defendants' unlawful discrimination.

## COUNT II
### Violation of the Administrative Procedure Act
### <u>Arbitrary and Capricious Agency Action</u>

*All Plaintiffs Against All Defendants*

179.    Plaintiffs incorporate by reference the facts and allegations set forth above as if fully set forth herein.

180.    Under the Administrative Procedure Act ("APA"), a reviewing court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

181.    SSA's implementation of its workforce reduction policy has eliminated thousands of staff and—by including a RIF plan to further reduce staff—will ultimately result in a loss of 7,000 staff in total. This mass reduction policy was the consummation of the agency's decision-making process after President Trump directed the agency to make staff cuts. This decision has resulted in SSA failing to meet its obligations under federal law and harm to Plaintiffs. As such, the mass reduction constitutes a final agency action for purposes of the APA.

182.    An agency acts arbitrarily and capriciously when it: (1) relies on factors Congress did not intend it to consider; (2) fails to address an important aspect of the problem; (3) offers an explanation that runs counter to the evidence; or (4) implements a decision so implausible that it cannot be ascribed to a legitimate difference in judgment or expertise. *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983); *Ark Initiative v. Tidwell*, 816 F.3d 119, 127 (D.C. Cir. 2016).

183.    When reversing longstanding agency practices that affect access to life-sustaining public benefits, agencies must meaningfully consider the reliance interests of those affected and provide a reasoned explanation for any departure. *U.S. Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30–31 (2020).

184.    Defendants failed to account for how millions of beneficiaries—particularly individuals with disabilities—rely on the availability of sufficient staff to ensure timely in-person assistance, responsive service, and accessible communications to maintain uninterrupted access to Social Security benefits.

185.    On information and belief, Defendants conducted no formal service impact analysis to assess how workforce reductions would affect public-facing operations, despite having previously documented the risks of understaffing to equitable service delivery.

186.    Defendants implemented sweeping workforce cuts and mass reassignments without issuing a public justification, without publishing any service continuity plan, and without engaging disability stakeholders—including Plaintiffs—about foreseeable consequences.

187.    These actions ignored the agency's own prior findings. SSA warned Congress in formal budget submissions that failure to restore staffing would cause rising backlogs, degraded service, and harm to underserved populations. Defendants nevertheless have already eliminated thousands of employees, with plans to eliminate over 7,000 employees in total—roughly 12 percent of the agency's workforce—without addressing how their prior assessments were wrong or how legal obligations would be fulfilled with fewer personnel.

188.    The workforce reduction policy, though definitive, was implemented hastily, without a reasoned explanation, in defiance of SSA's own data, and without acknowledgment of the statutory duties the agency exists to fulfill. This failure to consider critical facts *and* reliance interests renders Defendants' actions arbitrary and capricious.

189.    Plaintiffs and those similarly situated have long relied on SSA's core service infrastructure—including field offices, accessible call centers, and sufficient staffing—to apply for benefits, resolve eligibility issues, and secure legally-mandated accommodations. These systems

are not discretionary conveniences; they are fundamental to ensuring lawful program access. Defendants' workforce reduction—undertaken without analyzing consequences or considering alternatives—has destabilized claimants' access to critical benefits.

190.    On information and belief, Defendants failed to evaluate or mitigate the disproportionate impact of the workforce reductions on individuals with disabilities, despite their status as among the agency's primary service population.

191.    As a direct result of these unlawful actions, Plaintiffs and other individuals with disabilities have experienced—and will continue to experience—irreparable harm, including wrongful benefit terminations, excessive delays, denial of accommodations, and exclusion from the agency's core programs. Defendants' conduct has created a structural access crisis in violation of the APA and contrary to SSA's statutory mandate.

**COUNT III**
**Violation of the Administrative Procedure Act**
**<u>Agency Action in Excess of Statutory Authority</u>**

*All Plaintiffs Against All Defendants*

192.    Plaintiffs incorporate by reference the facts and allegations set forth above as if fully set forth herein.

193.    Under the APA, a reviewing court must "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

194.    SSA's decision to eliminate 7,000 staff constitutes final agency action for purposes of the APA.

195.    As a federal executive agency, SSA is bound by Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), and its implementing regulations. 45 C.F.R. § 85.21(a). These statutes and regulations prohibit federal agencies from excluding individuals with disabilities from

programs or benefits, or subjecting them to discrimination, including through policies or methods of administration that deny meaningful access.

196.    SSA's workforce reduction policy has had the effect of denying individuals with disabilities timely and equitable access to benefits, services, and accommodations to which they are legally entitled.

197.    SSA implemented these policies without safeguards to ensure continued compliance with Section 504.[4] On information and belief, the agency failed to analyze how these actions would affect individuals with disabilities, did not adopt alternatives to mitigate foreseeable harms, and did not establish procedures to ensure continuity of reasonable accommodations.

198.    Because federal agencies lack discretion to violate statutory civil rights mandates, SSA's policies are not mere exercises of agency judgment—they operate in excess of statutory authority. *See Alexander v. Sandoval*, 532 U.S. 275, 284 (2001) (holding that agency action inconsistent with civil rights mandates may not stand).

199.    SSA's failure to provide adequate access, accommodations, and nondiscriminatory services—as required by Section 504—renders its current service model unlawful under the APA.

200.    This unlawful conduct has harmed Plaintiffs, including individuals with disabilities who cannot access SSA benefits due to structural and procedural barriers, as well as organizational Plaintiffs who have been forced to divert resources to fill the service gaps created by the agency's dereliction of its legal obligations.

201.    Defendants' ongoing violations of Section 504 render their actions void as *ultra vires*, and they must be set aside under Section 706(2)(C) of the APA.

---

[4] Among these foregone safeguards, SSA abolished its Office for Civil Rights and Equal Opportunity—the SSA office responsible for ensuring the agency's compliance with Section 504 and other civil rights laws—days before it announced its workforce reduction plan.

## **RELIEF SOUGHT**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, and grant the following relief:

(1) Declare that Defendants' implementation of its agency-wide workforce reductions violate Section 504 of the Rehabilitation Act of 1973 and its implementing regulations, by denying individuals with disabilities meaningful access to Social Security services and benefits;

(2) Declare that Defendants' implementation of its agency-wide workforce reductions is arbitrary and capricious, and otherwise unlawful, in violation of the APA, 5 U.S.C. § 706(2)(A);

(3) Declare that, under the APA, 5 U.S.C. § 706(2)(C), Defendants have acted in excess of their statutory authority by administering the Social Security program in a manner that violates Section 504's legal mandates;

(4) Enjoin Defendants from continuing to implement or expand the current restructuring plan unless and until they:

    a. Conduct a comprehensive assessment of its impact on individuals with disabilities;

    b. Ensure continuity of access to services and reasonable accommodations for beneficiaries with disabilities; and

    c. Sufficiently staff the office(s) replacing the Office of Civil Rights and Equal Opportunity to ensure that qualified individuals with disabilities are not denied reasonable accommodations and are not discriminated against on the basis of disability, in accordance with 45 C.F.R. § 85.21(b)(3);

(5) Order Defendants to restore meaningful access to Social Security programs for individuals with disabilities, by:

    a.  Reinstating or maintaining in-person services where needed to ensure access;

    b.  Ensuring the availability of reasonable accommodations across all mechanisms of access, including in-person, telephone, and digital systems;

(6) Order Defendants to submit to the Court a corrective action plan within a specified time period, subject to judicial approval, outlining steps they will take to restore compliance with Section 504 and the APA;

(7) Retain jurisdiction to monitor and enforce compliance with the Court's orders, including requiring periodic progress reports from Defendants;

(8) Award Plaintiffs and/or their attorneys reasonable attorneys' fees, costs, and expenses; and

(9) Grant such other and further relief as the Court deems just and proper.

Dated: July 7, 2025                  Respectfully submitted,

_____

Eve L. Hill (DC Bar No. 424896)
Anthony J. May*
**BROWN, GOLDSTEIN & LEVY, LLP**
120 East Baltimore Street, Suite 2500
Baltimore, Maryland 21202
Tel.: (410) 962-1030
Fax: (410) 385-0869
ehill@browngold.com
amay@browngold.com

Regan Bailey (DC Bar No. 465677)
Kathryn Lang (DC Bar No. 479252)
Liam J. McGivern*
**JUSTICE IN AGING**
1444 Eye Street, NW, Suite 1100
Washington, DC 20005
Tel.: (202) 289-6976
rbailey@justiceinaging.org
klang@justiceinaging.org
lmcgivern@justiceinaging.org

*Counsel for Plaintiffs*

*\*Pro Hac Vice*