# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| AMERICAN ASSOCIATION OF PEOPLE WITH DISABILITIES, *et al.*,<br><br>　　　　　Plaintiffs,<br><br>　v.<br><br>FRANK BISIGNANO, *in his official capacity as Commissioner of the Social Security Administration*, *et al.*,<br><br>　　　　　Defendants. | No. 25-cv-977 (APM) |

## DEFENDANTS' MOTION TO DISMISS
## PLAINTIFFS' FIRST AMENDED COMPLAINT

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 3

I.      SSA WORKFORCE REDUCTIONS ........................................................................ 3

II.     SOCIAL SECURITY FRAMEWORK ...................................................................... 4

III.    THIS CASE ............................................................................................................. 6

        A.      Plaintiffs ...................................................................................................... 6

        B.      Alleged Injuries ........................................................................................... 7

        C.      Plaintiffs' Claims and Requested Relief ..................................................... 9

LEGAL STANDARDS ................................................................................................. 10

ARGUMENT ................................................................................................................ 10

I.      The Court Lacks Jurisdiction .............................................................................. 10

        A.      Plaintiffs Lack Article III Standing............................................................ 10

                1.      Individual Plaintiffs ........................................................................ 11

                2.      Organizational Plaintiffs ................................................................. 19

                        a.      Associational standing ......................................................... 19

                        b.      Organizational standing ....................................................... 20

        B.      Federal personnel statutes divest court of subject matter jurisdiction to consider
                claims concerning the employment of SSA employees........................................ 24

        C.      The Social Security Act Precludes General Federal Question Jurisdiction .......... 28

II.     PLAINTIFFS FAIL TO STATE A CLAIM ............................................................. 29

        A.      Administrative Procedure Act (Counts II–III).......................................... 29

                1.      APA review is precluded because SSA's administrative reforms
                        are committed to agency discretion ......................................... 29

                2.      Plaintiffs impermissibly seek wholesale improvement of SSA,
                        rather than review of discrete, final agency action ................... 31

i

a.    SSA's programmatic reforms are not discrete agency action subject to APA review ................................................................. 31

b.    Any discrete agency action is not final for APA purposes ........... 32

3.    Plaintiffs' APA claims fail.......................................................................... 33

a.    Arbitrary and Capricious (Count II) ................................................ 33

b.    In Excess of Statutory Authority (Count III) ................................. 35

B.    Rehabilitation Act (Count I) ................................................................................. 37

1.    The Rehabilitation Act does not provide for disparate-impact liability ................................................................................................. 37

2.    Plaintiffs have not shown a disparate impact............................................. 38

3.    Plaintiffs have not shown a lack of "material access" to any benefit ....... 38

4.    Plaintiffs' sweeping theory of disparate impact would unduly hamstring any meaningful agency reorganization .................................... 39

5.    Because there is no private right of action under the Rehabilitation Act, any disparate impact claim could proceed only under the APA ....... 39

CONCLUSION..................................................................................................................... 44

## TABLE OF AUTHORITIES

**Cases**

*Abril-Rivera v. Johnson*,
    806 F.3d 599 (1st Cir. 2015) ................................................................. 39

*Adams v. City of Indianapolis*,
    742 F.3d 720 (7th Cir. 2014) ............................................................... 38

*AFGE v. Ezell*,
    25-cv-10276-GAO, 2025 WL 470459 (D. Mass. Feb. 12, 2025) ............................ 27

*Alexander v. Choate*,
    469 U.S. 287 (1985) .................................................................... 37, 38, 39

*Alexander v. Sandoval*,
    532 U.S. 275 (2001) ...................................................................... 40, 42

*Am. Council of Blind v. Paulson*,
    463 F. Supp. 2d 51 (D.D.C. 2006), *aff'd*, 525 F.3d 1256 (D.C. Cir. 2008) ............ 43

*Am. Fed'n of Gov't Emps. v. Sec'y of the Air Force*,
    716 F.3d 633 (D.C. Cir. 2013) ............................................................. 24

*Am. Fed'n of Gov't Emps. v. Trump*,
    929 F.3d 748 (D.C. Cir. 2019) .......................................................... 24, 27

*Am. Foreign Serv. Ass'n v. Trump*,
    768 F. Supp. 3d 6 (D.D.C. Feb. 21, 2025) ................................................. 27

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ....................................................................... 10

*Axon Enterprises, Inc. v. FTC*,
    598 U.S. 175 (2023) ....................................................................... 26

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................ 10, 15, 36

*Bennett v. Spear*,
    520 U.S. 154 (1997) ..................................................................... 32, 33

*Block v. Community Nutrition Institute*,
    467 U.S. 340 (1984) ....................................................................... 25

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*,
  419 U.S. 281 (1974) ............................................................................................ 34

*Chamber of Com. of U.S. v. EPA*,
  642 F.3d 192 (D.C. Cir. 2011) .......................................................................... 19

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ............................................................................................ 15

*Clark v. Skinner*,
  937 F.2d 123 (4th Cir. 1991) ................................................................. 42, 43, 44

*Claybrook v. Slater*,
  111 F.3d 904 (D.C. Cir. 1997) .......................................................................... 30

*Cobell v. Kempthorne*,
  455 F.3d 301 (D.C. Cir. 2006) .......................................................................... 31

*Commissioned Officers Ass'n of the U.S. Pub. Health Serv. v. Bunch*,
  No. 21-853, 2022 U.S. Dist. LEXIS 58706 (D.D.C. Mar. 30, 2022) .................. 19

*Cousins v. Sec'y of the U.S. Dep't of Transp.*,
  880 F.2d 603 (1st Cir. 1989) ................................................................. 41, 42, 43

*Davis v. FEC*,
  554 U.S. 724 (2008) ............................................................................................ 18

*Doe v. BlueCross BlueShield of Tenn., Inc.*,
  926 F.3d 235 (6th Cir. 2019) ............................................................................ 37

*Doe v. District of Columbia*,
  796 F. Supp. 559 (D.D.C. 1992) ........................................................................ 43

*Drake v. FAA*,
  291 F.3d 59 (D.C. Cir. 2002) ............................................................................ 30

*Egbert v. Boule*,
  596 U.S. 482 (2022) ............................................................................................ 40

*Elec. Privacy Info. Ctr. v. FAA*,
  892 F.3d 1249 (D.C. Cir. 2018) .................................................................. 20, 22

*Elgin v. Dep't of Treasury*,
  567 U.S. 1 (2012) ................................................................................................ 24

*Encino Motorcars, LLC v. Navarro*,
  579 U.S. 211 (2016) ............................................................................................ 35

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) ................................................................................................ 34

*FCC v. Prometheus Radio Project*,
   592 U.S. 414 (2021) ................................................................................................ 34

*FDA v. All. for Hippocratic Med.*,
   602 U.S. 367 (2024) ........................................................................................... 21, 23

*FDA v. Wages & White Lion Invs.*,
   145 S. Ct. 898 (2025) ......................................................................................... 34, 35

*Fla. Power & Light Co. v. Lorion*,
   470 U.S. 729 (1985) ................................................................................................ 34

*Food & Water Watch, Inc. v. Vilsack*,
   808 F.3d 905 (D.C. Cir. 2015) ............................................................................... 21

*Fornaro v. James*,
   416 F.3d 63 (D.C. Cir. 2005) ................................................................................. 27

*Garcia v. Johanns*,
   444 F.3d 625 (D.C. Cir. 2006) ............................................................................... 38

*Graham v. Ashcroft*,
   358 F.3d 931 (D.C. Cir. 2004) ............................................................................... 26

*Greater New Orleans Fair Hous. Action Ctr. v. HUD*,
   639 F.3d 1078 (D.C. Cir. 2011) ............................................................................. 38

*Grosdidier v. Chairman, Broad. Bd. of Governors*,
   560 F.3d 495 (D.C. Cir. 2009) ............................................................................... 25

*Heckler v. Chaney*,
   470 U.S. 821 (1985) ................................................................................................ 29

*Heckler v. Day*,
   467 U.S. 104 (1984) .......................................................................................... *passim*

*Heckler v. Ringer*,
   466 U.S. 602 (1984) ................................................................................................ 28

*Hunt v. Wash. State Apple Advert. Comm'n*,
   432 U.S. 333 (1977) ................................................................................................ 19

*Indep. Equip. Dealers Ass'n v. EPA*,
    372 F.3d 420 (D.C. Cir. 2004) ................................................................ 31

*J.L. v. SSA*,
    971 F.2d 260 (9th Cir. 1992) ................................................................ 42

*Jesner v. Arab Bank, PLC*,
    584 U.S. 241 (2018) ................................................................ 39, 40

*Kareem v. Haspel*,
    986 F.3d 859 (D.C. Cir. 2021) ................................................................ 10

*Lane v. Pena*,
    518 U.S. 187 (1996) ................................................................ 41, 42, 43

*Lane v. Pena*,
    867 F. Supp. 1050 (D.D.C. 1994) ................................................................ 43

*Lincoln v. Vigil*,
    508 U.S. 182 (1993) ................................................................ 30

*Local 2855, AFGE v. United States*,
    602 F.2d 574 (3d Cir. 1979) ................................................................ 30

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ................................................................ 10, 11, 16

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990) ................................................................ 31, 32

*Maryland v. USDA*,
    No. 25-1248 (L), 2025 WL 1073657 (4th Cir. Apr. 9, 2025) ................................................................ 27

*Mathews v. Eldridge*,
    424 U.S. 319 (1976) ................................................................ 6

*Menoken v. McGettigan*,
    273 F. Supp. 3d 188 (D.D.C. 2017) ................................................................ 38

*Menoken v. Pon*,
    No. 17-5228, 2018 WL 2383278 (D.C. Cir. May 9, 2018) ................................................................ 38

*Modderno v. King*,
    82 F.3d 1059 (D.C. Cir. 1996) ................................................................ 37, 38

*Moya v. U.S. Dep't of Homeland Sec.*,
    975 F.3d 120 (2d Cir. 2020) ................................................................ 42, 44

*Nat'l Treasury Emps. Union v. Trump*,
  770 F. Supp. 3d 1 (D.D.C. 2025) ................................................................ 27

*National Ass'n of the Deaf v. Trump ("NAD")*,
  486 F. Supp. 3d 45 (D.D.C. 2020) .............................................................. 43

*Norton v. S. Utah Wilderness All.*,
  542 U.S. 55 (2004) .................................................................................. 31, 32

*OPM v. AFGE*,
  145 S. Ct. 1914 (2025) ............................................................................ 16, 27

*Pinar v. Dole*,
  747 F.2d 899 (4th Cir. 1984) ...................................................................... 26

*Ricci v. DeStefano*,
  557 U.S. 557 (2009) .................................................................................... 38

*RICU LLC v. HHS*,
  22 F.4th 1031 (D.C. Cir. 2022) ................................................................... 28

*Sai v. DHS*,
  149 F. Supp. 3d 99 (D.D.C. 2015) ..................................................... 41, 42, 43

*Salt Inst. v. Leavitt*,
  440 F.3d 156 (4th Cir. 2006) ....................................................................... 16

*Smith v. City of Jackson*,
  544 U.S. 228 (2005) .................................................................................... 38

*Steenholdt v. FAA*,
  314 F.3d 633 (D.C. Cir. 2003) ..................................................................... 29

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) .................................................................................... 19

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007) .................................................................................... 10

*Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*,
  576 U.S. 519 (2015) .................................................................................... 39

*Thunder Basin Coal Co. v. Reich*,
  510 U.S. 200 (1994) .................................................................................... 26

*Transamerica Mortg. Advisors, Inc. v. Lewis*,
  444 U.S. 11 (1979) ...................................................................................... 41

*TransUnion LLC v. Ramirez,*
   594 U.S. 413 (2021) ............................................................................................ 17, 18

*United States v. Fausto,*
   484 U.S. 439 (1988) ...................................................................................... 24, 25, 26

*Vera Inst. of Just. v. U.S. Dep't of Just.,*
   Case No. 25-cv-1643, 2025 WL 1865160 (D.D.C. July 7,2025) ........................... 16

*Webster v. Doe,*
   486 U.S. 592 (1988) ........................................................................................ 30, 31

*Weinberger v. Salfi,*
   422 U.S. 749 (1975) ........................................................................................ 28, 29

*Wisher v. Coverdell,*
   782 F. Supp. 703 (D. Mass. 1992) ............................................................................ 41

*Ziglar v. Abbasi,*
   582 U.S. 120 (2017) ................................................................................................ 40

**Statutes**

5 U.S.C. § 701 ................................................................................................... 29, 30

5 U.S.C. § 702 ........................................................................................... 29, 40, 43

5 U.S.C. § 704 ......................................................................................................... 31

5 U.S.C. § 706 ................................................................................................... 33, 35

5 U.S.C. §1204 ........................................................................................................ 24

5 U.S.C. § 7105 ....................................................................................................... 24

5 U.S.C. § 7512 ....................................................................................................... 24

5 U.S.C. § 7513 ....................................................................................................... 24

5 U.S.C. § 7701 ....................................................................................................... 24

5 U.S.C. § 7703 ....................................................................................................... 24

5 U.S.C. §§ 7101-7135 ........................................................................................... 24

7 U.S.C. § 608c ....................................................................................................... 25

28 U.S.C. § 1331 ............................................................................ 2, 28, 29

28 U.S.C. § 1346 ................................................................................... 28

29 U.S.C. § 791 .................................................................................... 39

29 U.S.C. § 794 ............................................................................. *passim*

29 U.S.C. § 794a ............................................................................. 40, 41

42 U.S.C. § 402 ...................................................................................... 5

42 U.S.C. § 405 ............................................................................. 5, 6, 28

42 U.S.C. § 423 ...................................................................................... 5

42 U.S.C. § 902 ............................................................................. 3, 29, 31

42 U.S.C. § 1382 ..................................................................................... 5

50 U.S.C. § 403 .................................................................................... 30

Rehabilitation Act Amendments of 1978,
    Pub. L. No. 95-602 § 119, 92 Stat. 2955 ("Section 504") ................................. *passim*

**Rules**

Fed. R. Civ. P. 12 ................................................................................ 10

Fed. R. Civ. P. 15 ................................................................................ 11

Fed. R. Civ. P. 25 ................................................................................. 7

**Regulations**

5 C.F.R. § 351.901 ............................................................................... 24

20 C.F.R. § 404.1503 .............................................................................. 5

20 C.F.R. §§ 404.907–404.921 .................................................................. 5

20 C.F.R. §§ 404.929–404.961 .................................................................. 5

20 C.F.R. §§ 404.967–404.983 .................................................................. 6

20 C.F.R. §§ 416.1400 *et seq.* ................................................................. 5

**Other Authorities**

*Br. for the Resp'ts, Lane v. Pena*,
    518 U.S. 187, 1996 WL 115795 (S. Ct. Mar. 15, 1996) ........................................................... 41

Eric Katz, *Some agencies are walking back planned layoffs, Trump administration says*,
    Government Executive (July 15, 2025), https://perma.cc/T74V-LDBB ............................ 31-32

H.R. Rep. No. 97-588 (1982) .............................................................................................................. 6

Jory Heckman, *SSA chief expects no mass layoffs to get to 'right level of staffing,' calls on
    DOGE to drive 'digital-first' agency*, Federal News Network (May 21, 2025),
    https://perma.cc/JX5F-ZT83 ..................................................................................................... 4

Laurel Wamsley, *Why there's an unexpected surge in people claiming Social Security*, NPR
    (June 12, 2025), https://perma.cc/W3ZG-X2FD ..................................................................... 16

Nicole Ogrysko, *SSA early retirement offers attract fewer than 200 employees*, Federal News
    Network (Dec. 16, 2021), https://perma.cc/NA9V-EDCD. .................................................... 3

SSA, *Disability Benefits*, https://perma.cc/E8U6-8CR5 ............................................................... 5

SSA, *Financial Services Industry Leader Frank Bisignano to be the 18th Commissioner
    of Social Security* (May 7, 2025), https://perma.cc/V4S6-J9W7 ........................................... 4

SSA, *Monthly Statistical Snapshot, May 2025*,
    https://perma.cc/GX67-MZ49 ................................................................................................... 4

SSA, Press Release, *Correcting the Record about Social Security Office Closings*
    (Mar. 27, 2025), https://perma.cc/5NLA-G8QL. ..................................................................... 4

SSA, Press Release, *Social Security Administration Highlights Key Accomplishments
    in the First 100 Days of the Trump Administration* (Apr. 29, 2025),
    https://perma.cc/8LFX-3EYW ................................................................................................... 4

SSA Press Release, Social Security Administration Implements New Anti-Fraud
    Measures to Enhance Telephone Claim Processing (Apr. 12, 2025),
    https://perma.cc/X7G3-SBGY .................................................................................................. 32

SSA, Press Release, *Social Security Announces Workforce and Organization Plans*
    (Feb. 28, 2025), https://perma.cc/W4MD-WTDY  ("Feb. 28 Press Release"). ......... 3, 4, 34, 35

SSA, Press Release, Social Security Continues to Provide Ways for the Public to Request
    Accommodations and File Civil Rights (Program Discrimination) Complaints
    (May 30, 2025), https://perma.cc/KK7D-NP9F ...................................................................... 33

SSA, Press Release, *Social Security Gains Momentum: Meeting Customer Needs Online, on the Phone, and In-Person* (July 23, 2025), https://perma.cc/H663-UAAM ("July 23 Press Release")............................................................................................... 9, 15

SSA, *Social Security Administration (SSA) Annual Data for Field Office Visitors (Daily Average)* (updated March 8, 2024), https://perma.cc/6MH6-AGJT.............................. 15

SSA, *Social Security Administration (SSA) Monthly Data for National 800 Number Network (N8NN) Average Speed to Answer* (Updated July 7, 2025), https://perma.cc/3G6V-GPJ8 ....... 8

SSA, *Social Security performance* (July 2, 2025), https://perma.cc/V72N-SDMD...................... 8

## INTRODUCTION

Plaintiffs, seven disabled individuals and five advocacy groups, filed this suit in April 2025 challenging various reforms the Social Security Administration had recently announced: principally, the closure of two headquarters offices—the Office of Civil Rights and Equal Opportunity (OCREO) and the Office of Transformation (OT)—and plans to reduce the size of the agency's workforce by about 12%, from 57,000 to 50,000. Plaintiffs alleged, in substance, that these reforms would cause benefits to be improperly denied or delayed, and accommodation requests and discrimination complaints to go unresolved. The Court denied preliminary relief, concluding that Plaintiffs "have failed to establish irreparable harm." Mem. Op. & Order at 1, ECF No. 34 ("Op.").

In July 2025, in response to Defendants' motion to dismiss, Plaintiffs amended their complaint. They no longer contend that OCREO and OT were unlawfully closed. They do not assert that accommodation requests or discrimination complaints are going unaddressed. And they abandon their constitutional claims. Instead, they focus on the contention that the planned workforce reductions are unlawful. But their amended complaint fails to correct the fundamental defect in their case—they lack standing, for much the same reasons they could not show irreparable harm.

Plaintiffs' central submission is that, because of the workforce reforms, "SSA no longer performs its core duty: the just and timely administration of Social Security benefits." Am. Compl. ¶ 11, ECF No. 40. But their allegations show no such thing. As the Court explained in denying preliminary relief, no Individual Plaintiff actually "assert[s] any termination or diminution of benefits" caused by the challenged reforms. Op. at 4. Rather, the Individual Plaintiffs "largely complain about matters," like backlogs and customer-service issues, "that predate the administrative actions at issue," *id.* at 3. They thus fail to show that the workforce reductions—rather than preexisting issues or other factors—are the cause of their grievances. And the Organizational Plaintiffs "fare no better," offering "no specifics that would permit the court to find

1

'perceptible impairment'" of their programming or a "direct conflict" with their missions. *Id.* at 5–6 (citation omitted).

To be sure, Plaintiffs are disappointed in the level of customer service they are receiving from the agency—and anyone who has endured a lengthy hold time with, say, their bank or cable provider could likely sympathize. But this phenomenon is not new, and any suggestion otherwise is contradicted by Plaintiffs' own allegations and the public record. In any event, such complaints are plainly insufficient to establish standing, least of all for the sweeping relief that Plaintiffs seek. The Supreme Court has unequivocally held that the Social Security Act does not guarantee that disability claims will be processed on any particular timeline—a principle that applies *a fortiori* when it comes to answering phones. Indeed, on Plaintiffs' theory, a single applicant who waited on hold for longer in June than in January could sue to enjoin the challenged reforms. But in a program that serves over 74 million Americans, such anecdotal frustrations are not cognizable— the federal courts do not sit to resolve one-off customer-service complaints, and the Court should decline to endorse such a boundless theory of standing.

Even if Plaintiffs had standing, they face a pair of other jurisdictional hurdles. First, their challenges to the workforce reductions are precluded. Congress has enacted comprehensive statutory schemes governing the review of federal employment decisions, requiring any challenges to those decisions to be channeled to administrative agencies before judicial review. Those schemes provide no rights to those outside the employment relationship, like Plaintiffs, and therefore bar review here.

Second, given that the crux of Plaintiffs' amended complaint is that the challenged reforms will cause their Social Security benefits to be delayed or denied, their claims "arise under" the Social Security Act. That statute limits judicial review to "final decisions" of the Commissioner issued after an applicant has exhausted administrative remedies, which no Plaintiff claims to have done—and, at the same time, precludes jurisdiction over claims brought under 28 U.S.C. § 1331, like Plaintiffs' here.

Jurisdiction aside, Plaintiffs' claims—one count under the Rehabilitation Act, and two under the Administrative Procedure Act (APA)—also fail on the merits, for reasons explained in detail below.  The Court should decline Plaintiffs' invitation to superintend the administrative reforms at SSA and dismiss this case.

## BACKGROUND

### I.    SSA Workforce Reductions

Chapter 7 of the Social Security Act provides that the Commissioner of the Social Security Administration "shall be responsible for the exercise of all powers and the discharge of all duties of the Administration, and shall have authority and control over all personnel and activities thereof."  42 U.S.C. § 902(a)(4).  The statute likewise provides that the Commissioner "may establish, alter, consolidate, or discontinue such organizational units or components within the Administration as the Commissioner considers necessary or appropriate, except that this paragraph shall not apply with respect to any unit, component, or provision provided for by this chapter."  *Id.* § 902(a)(6).  Thus, SSA has regularly offered voluntary early retirements for certain employees, with anywhere from 3 to 4% of eligible employees taking advantage of such offers in 2012, 2014, 2017, and 2019.[1]

On February 28, 2025, then–Acting Commissioner Lee Dudek announced plans to reduce the SSA workforce in an effort to "implement efficiencies and reduce costs, with a renewed focus on mission critical work."[2]  At that time, SSA set a "staffing target of 50,000, down from the current level of approximately 57,000 employees," with a "focus on functions and employees who do not directly provide mission critical services."  *Id.*  It explained that it "anticipates that much of the staff reductions . . . will come from retirement, VSIP [voluntary separation incentive payments], and resignation," with "[a]dditional reductions . . . from reduction-in-force (RIF) actions that could include abolishment of organizations and positions," although it noted that "[n]o

---

[1] Nicole Ogrysko, *SSA early retirement offers attract fewer than 200 employees*, Federal News Network (Dec. 16, 2021), https://perma.cc/NA9V-EDCD.
[2] SSA, Press Release, *Social Security Announces Workforce and Organization Plans* (Feb. 28, 2025), https://perma.cc/W4MD-WTDY  ("Feb. 28 Press Release").

date has been set when a RIF might begin." *Id*. SSA stated that, together with a reorganization of regional offices,[3] these steps would "prioritize customer service by streamlining redundant layers of management, reducing non-mission critical work, and potential[ly] reassign[ing] employees to customer service positions." *Id*. The agency emphasized that it "is committed to ensur[ing] this plan has a positive effect on the delivery of Social Security services." *Id*.

To date, about half of the originally planned workforce reductions have taken place, all through voluntary means, as Plaintiffs acknowledge. Am. Compl. ¶¶ 6–7. Specifically, on April 29, SSA announced that it had "processed to completion about 350 deferred resignations" and "over 3,000 voluntary separations."[4]

No RIF has been announced, however. On May 7, Frank Bisignano was sworn in as the Senate-confirmed Commissioner of Social Security Administration.[5] Later that month, he stated that he does not intend to conduct a RIF.[6] He explained: "I have no intent to RIF people . . . . If I wake up and find out we can do all our work with 20,000 people—which I can't see that right now—we'll be 20,000. If I wake up and say, 'We need 80,000,' we'll be 80,000. I've got to determine what the right staffing level is." *Id*.

## II.    Social Security Framework

More than 74 million Americans receive Social Security benefits of some kind.[7] Some 55 million receive retirement benefits, generally available starting at age 62 to those who worked and

---

[3] SSA also announced that its "regional structure consisting of 10 offices . . . is no longer sustainable," so will be "reduce[d] . . . down to four regions[,]" and that the organizational structure at Headquarters would likewise be modified. Feb. 28 Press Release. In response to concerns raised in certain press accounts, SSA subsequently clarified that it is not permanently closing any local field offices. *See* SSA, Press Release, *Correcting the Record about Social Security Office Closings* (Mar. 27, 2025), https://perma.cc/5NLA-G8QL.

[4] SSA, Press Release, *Social Security Administration Highlights Key Accomplishments in the First 100 Days of the Trump Administration* (Apr. 29, 2025), https://perma.cc/8LFX-3EYW.

[5] SSA, *Financial Services Industry Leader Frank Bisignano to be the 18th Commissioner of Social Security* (May 7, 2025), https://perma.cc/V4S6-J9W7.

[6] Jory Heckman, *SSA chief expects no mass layoffs to get to 'right level of staffing,' calls on DOGE to drive 'digital-first' agency*, Federal News Network (May 21, 2025), https://perma.cc/JX5F-ZT83.

[7] SSA, *Monthly Statistical Snapshot, May 2025*, https://perma.cc/GX67-MZ49.

paid Social Security taxes for at least 10 years.  42 U.S.C. § 402(a).  Nearly 6 million receive survivor benefits, available to certain relatives of deceased workers who paid Social Security taxes. *Id*. § 402(b)–(h).  About 8 million receive disability insurance ("SSDI") benefits, available to workers who have paid Social Security taxes but "whose disability prevents them from pursuing gainful employment." *Heckler v. Day*, 467 U.S. 104, 105–06 (1984) (citing 42 U.S.C. § 423). And about 7 million receive supplemental security income ("SSI"), available to certain low-income aged, blind, and disabled persons without regard to work history.  42 U.S.C. § 1382. Although Plaintiffs' amended complaint refers to each type of benefit at least in passing, they focus on SSDI. *See* Am. Compl. ¶¶ 73–124 (explaining that each of the seven Individual Plaintiffs is either receiving, applying for, or appealing the denial of SSDI).[8]

Given this number of beneficiaries, the "disability programs administered [by SSA] are of a size and extent difficult to comprehend." *Day*, 467 U.S. at 106 (citation omitted).  To "facilitate [their] orderly and sympathetic administration," Congress and the Commissioner "have established an unusually protective four-step process for the review and adjudication of disputed claims." *Id*.

- First, after SSA confirms that certain threshold eligibility requirements are met, an application is referred to a state agency, known as the Disability Determination Service (DDS), for an initial determination of "whether the claimant has a disability" that prevents gainful employment and when "the disability began." *Id*. (citing 20 C.F.R. § 404.1503). This process may be quite involved, as the agency will obtain medical records and other information related to the claimant's impairments and ability to work, and may require a special medical examination.[9]

- "Second, if the claimant is dissatisfied with that determination, he may request reconsideration," which "involves a de novo" review "by the state agency, and in some cases a full evidentiary hearing" with "[a]dditional evidence." *Id*. at 106–07 (citing 20 C.F.R. §§ 404.907–404.921).

- "Third, if the claimant receives an adverse reconsideration determination, he is entitled by statute to an evidentiary hearing and to a de novo review by an Administrative Law Judge (ALJ)." *Id*. at 107 (citing 42 U.S.C. § 405(b); 20 C.F.R. §§ 404.929–404.961).

---

[8] One Plaintiff (Wilshawn Tiller) also alleges that he is appealing the denial of an application for SSI, Am. Compl. ¶¶ 121, 123, which has an administrative appeal and exhaustion scheme analogous to SSDI, *see Day*, 467 U.S. at 106; 20 C.F.R. §§ 416.1400 *et seq.*

[9] SSA, *Disability Benefits*, at 2, https://perma.cc/E8U6-8CR5.

- Fourth, "if the claimant is dissatisfied with the decision of the ALJ, he may take an appeal to the Appeals Council." *Id*. (citing 20 C.F.R. §§ 404.967–404.983).

"These four steps exhaust the claimant's administrative remedies. Thereafter, he may seek judicial review in federal district court." *Id*. (citing 42 U.S.C. § 405(g)).

The Supreme Court has held that these "administrative procedures fully comport with due process." *Mathews v. Eldridge*, 424 U.S. 319, 349 (1976). It has also held that "it would be an unwarranted judicial intrusion into this pervasively regulated area for federal courts to issue injunctions imposing deadlines with respect to future disability claims." *Day*, 467 U.S. at 119. "[D]elays" in this process "are not a recent development," and date back to the 1970s. *Id*. at 111 n.16. But "Congress repeatedly has been made aware of the long delays associated with resolution of disputed disability claims," yet "repeatedly has considered and expressly rejected suggestions that mandatory deadlines be imposed to cure that problem," *id*. at 111, wary that "strict time limits . . . could result in incorrect determinations because time was not available to . . . reach well-reasoned decisions in difficult cases," *id*. at 115 (quoting H.R. Rep. No. 97-588, at 19–20 (1982)). Thus, it is not for "courts . . . to impose the very deadlines [Congress] repeatedly has rejected." *Id*. at 118.

### III.   This Case

#### A.  Plaintiffs

Plaintiffs are five advocacy groups and seven individuals either receiving SSDI benefits or at various stages of the application or appeals process.

Receiving Benefits:

- Elizabeth Rouse originally alleged that she "receives SSDI" benefits "[t]oday," but that "[m]anaging [these] benefits" is a "challenge." Compl. ¶¶ 117–18. She still "currently receives SSDI." Am. Compl. ¶ 74.

- Martha Hazen originally alleged that she lost SSDI benefits in 2023, when she obtained full-time employment, a decision she does not allege was erroneous, Compl. ¶ 127; she "reapplied for SSDI" "in February 2024," was "denied in September [2024]," and was "navigat[ing] the appeals process," *id*. That appeal appears to have been resolved in her favor: While Ms. Hazen now "[f]ear[s]" that the fact that her SSA account does not bear her married name "could interfere with her benefits," Am. Compl. ¶ 98, she does not claim to not be receiving them.

6

Pending Applications:

- Deja Powell originally alleged that she "applied for SSDI benefits in August 2024," Compl. ¶ 152, and that her application was "in the disability determination phase" before the state agency, *id*. ¶ 157. Her application remains "in the disability determination phase" before the state agency. Am. Compl. ¶ 117.

- Merry Schoch originally alleged that she lost SSDI benefits in "August 2024" "because she had been working full-time," a decision she does not claim was erroneous, Compl. ¶ 133; she reapplied in "December 2024," "work[ing] with her granddaughter to complete the paperwork," *id*. ¶ 135. She now alleges that she is "seeking help completing a vision impairment questionnaire required for her SSDI application," Am. Compl. ¶ 92, and has been "forced [to] rely upon the assistance of others, hoping that her granddaughter will be available to help her," as before. *Id*. ¶ 94.

Pending Administrative Appeals:

- William Weiss originally alleged that he lost SSDI benefits in "February 2024" due to "excess earnings from his part-time job" and was assessed an overpayment, Compl. ¶ 146, and that his appeal of that decision was pending, *see id*. ¶ 148. He now alleges that, in "May 2025, SSA reinstated [his] monthly benefits at a reduced amount, and reduced, but did not eliminate, his overpayment[]" assessment. Am. Compl. ¶ 110. His appeal remains pending. *See id.* ¶ 111.

- Wilshawn Tiller originally alleged that he "applied for SSI and SSDI" in "November 2023," Compl. ¶ 158, was "told his SSI application was denied" during a "February 2025" interview, *id*. ¶ 162, and that he had "no recourse but to appeal," *id*. He now clarifies that during that February 2025 meeting he was told that "his application for SSI benefits would be denied, but that his application for SSDI benefits would continue to be processed." Am. Compl. ¶ 122. He "received a formal denial letter" for his SSI application in "May 2025," and had already submitted an appeal. *Id*. ¶ 123. He does not indicate the status of his SSDI application.

- Marnie Garvey, a new Plaintiff, alleges that she lost SSDI benefits in April 2025 and was assessed an overpayment. Am. Compl. ¶ 80. Her appeal is pending. *Id*. ¶¶ 82–83.[10]

### B. Alleged Injuries

No Plaintiff "assert[s] any termination or diminution of benefits" caused by the challenged reforms, as the Court previously noted. Op. at 4.

Nor do Plaintiffs appear to contend that processing times have worsened. They originally alleged that, in 2024, the average processing time was "230 days" for initial disability determinations, "seven months" for reconsideration requests, and "345 days" for ALJ hearings.

---

[10] Treva Olivero passed away on May 25, Pls.' Statement Noting the Death of Treva Olivero at 1, ECF No. 36 (stating that this action proceeds "only to or against the remaining parties" (quoting Fed. R. Civ. P. 25(a)(2))), and she is not named in the amended complaint.

Compl. ¶¶ 39–41.  But their amended complaint alleges no increase in these average processing times—and, in fact, recent SSA data shows improvement:  For initial disability claims, between the end of FY 2024 and July 2, 2025, the number of initial disability claims dropped from 1,177,974 to 956,912, and the average processing time decreased from 231.1 to 229.9 days.[11]

And while Plaintiffs raise anecdotal customer-service complaints, such as long hold times or waits for office appointments, they previously acknowledged that these problems were preexisting and longstanding—as they put it, "persistent service delays . . . rooted in chronic staffing shortages and an outdated technology infrastructure."  Compl. ¶ 54.  Ms. Rouse, for example, alleged that, even before "staff cuts kick[ed] in," she "often wait[ed] on hold for an hour or longer," and "only 60 to 70 percent of her calls [we]re even answered."  *Id.* ¶ 119.  Ms. Hazen alleged that, while appealing her September 2024 denial of SSDI, *id.* ¶ 127, she "regularly spen[t] up to 90 minutes on hold," *id.* ¶ 129, and "waited between two and three hours for assistance" at a field office, *id.* ¶ 128, where she "observed the office guard turning away members of the public seeking assistance," *id.*  And Mr. Tiller alleged that when calling the National 800 Number in 2024, "wait times were upwards of an hour," *id.* ¶ 159, and though he arrived at a field office "before the office opened," he "found the line already spilling out the door," and the next day, it "stretched down the block," *id.* ¶ 160.

Yet Plaintiffs no longer appear to contend that these response times have worsened on average.  They previously alleged, for example, that the "[s]peed of answer" on the 800 number was "28 minutes" in 2024, *id.* ¶ 54(d), but had—"[o]n information and belief"— "significantly deteriorated in 2025," *id.* ¶ 55.  That allegation is gone from their amended complaint—and SSA data shows that, in fact, the speed of answer has improved significantly, dropping below 12 minutes by May 2025.[12]  Indeed,   stemming from "the implementation of new telephone technology on the National 800 Number and in SSA field offices, along with process engineering

---

[11] SSA, *Social Security performance* (July 2, 2025), https://perma.cc/V72N-SDMD.

[12] SSA, *Social Security Administration (SSA) Monthly Data for National 800 Number Network (N8NN) Average Speed to Answer* (Updated July 7, 2025), https://perma.cc/3G6V-GPJ8 (reflecting an average speed to answer in May 2025 of 695 seconds, or 11.58 minutes)

and better resource alignment," to "expand[] its capacity" and "improve[] service to the American people."[13]

Moreover, as before, "[n]o Individual Plaintiff . . . claims to have recently tried to file a discrimination complaint or request an accommodation from SSA," Op. at 5, whether related to their customer-service concerns or otherwise.

## C. Plaintiffs' Claims and Requested Relief

After the Court denied preliminary relief and Defendants moved to dismiss, Plaintiffs amended their complaint. They continue to press only three claims—namely, that the workforce reductions (1) violate the Rehabilitation Act, (2) exceed statutory authority, and (3) are arbitrary and capricious, in violation of the APA. Am. Compl. ¶¶ 166–201. The relief they request, however, remains broad. In addition to declaratory relief, they seek an injunction requiring Defendants to:

- Cease "implement[ing] or expand[ing] the current restructuring plan unless and until" Defendants

  o "[c]onduct a comprehensive assessment of its impact on individuals with disabilities,"

  o take steps to "[e]nsure continuity of access to services and reasonable accommodations for beneficiaries with disabilities,"

  o and "[s]ufficiently staff the office(s) replacing [OCREO] to ensure that qualified individuals with disabilities are not denied reasonable accommodations and are not discriminated against on the basis of disability . . . .";

- "[R]estore meaningful access to Social Security programs for individuals with disabilities, by"

  o "[r]einstating or maintaining in-person services where needed to ensure access" and

  o "[e]nsuring the availability of reasonable accommodations across all mechanisms of access, including in-person, telephone, and digital systems";

- "[S]ubmit to the Court a corrective action plan within a specified time period, subject to judicial approval, outlining steps they will take to restore compliance" with the Rehabilitation Act and the APA; and

- Submit "periodic progress reports" so that the Court may "monitor and enforce compliance with [its] orders."

---

[13] SSA, Press release, *Social Security Gains Momentum: Meeting Customer Needs Online, on the Phone, and In-Person* (July 23, 2025), https://perma.cc/H663-UAAM ("July 23 Press Release").

Am. Compl., Relief Sought ¶¶ 4-7.

## LEGAL STANDARDS

A motion to dismiss under Rule 12(b)(1) challenges the Court's subject matter jurisdiction. The plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992), and in making this determination the Court "may consider material outside the pleadings," *Kareem v. Haspel*, 986 F.3d 859, 866 n.7 (D.C. Cir. 2021).

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The court considers "the complaint in its entirety, as well as . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). While the Court accepts well-pleaded factual allegations as true, "mere conclusory statements" and "legal conclusion[s] couched as . . . factual allegation[s]" are "disentitle[d] . . . to [this] presumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 681 (2009) (citation omitted).

## ARGUMENT

### I.    The Court Lacks Jurisdiction

#### A.    Plaintiffs Lack Article III Standing

Plaintiffs' lack of standing resolves this case at the start, as no Plaintiff alleges a cognizable harm caused by the challenged reforms. *See Lujan*, 504 U.S. at 560. The Court's conclusions at the preliminary injunction stage effectively confirm as much.

As the Court explained, no Individual Plaintiff actually "assert[s] any termination or diminution of benefits" caused by the challenged reforms. Op. at 4. Rather, they "largely complain about matters," like backlogs and customer-service issues, "that predate the administrative actions at issue," *id*. at 3. And the Organizational Plaintiffs "fare no better," offering "no specifics that

would permit the court to find 'perceptible impairment'" of their programming or a "direct conflict" with their missions.  *Id*. at 5–6.

These conclusions, though reached in the context of determining whether any claimed harm was irreparable, show that Plaintiffs have not sufficiently alleged any cognizable harm caused by the challenged reforms at all.  The amended complaint does not cure this fundamental defect.

## 1.    Individual Plaintiffs

To establish Article III standing, a plaintiff must plausibly allege the familiar elements of an injury in fact, causation, and redressability.  *See Lujan*, 504 U.S. at 561.  The Individual Plaintiffs fail at each step.

As an initial matter, the allegations in the amended complaint concerning events that postdate the filing of this case are not properly before the Court.  While Plaintiffs responded to Defendants' prior motion to dismiss with what they characterized as an "amended" complaint, that pleading was also a "supplemental" complaint—that is, one "setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented."  Fed. R. Civ. P. 15(d).  Such a complaint may not be filed without leave, *see id.* ("the court may, on just terms, permit" a supplemental complaint "[o]n motion and reasonable notice"), which was not sought.  In any event, even if considered, the newer allegations do not rescue Plaintiffs' standing.

To start, the Individual Plaintiffs identify no cognizable injury in fact.  Indeed, what is *not* alleged in their amended complaint speaks volumes.

As noted, no Individual Plaintiff "assert[s] any termination or diminution of benefits" caused by the workforce reductions.  Op. at 4.  On the contrary, two of the Individual Plaintiffs make clear in the amended complaint that they are now receiving *more* benefits than when this suit was filed:  After an apparently successful appeal, Ms. Hazen is now receiving SSDI, *see supra* p. 6 (citing Am. Compl. ¶ 98), and Mr. Weiss's benefits have been reinstated at a reduced amount, *see id.* p. 7 (citing Am. Compl. ¶ 110).  Thus, the administrative process seems to be working as

intended, illustrating why Congress has sharply limited jurisdiction in Social Security cases. *See infra* Part I.C.

Nor do Plaintiffs claim that the time it takes for disability applications to be resolved, or for denials to work their way through the administrative process, has worsened. For good reason, it seems, as at least some of those processing times have recently improved. *See supra* p. 8 & n.11.

And Plaintiffs do not contend that customer-service metrics have worsened, at least on average. While they initially made such an allegation, it was based only on "information and belief," and it is gone from their amended complaint. *See supra* p. 8 (citing Compl. ¶ 55). Again, this is perhaps for good reason, as these metrics, too, have seen improvement along many dimensions, including speed to answer on the 800 number. *See supra* p. 8–9 & nn.12–13.

Thus, the "access crisis" that Plaintiffs posit, Am. Compl. ¶ 9, is not reflected in any concrete loss of Social Security benefits or delays in their receipt. Instead, it appears to be based on the anecdotal customer-service experiences of the 7 Individual Plaintiffs—an infinitesimally tiny fraction of the 47 million beneficiaries that Social Security serves. Even so, Plaintiffs fail to show (1) that these experiences are meaningfully worse than before the workforce reductions were implemented; (2) that if so, this was caused by the workforce reductions, rather than preexisting issues or other factors; and (3) that, in any event, such complaints are cognizable to begin with.

**1.** First, Plaintiffs have not shown that their customer-service experiences have meaningfully deteriorated. Rather, from the start of this case, their papers have repeatedly acknowledged that such complaints are longstanding and predate the workforce reductions—in short, "persistent service delays . . . rooted in chronic staffing shortages and an outdated technology infrastructure." Compl. ¶ 54.

**a.** Plaintiffs focus heavily on telephone services, one of three so-called "primary access channels" they find fault with, Am. Compl. ¶ 37, especially when it comes to hold times. But they previously acknowledged, for instance, that even before "staff cuts kick[ed] in," Ms. Rouse "often wait[ed] on hold for an hour or longer," and "only 60 to 70 percent of her calls [we]re even

answered." Compl. ¶ 119. Likewise, while appealing her September 2024 denial of SSDI, *id.* ¶ 127, Ms. Hazen "regularly spen[t] up to 90 minutes on hold," *id.* ¶ 129.

Many hold times Plaintiffs now complain about are roughly equivalent or even shorter. *See* Am. Compl. ¶ 108 ("wait[ed] on hold for about 45 minutes"); *id.* ¶ 92 ("waited on hold for over an hour"); *id.* ¶ 77 ("spent over an hour on the phone waiting for, *and . . . speaking to* a representative" (emphasis added)); *id.* ¶ 83 ("wait[ed] on hold for" an unspecified number of "hours," presumably collectively, for *two* calls). A few are longer, but appear to have taken place before the workforce reductions took effect, or the timing is unspecified or ambiguous. *See* Am. Compl. ¶¶ 114–15 ("in February 2025, Ms. Powell did not receive a payment"; "[c]oncerned, she contacted the 800 Number," but waited "on hold for five and a half hours"); *id.* ¶ 91 ("[i]n one" unspecified "instance, she remained on the line for nearly two hours"). And in the rare longer instances where a later date is specified, no facts are pleaded to show that these wait times are longer than the relevant wait times Plaintiff experienced before the workforce reductions were implemented. *See, e.g.*, Am. Compl. ¶¶ 81, 83 (alleging hold times of about three and four hours, but no prior history). It is of course Plaintiffs' burden to plead such factual material, and conclusory assertions such as "SSA's telephone services are increasingly difficult to reach" and "delays have lengthened since early 2025," Am. Compl. ¶ 91, fall short of meeting it.

**b.** The same is true with respect to field office visits, the second "channel" of communication that Plaintiffs address. Plaintiffs previously acknowledged that field office wait times were long well before the workforce reductions. In June 2024, for example, Mr. Tiller arrived at a field office "before the office opened," but "found the line already spilling out the door," and the next day, it "stretched down the block." Compl. ¶ 160. And while appealing her September 2024 denial of SSDI, *id.* ¶ 127, Ms. Hazen "visited her local SSA office five times," "opted to arrive before the office opened," and "waited between two and three hours for assistance"—and, in addition, "observed the office guard turning away members of the public seeking assistance." *Id.* ¶ 128.

The few more recent complaints about service at field offices that Plaintiffs now lodge are, if anything, more modest.  *See* Am. Compl. ¶ 75 (at a field office, "she has encountered long waits, often 40 minutes to over an hour"); *id.* ¶¶ 82, 84 (on April 22, "a security guard prevented Ms. Garvey from entering the [field] office because she had not made an appointment in advance," although on June 9, the "security guard allowed [her] to enter the office, where she met with an SSA staff member," seemingly without an appointment).

**c.** So too with online systems, the third of Plaintiffs' alleged "channels" of communication. Plaintiffs' complaints about the "*my* Social Security" portal—a website where applicants and beneficiaries can take care of various administrative tasks, like checking the status of an application—long predate the workforce reductions.  Even before "staff cuts kick[ed] in," for example, Ms. Rouse "prefer[red] calling SSA over using its difficult-to-navigate online portal." Compl. ¶ 119.  And in appealing her September 2024 denial of SSDI, *id.* ¶ 127, Ms. Hazen found that "using SSA.gov has proven unreliable," *id.* ¶ 129.

Plaintiffs' new allegations again show no recent deterioration in this system.  Ms. Powell states that she "cannot navigate SSA's online platform without consistent and reliable screen-reader compatibility," Am. Compl. ¶ 119, but she does not supply the dates of any such difficulties, or even allege that screen-reader compatibility has changed at all.  Ms. Rouse states that, in June, she "attempted to find an appointment-making mechanism" on the *my* Social Security portal, but the "automated response tool produced little to no helpful information to do so," *id.* ¶ 76; however, she does not allege that the portal offered this function (or better instructions) before the workforce reductions.  And while Ms. Schoch relates an episode in late March which she "encountered an error message that prevented her from using her online account," she does not specify the date, the error message, whether she had ever run into this problem before, or whether she attempted to try again, instead declaring the "digital systems completely unusable" based on this single episode. *Id.* ¶ 93.  This again falls short of Plaintiffs' burden, particularly given their prior allegations about the system's previous "unreliab[ility]."  Compl. ¶ 129.  Notably, neither Ms. Schoch nor any other Plaintiff claims to have been affected by one of the alleged "severe digital outages" supposedly

affecting the portal on four particular days in March and April.  Am. Compl. ¶ 53.  And in July, SSA "eliminat[ed] the longstanding scheduled downtime of 29 hours a week for *my* Social Security," increasing access.  *See* July 23 Press Release.

**2.**  Even if Plaintiffs had shown a deterioration in customer service, they fail to show that it was caused by the workforce reductions.  To begin, that their grievances generally predate the workforce reductions—which were announced on February 27, and necessarily took time to implement—is powerful evidence that those reforms were not the cause of their alleged injuries.  But timing aside, Plaintiffs offer nothing besides conjecture to suggest that their customer-service complaints are attributable to the workforce reductions.  Any such assumption necessarily relies on a "highly attenuated chain of possibilities," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013) —for example, that (1) a former SSA employee (2) who would not have left the agency but for the offer of voluntary retirement (3) worked in one of the 1,230 SSA field offices[14] closest to one of the 7 Individual Plaintiffs' homes, (4) leaving that field office so short-staffed that (5) when the Individual Plaintiff decided to make an office visit, rather than take care of her issue by phone or online, (6) the wait time was materially longer than before.

The length of that chain alone is enough to reject the theory.  But Plaintiffs also plainly fail to establish certain links in it.  In arguing that "field office capacity" has been "decimated," they claim that "[n]early 40 field offices nationwide have lost 25 percent or more of their staff," and "[s]everal offices have lost more than 50 percent of their staff."  Am. Compl. ¶ 49.  But again, there are approximately 1,230 SSA field offices, and Plaintiffs nowhere allege that any of the 40-odd offices they cite is the local field office of any Individual Plaintiff—and a comparison of the office locations, *see* ECF No. 29-7, Ex. 2 (spreadsheet titled "Field Offices with 25% or More Losses"), with Plaintiffs' home addresses, *see* Am. Compl. p. 1 (caption), shows they are not.

Plaintiffs' causation theory also disregards "obvious alternative explanation[s]," *Twombly*, 550 U.S. at 567, which is an independent reason to reject it.  As has been widely reported, there

---

[14] SSA, *Social Security Administration (SSA) Annual Data for Field Office Visitors (Daily Average)* (updated March 8, 2024), https://perma.cc/6MH6-AGJT.

was an 18% rise in Social Security claims during the first half of this year[15]—a spike that could readily account for the customer-service issues Plaintiffs complain about.

On Plaintiffs' view of causation, virtually any American could sue over administrative cuts at any federal agency if they could imagine any possible downstream effect on customer service. The Supreme Court recently invoked *Clapper* to reject a similarly attenuated theory of standing. *See OPM v. AFGE*, 145 S. Ct. 1914 (2025) (mem.) (staying injunction granted on the theory that nonprofit organizations suffered downstream injury from RIFs affecting public services) (citing *Clapper*). As this Court has noted, where the Supreme "Court has spoken in a case substantially the same as this one," "[t]his court must listen." *Vera Inst. of Just. v. U.S. Dep't of Just.*, Case No. 25-cv-1643, 2025 WL 1865160, at *11 (D.D.C. July 7,2025), *appeal filed*, No. 25-5248 (D.C. Cir. July 10, 2025).

**3.** In any event, the sorts of customer-service issues that Plaintiffs complain of are not cognizable harms to begin with. To establish an Article III injury, a plaintiff must "allege[] an invasion of a legal right" protected by statute or the common law. *Salt Inst. v. Leavitt*, 440 F.3d 156, 159 (4th Cir. 2006); *see Lujan*, 504 U.S. at 578 (the injury "required by Art. III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing" (citation omitted)). But here, even assuming the Social Security Act entitles eligible disability applicants to monetary benefits, it does not do so on any particular time frame. On the contrary, the Supreme Court has explained that Congress "repeatedly has considered and expressly rejected suggestions that mandatory deadlines be imposed to cure [the] problem" of "long delays associated with resolution of disputed disability claims," *Day*, 467 U.S. at 111—and it is not for "courts . . . to impose the very deadlines [Congress] repeatedly has rejected," *id.* at 118. This is all the more so when it comes to alleged delays in, say, fielding phone calls from applicants. While the Social

---

[15] Laurel Wamsley, *Why there's an unexpected surge in people claiming Social Security*, NPR (June 12, 2025), https://perma.cc/W3ZG-X2FD ("In a statement to NPR, the Social Security Administration wrote that it had identified 'three key reasons' that people are filing claims now: a peak of retiring Baby Boomers; a rule change that increases Social Security benefits for some people with pensions; and a bump in people who had been collecting spousal benefits re-filing to claim a higher benefit based on their own records.").

Security Act may provide an entitlement to benefits, it does not provide an entitlement to any particular level of customer service.

Moreover, even if Plaintiffs had plausibly alleged a statutory right to a particular level of customer service, that would not establish sufficient concreteness for Article III purposes. "[A]n injury in law is not an injury in fact," and "Article III standing requires a concrete injury even in the context of a statutory violation." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 426-27 (2021) (citation omitted). "[M]onetary harm[]" would qualify as an "obvious" concrete injury, *id.* at 425, but Plaintiffs here show no denial or delay in benefits. And while some "intangible harms" can also be concrete, these generally must be "injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." *Id.*

Plaintiffs do not connect their commonplace customer-service grievances to any such historical tradition. Their own allegations illustrate the point. Take Ms. Hazen, who principally complains about long hold times, claiming that her "customer service experiences demonstrate the effects of SSA's dramatic cuts in personnel: longer wait times, less experience to share, and more confusion for beneficiaries." Am. Compl. ¶ 100. But Ms. Hazen appears to be receiving benefits, following a successful administrative appeal. *See supra* p. 6 (citing Compl. ¶ 127, Am. Compl. ¶ 98). Her "fear" is simply that her SSA account does not bear her married name, which she worries "*could* interfere with her benefits," Am. Compl. ¶ 98 (emphasis added). Such a fear of "future harm" that "does not materialize" does not amount to concrete Article III injury. *See TransUnion*, 594 U.S. at 436–37.

The experience of Ms. Rouse is similar. She likewise complains of long wait times, alleging a deprivation of "timely support." Am. Compl. ¶ 78. But she, too, is currently receiving benefits. *See supra* p. 6 (citing Am. Compl. ¶ 74). Her principal grievance is that, after spending "over an hour" on the phone, an SSA representative "could not answer her questions" "about two proof of employment forms she needed to submit to manage her benefits," and instead "made an appointment" for her to "have her questions answered in person at her local field office." Am. Compl. ¶ 77. This, she says, "delayed a process that, *if* mishandled, *would* jeopardize her benefits."

17

*Id.* (emphasis added).  Again, such unmaterialized fears do not constitute a cognizable injury.  *See TransUnion*, 594 U.S. at 436–37.

Anecdotal customer-service complaints from a handful of beneficiaries would be an exceedingly thin reed upon which to rest the sweeping injunctive relief that Plaintiffs seek.  In a program that serves more than 74 million Americans, where Congress has repeatedly declined to require that applications be resolved on a particular time frame, *see Day*, 467 U.S. at 119, such commonplace customer-service issues do not amount to cognizable harm.  That is particularly so in the absence of any concrete denial of benefits—a denial that would itself be subject to administrative appeal and judicial review.

**4.**  Finally, Plaintiffs fail to show that the requested relief would redress their alleged injuries.  Indeed, there is a considerable disconnect between central aspects of the injunction they seek and their claims of harm.  *See Davis v. FEC*, 554 U.S. 724, 734 (2008) (a plaintiff must show standing "for each form of relief" sought).  Although Plaintiffs no longer contend that the closure of OCREO was unlawful, they ask the Court to enjoin Defendants to, among other things:

- "[s]ufficiently staff the office(s) replacing [OCREO] to ensure that qualified individuals with disabilities are not denied reasonable accommodations and are not discriminated against on the basis of disability";

- "[e]nsure continuity of access to services and reasonable accommodations for beneficiaries with disabilities"; and

- "[e]nsur[e] the availability of reasonable accommodations across all mechanisms of access."

Am. Compl., Relief Sought ¶¶ 4-5.  But as the Court previously found, no Individual Plaintiff "describe[s] any injury arising from the dissolution of OCREO."  Op. at 5.  Nor does any Individual Plaintiff "claim[] to have recently tried to file a discrimination complaint or request an accommodation from the SSA."  *Id.*  Conspicuously, Plaintiffs' amended complaint still does not allege that any Individual Plaintiff has been "impacted . . . personally" by OCREO's closure, *id.*, or filed a discrimination complaint or accommodation request.  They plainly lack standing to seek an injunction along these lines.

### 2.    Organizational Plaintiffs

The Organizational Plaintiffs "fare no better."  Op. at 5.  To the extent they sue on behalf of their members, they do not identify any with standing.  And to the extent they sue on their own behalf, they show no "perceptible impair[ment]" to their programs or "direct conflict" with their mission, as the Court has found.  Op. at 6 (citation omitted).

### a.    Associational standing

An organization has standing to sue on behalf of its members when (1) "its members would otherwise have standing to sue in their own right"; (2) "the interests it seeks to protect are germane to the organization's purpose"; and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).  Three Organizational Plaintiffs—NFB, NCPSSM, and MSAC—claim associational standing, Am. Compl. ¶ 171, but each fails at the first step, as they fail to identify any individual member with standing in his own right.

"When a [plaintiff] claims associational standing, it is not enough to aver that unidentified members have been injured.  Rather, the [plaintiff] must specifically 'identify members who have suffered the requisite harm.'"  *Commissioned Officers Ass'n of the U.S. Pub. Health Serv. v. Bunch*, No. 21-853, 2022 U.S. Dist. LEXIS 58706, at *10-11 (D.D.C. Mar. 30, 2022) (quoting *Chamber of Com. of U.S. v. EPA*, 642 F.3d 192, 199 (D.C. Cir. 2011) (quoting, in turn, *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009))).  Here, the only organization attempting to do so is NFB, *see* Am. Compl. ¶¶ 151–53, so the claims of the other organizations fail at the outset.[16]  And while

---

[16] For NCPSSM, no declarations were submitted by any member, just a declaration from the President of the organization, Max Richtman, who does not aver any personal injury.  *See* Decl. of Max Richtman, ECF No. 2-12 ("Richtman Decl.").  So too with MSAC, whose Executive Director, Ms. Villers, alleges no personal injury, only that she is "devoting significant time with staff" discussing how to respond to recent changes at SSA.  *See* Decl. of Carolyn Villers, ¶¶ 16-17, ECF No. 12 ("Villers Decl.").  The same is true of the second declarations submitted by Mr. Richtman and Ms. Villers.  *See* Decl. of Max Richtman, ECF No. 29-8 ("2d Richtman Decl."); Decl. of Carolyn Villers, ECF No. 29-11 ("2d Villers Decl.").

NFB met this threshold obligation, none of its members has standing, for all the same reasons the Individual Plaintiffs lack standing.  *See supra* pp. 10–18.[17]

Thus, Plaintiffs' theory of associational standing fails.

### b.  Organizational standing

Plaintiffs' organizational standing theory is equally flawed, as the Court concluded after careful review of the timely submitted declarations of the named Organizational Plaintiffs—NFB, NCPSSM, and Deaf Equality.  *See* Op. at 5 (considering even the declarations "uncited" in Plaintiffs' preliminary injunction papers).  As the Court explained, while NFB, for example, alleges a "diver[sion] of resources," it "provides no specifics that would permit the court to find 'perceptible impairment'" of the organization's programs or a "'direct conflict'" with its mission. *Id*. at 6.  And NCPSSM and Deaf Equality's "declarations are similarly lacking in detail and support."  *Id*. at 6 n.4  (AAPD and MSAC "did not submit declarations with Plaintiffs' opening [preliminary injunction] brief.").

The Court of course "decline[d] to consider" at the preliminary injunction stage "any declaration submitted by Plaintiffs for the first time with their reply."  *Id.* at 3 n.2.  But neither the four declarations belatedly submitted by NFB, AAPD, and MSAC, nor the allegations in the amended complaint, change the analysis.

The D.C. Circuit has held that, to "establish organizational standing, a party must show that it suffers [1] 'a concrete and demonstrable injury to its activities,' distinct from 'a mere setback to the organization's abstract social interests,'" and that there is "[2] a direct conflict between the defendant's conduct and the organization's mission.'"  *Elec. Priv. Info. Ctr. v. FAA*, 892 F.3d 1249, 1255 (D.C. Cir. 2018) *("EPIC")* (citation modified); *see also* Op. at 5.  With respect to the first prong, to show the requisite injury, "an organization must allege that the defendant's conduct

---

[17] NFB alleges that one member did not receive a scheduled call from SSA on April 11, Am. Compl. ¶ 153, and another was unable to get help completing a form during an office visit in May 11, *id.* ¶ 151.  Neither contends that they have since been unable to complete these tasks, much less alleges any denial of or delay in benefits; attempts to show that these incidents reflect worse customer service than before; or claims to have filed a discrimination complaint or accommodation request.

perceptibly impaired the organization's ability to provide services." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) (quotation omitted). And, as the Supreme Court recently clarified, the notion that "standing exists when an organization diverts its resources in response to a defendant's actions . . . is incorrect." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024). Otherwise, "all the organizations in America would have standing to challenge almost every federal policy that they dislike." *Id.*

Plaintiffs' more recent declarations fall short of these standards for the same reasons as their earlier ones. Take, for example, the declaration of Maria Town, for AAPD. This largely seems to repurpose passages (at times verbatim) from the Riccobono declaration, for NFB, which the Court has already found insufficient, largely for alleging a mere "diver[sion of] resources" without providing "specifics." Op. at 6 (citation omitted). *Compare* Decl. of Maria Town ¶ 7, ECF No. 29-10 ("Town Decl.") *to* Decl. of Mark Riccobono ¶ 16, ECF No. 2-16 ("Riccobono Decl."); *compare same* ¶ 8 *to* ¶ 17; ¶ 9 *to* ¶ 18; ¶ 11 *to* ¶ 19; ¶ 12 *to* ¶ 20; ¶ 13 *to* ¶ 21; ¶ 14 (second sentence onwards) *to* ¶ 10; ¶ 17 *to* ¶ 10; ¶ 18 (first three sentences) *to* ¶ 11; ¶ 19 (second sentence onwards) *to* ¶ 12; ¶ 21 *to* ¶ 21. The Town declaration provides no firmer basis for standing. It generically asserts that the reforms will "frustrate AAPD's mission" and "directly interfere with its core business activities," including "[i]nformation and referrals" and "[a]dvocacy and community education efforts." Town Decl. ¶¶ 12-13. But these sorts of conclusory assertions, devoid of specifics, are insufficient. *See* Op. at 6 (faulting declarations "lacking in detail and support"). And AAPD's attempt to rely on hearsay accounts of the supposed effect of the challenged reforms on unnamed members, *e.g.*, Town Decl. ¶¶ 14–15, 18–19, should not be credited.

The declarations of Carolyn Villers, for MSAC, are similarly flawed. To start, she acknowledges that MSAC's focus is on Medicare—it has only "limited capacity" with respect to Social Security, Villers Decl. ¶ 10, and does not "formally track[] Social Security related inquiries," *id.* ¶ 18—and her statements should be read in that light. In any event, her first declaration essentially relies upon the "diversion of resources" theory already found insufficient.

*Compare* Villers Decl. ¶¶ 14, 15, *with* Riccobono Decl. ¶¶ 15, 19.  And while she asserts that she has "noticed an increase," "in the past two months, we've gotten approximately twenty call[s] or inquiries," Villers Decl. ¶ 18, she does not explain how this number of calls—about 1 every 3 days—could have "perceptibly impaired" the organization, much less created a "direct conflict." Op. at 6 (citation omitted).

Ms. Villers's second declaration does not cure these defects.  There, she essentially asserts that calls to SSA have recently taken longer, so MSAC has been able to help fewer Social Security applicants.  2d Villers Decl. ¶ 13.  Notably, she claims that this began in February 2025, *id.*, before the reforms were announced, casting doubt on whether they could have been the cause. Regardless, this shows neither perceptible impairment nor a direct conflict.  Indeed, helping applicants navigate the application process is MSAC's *raison d'être*, and nothing about the challenged reforms interferes with the organization's ability to do so, even if it were true that more clients were now seeking their assistance.  And as with AAPD, MSAC's hearsay accounts of the experiences of unnamed members, who are not even alleged to have sought MSAC's help, cannot establish its standing.  *Id*. ¶¶ 10–11.

The second declaration of Max Richtman, for NCPSSM, shares these key faults.  His central claim is that recent SSA policy changes have meant that "the information and advice we have given to our members previously about how best to interact with the agency and receive services is no longer accurate and effective."  2d Richtman Decl. ¶ 9.  So, NCPSSM has "found it necessary to spend time and resources to develop written materials for our members suggesting ways they might protect themselves, which will need to be monitored and updated regularly."  *Id*. ¶ 12.  But, again, it is NCPSSM's very mission to provide guidance to applicants.  Nothing in Mr. Richtman's second declaration shows that the reforms are at "loggerheads" with that mission or impair the organization's programming in any way.  This is, instead, a disagreement over policy, dressed up as a mission conflict—prototypical "pure issue-advocacy [that] cannot establish standing."  *EPIC*, 892 F.3d at 1255 (quotation omitted).

The allegations in the amended complaint essentially track the declarations and provide no greater basis for standing. Perhaps the most striking common thread is that each organization continues to centrally rely on a diversion-of-resources theory. For example, the lead Plaintiff, AAPD, alleges that the workforce reductions have forced it to "divert significant organizational resources to mitigate [SSA] service reductions," Am. Compl. ¶ 125, distracting the organization from its "core functions," *id.* ¶ 127; it offers a list of four ways in which it claims to have been "forced to divert staff and operational resources," *id.* ¶ 128. The other organizations make similar claims. *Id*. ¶ 130 ("SSA's recent policy changes . . . have . . . forced Deaf Equality to divert resources from its other central functions"); *id*. ¶ 136 (same, verbatim, for MSAC); *id.* ¶ 147 ("SSA's workforce reduction has required NFB to divert institutional resources"); *id.* ¶ 160 ("As SSA makes it more difficult to access services," "NCPSSM has shifted resources to meet this need," and "this diversion of resources detracts from" other goals). But, as noted, this theory of standing does not survive *Alliance*, where the Court made clear that an organization simply cannot "spend its way into standing" in this way. 602 U.S. at 394. And while several of the organizations suggest they have had to modify the guidance they offer to applicants, *see, e.g.*, Am. Compl. ¶¶ 134–35 (Deaf Equality "creates digital materials and resources," but "under this new regime," [its] education about those systems and advice on how to navigate them is futile"); *id.* ¶ 158 (describing NCPSSM's development of a new "Fact Sheet" for beneficiaries), they have chosen to make this part of their mission, and nothing about the workforce reductions interferes with their ability to provide such services. Indeed, on their theory, it stands to reason that these organizations are actually fulfilling part of their organizational mission not *despite* the workforce reductions, but *because* those reforms have made their services all the more valuable to their members.

Thus, the Organizational Plaintiffs cannot remedy the Individual Plaintiffs' lack of standing. The Court therefore lacks jurisdiction, and it need go no further to dismiss the complaint.

### B.    Federal personnel statutes divest court of subject matter jurisdiction to consider claims concerning the employment of SSA employees

Even if Plaintiffs had standing, they face another jurisdictional hurdle. The Amended Complaint largely focuses on SSA's workforce reduction plans, asking the Court to permanently enjoin Defendants from "implement[ing] . . . its agency-wide workforce reductions." *See* Am. Compl., Prayer for Relief ¶ 2. But Congress has precluded district-court review of such federal-employment claims, which must proceed in another forum. That is because Congress has "established a comprehensive system" that provides the "exclusive means" for reviewing challenges to the employment decisions of federal agencies. *Elgin v. Dep't of Treasury*, 567 U.S. 1, 5, 8 (2012) (quotation omitted).

The Civil Service Reform Act ("CSRA"), together with the Federal Service Labor-Management Relations Statute ("FSLMRS"),[18] "creates an integrated scheme of administrative and judicial review, wherein the Congress intentionally provided—and intentionally chose not to provide—particular forums and procedures for particular kinds of claims." *Am. Fed'n of Gov't Emps. v. Sec'y of the Air Force*, 716 F.3d 633, 636 (D.C. Cir. 2013) (citation modified). Congress allowed certain individual federal employees who are affected by agency personnel decisions to challenge those decisions "by litigating their claims through the statutory scheme in the context of [a] concrete" dispute, with limitations imposed by Congress on the kinds of claims and remedies available. *See Am. Fed'n of Gov't Emps. ("AFGE") v. Trump*, 929 F.3d 748, 757 (D.C. Cir. 2019). The purpose of this statute was to "replace the haphazard arrangements for administrative and

---

[18]  The CSRA establishes the "comprehensive system for reviewing personnel action taken against federal employees." *United States v. Fausto*, 484 U.S. 439, 455 (1988). Under the CSRA, most civilian employees can appeal a major adverse personnel action to the Merit Systems Protection Board (MSPB). 5 U.S.C. §§ 7512, 7513(d), 7701. Employees subject to a RIF may also pursue relief before the MSPB. *See* 5 C.F.R. § 351.901. The CSRA empowers the MSPB to order relief, including reinstatement. 5 U.S.C. §§ 1204(a)(2), 7701(g). An employee aggrieved by a final decision of the MSPB may obtain judicial review. *Id.* § 7703(a)(1); *see also id.* § 7703(b) (providing the Federal Circuit with exclusive jurisdiction over most final MSPB decisions). In addition, the FSLMRS governs labor relations between the Executive Branch and its employees. *See* 5 U.S.C. §§ 7101-7135; *Am. Fed'n of Gov't Emps. v. Trump*, 929 F.3d 748, 752 (D.C. Cir. 2019). The Federal Labor Relations Authority ("FLRA") is charged with adjudicating federal labor disputes. 5 U.S.C. § 7105(a)(2). Review of the FLRA's decisions is available in the courts of appeals. *Id.* § 7123(a).

judicial review of personnel action, part of the outdated patchwork of statutes and rules built up over almost a century that was the civil service system." *United States v. Fausto*, 484 U.S. 439, 444 (1988) (quotation omitted).

When a comprehensive remedial scheme like this permits only some plaintiffs to seek review, the scheme implicitly precludes judicial review by other plaintiffs who are not authorized to bring claims. The Supreme Court recognized this in *Block v. Community Nutrition Institute*, 467 U.S. 340, 347 (1984), where it considered a statute that permitted dairy *handlers* to obtain review of certain "market orders" after exhausting administrative remedies, but did not authorize review by anyone else. *See id.* at 346 (citing 7 U.S.C. § 608c). When a group of dairy *consumers* sought review of a marketing order, the Supreme Court explained that the statute omits a "provision for participation by consumers in any proceeding." *Id.* at 347. In the "complex scheme" Congress had provided, "the omission of such a provision is sufficient reason to believe that Congress intended to foreclose consumer participation in the regulatory process." *Id.* Accordingly, the statute's "structure . . . indicates that Congress intended only producers and handlers, and not consumers, to ensure that the statutory objectives would be realized." *Id.* The "restriction of the administrative remedy to handlers strongly suggests that Congress intended a similar restriction of judicial review of market orders." *Id.* Any other result, the Court said, would facilitate circumvention of the comprehensive statutory scheme. *See id.* at 348.

In *Fausto*, the Supreme Court applied the same reasoning to the CSRA itself. The Court explained that the "exclusion" of a party "from the provisions establishing administrative and judicial review for personnel action" of the type challenged here "*prevents* [the party] from seeking review" under other provisions. 484 U.S. at 455 (emphasis added). The Court emphasized that the CSRA's "comprehensive nature," its express provisions for different kinds of review for different kinds of plaintiffs, and its exclusion of those in the plaintiffs' position from the comprehensive scheme, reflected a "considered congressional judgment" that those employees "should not have statutory entitlement to review for" that type of personnel action covered by the CSRA. *Id.* at 448-49; *see Grosdidier v. Chairman, Broad. Bd. of Governors*, 560 F.3d 495, 497

25

(D.C. Cir. 2009) (Kavanaugh, J.) ("[T]he CSRA is the exclusive avenue for suit even if the plaintiff cannot prevail in a claim under the CSRA.").

Those principles likewise foreclose this Court's exercise of subject matter jurisdiction over Plaintiffs' employment-related claims. Just as Congress "intentionally foreclosed judicial review to" certain employees under the CSRA, *see Pinar v. Dole*, 747 F.2d 899, 912 (4th Cir. 1984), it intentionally foreclosed judicial review by parties other than those whom it specifically authorized to seek relief. As in *Fausto*, it would turn the CSRA's comprehensive structure "upside down" for the Plaintiffs, who are strangers to the federal government's employment relationships, to challenge the SSA's employment actions in federal district court, "free" from any of the restrictions that would apply if the claim were brought by the SSA employees (or former SSA employees) themselves. *See* 484 U.S. at 449-50. The exclusion from the CSRA's review scheme reflects Congress's considered judgment limiting who may challenge a personnel decision and on what grounds—rather than providing carte blanche for those excluded to sue outside the CSRA's comprehensive scheme. *See Graham v. Ashcroft*, 358 F.3d 931, 935 (D.C. Cir. 2004) (Roberts, J.) (explaining that "it is the comprehensiveness of the statutory scheme involved, not the 'adequacy' of the specific remedies" that precludes jurisdiction).

The Supreme Court's more recent decisions in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), and *Axon Enterprises, Inc. v. FTC*, 598 U.S. 175, 186 (2023), reflect these same principles. Those cases underscore that where, as here, Congress has established a "comprehensive" review scheme, district courts lack subject matter jurisdiction over a claim where it is, as here, "of the type Congress intended to be reviewed within" the statutory structure. *See Axon*, 598 U.S. at 186 (quoting *Thunder Basin*, 510 U.S. at 212).

Congress did not establish an implausible scheme in which employees must litigate their employment actions through a comprehensive, integrated scheme, but others are left free to challenge those same employment actions directly in federal district court with "greater rights" than the affected employees themselves. *See Graham*, 358 F.3d at 935. Instead, Congress limited review of federal employment actions to actions by affected employees themselves, in a different

forum.  And as then-Judge Roberts summed up, "what you get under the CSRA is what you get." *Fornaro v. James*, 416 F.3d 63, 67 (D.C. Cir. 2005).

Multiple courts have recently declined jurisdiction on this ground.  *See, e.g.*, *AFGE v. Trump*, 929 F.3d at 752; *see also, e.g., AFGE v. Ezell*, 25-cv-10276-GAO, 2025 WL 470459, at *1 (D. Mass. Feb. 12, 2025) (no jurisdiction to consider plaintiffs' claims to enjoin OPM from enforcing the deadline for its "Fork in the Road" offer) (citing *AGFE v. Trump*); *Nat'l Treasury Emps. Union v. Trump,* 770 F. Supp. 3d 1 (D.D.C. 2025) (Cooper, J); *Am. Foreign Serv. Ass'n v. Trump*, 768 F. Supp. 3d 6 (D.D.C. Feb. 21, 2025) (Nichols, J.); *see also Maryland v. USDA*, No. 25-1248 (L), 2025 WL 1073657, at *1 (4th Cir. Apr. 9, 2025) (ordering stay of district court's preliminary injunction and explaining that the government is likely to show that the district court lacked jurisdiction over plaintiff States' claims, where the government had argued, among other things, that the "[CSRA] provides the exclusive means for review of personnel actions taken against federal employees"—and observing that "[t]he Supreme Court has stayed a similar preliminary injunction issued by the United States District Court for the Northern District of California") (citing *OPM v. AFGE*, 145 S. Ct. 1914)).

Here, much of the relief Plaintiffs seek is at its core a challenge to SSA employment policies, including recent and prospective separations.  That Plaintiffs have framed their alleged injury under the Rehabilitation Act and the APA does not allow them to sidestep the CSRA's mandatory channeling regime.  Were their theory correct, downstream consumers of government services and benefits could always go directly to court to raise such challenges, notwithstanding Congress's determination that federal employees must first pursue relief administratively.  It would be an odd result indeed if claims that cannot be raised in district court by those most directly affected—the employees themselves—could be raised by plaintiffs whose asserted injuries are entirely derivative.  The Court therefore lacks jurisdiction over these employment and termination related claims because they must be litigated in another forum.

**C.    The Social Security Act Precludes General Federal Question Jurisdiction**

The Social Security Act "establishe[s] an unusually protective four-step process for the review . . . of disputed claims." *Day*, 467 U.S. at 106.  It permits judicial review only after "exhaust[ion of] . . . administrative remedies," *id*. at 107, produces a "final decision of the Commissioner . . . made after a hearing," 42 U.S.C. § 405(g).  And it deprives courts of federal question jurisdiction to hear other suits "arising under" the Act.  *Id*. § 405(h).

This jurisdiction-stripping provision is "more than a codified requirement of administrative exhaustion"; rather, its "sweeping and direct" language makes "plain" that "*no* action shall be brought under § 1331," not merely that unexhausted actions are precluded.  *Weinberger v. Salfi*, 422 U.S. 749, 757 (1975) (emphasis added).  This bar extends to procedural claims, *Heckler v. Ringer*, 466 U.S. 602, 615 (1984) ("federal-question jurisdiction is barred by 42 U.S.C. § 405(h) even in a case where [the] claimant is challenging the administrative procedures used to terminate welfare benefits"), as well as constitutional ones, *id.* at 622 ("we held in *Salfi* that the constitutional claim was nonetheless barred by § 405(h)").  This scheme "assures the [Commissioner] the opportunity prior to constitutional litigation to ascertain, for example, that the particular claims involved are neither invalid for other reasons nor allowable under other provisions of the Social Security Act."  *Salfi*, 422 U.S. at 762.  Thus, it is settled that, "[b]y its plain terms . . . 42 U.S.C. § 405(h) . . . strips the court of jurisdiction under 28 U.S.C. § 1331 and § 1346 over 'any claim arising under'" the Act.  *RICU LLC v. HHS*, 22 F.4th 1031, 1035 (D.C. Cir. 2022).

Plaintiffs' claims "arise under" the Social Security Act.  The core of their amended complaint is that the challenged reforms will cause their benefits to be delayed or denied.  See, e.g., Am. Compl. ¶¶ 9, 175, 191.  That readily qualifies under the "broad" construction the Supreme Court has given to the "arising under" language, which reaches "any claims in which 'both the standing and the substantive basis for the presentation' is the Social Security Act." *Ringer*, 466 U.S. at 615 (quoting *Salfi*, 422 U.S. at 760-61).  Indeed, to "contend that such an

action does not arise under the Act whose benefits are sought is to ignore both the language and the substance of the complaint." *Salfi*, 422 U.S. at 761.

Plaintiffs must therefore channel their complaints through the administrative process. In the meantime, their claims relying on 28 U.S.C. § 1331, *see* Am. Compl. ¶ 13, should be dismissed, and any claim they may wish to pursue under the Act should be dismissed as unexhausted.

## II. Plaintiffs Fail to State a Claim

Jurisdiction aside, each of Plaintiffs' claims fails on the merits.

### A. Administrative Procedure Act (Counts II–III)

Plaintiffs assert two APA claims. Both fail.

#### 1. APA review is precluded because SSA's administrative reforms are committed to agency discretion

The APA grants a cause of action to "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. But it withdraws that cause of action "to the extent that . . . agency action is committed to agency discretion by law." *Id*. § 701(a). "Agency action is committed to agency discretion by law when 'the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" *Steenholdt v. FAA*, 314 F.3d 633, 638 (D.C. Cir. 2003) (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)).

As noted above, the Court lacks jurisdiction over challenges to the workforce reductions, which Congress has channeled to other forums. *See supra* pp. 24-27. The balance of the complaint largely challenges various plans to administratively reorganize the agency. But Congress vested the Commissioner of Social Security with broad, unreviewable discretion to make such decisions, providing that the "[t]he Commissioner *may* establish, alter, consolidate, or discontinue such organizational units or components within the Administration *as the Commissioner considers necessary or appropriate*, except that this paragraph shall not apply with respect to any unit, component, or provision provided for by this chapter." 42 U.S.C. § 902(a)(6) (emphasis added).

"In determining whether a matter has been committed solely to agency discretion, [courts] consider both [1] the nature of the administrative action at issue and [2] the language and the structure of the statute that supplies the applicable legal standards for reviewing that action." *Drake v. FAA*, 291 F.3d 59, 70 (D.C. Cir. 2002). First, staffing and organizational decisions fall squarely in the realm of actions that courts have traditionally found committed to agency discretion. *See, e.g.*, *Lincoln v. Vigil*, 508 U.S. 182, 184, 191, 193 (1993) (holding that the Indian Health Service's 1985 decision to "reallocate the [Indian Children's] Program's resources from "handicapped Indian children in the Southwest," who had been served since the late 1970s and early 1980s, to a "nationwide effort to assist such children" was "committed to agency discretion by law" and "therefore not subject to judicial review under the Administrative Procedure Act, 5 U.S.C. § 701(a)(2)"); *Local 2855, AFGE v. United States*, 602 F.2d 574, 579 (3d Cir. 1979) ("The existence of broad discretionary power in an agency often suggests that the challenged decision is the product of political, military, economic, or managerial choices that are not really susceptible to judicial review."). Second, Congress's choice of the deferential word "may," coupled with the formulation "as the Commissioner considers necessary and appropriate"—demonstrates that Congress committed the exercise of this authority to the agency's broad discretion.

The Supreme Court recognized the discretion inherent in an analogous formulation in *Webster v. Doe*, where the statute authorized the CIA to terminate employees "whenever the Director 'shall *deem* such termination necessary or advisable in the interests of the United States.'" 486 U.S. 592, 600 (1988) (quoting 50 U.S.C. § 403(c)). Stressing that the statute did not limit termination to "when the dismissal *is* necessary or advisable to those interests," the Court found that, given Congress's use of the word "deem," the statutory "standard fairly exudes deference to the Director" and "foreclose[s] the application of any meaningful judicial standard of review." *Id*. (emphasis in original); *see also Claybrook v. Slater*, 111 F.3d 904, 909 (D.C. Cir. 1997) (noting that *Webster* gave "weight to [the] fact that [a] statute authorizes termination when [the] agency head 'shall deem [it] necessary or advisable' rather than when it 'is' necessary or advisable" (alteration in original)). Thus, the statute's implementation was committed to agency discretion,

and APA review was precluded.  *Webster*, 486 U.S. at 600-01.  Because "considers" is not meaningfully different than "deems," the same result obtains here.

Plaintiffs point to no statute limiting the agency's inherent discretion to reorganize.  They nowhere claim that any of the offices for which closure was considered was "provided for by this chapter," 42 U.S.C. § 902(a)(6), or required by any other statute.  And they offer no judicially manageable standard for the Court to apply in second-guessing the Commissioner's judgment about what staffing levels or office structure are the "right" ones to best accomplish the agency's policy priorities.  Those decisions therefore are not subject to APA review.

### 2. Plaintiffs impermissibly seek wholesale improvement of SSA, rather than review of discrete, final agency action

Even if APA review is not precluded, it is limited to (a) discrete "agency action" that is (b) "final."  5 U.S.C. § 704.  Plaintiffs' challenges fail on both counts.

### a. SSA's programmatic reforms are not discrete agency action subject to APA review

The APA's definition of "agency action" is "not so all-encompassing as to authorize [courts] to exercise judicial review [over] everything done by an administrative agency."  *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004) (Roberts, J.) (citation omitted).  Rather, the "agency action" limitation prevents plaintiffs from "seek[ing] wholesale improvement of [a] program by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made."  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990).  That is, "[u]nder the terms of the APA, [Plaintiffs] must direct [their] attack against some particular 'agency action' that causes [them] harm."  *Id*. And that agency action must be "circumscribed" and "discrete[.]"  *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004).  "Because 'an on-going program or policy is not, in itself, a final agency action under the APA,' [a court's] jurisdiction does not extend to reviewing generalized complaints about agency behavior."  *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006) (citation omitted).

Here, Plaintiffs' APA claims amount to impermissible wholesale challenges, *i.e.*, the sort of "broad programmatic attack" rejected in *Lujan*, rather than challenges to discrete final agency

action.  While Plaintiffs principally fault the agency's workforce reductions, they continue to take issue with a collection of other past, ongoing, and future actions—the closure or reorganization of various offices, redirection of priorities, transfer of functions, and so on.  *See, e.g.*, Am. Compl. ¶¶ 1, 5, 11 (alleging "sweeping" and "significant policy changes" resulting in the failure to "perform[] its core duty"), *id.* ¶ 37 (alleging degradation of "three primary access channels: in-person service . . . , telephone support . . . , and online systems"), *id.* ¶ 174; *see also id.* at 49–50 (prayer for relief) (seeking "continuity of access to services and reasonable accommodations," including by "[s]ufficiently staffing the office(s) replacing [OCREO]").  In *Lujan*, the Supreme Court dispelled any notion that such a programmatic challenge can proceed under the APA:

> [I]t is at least entirely certain that the flaws in the entire "program"—consisting *principally of the many individual actions referenced in the complaint, and presumably actions yet to be taken as well*—cannot be laid before the courts for wholesale correction under the APA, simply because one of them is ripe for review and adversely affects [a plaintiff].

497 U.S. at 892-93 (emphasis added).  Indeed, the purpose of the APA's discrete agency action requirement is "to protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve."  *Norton*, 542 U.S. at 66.  That describes this case to a T.

### b.    Any discrete agency action is not final for APA purposes

For an agency action to be "final" within the meaning of the APA, two considerations must be met.  "First, the action must mark the 'consummation' of the agency's decision making process—[i]t must not be of a merely tentative or interlocutory nature."  *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal citation omitted).  "[S]econd, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow[.]'"  *Id.* at 178 (citation omitted).  Here, Plaintiffs allege that SSA's workforce reduction policy, including a "RIF plan to further reduce staff" is a "final agency action for purposes of the APA."  Am. Compl. ¶ 181.  But this provisional course of action cannot possibly qualify as "final."

First, many of the previously complained of reforms have been subject to revision, evidencing their interlocutory nature.  Eric Katz, *Some agencies are walking back planned layoffs,*

*Trump administration says*, Government Executive (July 15, 2025), https://perma.cc/T74V-LDBB.  While Plaintiffs complain about policies requiring that "some transactions . . . be done in person," Am. Compl. ¶ 10, SSA later announced that, beginning April 14, it "will allow individuals to complete all claim types via telephone, supported by new anti-fraud capabilities," *see* SSA Press Release, Social Security Administration Implements New Anti-Fraud Measures to Enhance Telephone Claim Processing (Apr. 12, 2025), https://perma.cc/X7G3-SBGY.  And although Plaintiffs request that SSA ensure "continuity of access to services and reasonable accommodations for beneficiaries with disabilities," Am. Compl., Relief Requested ¶ 4, SSA has clarified that accommodation requests or discrimination complaints may continue to be submitted by phone, email, or hard copy.[19]  Other challenged actions may similarly prove to be tentative, or merely based on misapprehensions.  Indeed, Plaintiffs' central allegation—that the workforce will be reduced by a full 7,000 employees, including through RIFs—has not come to pass, and the newly confirmed Commissioner recently stated that he does not currently intend to conduct a RIF. *See supra* p. 4.

Second, Plaintiffs identify no way in which the challenged reforms have any concrete effect on their "rights or obligations."  *Bennett*, 520 U.S. at 178.  As the Court has observed, no Plaintiff actually "assert[s] any termination or diminution of benefits" caused by the workforce reductions. Op. at 4.  Plaintiffs therefore fail to show that these reforms have "legal consequences" in and of themselves, *Bennett*, 520 U.S. at 178, and thus constitute "final" agency action subject to APA review.

### 3.    Plaintiffs' APA claims fail

Even if Plaintiffs could satisfy the APA's threshold requirements, they still fail to state a claim.

### a.    Arbitrary and Capricious (Count II)

---

[19] SSA, Press release, Social Security Continues to Provide Ways for the Public to Request Accommodations and File Civil Rights (Program Discrimination) Complaints (May 30, 2025), https://perma.cc/KK7D-NP9F ("May 30 Press Release").

In Count II, Plaintiffs claim that SSA's "implementation of its workforce reduction policy" is arbitrary and capricious.  Am. Compl. ¶¶ 181, 188; *see* 5 U.S.C. § 706(2)(A) (authorizing courts to set aside "arbitrary" or "capricious" agency action).  They mistake the standard of review, and each of their theories fails.

First, Plaintiffs allege that SSA failed to articulate a "reasoned explanation" and consider reliance interests for these reforms.  *Id.* ¶ 188.  But "[u]nder the 'arbitrary and capricious' standard the scope of review is a narrow one."  *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974).  The agency need only "a rational connection between the facts found and the choice made," *id.* (quotation omitted), acting within a wide "zone of reasonableness," *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).  Even "a decision of less than ideal clarity" will be upheld so long as "the agency's path may reasonably be discerned."  *Bowman*, 419 U.S. at 286.  SSA amply clears this bar.  The agency's press releases clearly set out the reasons for the reforms—explaining, for example, that SSA plans to reduce its workforce size and organizational structure," and "will continue to implement efficiencies and reduce costs, with a renewed focus on mission critical work."  Feb. 28 Press Release; *see also supra* pp. 3-4.[20]

Second, Plaintiffs claim that SSA failed to sufficiently consider "reliance interests."  Am. Compl. ¶ 188.  But while the "change-in-position" doctrine requires an agency to account for "serious reliance interests" when changing a formal policy, *see FDA v. Wages & White Lion Invs*., 145 S. Ct. 898, 917 (2025), here Plaintiffs' complaint identifies no particular change in position— much less a change to the sort of formal policy to which the doctrine has been held to apply, *see, e.g.*, *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009)—so the doctrine has no application, *see Wages*, 145 S. Ct. at 918 n.5 (noting that "[w]e have traditionally applied the change-in-position doctrine when an agency shifts from a position expressed in a more formal setting").

---

[20]  Even if, hypothetically, the Court were ultimately to conclude that the explanation provided is insufficient for judicial review, that would not justify the injunctive relief sought in the complaint. Rather, "the proper course" would be "to remand to the agency for additional . . . explanation," not any type of injunction.  *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).

Regardless, the doctrine requires consideration of only sufficiently "serious" reliance interests—a "high[] bar," typically "requiring, for example, decades of industry reliance on [an agency's] prior policy." *Wages*, 145 S. Ct. at 927. Plaintiffs cannot reasonably claim such an interest in a certain level of customer service. In any event, "reliance does not overwhelm good reasons for a policy change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 226 (2016) (Ginsburg, J., concurring). Here, SSA identified the need to change its workforce and organizational structure, focusing on functions and employees "who do not directly provide mission critical services." *See* Feb. 28 Press Release. SSA thus concluded that such reforms would "prioritize customer service by streamlining redundant layers of management, reducing non-mission critical work, and potential reassignment of employees to customer service positions," *id.*—a reason sufficient to overcome any cognizable reliance interest.

### b.    In Excess of Statutory Authority (Count III)

In Count III, Plaintiffs allege that SSA's "workforce reduction policy," Am. Compl. ¶ 196—that is, its "decision to eliminate 7,000 staff," *id.* ¶ 194—exceeds the agency's statutory authority, *see id.* ¶ 193 (authorizing courts to "set aside" agency action "in excess of statutory . . . authority"(citing 5 U.S.C. § 706(2)(C)). Their theory is not entirely clear. They do not contest that the Social Security Act vests the Commissioner with the requisite authority over "all [SSA] personnel and activities," 42 U.S.C. § 902(a)(4), and that he generally "may establish, alter, consolidate, or discontinue such organizational units or components" as he "considers necessary or appropriate," *id*. § 902(a)(6); *see supra* pp. 3, 29, 31. Instead, they appear to contend only that the workforce reforms violate the Rehabilitation Act, and therefore the agency's statutory authority, and thus must be set aside under the APA. *See* Am. Compl. ¶ 201 ("Defendants' ongoing violations of Section 504 render their actions void as *ultra vires*, and they must be set aside under . . . the APA.").

Plaintiffs must offer "more than labels and conclusions" or "a formulaic recitation" of legal elements to state a claim for relief. *Twombly*, 550 U.S. at 555.[21]  They have not cleared this basic hurdle.  The only mention in this count of any statutory requirement is a generic reference to "Section 504 of the Rehabilitation Act" and its "implementing regulations."  Am. Compl. ¶ 195. They point to no statutory or regulatory text that has been violated, much less the elements of a cause of action.  And the sum of the allegedly unlawful behavior is that SSA has "fail[ed] to provide adequate access, accommodations, and nondiscriminatory services," as "required by Section 504," which "renders its current service model unlawful."  Am. Compl. ¶ 199.  This attempt to state a claim falls well short of Plaintiffs' burden.

Indeed, these conclusory allegations are contradicted by the public record and Plaintiffs' own allegations.  It bears repeating that no Plaintiff "claims to have recently tried to file a discrimination complaint or request an accommodation from the SSA" or "describes any injury arising from the dissolution of OCREO."  Op. at 5.  Regardless, Plaintiffs themselves have explained that OCREO's functions were transferred to OMS, effectively pleading themselves out of this claim.  *See* Compl. ¶¶ 191–92 ("OCREO served as SSA's grievance system, processing and adjudicating discrimination complaints and handling reasonable accommodation requests. . . . Defendants' restructuring of SSA . . . places these essential responsibilities under OMS.").  And SSA has clarified that grievances may continue to be submitted by phone, email, and hard copy. *See* May 30 Press Release.  Indeed, this may be why Plaintiffs have abandoned their earlier claim that Defendants "have unlawfully withheld SSA's statutory obligation to provide grievance mechanisms for claimants and employees."  Compl. ¶ 201; *see also id.* ¶¶ 202–03.

In any event, it is difficult to see what, if anything, this claim adds to Plaintiffs' separate Rehabilitation Act claim in Count I, and it fails for all the same reasons.  *See infra* Part II.D. Nothing in that Act purports to strip agencies of their discretion to reduce staffing, restructure

---

[21] Plaintiffs do not assert an *ultra vires* claim (notwithstanding the reference to *ultra vires* action at Am. Compl. ¶ 201).  But an *ultra vires* claim is a nonstatutory claim, not an APA one, and the Amended Complaint does not assert a nonstatutory claim.

operations, or implement programmatic reforms. Plaintiffs' disagreement with the agency's discretionary choices does not establish that the agency has exceeded its statutory authority.

## B. Rehabilitation Act (Count I)

Plaintiffs' claim that the reforms violate Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), because they disparately impact disabled persons, fails for multiple reasons.

### 1. The Rehabilitation Act does not provide for disparate-impact liability

Section 504 provides that "[n]o otherwise qualified individual with a disability . . . shall, *solely by reason of her or his disability*, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." *Id.* (emphasis added). In *Alexander v. Choate*, 469 U.S. 287 (1985), the Supreme Court considered whether Section 504 "reaches only purposeful discrimination." *Id.* at 292. It "assume[d] without deciding" that Section 504 "reach[es] some claims of disparate-impact discrimination," but held that such claims would be limited to disparate impacts so significant that "an otherwise qualified handicapped individual" was not "provided with meaningful access to the benefit that the grantee offers." *Id.* at 299, 301, 309.

While several circuits have since allowed disparate-impact claims falling within these contours to go forward, the Sixth Circuit in 2019 "resolve[d] what *Choate* did not and conclude[d] that § 504 does not prohibit disparate-impact discrimination." *Doe v. BlueCross BlueShield of Tenn., Inc.*, 926 F.3d 235, 241 (6th Cir. 2019). As Judge Sutton explained, the statutory text— namely, the phrase "solely by reason of her or his disability"—"does not encompass actions taken for nondiscriminatory reasons," as a "comparison to other antidiscrimination statutes," including Title VII, confirms. *Id.*

This Court should follow the Sixth Circuit's lead, notwithstanding the assumptions of other circuits. While the D.C. Circuit has not directly addressed this issue, in *Modderno v. King*, 82 F.3d 1059 (D.C. Cir. 1996), it held that a plaintiff cannot state a disparate impact claim under

Section 504 based "on the terms of an insurance plan." *Id.* at 1061 n.1. As Judge Ginsburg stated in concurrence: "As long as the [plan] offers the same coverage to all insureds, regardless of disability, it cannot be said to discriminate on the basis of disability." *Id.* at 1066 (Ginsburg, J., concurring). That is an apt description of the challenged SSA reforms here.

### 2.    Plaintiffs have not shown a disparate impact

Assuming arguendo that a disparate-impact claim is available under Section 504, Plaintiffs have not plausibly alleged such an impact, instead asserting in only general terms that the effects of the challenged reforms will fall more heavily on disabled persons.

To state a disparate impact claim, a plaintiff must generally point to "statistical evidence that the practice or policy has an adverse effect on the protected group." *Greater New Orleans Fair Hous. Action Ctr. v. HUD*, 639 F.3d 1078, 1085–86 (D.C. Cir. 2011) (quoting *Garcia v. Johanns*, 444 F.3d 625, 633 (D.C. Cir. 2006)); *see also Adams v. City of Indianapolis*, 742 F.3d 720, 733 (7th Cir. 2014) ("statistical methods and comparisons," if "basic," must "move the disparate-impact claims over the plausibility threshold"). Here, Plaintiffs merely state in conclusory fashion that the reforms will disproportionately affect disabled persons, never comparing the supposed effects on that group to a similarly situated group of non-disabled persons. *Cf., e.g.*, *Ricci v. DeStefano*, 557 U.S. 557, 578 (2009).

It is "not enough to simply allege that there is a disparate impact on workers, or point to a generalized policy that leads to such an impact." *Menoken v. McGettigan*, 273 F. Supp. 3d 188, 199 (D.D.C. 2017) (quoting *Smith v. City of Jackson*, 544 U.S. 228, 241 (2005)), *aff'd sub nom. Menoken v. Pon*, No. 17-5228, 2018 WL 2383278 (D.C. Cir. May 9, 2018). Plaintiffs' failure to do more is fatal to their Rehabilitation Act claim.

### 3.    Plaintiffs have not shown a lack of "material access" to any benefit

Even if Plaintiffs had plausibly alleged disparate impact, that would not be enough to state a Rehabilitation Act claim, as the Supreme Court in *Choate* "reject[ed] the boundless notion that all disparate-impact showings constitute prima facie cases under § 504." *See* 469 U.S. at 299.

There, assuming the viability of a disparate impact theory, the Court ultimately found no prima facie violation of Section 504:  The challenged rule was neutral on its face, was not alleged to rest on a discriminatory motive, and did not deny access to handicapped individuals of Medicaid services.  *Id.* at 309.  So too here.  The SSA reforms are neutral on their face and are not alleged to rest on such a discriminatory motive, instead being carried out to improve efficiency.

Nor do Plaintiffs contend that they have been deprived of "meaningful access" to any benefit within the meaning of *Choate.*  "Meaningful access" does not mean "equal results," but requires only that the disabled be provided an equal opportunity to obtain the same result or benefit.  *Id.* at 304-06.  The across-the-board SSA reforms do just that.

### 4.    Plaintiffs' sweeping theory of disparate impact would unduly hamstring any meaningful agency reorganization

Finally, as a practical matter, Plaintiffs' theory of disparate impact under Section 504 sweeps far too broadly.  Such a challenge to large programmatic changes would inappropriately hamstring agency administration, as any budget cut could be portrayed as disproportionately affecting disabled persons.  Such a theory threatens to invite challenges to virtually any attempt to trim costs—a prospect that is especially problematic for the government.  *Cf., e.g.*, *Abril-Rivera v. Johnson*, 806 F.3d 599, 606 (1st Cir. 2015) (stating that, in the RIF context, disparate-impact liability "must . . . be limited as applied to government entities so as to avoid 'inject[ing] racial considerations into every [agency] decision'" (quoting *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 543 (2015)).

### 5.    Because there is no private right of action under the Rehabilitation Act, any disparate impact claim could proceed only under the APA

In any event, because there is no private right of action under the Rehabilitation Act, to the extent Plaintiffs have a viable disparate-impact claim, it could proceed only under the APA and subject to that Act's limitations, including the final-agency-action requirement.

The Rehabilitation Act prohibits discrimination (1) by federal agencies in their capacity as employers, 29 U.S.C. § 791; (2) by recipients of federal funds and federal agencies in their capacity

as funders, *id.* § 794(a); and (3) by federal agencies in their capacity as the operators of their own "program[s] or activit[ies]." *Id.* Congress provided express remedies, including private rights of action, to enforce the first two prohibitions, but not the third. *Id.* § 794a. Particularly when viewed in light of the Supreme Court's guidance regarding implied private rights of action, *see, e.g.*, *Jesner v. Arab Bank, PLC*, 584 U.S. 241, 264–65 (2018), that omission strongly suggests that no private right of action exists.

"[W]hen deciding whether to recognize an implied cause of action, the 'determinative' question is one of statutory intent." *Ziglar v. Abbasi*, 582 U.S. 120, 133 (2017) (quoting *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001)). "If the statute does not itself so provide, a private cause of action will not be created through judicial mandate." *Id.* While a more flexible approach was once *en vogue*, the Supreme Court has "recently and repeatedly said that a decision to create a private right of action is one better left to legislative judgment in the great majority of cases." *Jesner*, 584 U.S. at 264 (citation omitted); *see also Egbert v. Boule*, 596 U.S. 482, 491 (2022) ("At bottom, creating a cause of action is a legislative endeavor.").

Section 504 of the Rehabilitation Act originally applied only to recipients of federal funds. Congress amended the statute in 1978 to apply to a federal agency acting in its programmatic capacity, adding the following language to Section 504:

> or under any program or activity conducted by any Executive agency or by the United States Postal Service. The head of each such agency shall promulgate such regulations as may be necessary to carry out the amendments to this section made by the Rehabilitation, Comprehensive Services, and Developmental Disabilities Act of 1978. Copies of any proposed regulation shall be submitted to appropriate authorizing committees of the Congress, and such regulation may take effect no earlier than the thirtieth day after the date on which such regulation is so submitted to such committees.

*See* Rehabilitation Act Amendments of 1978, Pub. L. No. 95-602 § 119, 92 Stat. 2955, 2982. Congress did not include an express cause of action to enforce this provision, leaving an aggrieved person to seek a remedy through the administrative pathway that Congress directed agencies to create and then, if necessary, judicial review via the APA. *See id.*; 5 U.S.C. § 702.

At the same time it amended Section 504, Congress amended Section 505 to create a limited, express cause that did not include an express private right of action regarding the non-funding, non-employment activities of federal agencies. *See* Rehabilitation Act Amendments of 1978, § 120(a), 92 Stat. at 2982–83 (adding Section 505 to the Rehabilitation Act of 1973). Notably, while the new Section 505 authorizes specific remedies through a direct cause of action for any Section 504 violation committed by a *non-federal* recipient of federal funds or by a federal agency that provides such funds, it does not create such remedies for disability discrimination under any programs or activities conducted by a federal agency. Congress knows how to create a private right of action, and while it directed agencies to "promulgate such regulations as may be necessary to carry out the amendments" to Section 504, it created a private right of action only for employment issues and federal agencies' funding activities. 29 U.S.C. §§ 794(a), 794a(a). Indeed, in another context, the Supreme Court found it "telling" that Section 505 "makes no mention whatsoever of 'program[s] or activit[ies] conducted by any Executive agency[.]'" *Lane v. Pena*, 518 U.S. 187, 192–93 (1996) (addressing the question of whether the government had waived sovereign immunity for money damages for a violation of Section 504 of the Rehabilitation Act) (citation omitted).[22]  It follows that Congress intended challenges to non-funding activities of the federal government to be brought through the administrative pathway. *See Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 19 (1979) (It is "an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it."); *Wisher v. Coverdell*, 782 F. Supp. 703, 707 (D. Mass. 1992) ("[T]here

---

[22] In *Lane*, the Supreme Court held that Congress, in amending the Rehabilitation Act to cover federal programs and activities, did not intend to waive the United States's sovereign immunity for suits for money damages. *See* 518 U.S.at 189, 200.  The question at issue here—whether the cause of action for a substantive claim of disability discrimination in a federal program or activity arises under the Rehabilitation Act or under the APA—was not addressed in *Lane*.  That is "because, as the Solicitor General noted in his brief [in *Lane*], 'resolution of the source of the cause of action, be it under Section 504(a) directly or the APA, would . . . not [have] alter[ed] the outcome of [that] case' as long as Section 504(a) was not read to waive sovereign immunity for monetary damages.'" *Sai v. DHS*, 149 F. Supp. 3d 99, 113 (D.D.C. 2015), (quoting *Br. for the Resp'ts, Lane v. Pena*, 518 U.S. 187, 1996 WL 115795, at *27 n.17 (S. Ct. Mar. 15, 1996)).

was no need for Congress to create a private right of action because a means of review [under the APA] already existed.").

Although the D.C. Circuit has not directly addressed the question, the weight of circuit authority supports the lack of a private cause of action under Section 504 for federal programs or activities. Three circuits have adopted that view, including the *en banc* First Circuit in an opinion by then-Judge Breyer. *See Moya v. U.S. Dep't of Homeland Sec.*, 975 F.3d 120, 128 (2d Cir. 2020); *Clark v. Skinner*, 937 F.2d 123, 126 (4th Cir. 1991); *Cousins v. Sec'y of the U.S. Dep't of Transp.*, 880 F.2d 603, 610 (1st Cir. 1989) (en banc) (Breyer, J.) ("[t]here is no reason to strain to find an implied right of action against federal agencies under § 504" because "the APA's review procedures" are available). Only the Ninth Circuit has disagreed, and it did so based on the premise—inconsistent with the Supreme Court's later decision in *Lane*—that a right of action under Section 504 was needed to ensure that plaintiffs could secure "money damages." *J.L. v. SSA*, 971 F.2d 260, 268 (9th Cir. 1992), *disapproved of by Lane*, 518 U.S. at 191.

Courts in this district are split on the question. In *Sai v. DHS*, Judge Moss concluded that there is no cause of action under the Rehabilitation Act for discrimination in federal programs and activities, and that Congress intended for the rights created by Section 504 to be enforceable through judicial review of agency action under the APA. 149 F. Supp. 3d 99, 113 (D.D.C. 2015). First, the court noted that the Supreme Court "has repeatedly cautioned courts not to imply causes of action in the absence of evidence that Congress intended 'to create not just a private right but also a private remedy.'" *Id.* (quoting *Sandoval*, 532 U.S. at 286). In considering the statutory text and structure, the court found "relatively little evidence that Congress intended to create a private cause of action under the Rehabilitation Act to enforce" the substantive rights regarding federal programs and activities contained therein. *Id.* Judge Moss observed that Section 505 expressly specifies the remedies available to some persons aggrieved under Section 504 but "says nothing about the remedies available to a person aggrieved by discrimination in a 'program or activity conducted by an[ ] Executive agency.'" *Id.* (quoting 29 U.S.C. § 794(a)). Second, Judge Moss reasoned that Congress has "no need to provide for a cause of action that is independent of the

APA" "when it intends to permit only declaratory and injunctive relief" to enforce a statute.  *Id.* at 114.  Third, Judge Moss court found the First Circuit's and Fourth Circuit's opinions in *Cousins* and *Clark* persuasive.  *Id.* at 114–15 (discussing *Cousins*, 880 F.2d at 605–08; *Clark*, 937 F.2d at 125–26).  On these bases, *Sai* concluded "that the Rehabilitation Act does not provide an implied cause of action for discrimination in federal programs and activities (or for failure to comply with administrative procedures), but that the APA provides a cause of action to challenge final agency action that is not in accordance with the Rehabilitation Act."  *Id.* at 115.  Judge Moss's reasoning should be followed here.[23]

The conclusion that the Rehabilitation Act does not imply a private right of action for the government's non-funding, non-employment activities is "buttressed by the fact that Congress

---

[23] In *National Ass'n of the Deaf v. Trump ("NAD")*, Judge Boasberg reached a contrary conclusion and found that Section 504 includes an implied cause of action to sue Executive branch agencies for federal programs and activities.  486 F. Supp. 3d 45, 54 (D.D.C. 2020).  Judge Boasberg reasoned that Congress did not expressly "direct[ ] those plaintiffs who seek relief from Executive agencies' violations of Section 504 to rely on the Administrative Procedure Act."  *Id.*  But the court did not explain why it would have been necessary (or even important) for Congress to do so. *See id.*  The APA itself provides that anyone "adversely affected or aggrieved by agency action within the meaning of a relevant statute" can obtain review of "agency action" pursuant to the APA.  5 U.S.C. § 702.  Given the APA's general cause of action, it would have been unnecessary for Congress to additionally specify in the Rehabilitation Act that plaintiffs challenging the federal government's compliance with Section 504 in the government's non-funding activities could bring suit under the APA.  (The plaintiffs in *NAD* did not have a judicial remedy available to them under the APA, as Judge Boasberg noted, because the defendants in that case, which included the White House, were not "agencies" subject to the APA.  486 F.3d at 57.)  Additionally, Judge Boasberg's *NAD* decision relied on several cases in this district analyzing whether the Rehabilitation Act waives the government's sovereign immunity, or standing for the proposition that declaratory and injunctive relief was available, but those cases did not address the separate question of whether the available cause of action lies within the Rehabilitation Act itself or the APA.  486 F. Supp. 3d at 55–56 (citing *Am. Council of Blind v. Paulson*, 463 F. Supp. 2d 51, 57–58 (D.D.C. 2006), *aff'd*, 525 F.3d 1256 (D.C. Cir. 2008); *Lane v. Pena*, 867 F. Supp. 1050, 1053 (D.D.C. 1994), *vacated in part*, 518 U.S. 187, 190–91 (1996); and *Doe v. District of Columbia*, 796 F. Supp. 559, 573 (D.D.C. 1992)).  Finally, *NAD* distinguished the First Circuit's and Fourth Circuit's opinions in *Cousins* and *Clark* on the basis that those cases "dealt with Executive agencies acting as a *regulator*, as opposed to in a substantive capacity."  486 F. Supp. 3d at 56.  But *Cousins* and *Clark* made clear that their holdings apply to "any program or activity conducted by any Executive agency," 29 U.S.C. § 794(a); *Cousins*, 880 F.2d at 604-05; *Clark*, 937 F.2d at 125.  Indeed, the Rehabilitation Act does not distinguish among federal programs and activities based on whether they are "regulatory" or "substantive" in nature.  *See* 29 U.S.C. § 794(a).

43

expressly provided two alternative mechanisms to enforce the prohibition against discriminatory agency action." *Moya*, 975 F.3d at 128. First, Section 504(a) directs agency heads to "'promulgate such regulations as may be necessary to carry out the'" prohibition against discrimination in programs and activities conducted by the agency. *Id.* (quoting 29 U.S.C. § 794(a)). Second, the APA provides an express cause of action for plaintiffs who wish to sue an executive agency for violating the Rehabilitation Act. "The availability of these alternative mechanisms to enforce the Rehabilitation Act strongly suggests that Congress did not intend to imply a superfluous private right of action." *Id.*; *see also Clark*, 937 F.2d at 126 ("[T]he APA was intended to provide a single uniform method for review of agency action and . . . an implied private right of action to enforce a federal statute against a federal regulatory agency is unnecessary.").

Of course, the Court need not address this issue, because Plaintiffs lack a viable disparate impact claim for other reasons. But to the extent the Court concludes otherwise, this claim could at most proceed only under the APA and subject to that Act's limitations.

## CONCLUSION

The Amended Complaint should be dismissed.

DATED: August 13, 2025                    Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ERIC BECKENHAUER
Assistant Branch Director

*/s/ Steven M. Chasin*
STEVEN M. CHASIN
PIERCE J. ANON (N.Y. Bar No. 6184303)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005

*Counsel for Defendants*