# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AMERICAN ASSOCIATION OF PEOPLE
WITH DISABILITIES *et al*.,

       *Plaintiffs*,

  v.

FRANK BISIGNANO, *in his official capacity as
Administrator of the Social Security
Administration et al.*,

       *Defendants*.

Civil Action No.: 25-cv-00977-APM

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT**

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

ARGUMENT ...................................................................................................... 2

I.    Plaintiffs Have Standing To Assert Their Claims................................................ 2

    A.  Plaintiffs Have Plausibly Alleged Concrete and Particularized Injuries in Fact. ......... 3

        1.  Individual Plaintiffs Have Alleged Injuries in Fact Caused by the Workforce Reduction Policy.............................................................................................. 4

        2.  Organizational Plaintiffs Have Alleged Injuries in Fact Caused by the Workforce Reduction Policy........................................................................ 7

            a.  Organizational Standing.............................................................................. 7

            b.  Associational Standing.................................................................................. 9

    B.  Plaintiffs Have Plausibly Alleged A Substantial Likelihood that Their Injuries Are Caused By Defendants' Conduct. .......................................................... 11

    C.  Plaintiffs Have Plausibly Alleged A Substantial Likelihood That Their Injuries Are Likely To Be Redressed by the Injunctive Relief They Seek................. 12

II.   This Court Has Subject Matter Jurisdiction Over Plaintiffs' Claims. ............................. 14

    A.  Federal Personnel Statutes Do Not Preclude Jurisdiction............................................ 14

    B.  The Social Security Act Does Not Preclude Jurisdiction. ........................................... 16

III.  The Workforce Reduction Policy Is Reviewable Under the APA..................................... 18

    A.  The Policy Is Not Committed To Agency Discretion By Law. ................................... 18

    B.  The Policy Constitutes Final Agency Action........................................................... 19

        1.  The Policy marks the consummation of the agency's decisionmaking process................................................................................................ 19

        2.  In denying access to SSA programs, the Policy impairs Plaintiffs' rights and causes concrete harms. ...................................................................... 20

    C.  The Policy is Arbitrary and Capricious. ................................................................... 20

    D.  The Policy Exceeds Statutory Authority and is Contrary to Law............................... 23

IV.  Plaintiffs May Challenge SSA's Policy Under Section 504 of the Rehabilitation
     Act. ................................................................................................................. 23

     A.  Section 504(a) Provides a Private Right of Action for Disparate-Impact
         Claims. ...................................................................................................... 24

         1.  Section 504(a)'s rights-creating language establishes a private right of
             action for both intentional and disparate-impact discrimination. ......................... 24

         2.  Section 505 does not erase Section 504(a)'s private enforceability. .................... 26

         3.  Congress authorized private enforcement of disparate-impact claims under
             Section 504(a). ................................................................................... 27

         4.  The APA does not supplant Section 504's private right of action for
             disparate-impact claims. ...................................................................... 28

     B.  Plaintiffs Have Sufficiently Pled Their Disparate-Impact Claim. ............................. 30

CONCLUSION ...................................................................................................... 32

## TABLE OF AUTHORITIES

**Cases**

*Action All. of Senior Citizens v. Leavitt*,
    483 F.3d 852 (D.C. Cir. 2007) ................................................................ 17

*Alexander v. Choate*,
    469 U.S. 287 (1985) .................................................................. *passim*

*Alexander v. Sandoval*,
    532 U.S. 275 (2001) ............................................................. 19, 25

*Allen v. Wright*,
    468 U.S. 737 (1984) ............................................................. 12–13

*Am. Ass'n of Cosm. Schs. v. DeVos*,
    258 F.Supp.3d 50 (D.D.C. 2017) ...................................................... 10

*Am. Coll. of Emergency Physicians v. Ga. Blue Cross & Blue Shield*,
    833 F. App'x 235 (11th Cir. 2020) .................................................... 10

*Am. Council of the Blind v. Paulson*,
    525 F.3d 1256 (D.C. Cir. 2008) ..................................................... 3, 18

*Am. Fed'n of Gov't Emps. v. Trump*,
    139 F.4th 1020 (9th Cir. 2025) ....................................................... 16

*Arbaugh v. Y&H Corp.*,
    546 U.S. 500 (2006) .................................................................. 26

*Ass'n of Am. Physicians & Surgeons, Inc. v. Sebelius*,
    901 F.Supp.2d 19 (D.D.C. 2012) ...................................................... 10

*Axon Enterprise v. Fed. Trade Comm'n*,
    598 U.S. 175 (2023) .................................................................. 15

*Barnes v. Gorman*,
    536 U.S. 181 (2002) .................................................................. 26

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .................................................................. 12

*Bennett v. Spear*,
    520 U.S. 154 (1997) ............................................................. 2, 3, 20

*Bowen v. Mich. Acad. of Fam. Physicians*,
    476 U.S. 667 (1986) .................................................................. 15

*Carr v. Saul,*
   593 U.S. 83 (2021) ........................................................................................ 17

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013) ...................................................................................... 11

*Clark v. Martinez,*
   543 U.S. 371 (2005) ...................................................................................... 25

*Clark v. Skinner,*
   937 F.2d 123 (4th Cir. 1991).......................................................................... 29

*Commissioned Officers Ass'n of U.S. Pub. Health Serv. v. Bunch,*
   2022 WL 951271 (D.D.C. Mar. 30, 2022).................................................. 9–10

*Corley v. United States,*
   556 U.S. 303 (2009) ...................................................................................... 28

*Cousins v. Sec'y of the U.S. Dep't of Transp.,*
   880 F.2d 603 (1st Cir. 1989) .......................................................................... 29

*Brook Ctr. for Psychotherapy, Inc. v. Phil. Indem. Ins.,*
   955 F.3d 305 (2d Cir. 2020)....................................................................... 29–30

*Cummings v. Premier Rehab Keller, P.L.L.C.,*
   596 U.S. 212 (2022) ...................................................................................... 24

*Dep't of Com. v. New York,*
   588 U.S. 752 (2019) ...................................................................................... 21

*Diamond Alt. Energy, LLC v. Env't Prot. Agency,*
   No. 24-7 (U.S. June 20, 2025)........................................................................ 16

*Doe v. CVS Pharmacy, Inc.,*
   982 F.3d 1204 (9th Cir. 2020)........................................................................ 30

*Drs. for Am. v. Off. of Pers. Mgmt.,*
   2025 WL 1836009 (D.D.C. Apr. 15, 2025) .................................................... 18

*El Paso Nat. Gas Co. v. United States,*
   750 F.3d 863 (D.C. Cir. 2014) ....................................................................... 24

*Elgin v. U.S. Dep't of Treasury,*
   567 U.S. 1 (2012) ...................................................................................... 14–15

*Encino Motorcars, LLC v. Navarro,*
   579 U.S. 211 (2016) ................................................................................ 21, 22

*Firestone v. Firestone*,
   76 F.3d 1205 (D.C. Cir. 1996) ................................................................. 31

*Food & Water Watch, Inc. v. Vilsack*,
   808 F.3d 905 (D.C. Cir. 2015) ............................................................. 3, 12

*Forest Grove Sch. Dist. v. T.A.*,
   557 U.S. 230 (2009) ................................................................................ 28

*U.S. Food & Drug Admin. v. All. for Hippocratic Med.*,
   602 U.S. 367 (2024) .................................................................................. 4

*Garcia v. Johanns*,
   444 F.3d 625 (D.C. Cir. 2006) ................................................................. 30

*Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't of Hous. & Urban Dev.*,
   639 F.3d 1078 (D.C. Cir. 2011) ............................................................... 30

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982) ................................................................... 2, 3, 4, 7, 9

*Heckler v. Chaney*,
   470 U.S. 821 (1985) ................................................................................ 18

*Henrietta D. v. Bloomberg*,
   331 F.3d 261 (2d Cir. 2003) .................................................................... 12

*Hisp. Affs. Project v. Acosta*,
   901 F.3d 378 (D.C. Cir. 2018) ................................................................. 19

*Hunt v. Wash. State Apple Advert. Comm'n*,
   432 U.S. 333 (1977) .................................................................................. 7

*Kingdom v. Trump*,
   2025 WL 1568238 (D.D.C. June 3, 2025) ................................................ 21

*Lane v. Peña*,
   518 U.S. 187 (1996) ........................................................................... 26, 27

*Lee v. U.S. Agency for Int'l Dev.*,
   859 F.3d 74 (D.C. Cir. 2017) .................................................................. 24

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   572 U.S. 118 (2014) ................................................................................ 12

*Lincoln v. Vigil*,
   508 U.S. 182 (1993) ............................................................................ 18–19

*Lloyd v. Reg'l Transp. Auth.*,
   548 F.2d 1277 (7th Cir. 1977) ................................................................. 30

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ................................................................................ 2

*Michigan v. EPA*,
   576 U.S. 743 (2015) ............................................................................... 21

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ................................................................................ 21

*Moya v. U.S. Dep't of Homeland Sec.*,
   975 F.3d 120 (2d Cir. 2020) ................................................................... 29

*Nat'l Ass'n of the Deaf v. Trump*,
   486 F.Supp.3d 45 (D.D.C. 2020) ...................................................... 28, 30

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*,
   775 F.Supp.3d 100 (D.D.C. 2025) .......................................................... 18

*Nat'l Treasury Emps. Union v. Vought*,
   2025 WL 2371608 (D.C. Cir. Aug. 15, 2025) .................................... 15, 16

*New York v. Trump*,
   133 F.4th 51 (1st Cir. 2025) ................................................................... 19

*Norton v. S. Utah Wilderness All.*,
   542 U.S. 55 (2004) ................................................................................ 19

*Payan v. L.A. Cmty. Coll. Dist.*,
   11 F.4th 729 (9th Cir. 2021) ............................................................ 29–30

*Pennsylvania v. DeVos*,
   480 F.Supp.3d 47 (D.D.C. 2020) ........................................................... 23

*Pharm. Rsch. & Mfrs. of Am. v. Becerra*,
   2021 WL 5630798 (D.D.C. Dec. 1, 2021) ................................................ 9

*POET Biorefining, LLC v. Env't Prot. Agency*,
   970 F.3d 392 (D.C. Cir. 2020) ............................................................... 19

*Pushkin v. Regents of Univ. of Colo.*,
   658 F.2d 1372 (10th Cir. 1981) .............................................................. 30

*Rollins v. Wackenhut Servs., Inc.*,
   703 F.3d 122 (D.C. Cir. 2012) ............................................................... 31

*Rumsfeld v. Forum for Acad. & Inst. Rts., Inc.*,
    547 U.S. 47 (2006) .................................................................................. 11

*Se. Cmty. Coll. v. Davis*,
    442 U.S. 397 (1979) ................................................................................. 30

*Shalala v. Ill. Council on Long Term Care*,
    529 U.S. 1 (2000) .................................................................................... 17

*Sierra Club v. Jackson*,
    648 F.3d 848 (D.C. Cir. 2011) ......................................................... 18, 20

*Sierra Club v. U.S. Army Corps of Eng'rs*,
    909 F.3d 635 (4th Cir. 2018) .................................................................. 23

*Spence v. Straw*,
    54 F.3d 196 (3d Cir. 1995) ..................................................................... 30

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) ................................................................................... 3

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998) .................................................................................. 26

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ................................................................................. 10

*Tennessee v. Cardona*,
    762 F.Supp.3d 615 (E.D. Ky. 2025) ...................................................... 23

*Thunder Basin Coal Co. v. Reich*,
    510 U.S. 200 (1994) ................................................................................. 15

*TransUnion, LLC v. Ramirez*,
    594 U.S. 413 (2021) ................................................................................. 11

*TRW Inc. v. Andrews*,
    534 U.S. 19 (2001) .................................................................................. 26

*U.S. Chamber of Com. v. Env't Prot. Agency*,
    642 F.3d 192 (D.C. Cir. 2011) ............................................................... 10

*United Spinal Ass'n, Inc. v. O'Malley*,
    2024 WL 3400259 (D.D.C. July 11, 2024) ............................................ 17

*United States v. Fausto*,
    484 U.S. 439 (1988) ................................................................................. 14

*Univ. of Tex. v. Camenisch,*
  451 U.S. 390 (1981) ................................................................................. 3

*Valencia v. Springfield,*
  883 F.3d 959 (7th Cir. 2018) ................................................................. 30

*Vill. of Kake v. U.S. Dep't of Agric.,*
  795 F.3d 956 (9th Cir. 2015) ........................................................... 21, 22

*Weinberger v. Salfi,*
  422 U.S. 749 (1975) ............................................................................... 17

**Statutes**

5 U.S.C. § 701(a)(2) ................................................................................. 18

5 U.S.C. § 706 ........................................................................... 18, 20, 23

5 U.S.C. § 7512 ......................................................................... 14, 15, 16

20 U.S.C. § 1681(a) ................................................................................. 25

29 U.S.C. § 791 ....................................................................................... 27

29 U.S.C. § 794(a) ........................................................... 24, 26, 28, 29

42 U.S.C. § 405(t) ............................................................................ 5, 6, 23

42 U.S.C. § 423(a)(1)–(2) ....................................................................... 23

42 U.S.C. § 1383 .............................................................................. 5, 6, 23

42 U.S.C. § 2000d .................................................................................. 25

Civil Rights Restoration Act of 1987,
  Pub. L. No. 100-259, 102 Stat. 28 ........................................................ 28

Rehabilitation Act Amendments of 1992,
  Pub. L. No. 102-569, 106 Stat. 4344 ................................................... 28

Rehabilitation, Comprehensive Services, and Developmental
Disabilities Amendments of 1978,
  Pub. L. No. 95-602, 92 Stat. 2955 ........................................................ 28

Rehabilitation Act Amendments of 1992,
  Pub. L. No. 99-506, 100 Stat. 1807 ...................................................... 28

Rehabilitation Act of 1973,
  Pub. L. No. 93-112, 87 Stat. 355 .......................................................... 24

**Regulations**

Exec. Order No. 14,210, 90 C.F.R. 9669 (Feb. 13, 2025) ............................................................. 1

5 C.F.R. § 351.901 ................................................................................................................. 15

20 C.F.R. § 404.1588 ........................................................................................................... 4, 5

**Legislative History**

124 Cong. Rec. 30,349 (1978) .................................................................................................. 27

138 Cong. Rec. 31,520 (1992) .................................................................................................. 28

## INTRODUCTION

Through this action, Plaintiffs seek to enforce Congress's command that federal agencies cannot discriminate against people with disabilities in administering their programs. Section 504 of the Rehabilitation Act of 1973 guarantees individuals with disabilities meaningful access to the programs and benefits of the Social Security Administration ("SSA"). Plaintiffs have standing to seek restoration of that access, and both the Rehabilitation Act and Administrative Procedure Act ("APA") grant them a right of action to challenge Defendants' unlawful policies.

This case is not about "customer service" or case-processing speed. It is about SSA's abrupt "Workforce Reduction Policy"— rolled out a mere sixteen days after Executive Order 14,210 called for government-wide "workforce optimization."[1] SSA adopted the Policy without assessing its impact on people with disabilities or considering decades of reliance on field offices, phone systems, and online services. It did so even after repeatedly telling Congress that more staff were essential to meet rising public need.[2] Predictably, eliminating thousands of positions in an already overstretched agency has denied people with disabilities—who face unique barriers to access—a meaningful opportunity to obtain the benefits they need for food, housing, and other essentials.

---

[1] 90 Fed. Reg. 9669 (Feb. 11, 2025), https://www.govinfo.gov/content/pkg/FR-2025-02-14/pdf/2025-02762.pdf.

[2] *See, e.g.*, SSA, FY 2024 AGENCY FINANCIAL REPORT 163, 164 (Nov. 5, 2024), (requesting "funding to restore staffing" to "improve service delivery, including reducing National 800 Number wait times and disability claims processing delays"), https://perma.cc/RUP6-AEHM; Kathleen Romig, *SSA Staffing Shortage Hurts Hard-Working Americans*, CTR. ON BUDGET & POL'Y PRIORITIES (Aug. 29, 2018), https://www.cbpp.org/blog/ssa-staffing-shortage-hurts-hard-working-americans.

## ARGUMENT

**I.     Plaintiffs Have Standing To Assert Their Claims.**

Plaintiffs have standing to challenge SSA's Workforce Reduction Policy because, in adopting it, the agency erected barriers against people with disabilities accessing the agency's services and programs. At the pleading stage, Plaintiffs need only meet the "relatively modest" burden of alleging: (1) an injury in fact that is concrete, particularized, and actual or imminent, (2) a causal connection between the injury and the Defendants' conduct, and (3) redressability by judicial relief. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992); *Bennett v. Spear*, 520 U.S. 154, 171 (1997). Plaintiffs have done so here.

The Amended Complaint alleges that SSA's staffing cuts deny individuals with disabilities "meaningful access" to its programs and services—the very harm Section 504 was enacted to prevent. *See Alexander v. Choate*, 469 U.S. 287, 301 (1985). Because of their disabilities, Plaintiffs cannot navigate SSA without adequate staff support through field offices, phone lines, or online systems. Severely restricting those access points disproportionately impedes Plaintiffs' ability to access SSA and its services.

Organizational Plaintiffs are not traditional direct service providers. Their missions center on systemic advocacy, education, and empowerment, while most of them also provide at least some form of direct service to people with disabilities in gaining access to benefits. SSA's Workforce Reduction Policy has compelled Organizational Plaintiffs  to reallocate scarce resources away from their core functions, while frustrating their ability to provide direct assistance. This is the paradigmatic diversion-of-resources harm recognized in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982): organizations forced to abandon their core mission to fill gaps created by unlawful or discriminatory conduct.

Together, Individual Plaintiffs' allegations of direct, disability-related barriers and Organizational Plaintiffs' allegations of concrete diversion of resources and frustration of mission amount to particularized injuries, fairly traceable to SSA's Workforce Reduction Policy, and redressable through declaratory and injunctive relief. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016).[3]

Defendants' effort to reframe these allegations as "customer service complaints" misses the point. Plaintiffs allege a systemic "access crisis" created by the Workforce Reduction Policy— measured in shuttered field offices, hours-long telephone hold times, unanswered calls, and prolonged delays in essential services. *See* ECF 40 ¶9. The injury is not a lost check or bureaucratic inconvenience. It is the denial of meaningful access itself, which the Rehabilitation Act forbids. *See Choate*, 469 U.S. at 301. As the D.C. Circuit has recognized, "the Rehabilitation Act's emphasis on independent living and self-sufficiency ensures that, for the disabled, the enjoyment of a public benefit is not contingent upon the cooperation of third persons." *Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1269 (D.C. Cir. 2008).

### A.   Plaintiffs Have Plausibly Alleged Concrete and Particularized Injuries in Fact.

Each Individual Plaintiff's allegations demonstrate that the Workforce Reduction Policy imposes unique burdens on people with disabilities. Each Organizational Plaintiff likewise pleads a concrete injury sufficient to establish standing in its own right. An organization may sue on its

---

[3] At this stage, "general factual allegations of injury resulting from defendant's conduct may suffice, for on a motion to dismiss we presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) (quoting *Bennett v. Spear*, 520 U.S. 154, 168 (1997)).

own behalf when government action "perceptibly impair[s]" its ability to carry out its mission by forcing it to divert resources from core activities. *Havens*, 455 U.S. at 379.[4]

Defendants' reliance on *Food and Drug Administration v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), is misplaced. Unlike the plaintiffs in *Alliance*—"issue-advocacy organization[s]" whose alleged injury was limited to spending money to oppose government policy—Plaintiff Organizations here allege direct, operational harm. *Cf. id.* at 394. The Workforce Reduction Policy has forced them to reallocate scarce resources away from core systemic advocacy and programmatic work and into providing SSA-related direct services to members and constituents who can no longer access SSA on their own. That is the precise diversion-of-resources injury *Havens* recognized, not the abstract "policy disagreement" rejected in *Alliance*.

1. Individual Plaintiffs Have Alleged Injuries in Fact Caused by the Workforce Reduction Policy.

Elizabeth Rouse is blind, employed, and receives Social Security Disability Insurance ("SSDI") and Medicare. ECF 40 ¶¶73–74. Because she must regularly report her employment income to SSA, *see* 20 C.F.R. § 404.1588, her ability to meaningfully access SSA is a condition of her continued receipt of benefits. Yet she alleges that SSA's Workforce Reduction Policy has substantially impaired her ability to provide the required income-verification information. ECF 40 ¶56. Specifically, she cannot access SSA through her local office, by telephone, or through SSA's online portal. *Id.* ¶¶75–77. This denial of access to SSA programs constitutes a concrete and particularized injury sufficient for Article III. The injury is fairly traceable to SSA's adoption of

---

[4] Defendants' effort to re-litigate Plaintiffs' preliminary-injunction motion is unavailing. *See* ECF 46-1 at 20–22 (challenging declarations supporting the motion and citing the Court's order denying it). Success at the preliminary-injunction stage is not required to establish standing, particularly where, as here, Plaintiffs have since filed an amended complaint. *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).

the Workforce Reduction Policy, which reduced the staff and resources needed to ensure accessible services, and an injunction requiring SSA to remedy these barriers would redress Ms. Rouse's injuries.

Marni Garvey is disabled, *see id.* ¶79, and relies on SSDI and Medicare for her subsistence. After SSA terminated her benefits, she faced extraordinary barriers in attempting to secure reinstatement: hours on hold across multiple phone calls, disconnected calls, and being turned away from an SSA field office, *see id.* ¶¶80–84, despite Congress's mandate that beneficiaries facing termination receive same-day, in-person access. 42 U.S.C. §§ 405(t), 1383(e)(6). As a direct result, she lost the benefits necessary to pay rent and obtain life-sustaining healthcare, forcing her to ration care. ECF 40 ¶¶86–87. These injuries are concrete, particularized, and ongoing, and they flow directly from SSA's Workforce Reduction Policy, which eliminated staff essential to providing the access Congress required. The relief Plaintiffs seek—injunctive relief restoring accessible avenues to contest benefit terminations—would redress her injury. This denial of "meaningful access" to SSA services because of disability easily suffices for Article III.

Merry Schoch is blind, employed, and relies on SSDI and Medicare. *Id.* ¶¶88, 92–94. When she sought assistance in completing an SSDI questionnaire, she was unable to get timely help. *Id.* ¶92. Multiple barriers—prolonged telephone delays, lack of timely field office access, and an inaccessible online portal—left her with no viable avenue to reach SSA. *Id.* ¶¶91–94. These barriers substantially delayed her SSDI application. *Id.* ¶92. Such denial of access to SSA's programs is a concrete, particularized injury traceable to the Workforce Reduction Policy and redressable by injunctive relief.

Martha Willingham Hazen is blind, employed, and depends on SSDI to support herself and her family. *Id.* ¶96. She has an ongoing obligation to report her employment income to SSA. *See*

20 C.F.R. § 404.1588. Yet she cannot reliably access SSA by phone, enduring waits of 90 minutes to 3 hours, frequent disconnects, and unreturned messages. ECF 40 ¶¶97, 99. Even when connected, she has received inconsistent information from different representatives, exacerbating her inability to comply. *Id.* ¶¶99–100. These individualized barriers prevent her from fulfilling statutory reporting obligations and constitute a concrete, particularized injury caused by SSA's staffing reductions and redressable by this Court.

William Weiss is blind, employed, and depends on SSDI benefits to support himself. *Id.* ¶¶101–02. After SSA terminated Mr. Weiss's SSDI and assessed an overpayment, he encountered repeated barriers to pursuing an appeal and waiver. In January 2025, his local field office turned him away despite statutory entitlement to same-day appointments. *Id.* ¶106; 42 U.S.C. §§ 405(t), 1383(e)(6). He then faced hours on hold, disconnected calls, and an abbreviated ten-minute appointment, during which SSA staff refused to add medical records to his file. ECF 40 ¶107. In June 2025, when he finally was able to get assistance concerning his benefits and appeal, he was cut off after six minutes pursuant to a new SSA policy prohibiting longer calls. *Id.* ¶111. These systemic barriers directly impair his ability to contest termination and repayment, causing concrete, particularized harm redressable by judicial relief.

A blind SSDI applicant, Deja Powell has endured an "opaque and disorienting" process that has left her cut off from meaningful access. *Id.* ¶¶112, 118. She waited over five hours on hold, only to speak with an SSA representative who could not explain her benefits. *Id.* ¶¶113–16. SSA's online portal is unusable with her adaptive screen reader. *Id.* ¶119. As a result, Ms. Powell cannot determine the status of her application or correct agency errors. *Id.* ¶120. These harms are concrete, particularized, and ongoing, traceable to SSA's Workforce Reduction Policy, and redressable through injunctive relief requiring restoration of access.

Wilshawn Tiller is a veteran with a 90-percent service-connected disability rating and a current applicant for SSI and SSDI. *Id.* ¶121. Mr. Tiller's conditions include PTSD, which severely impairs daily functioning. *Id.* During his eligibility interview, SSA personnel told him his SSI claim would be denied. *Id.* ¶122. After appealing, he attempted to contact SSA but faced repeated dropped calls and no live assistance. *Id.* ¶123. He remains unable to access SSA services to learn the status of his appeal. *Id.* ¶124. These allegations demonstrate a concrete, particularized injury caused by SSA's staffing reductions, and the requested relief would redress his exclusion.

2. Organizational Plaintiffs Have Alleged Injuries in Fact Caused by the Workforce Reduction Policy.

Organizations may sue on their own behalf to redress injury to the organization itself. Membership organizations may also assert claims on behalf of their members when: (1) members would otherwise have standing in their own right; (2) the interests at stake are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires participation of individual members. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Plaintiffs American Association of People with Disabilities ("AAPD") and Deaf Equality have organizational standing. Plaintiffs National Federation of the Blind ("NFB"), Massachusetts Senior Action Council ("MSAC"), and National Committee to Preserve Social Security and Medicare ("NCPSSM") have both organizational and associational standing.

a. *Organizational Standing*

AAPD's core mission is national advocacy to increase the political and economic power of Americans with disabilities. ECF 40 ¶126. The Workforce Reduction Policy has "forced [it] to divert staff and operational resources" from its advocacy work to emergency constituent assistance. *Id.* ¶128. Staff who should be advancing federal policy reforms now spend time fielding calls and referrals from individuals stranded by SSA's inaccessibility. *Id.* ¶126. That increased

service burden, layered on top of diminished advocacy capacity, is precisely the sort of "perceptible impairment" *Havens* recognized.

Deaf Equality exists to dismantle systemic barriers for Deaf, DeafBlind, Hard of Hearing, and DeafDisabled people. *Id.* ¶131. The Workforce Reduction Policy has forced it to handle mounting language-access crises at SSA offices, pulling staff away from public education and "train the advocate" programming. *Id.* ¶132–34. The organization is now spending more time on individualized troubleshooting than on its broader mission. That shift is the quintessential diversion-of-resources injury.

MSAC is a grassroots, senior-run organization whose members heavily rely on SSA benefits. *Id.* ¶138. Before the staffing cuts, MSAC could occasionally assist members with discrete SSA interactions. *Id.* ¶140. Now, as wait times stretch to hours and in-person access collapses, staff are inundated with requests for help. *Id.* The sheer volume of member requests, coupled with the prolonged wait times, has made it "so time consuming to reach SSA" that MSAC must devote far more time to one-on-one assistance, leaving less for collective advocacy. *Id.* ¶¶141, 143. These barriers have made it so time-consuming to reach SSA that MSAC can no longer provide meaningful individual assistance navigating benefits, forcing the group to curtail its broader senior-advocacy work. *Id.* ¶¶141, 143. That increased service load and the corresponding reduction in systemic work together establish organizational injury.

NFB's mission is to ensure full and equal access for blind and low-vision individuals. The Workforce Reduction Policy has required it to "divert institutional resources, including reassigning staff and increasing its budget for individualized member assistance." *Id.* ¶147. As a result, NFB has scaled back "other mission-critical initiatives" to respond to SSA failures, directly impairing its broader civil rights. *Id.* What had been incidental support has now ballooned into a major

demand, directly impairing the organization's ability to pursue its broader initiatives. *Id.* ¶149. NFB emphasizes that "SSA's "dismantled federal system . . . now shifts [the] essential navigation and accommodation burdens onto advocacy organizations" like NFB. *Id.*

NCPSSM's core work is advocacy and education on Social Security and Medicare. Since the Workforce Reduction Policy, members increasingly turn to NCPSSM when SSA fails to answer phones or schedule timely appointments. *Id.* ¶157. The organization has been forced "to shift its resources" into filling that gap, *id.* ¶158, leaving less capacity for national campaigns on Medicare, drug pricing, and long-term care. *Id.* ¶160. This redirection of resources away from core advocacy work constitutes classic *Havens*-style organizational injury.

Taken together, these allegations show more than a loss of advocacy capacity. The Workforce Reduction Policy has compelled each Plaintiff Organization to do more direct service work than ever before, absorbing time, staff, and budget that would otherwise fuel their broader missions. That dual burden—expanded service obligations and diminished advocacy—falls squarely within *Havens*'s rule that organizational standing exists where unlawful government action forces organizations to alter their resource allocation and impairs their mission.

    b.  *Associational Standing*

Plaintiffs NFB, MSAC, and NCPSSM also adequately allege associational standing. Courts in this District are divided on whether an organization must identify a specific injured member at the pleading stage. But precedent and logic both favor Plaintiffs' position.

Defendants rest their argument on a single, unreported decision—*Commissioned Officers Association of United States Public Health Service v. Bunch*, 2022 WL 951271 (D.D.C. Mar. 30, 2022)—which held that, at the motion to dismiss stage, a plaintiff claiming associational standing

must "specifically identify members who have suffered the requisite harm." ECF 46-1 at 19.[5] Defendants overstate the significance of Commissioned Officers. That decision relies on *U.S. Chamber of Commerce v. EPA*, 642 F.3d 192 (D.C. Cir. 2011), a case filed directly in the court of appeals on administrative review—where district court pleading standards were not at issue. It likewise relies on *Summers v. Earth Island Inst.*, 555 U.S. 488 (2009), which involved review of a preliminary injunction, not a Rule 12(b)(6) motion, and thus provides no guidance on pleading sufficiency.

By contrast, numerous courts have held that at the motion to dismiss stage "general allegations encompass the specific facts necessary to support the claim, so the plaintiff need not identify an affected member by name." *Ass'n of Am. Physicians & Surgeons, Inc. v. Sebelius*, 901 F.Supp.2d 19, 31 (D.D.C. 2012); *see Am. Coll. of Emergency Physicians v. Ga. Blue Cross & Blue Shield*, 833 F. App'x 235, 241 n.8 (11th Cir. 2020) ("[R]equiring specific names at the motion to dismiss stage is inappropriate."). This rule reflects sound practice: discovery, not the pleadings, is the proper stage to test the adequacy of member-specific standing allegations. *Am. Ass'n of Cosm. Schs. v. DeVos*, 258 F.Supp.3d 50 (D.D.C. 2017).

In any event, the Amended Complaint clears even Defendants' heightened standard. MSAC alleges that "members have reported needing a replacement Social Security card, had questions regarding the Social Security Fairness Act, or needed documents from SSA. Members report having great difficulty reaching SSA or getting appointments to resolve these issues." ECF 40 ¶140. NCPSSM alleges that "[a]fter SSA began implementing the workforce reduction policy in late February 2025, NCPSSM members reported experiencing increased telephone hold times,

---

[5] *See Pharm. Rsch. & Mfrs. of Am. v. Becerra*, 2021 WL 5630798 (D.D.C. Dec. 1, 2021) (requiring identification by name of at least one member with standing, but permitting reliance on materials incorporated by reference).

dropped calls, and busy signals when contacting SSA to schedule appointments. Members report that when they were able to secure an appointment, it was for many weeks down the road. Members report that they are not allowed to visit SSA offices without an appointment." *Id.* ¶157. These allegations plainly reflect concrete injuries to identifiable members. And NFB went further still, naming specific members, including several Individual Plaintiffs, impacted by SSA's policies. Because "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement," this Court need not resolve the member-identification question. *Rumsfeld v. Forum for Acad. & Inst. Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006).

### B. Plaintiffs Have Plausibly Alleged A Substantial Likelihood that Their Injuries Are Caused By Defendants' Conduct.

The Amended Complaint plausibly alleges that SSA's Workforce Reduction Policy deprived Plaintiffs of meaningful access to SSA services and benefits. For causation, plaintiffs must show that their "injury was likely caused by the defendant." *TransUnion, LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Here, Plaintiffs meet this burden by alleging that Defendants' Policy eliminated staff essential to ensuring accessible field offices, phone lines, and online systems, leaving Plaintiffs unable to access SSA.

Defendants argue that Plaintiffs rely on a "highly attenuated chain of possibilities" to establish causation. ECF 46-1 at 15 (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013)). But *Clapper* addressed whether a *future* injury was "certainly impending." 568 U.S. at 410. There, the plaintiffs argued that they would need to expend their own money to protect the confidentiality of their communications in the wake of the National Security Agency's new surveillance program. Plaintiffs here allege present, ongoing harms—reduced office staffing, hours-long hold times, disconnected calls. *Clapper* says nothing about causation where, as here,

the defendant agency itself implemented the challenged policy and Plaintiffs have suffered the results.

Defendants next suggest that Plaintiffs' injuries "could" instead stem from rising demand for SSA services. ECF 46-1 at 15–16. That theory fails twice over. First, it rests on "facts" outside the Amended Complaint and, in any event, unsupported by anything but Defendants' own say-so. At this stage, Plaintiffs' well-pled allegations control. *Food & Water Watch*, 808 F.3d at 913. Second, causation under Article III does not require that the Workforce Reduction Policy be the exclusive cause of Plaintiffs' injuries. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 (2014); *Henrietta D. v. Bloomberg*, 331 F.3d 261, 278 (2d Cir. 2003) (noting that causes of inaccessibility "are not mutually exclusive"). Even if increased demand played a role, SSA's decision to slash staff during that very period of increased demand only underscores its responsibility for the denial of access.

Furthermore, an 18-percent "spike" in the need for SSA's services is not an "obvious alternative explanation" that defeats the plausibility of plaintiffs' harms because—despite the evident need for SSA services—SSA still chose to cut its workforce by 12 percent. ECF 46-1 at 15 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). Such a choice confirms that Defendants implemented the Workforce Reduction Policy in complete disregard of the Policy's impact on the rights of people with disabilities under Section 504 of the Rehabilitation Act to access SSA programs and strengthens Plaintiffs' claim that Defendants acted in contravention of the statute. *See Choate*, 469 U.S. at n.21.

### C. Plaintiffs Have Plausibly Alleged A Substantial Likelihood That Their Injuries Are Likely To Be Redressed by the Injunctive Relief They Seek.

Plaintiffs plausibly allege that their inability to meaningfully access SSA would be redressed by the injunction they seek. Causation and redressability are "two facets of a single

causation requirement." *Allen v. Wright*, 468 U.S. 737, 753 n.19 (1984).[6] The former looks to the connection between misconduct and injury; the latter to the connection between injury and requested relief. Redressability requires only a showing that relief is "likely" to remedy the injury—not that it will provide complete relief. *See Diamond Alt. Energy, LLC v. EPA*, No. 24-7 (U.S. June 20, 2025) (finding standing where invalidating the regulation is likely to redress at least some of the defendants' injuries).

Defendants attack redressability only as to the requested injunctive relief requiring SSA to (1) staff offices adequately to ensure that individuals with disabilities are not denied reasonable accommodations, (2) ensure continuity of accommodations across all access points, and (3) make necessary accommodations available. ECF 46-1 at 18. But Plaintiffs' allegations make clear that their inability to access SSA stems precisely from SSA's failure to maintain those accommodations after gutting its staff.

The Amended Complaint alleges that Plaintiffs and similarly situated individuals have "long relied on SSA's core service infrastructure—including field offices, accessible call centers, and sufficient staffing—to secure legally mandated accommodations," ECF 40 ¶189, and that SSA "did not establish procedures to ensure continuity of reasonable accommodations" prior to implementing its Workforce Reduction Policy. *Id.* ¶197. Plaintiff Rouse alleges SSA failed to accommodate her disability. *Id.* ¶78. Plaintiff NFB alleges that SSA's staffing cuts "shift essential navigation and accommodation burdens onto advocacy organizations." *Id.* ¶149. SSA denied an NFB member disability accommodation at a field office "due to a lack of capacity and insufficient staff." *Id.* ¶151.

---

[6] *Abrogated on other grounds by* 572 U.S. 118.

An injunction requiring SSA to ensure continuity and availability of disability accommodations will directly redress these harms by restoring access channels that allow Plaintiffs to obtain benefits on an equal basis. Defendants' suggestion that accommodation relief is "useless" misconstrues both the allegations and the law: Section 504 exists precisely to ensure that agencies provide accommodations necessary for individuals with disabilities to enjoy meaningful access to federal programs.

## II.    This Court Has Subject Matter Jurisdiction Over Plaintiffs' Claims.

This Court has federal question jurisdiction over Plaintiffs' Rehabilitation Act and APA claims. Defendants' effort to reframe those claims as precluded personnel or benefits disputes misreads both the pleadings and the governing statutes. Neither the federal personnel statutes nor the Social Security Act strips this Court of jurisdiction. Plaintiffs are not federal employees, assert no employment claims, and seek no benefits determinations. Instead, they challenge an agency policy that impairs statutory rights to meaningful access—claims that fall squarely within this Court's jurisdiction.

### A.    Federal Personnel Statutes Do Not Preclude Jurisdiction.

Defendants attempt to defeat jurisdiction by recasting Plaintiffs' case as "federal employment claims" and then insisting those phantom claims must be channeled through the Civil Service Reform Act ("CSRA") or the Federal Service Labor-Management Relations Statute ("FSLMRS"). ECF 46-1 at 24. That argument fails for two reasons.

First, the text of the CSRA forecloses Defendants' theory. The CSRA applies only to specific "adverse actions"—removals, suspensions, reductions in grade or pay, and brief furloughs—and expressly excludes "a reduction-in-force action under section 3502." 5 U.S.C. § 7512. Voluntary Separation Incentive Payments are not covered actions, and RIFs are explicitly excluded. Plaintiffs are not federal employees, and the statute governs disputes between employees

and their employer. *See United States v. Fausto*, 484 U.S. 439, 455 (1988); *Elgin v. U.S. Dep't of Treasury*, 567 U.S. 1, 13 (2012).[7] By its terms, the CSRA simply does not apply to the Workforce Reduction Policy. Defendants invoke 5 C.F.R. § 351.901 to suggest that adverse reduction-in-force actions are reviewable under the CSRA, but they ignore the threshold problem: an agency regulation cannot expand the statute's reach. Congress expressly excluded reduction-in-force decisions from CSRA's review provisions, and an agency cannot override that limitation by regulation.

Second, even if Defendants could recast Plaintiffs' allegations as employment-based claims, jurisdiction remains proper under the framework set out in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), as reaffirmed in *Axon Enterprise v. FTC*, 598 U.S. 175, 186 (2023).[8] *Thunder Basin* directs courts to consider three factors in determining whether Congress intended claims to be channeled through a statutory review scheme: (1) whether denying district court jurisdiction would foreclose all meaningful judicial review; (2) whether the claim is wholly collateral to the statute's review provisions; and (3) whether the claim falls outside the agency's expertise. Each factor weighs heavily against channeling here.

Congress "rarely allows claims about agency action to escape effective judicial review." *Id.* (quoting *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 670 (1986)). Defendants implemented staffing cuts without taking any "adverse action" cognizable under the CSRA, no

---

[7] The CSRA's "Adverse Actions" provisions, 5 U.S.C. §§ 7512(1)–(5), cover only removals, suspensions, reductions in grade or pay, and brief furloughs. As the Amended Complaint alleges, SSA's staffing reductions were carried out through voluntary incentive programs, not any covered adverse action. Voluntary departures fall outside the statute's reach.

[8] Plaintiffs' position is in accord with *National Treasury Employees Union v. Vought*, 2025 WL 2371608 (D.C. Cir. Aug. 15, 2025), which applied CSRA channeling only to claims brought by unions on behalf of federal *employees* challenging adverse *employment* actions. Plaintiffs here are neither federal employees nor challenging such actions.

federal employee—current or former—could challenge the Policy through CSRA review. Plaintiffs' injuries are not employment harms but denials of meaningful access to SSA services by beneficiaries, applicants, and advocacy organizations. Channeling such claims through the CSRA would extinguish them outright—the paradigmatic case of foreclosing judicial review. *Id.*

Plaintiffs' claims are wholly collateral to the CSRA's review provisions. The CSRA governs employment disputes, not access-to-services claims under Section 504. Whether an employee voluntarily accepted a buyout has nothing to do with whether SSA's workforce reduction denies people with disabilities access to benefits. Plaintiffs' claims stand wholly apart from any covered employment dispute. The Merit Systems Protection Board ("MSPB") adjudicates appeals of adverse employment actions. *See* 5 U.S.C. §§ 7512–14. It has no expertise in disability discrimination under the Rehabilitation Act or in systemic APA challenges to agency policies affecting program beneficiaries. *See Vought*, 2025 WL 2371608 at *6.

In short, Congress did not design the CSRA to strip beneficiaries, applicants, or advocacy groups of judicial review when they allege discrimination in access to agency programs. As the Ninth Circuit recently explained, "it is unlikely that Congress intended for the CSRA to preclude review for parties not even covered by that statute who allege claims outside the MSPB's and FLRA's jurisdiction." *Am. Fed'n of Gov't Emps. v. Trump*, 139 F.4th 1020, 1033 (9th Cir. 2025).

Defendants' jurisdictional theory rests on a strawman. Plaintiffs are not federal employees, assert no employment claims, and  seek no remedy related to any adverse employment actions. And even if Defendants' recharacterization were accepted, *Thunder Basin* makes clear that jurisdiction remains proper here.

**B.    The Social Security Act Does Not Preclude Jurisdiction.**

Plaintiffs' standing to challenge the Workforce Reduction Policy comes from the Rehabilitation Act and the APA, and the substantive basis of their claims is the Rehabilitation

Act—not the Social Security Act. *See* ECF 40 at ¶¶10, 167–68, 180, 183. A claim "arises under" the Social Security Act only when both "the standing and the substantive basis for the presentation" rest on the Act. *Weinberger v. Salfi*, 422 U.S. 749, 760–61 (1975). Because neither prong is met here, Plaintiffs' claims do not "arise under" the Social Security Act.

That conclusion is reinforced by precedent. Plaintiffs seek injunctive relief ensuring meaningful access for people with disabilities—not entitlement to benefits. "[T]he relief [Organizational] Plaintiff[s] seek[] does not affect whether" any applicant or beneficiary "is entitled to benefits." *United Spinal Ass'n, Inc. v. O'Malley*, 2024 WL 3400259, at *10 (D.D.C. July 11, 2024). Plaintiffs do not argue SSA has wrongfully denied benefits; they argue SSA has created illegal barriers to access. *Id.* at *9. Eliminating those barriers is not equivalent to awarding benefits, and therefore these claims do not "arise under" the Act.

Defendants' contrary argument—that the "core" of Plaintiffs' complaint is delayed or denied benefits, ECF 46-1 at 28—mischaracterizes the pleadings. The Amended Complaint describes an access crisis resulting from shuttered and understaffed field offices, hours-long hold times, and lack of staff capacity across the agency. ECF 40 ¶9. While delays are one consequence of SSA's Workforce Reduction Policy, the gravamen of Plaintiffs' claim is denial of access, not an attempt to impose timeliness standards on the agency. Plaintiffs' claims therefore fall outside the Act's "arising under" bar.[9]

---

[9] Were the Court to find Plaintiffs' Section 504 and APA claims "arise under" the Social Security Act, exhaustion should be excused under *Shalala v. Illinois Council on Long Term Care*, which recognizes that exhaustion is not required when imposing such a requirement would "mean no review at all." 529 U.S. 1, 19 (2000). SSA cannot adjudicate the claims asserted in this case, so forcing exhaustion would extinguish them. *See Carr v. Saul*, 593 U.S. 83 (2021); *Action All. of Senior Citizens v. Leavitt*, 483 F.3d 852, 858 (D.C. Cir. 2007).

III.    **The Workforce Reduction Policy Is Reviewable Under the APA.**

Defendants' Workforce Reduction Policy is final. It is not an action committed to agency discretion by law. And it is unlawful because it deprives people with disabilities of access to SSA's programs in contravention of the Rehabilitation Act. As such, the Policy should be "set aside" under the APA. 5 U.S.C. § 706(2).

A.    **The Policy Is Not Committed To Agency Discretion By Law.**

Defendants contend that the Workforce Reduction Policy is insulated from review under the APA's narrow exception for actions "committed to agency discretion by law." *Id.* § 701(a)(2). That contention fails for a simple reason: this case is not one of those "rare instances" where there is "no law to apply." *Jackson*, 648 F.3d at 855. Congress has provided ample law to apply in the Rehabilitation Act and the Social Security Act, both of which impose concrete, judicially manageable duties to ensure meaningful access for people with disabilities. *See Am. Council of the Blind*, 525 F.3d at 1273 (noting that agency discretion is constrained by the Rehabilitation Act).

When an agency decides not to undertake enforcement actions, its choice is generally committed to agency discretion and is presumed immune from judicial review—absent particular circumstances. *Heckler v. Chaney*, 470 U.S. 821, 837–38 (1985). Unlike *Heckler*, this case does not involve nonenforcement discretion. Nor does it concern internal personnel matters of the kind reserved to agency judgment. Rather, it challenges an agency-wide staffing policy that directly impairs statutory rights. That is reviewable. *See Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 775 F.Supp.3d 100, 115–16 (D.D.C. 2025) (finding that executive-order-driven termination of grants not committed to discretion).

Moreover, federal agencies lack discretion to violate statutory civil rights mandates. *See, e.g.*, *Drs. for Am. v. Off. of Pers. Mgmt.,* 2025 WL 1836009, at *1 (D.D.C. Apr. 15, 2025) (limiting agency's implementation of executive order in light of statutory constraints); *Lincoln v. Vigil*, 508

18

U.S. 182, 193 (1993) (distinguishing unreviewable resource allocations from actions that infringe statutory rights); *Alexander v. Sandoval*, 532 U.S. 275, 284 (2001). SSA cannot claim discretion to ignore the Rehabilitation Act.

Defendants seek to stretch Section 701(a)(2) far beyond its narrow reach. The Workforce Reduction Policy is reviewable because there is law to apply, there are standards to enforce, and statutory rights are at stake.

### B. The Policy Constitutes Final Agency Action.

1. <u>The Policy marks the consummation of the agency's decisionmaking process.</u>

In arguing that Plaintiffs' challenge is an impermissible "programmatic attack" under *Norton v. Southern Utah Wilderness Alliance*, Defendants mischaracterize the Amended Complaint. Plaintiffs do not challenge SSA's "day-to-day operations." 542 U.S. 55, 66–67 (2004). They challenge a single, discrete policy: SSA's Workforce Reduction Policy. Courts consistently treat such singular decisions as "discrete final agency action" reviewable under the APA. *See, e.g.*, *Hisp. Affs. Project v. Acosta*, 901 F.3d 378, 387 (D.C. Cir. 2018) (holding plaintiffs could challenge DHS's practice of "shrugging off" statutory obligations); *New York v. Trump*, 133 F.4th 51, 67 (1st Cir. 2025) (holding categorical funding freezes constituted discrete final agency actions). The Policy has been implemented—2,477 employees departed via Voluntary Separation Incentive Payments, and SSA's budget documents reflect a reduced workforce. ECF 40 ¶¶60, 65–66. Far from a generalized programmatic attack, Plaintiffs mount a targeted challenge to a specific, final policy with immediate and concrete consequences.

Defendants argue that subsequent adjustments to related procedures render the Policy nonfinal. But "[t]he possibility of revision is a common characteristic of agency action, and does not make an otherwise definitive decision nonfinal." *POET Biorefining, LLC v. EPA*, 970 F.3d 392, 404 (D.C. Cir. 2020). SSA's post-Policy proclamations may have compounded its harms, *see*

ECF 40 ¶164, but they did not undo the Policy itself. SSA staff have departed, budgets have been cut, and access has been curtailed. The consummation prong is satisfied.[10]

2. <u>In denying access to SSA programs, the Policy impairs Plaintiffs' rights and causes concrete harms.</u>

Finality also requires that the challenged action determine rights or obligations or produce legal consequences. *Bennett*, 520 U.S. at 178. Plaintiffs' allegations meet that standard. By slashing staff and shuttering access points, SSA curtailed statutorily mandated services for individuals with disabilities—services such as same-day in-person appointments, accommodation in communication, and assistance with reporting obligations.[11] *See* ECF 40 ¶¶10, 42, 51, 167. These allegations are not speculative—they are ongoing consequences of the Policy's implementation that impair Plaintiffs' ability to maintain benefits and comply with statutory requirements.

Because the Policy both consummates SSA's decisionmaking and produces immediate legal consequences for beneficiaries and organizations, it qualifies as a final agency action reviewable under the APA.

**C. The Policy is Arbitrary and Capricious.**

The Workforce Reduction Policy is the paradigm of arbitrary and capricious agency action. *See* 5 U.S.C. § 706(2)(A). Agency action is arbitrary and capricious if adopted without

---

[10] Defendants miscast finality as a jurisdictional defect. The D.C. Circuit has squarely rejected that gambit, holding that finality goes to the merits under the Administrative Procedure Act ("APA"), not Article III jurisdiction. *See Sierra Club v. Jackson*, 648 F.3d 848, 854 (D.C. Cir. 2011).

[11] Defendants fault Plaintiffs for citing SSA's own list of 40 field offices with staffing losses exceeding 25 percent. ECF 40 ¶49. But that list was publicly posted by SSA, and it reflected the offices identified at that time. At this early stage—especially given SSA's recent decision to scrub most performance data from public view—Plaintiffs are entitled to rely on the data available before discovery. ECF 46-1 at 15. In any event, the Amended Complaint details the specific understaffing barriers faced by each individual Plaintiff at their local field offices.

explanation, justified with contrived reasoning, or undertaken without consideration of relevant factors. *See Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) (finding agency acted arbitrarily by providing "contrived" rationale); *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (stating arbitrary and capricious review requires "reasoned decisionmaking"); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (requiring consideration of relevant factors). An agency may change its policy, but it may not, without reasoned explanation, disregard its own prior findings. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222–24 (2016) (invalidating agency rule where agency "offered barely any explanation" for reversal); *Org. Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 968 (9th Cir. 2015) (en banc) (holding agency acted arbitrarily by ignoring prior factual findings).

For years, SSA emphasized that staffing increases were essential for it to serve the public. Each year, it requested funding for over 61,000 employees to meet growing demand. ECF 40 ¶60. It acknowledged pandemic-related staffing losses and sought restoration. *Id.* ¶60 n.2. Its 2023 Congressional Justification requested 62,768 staff, citing the need to "restore our workforce and help us mitigate the growth in our pandemic-related backlogs." *Id.* SSA's performance reports echoed this need for long-term workforce expansion. *See* SSA, ANNUAL PERFORMANCE REPORT FY 2021–2023, 34–35 (Apr. 2022), https://www.ssa.gov/agency/performance/materials/2023/ SSA_FYs21-23_APR_Signed.pdf (committing to strategic workforce planning to "ensure the effective acquisition, development, and retention of a talented and diverse workforce").

Yet, within 16 days of Executive Order 14,210, SSA abruptly abandoned this evidence-based approach. The fact that SSA undertook actions to fulfill a presidential directive does not exempt those actions from arbitrary and capricious review. *Kingdom v. Trump*, 2025 WL 1568238, at *8 (D.D.C. June 3, 2025). SSA has provided no coherent justification for massively cutting its

staff in contravention of its own longstanding analysis of its workforce needs. It has cited the Executive Order and vague aspirations to "optimize its workforce" and "prioritize customer service,"—nothing more. ECF 46-1 at 4, 35.

The Policy was only publicly explained in a press release, claiming it would "prioritize customer service by streamlining redundant layers of management, reducing non-mission critical work, and potential reassignment of employees to customer service positions."[12] But no evidence or analysis supports these claims. Conclusory statements, particularly where contradicted by SSA's own data on rising public demand, cannot sustain agency action. *Encino Motorcars*, 579 U.S. at 224.  (finding conclusory explanation inadequate).

SSA had years of documented findings that staffing increases were essential to address rising demand. By ignoring these determinations and failing to reconcile the shift with its prior commitments, SSA violated *State Farm*'s requirement of reasoned explanation. An about-face of this magnitude without explanation is a textbook illustration of arbitrary and capricious decision-making. *Id.* at 222–24. An agency cannot disregard its prior determinations without acknowledging and explaining the departure. *Kake*, 795 F.3d at 968 (agency acted arbitrarily by "simply discard[ing]" prior factual findings).

Critically, SSA failed to consider its statutory obligations to ensure meaningful access for people with disabilities. Federal agencies lack discretion to violate civil rights mandates. SSA's failure to account for these duties renders the Workforce Reduction Policy not only arbitrary and capricious but also unlawful.

---

[12] Press release, SSA, Social Security Announces Workforce and Organization Plans (Feb. 28, 2025), https://blog.ssa.gov/social-security-announces-workforce-and-organization-plans/.

### D.  The Policy Exceeds Statutory Authority and is Contrary to Law.

The APA directs courts to "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). SSA's Workforce Reduction Policy must be set aside, because it leaves the agency unable to perform duties Congress expressly imposed.

Congress required SSA to provide same-day, in-person service for claimants facing urgent deadlines, such as overpayment notices or benefit redeterminations. 42 U.S.C. §§ 405(t), 1383(e)(6). It required SSA to accept and process disability insurance applications, changes in status, and requests for determinations. *See id.* §§ 423(a)(1)–(2), 1383. These statutory commands presuppose a functioning, accessible system—including adequate staff to deliver the services. By hollowing out the workforce, SSA has rendered itself incapable of fulfilling these obligations.

The APA's limits on agency authority are not confined to an agency's "organic" statute. Courts routinely apply cross-cutting statutes to test agency action. *See, e.g.*, *Pennsylvania v. DeVos*, 480 F.Supp.3d 47, 62–63 (D.D.C. 2020) (applying Title IX to Department of Education policy); *Tennessee v. Cardona*, 762 F.Supp.3d 615 (E.D. Ky. 2025) (same); *Sierra Club v. U.S. Army Corps of Eng'rs*, 909 F.3d 635 (4th Cir. 2018) (applying the Clean Water Act to Army Corps permits). So too here: SSA cannot implement a policy that strips beneficiaries with disabilities of the "meaningful access" guaranteed by Section 504. Because the Workforce Reduction Policy renders SSA unable to carry out both its own statutory mandates and binding civil-rights law, it exceeds the agency's authority and is contrary to law.

### IV.  Plaintiffs May Challenge SSA's Policy Under Section 504 of the Rehabilitation Act.

The text and structure of the Rehabilitation Act, as well as the case law interpreting it, all confirm that Section 504(a) supplies Plaintiffs with a direct cause of action against SSA's Workforce Reduction Policy. Congress wrote Section 504(a) in unmistakably rights-creating

terms, extending its protections to "any program or activity conducted by any Executive agency." 29 U.S.C. § 794(a). Courts have long recognized such language as privately enforceable, both for intentional discrimination and for unjustified disparate impacts.

**A. Section 504(a) Provides a Private Right of Action for Disparate-Impact Claims.**

Section 504 speaks in rights-creating terms, the kind the Supreme Court has long held enforceable by individuals and that lower courts have applied for decades. To accept Defendants' view would be to recognize a statutory right while withholding any remedy—an interpretation irreconcilable with the Rehabilitation Act's text and structure.

1. <u>Section 504(a)'s rights-creating language establishes a private right of action for both intentional and disparate-impact discrimination.</u>

Section 504(a)'s text makes plain that Congress provided not merely a prohibition against discrimination by federal agencies, but a remedy enforceable by those whose rights are violated. The touchstone in determining whether a statute creates a private right of action is Congress's intent, discerned first and foremost from the statutory text. *Lee v. U.S. Agency for Int'l Dev.*, 859 F.3d 74, 77–78 (D.C. Cir. 2017); *El Paso Nat. Gas Co. v. United States*, 750 F.3d 863, 889 (D.C. Cir. 2014). Section 504(a) originally stated: "No otherwise qualified handicapped individual in the United States . . . shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." Pub. L. No. 93-112, § 504, 87 Stat. 355, 394 (1973). In 1978, Congress extended the prohibition to "any program or activity conducted by any Executive agency." 29 U.S.C. § 794(a). Section 504(a) provides a private right of action against recipients of federal financial assistance. *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 218 (2022). When Congress repeats rights-creating text within the same statute, courts presume the

same meaning. *Clark v. Martinez*, 543 U.S. 371, 378 (2005). It would be untenable to give those words one effect against funding recipients and another against executive agencies.

The Supreme Court has long treated this formulation—identical to Title VI Section 601 of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and Title IX Section 901 of the Education Amendments of 1972, 20 U.S.C. § 1681(a)—as the hallmark of private enforceability. Section 504(a) identifies the protected class ("qualified individual[s] with a disability"), places them at the center of the prohibition, specifies forbidden injuries ("be excluded," "be denied," "be subjected"), and secures access to federal programs as the protected interest.

*Sandoval* sharpened that distinction: provisions like Title VI Section 601 that use rights-creating language are enforceable in court; provisions that merely impose duties on agencies, like Title VI Section 602, 42 U.S.C. § 2000d–1, are not. 532 U.S. at 288–89. Section 504(a) falls squarely on the enforceable side of that divide. Its text is materially identical to Section 601 and Section 901, both of which support private suits.

That private right encompasses both intentional and disparate-impact discrimination. In *Choate*, the Court considered whether Tennessee's reduction of Medicaid inpatient hospital coverage from 20 to 14 days per year violated Section 504. While rejecting the particular claim, the Court assumed—consistent with Section 504's text—that the statute "reaches at least some conduct that has an unjustifiable disparate impact upon the handicapped," 469 U.S. at 299, and held that the relevant standard is whether disabled individuals are denied "meaningful access" to the benefit provided. *Id.* at 301. Applying that rule, the Court upheld Tennessee's 14-day cap because the benefit was defined as "14 days of coverage," and disabled recipients had the same access to that limited package as others. *Id.* at 302–03.

*Choate* thus clarified two points: Section 504 can be enforced against policies with unjustified disparate impacts, and the "meaningful access" standard sets the boundary. The Court's willingness to resolve the claim on the merits presupposes private enforceability. *See, e.g.*, *Barnes v. Gorman*, 536 U.S. 181 (2002) (holding punitive damages unavailable in private Section 504 actions); *Lane v. Peña*, 518 U.S. 187 (1996) (rejecting punitive damages but affirming injunctive relief in private action against a federal agency). Otherwise, the case would have been dismissed at the threshold. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 84 (1998).[13] The Court's merits decisions in *Choate*, *Barnes*, and *Lane* all presuppose the availability of private enforcement of Section 504(a).

Accordingly, Section 504(a) is self-executing, rights-creating, and judicially enforceable. Its scope, confirmed in *Choate*, encompasses intentional discrimination and unjustified disparate impacts that deny individuals with disabilities meaningful access to federal programs.

2. Section 505 does not erase Section 504(a)'s private enforceability.

Defendants invert the Rehabilitation Act's statutory scheme. *See* ECF 46-1 at 41. Section 504(a) itself creates the substantive right: no qualified individual "shall be subjected to discrimination" by a federal agency or funding recipient. Section 504(b) then authorizes agencies to promulgate regulations to enforce that right, and Section 505, 29 U.S.C. § 794a, specifies the available remedies. Read together, these provisions confirm that Section 505 does not withdraw private enforceability of Section 504(a). To the contrary, treating Section 505's silence about "programs or activities conducted by any Executive agency" as a foreclosure of judicial review would nullify Congress's 1978 amendment extending Section 504 to federal agency programs. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001).

---

[13] *Abrogated on other grounds by Arbaugh v. Y&H Corp.*, 546 U.S. 500 (2006).

*Lane* does not help Defendants. There, the Court held only that Congress had not waived sovereign immunity for damages, leaving intact the availability of equitable relief. 518 U.S. at 192–93. Indeed, the Court went on to adjudicate the Section 504 claim on the merits, presupposing the existence of a private cause of action for injunctive relief.

The structure of the statute confirms the point. Where Congress wanted purely administrative enforcement, it said so. *See, e.g.*, 29 U.S.C. § 791 (vesting the Department of Labor with exclusive enforcement authority), § 793 (tying federal-employment claims expressly to Title VII's framework). Section 504(a) contains no such limitation. It speaks in unmistakably rights-creating terms, and Section 505 incorporates Title VI's remedial scheme—a scheme long understood to include private suits.

Read together, Sections 504 and 505 preserve the availability of private suits—at least for injunctive and declaratory relief—to vindicate Section 504's nondiscrimination command. And because the Supreme Court has construed that command to reach unjustified disparate impacts as well as intentional discrimination, *see Choate*, 469 U.S. at 299–301, the scope of private enforcement necessarily extends to both. Defendants' contrary reading would gut the 1978 amendment, erase the Court's consistent merits adjudications, and rewrite the statute Congress enacted.

3.  <u>Congress authorized private enforcement of disparate-impact claims under Section 504(a).</u>

Even if Section 504's conferral of a private right of action were somehow ambiguous, its legislative history confirms Congress's intent. During debate on the 1978 amendments, members of Congress expressly recognized "the continuing intention of Congress that private actions be allowed under . . . [Section 504] of the Rehabilitation Act." 124 Cong. Rec. 30,349 (1978). Later floor statements reiterated that contrary court rulings "are in direct conflict with congressional intent." 138 Cong. Rec. 31,520 (1992).

Congress's subsequent actions confirm its intent to authorize private enforcement. On multiple occasions—in 1988, 1990, and 1992—Congress reenacted Section 504(a) without altering its operative rights-creating language.[14] Reenactment of statutory text against the backdrop of consistent judicial recognition of private enforcement constitutes ratification of that construction. *See Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 243 n.11 (2009) (holding that reenactment without change "implicitly adopted" the prior judicial interpretation). By leaving the key language untouched, Congress confirmed that courts had it right: Section 504 is privately enforceable.

Finally, Congress paired Section 504 with an attorneys' fees provision. *See* 29 U.S.C. § 794a(b). That provision would serve little purpose if enforcement were limited to rare government-initiated suits or intentional-discrimination claims alone. Its inclusion only makes sense if Congress anticipated private plaintiffs would bring Section 504 actions—including disparate-impact challenges—to ensure that the rights conferred were vindicated in court. *See Nat'l Ass'n of the Deaf v. Trump* (*NAD*), 486 F.Supp.3d 45, 52 (D.D.C. 2020); *see also Corley v. United States*, 556 U.S. 303 (2009) (invoking the canon against superfluity).

4. <u>The APA does not supplant Section 504's private right of action for disparate-impact claims.</u>

Defendants miscast the APA as the exclusive vehicle for Plaintiffs' claims. Section 504(a) itself is rights-creating: "no qualified individual . . . shall be subjected to discrimination" by a federal agency or funding recipient. 29 U.S.C. § 794(a). Section 505(a)(2) then makes Title VI

---

[14] *See* Rehabilitation, Comprehensive Services, and Developmental Disabilities Amendments of 1978, Pub. L. No. 95-602, § 119, 92 Stat. 2955, 2982; Rehabilitation Act Amendments of 1986, Pub. L. No. 99-506, 100 Stat. 1807; Civil Rights Restoration Act of 1987, Pub. L. No. 100-259, 102 Stat. 28; Rehabilitation Act Amendments of 1992, Pub. L. No. 102-569, 106 Stat. 4344.

remedies available to "any person aggrieved" under Section 504. Reading the APA to displace that express remedial scheme would collapse Section 504(a) into a nullity.

The APA is a general review statute. It does not extinguish private remedies Congress created elsewhere. Title VI and Title IX both authorize agency regulations, yet courts have long recognized private enforcement of their rights independent of the APA. Section 504 operates the same way: its substantive command and cross-reference to Title VI remedies confirm that Congress intended private enforcement alongside agency enforcement.

Defendants' reliance on *Moya v. U.S. Department of Homeland Security*, 975 F.3d 120 (2d Cir. 2020), *Clark v. Skinner*, 937 F.2d 123 (4th Cir. 1991), and *Cousins v. Secretary of the U.S. Department of Transportation*, 880 F.2d 603 (1st Cir. 1989) (en banc), is misplaced. Each involved agencies acting in their regulatory capacity—immigration enforcement (*Moya*), transportation waivers (*Clark*), and transportation regulations (*Cousins*). In that setting, courts applied the APA as the proper vehicle. None concerned discrimination in the *operation* of a federal benefits program. SSA's Workforce Reduction Policy is an operational decision in administering Social Security programs, squarely within the coverage of Section 504.

Congress closed the very gap Defendants attempt to reopen. In 1978, it amended Section 504 to cover "any program or activity conducted by any Executive agency." 29 U.S.C. § 794(a). That amendment ensures federal agencies like SSA are bound by the same nondiscrimination mandate as funding recipients. Recasting Plaintiffs' claims as APA-only disputes would erase Congress's deliberate extension of Section 504 to agency-operated programs.

In any event, Defendants' cases are the outliers. Courts across circuits have entertained private Section 504 suits against federal agencies. *See, e.g.*, *Payan v. L.A. Cmty. Coll. Dist.*, 11 F.4th 729, 737 (9th Cir. 2021); *Brook. Ctr. for Psychotherapy, Inc. v. Phil. Indem. Ins.*, 955 F.3d

305, 311–12 (2d Cir. 2020); *Doe v. CVS Pharmacy, Inc.*, 982 F.3d 1204 (9th Cir. 2020); *Valencia v. Springfield*, 883 F.3d 959 (7th Cir. 2018); *Spence v. Straw*, 54 F.3d 196, 201–02 (3d Cir. 1995); *Pushkin v. Regents of Univ. of Colo.*, 658 F.2d 1372, 1381 (10th Cir. 1981); *Lloyd v. Reg'l Transp. Auth.*, 548 F.2d 1277, 1285 (7th Cir. 1977); *see also Mendez v. Gearan*, 947 F.Supp.1364, 1368–69 (N.D. Cal. 1996). This Court should follow that line of authority. *See NAD*, 486 F.Supp.3d 45.

Finally, Defendants' parade of horribles collapses under *Choate*. Section 504 disparate-impact liability is not boundless. *See* ECF 46-1 at 39. It is limited by the "meaningful access" standard, which balances the rights of people with disabilities against agencies' cost-control interests. 469 U.S. at 300–01 (citing *Se. Cmty. Coll. v. Davis*, 442 U.S. 397, 412–13 (1979)). Not every budget cut is actionable—only those, like SSA's Workforce Reduction Policy, that deprive people with disabilities of meaningful access to benefits and services.

## B. Plaintiffs Have Sufficiently Pled Their Disparate-Impact Claim.

At the motion to dismiss stage, plaintiffs need not marshal statistical proof. Defendants' reliance on cases decided at the preliminary-injunction and class-certification stages is misplaced. *See* ECF 46-1 at 38 (citing *Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't of Hous. & Urban Dev.*, 639 F.3d 1078 (D.C. Cir. 2011) (denying preliminary injunction); *Garcia v. Johanns*, 444 F.3d 625 (D.C. Cir. 2006) (denying class certification)). Those decisions turned on evidentiary showings at later stages. They do not govern pleading standards under Rule 12(b)(6).

Nor are Plaintiffs' allegations "conclusory." The Amended Complaint details precisely how SSA's Workforce Reduction Policy falls more harshly on individuals with disabilities, leaving them unable to secure "meaningful access" to benefits. *See, e.g.*, ECF 40 ¶50 (explaining why the Policy's impact is "especially acute for individuals with disabilities"); ¶56 (alleging disproportionate effect on people with disabilities); ¶¶75–77 (recounting Plaintiff Rouse's inability to navigate SSA field offices without accommodation); ¶¶92–94 (detailing Plaintiff Schoch's

inability to obtain vision-related assistance through any access channel); ¶¶127–28 (describing AAPD's diversion of resources to assist constituents shut out by the Policy); ¶133 (documenting Deaf Equality constituents' inability to secure language access); ¶¶138–41 (describing MSAC's inability to help disabled seniors reach SSA at all); ¶¶145–47 (detailing NFB members' lost access to SSA services); ¶¶151–53 (providing concrete examples of blind beneficiaries denied access under the Policy).

Finally, the Complaint ties those allegations directly to the controlling standard in *Choate*: whether disabled individuals are denied "meaningful access" to the benefit. *See id.* ¶¶50, 55, 59, 173, 195; Relief Sought (1), (5). That is all Rule 12(b)(6) requires. Defendants' attempt to frontload evidentiary burdens from later stages should be rejected.[15]

---

[15] Should the Court grant the government's motion to dismiss, dismissal should be without prejudice to allow Plaintiffs an opportunity to amend. *See Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996); *Rollins v. Wackenhut Servs., Inc.*, 703 F.3d 122, 131 (D.C. Cir. 2012).

## <u>CONCLUSION</u>

Defendants' motion to dismiss should be denied.


Dated:  September 17, 2025                    Respectfully submitted,


                                              _____*/s/ Eve L. Hill*_____
                                              Eve L. Hill (DC Bar No. 424896)
                                              **BROWN, GOLDSTEIN & LEVY, LLP**
                                              120 East Baltimore Street, Suite 2500
                                              Baltimore, Maryland 21202
                                              Tel.: (410) 962-1030
                                              Fax: (410) 385-0869
                                              ehill@browngold.com

                                              Regan Bailey (DC Bar No. 465677)
                                              Liam McGivern (Admitted *Pro Hac Vice*)
                                              **JUSTICE IN AGING**
                                              1444 Eye Street, N.W., Suite 1100
                                              Washington, DC 20005
                                              Tel.: (202) 289-6976
                                              rbailey@justiceinaging.org
                                              lmcgivern@justiceinaging.org

                                              *Counsel for Plaintiffs*