# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| AMERICAN ASSOCIATION OF PEOPLE WITH DISABILITIES, *et al.*,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>FRANK BISIGNANO, *in his official capacity as Commissioner of the Social Security Administration*, *et al.*,<br><br>　　　　　Defendants. | No. 25-cv-977 (APM) |

## DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................... 1

ARGUMENT ........................................................................................................................... 2

I.     The Court Lacks Jurisdiction ...................................................................................... 2

      A.     Plaintiffs Lack Article III Standing.................................................................. 2

             1.     Individual Plaintiffs Never Respond To The Numerous Standing
                    Defects Identified in Defendants' Opening Brief ....................................... 2

             2.     Organizational Standing................................................................... 8

             3.     Associational Standing.................................................................... 8

      B.     This Court Lacks Jurisdiction To Consider Claims Concerning The Employment
           Of SSA Employees ....................................................................................... 12

      C.     Plaintiffs' Claims "Arise Under" The Social Security Act, And Thus, The Court
           Lacks Jurisdiction ....................................................................................... 13

II.     Plaintiffs Fail to State a Claim ................................................................................. 14

      A.     Administrative Procedure Act (Counts II–III)...................................................... 14

             1.     APA Review Is Precluded Because SSA's Administrative Reforms
                    Are Committed To Agency Discretion ....................................................... 14

             2.     Plaintiffs Impermissibly Seek Wholesale Improvement Of SSA,
                    Rather Than Review Of Discrete, Final Agency Action ......................... 15

                   a.     SSA's Programmatic Reforms Are Not Discrete Agency
                        Action Subject To APA Review.................................................... 15

                   b.     Any Discrete Agency Action Is Not Final For APA
                        Purposes ....................................................................................... 15

             3.     Plaintiffs' APA Claims Fail ....................................................................... 16

                   a.     Arbitrary and Capricious (Count II) .............................................. 16

                   b.     In Excess of Statutory Authority (Count III) ................................ 17

      B.     Rehabilitation Act (Count I) .................................................................... 18

             1.     There Is No Private Right Of Action Under The Rehabilitation Act........ 18

             2.     Plaintiffs Have Not Shown A Disparate Impact ...................................... 22

i

CONCLUSION.................................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**

*Adams v. City of Indianapolis*,
   742 F.3d 720 (7th Cir. 2014) ............................................................................. 22

*AFGE v. Trump*,
   929 F.3d 748 (D.C. Cir. 2019) ........................................................................... 13

*Alexander v. Choate*,
   469 U.S. 287 (1985) ........................................................................................... 25

*Alexander v. Edgewood Mgmt. Corp.*,
   No. 15-cv-1140, 2016 WL 5957673 (D.D.C. July 25, 2016) .............................. 24

*Allen v. Wright*,
   468 US 737 (1984) ............................................................................................... 5

*Ass'n of Am. Physicians & Surgeons, Inc. v. Sebelius*,
   901 F. Supp. 2d 19 (D.D.C. 2012) ..................................................................... 12

*Bowman Transp., Inc. v. Ark.-Best Freight Sys. Inc.*,
   419 U.S. 218 (1974) ........................................................................................... 17

*Boykin v. Fenty*,
   650 F. App'x 42 (D.C. Cir. 2016) ................................................................. 23, 24

*Briggs v. Campbell*,
   No. 23-CV-116 (TSC), 2024 WL 1212294 (D.D.C. Mar. 20, 2024) ................... 24

*Californians for Renewable Energy v. U.S. Dep't of Energy*,
   860 F.Supp.2d 44 (D.D.C. 2012) ....................................................................... 11

*Chamber of Com. v. EPA*,
   642 F.3d 192 (D.C. Cir. 2011) ........................................................................... 10

*Cherokee Nation v. U.S. DOI*,
   643 F. Supp. 3d 90 (D.D.C. 2022) ....................................................................... 6

*Cigar Ass'n of Am. v. U.S. Food & Drug Admin.*,
   323 F.R.D. 54 (D.D.C. 2017) ............................................................................... 9

*Clapper v. Amnesty, Int'l USA*,
   568 U.S. 398 (2005) ............................................................................................. 5

*Clark v. Skinner*,
  937 F.2d 123 (4th Cir. 1991) ........................................................................... 19, 20, 21

*Commissioned Officers Ass'n of United States Pub. Health Serv. v. Bunch*,
  No. 21-853 (JDB), 2022 WL 951271 (D.D.C. Mar. 30, 2022)................................................ 11

*Common Cause v. Biden*,
  909 F. Supp. 2d 9 (D.D.C. 2012)................................................................................. 11

*Conf. of State Bank Supervisors v. Off. of Comptroller of Currency*,
  313 F. Supp. 3d 285 (D.D.C. 2018).............................................................................. 11

*Coubaly v. Cargill Inc.*,
  144 F4th 343 (D.C. Cir. 2025)................................................................................ 2, 5

*Cousins v. Sec'y of U.S. Dep't of Transp.*,
  880 F.2d 603 (1st Cir. 1989)................................................................................. 19, 20, 21

*Ctr. for Responsible Sci. v. Gottlieb*,
  346 F. Supp. 3d 29 (D.D.C. 2018),
  *aff'd sub nom. Ctr. for Responsible Sci. v. Hahn*, 809 F. App'x 10 (D.C. Cir. 2020)................. 9

*Davis v. District of Columbia*,
  949 F. Supp. 2d 1 (D.D.C. 2013)................................................................................ 23

*Day v. D.C. Dep't of Consumer & Regul. Affs.*,
  191 F. Supp. 2d 154 (D.D.C. 2002)........................................................................... 3, 5

*Delta Constr. Co. v. EPA*,
  783 F.3d 1291 (D.C. Cir. 2015)................................................................................ 6

*Doe 1 v. Apple Inc.*,
  96 F.4th 403 (D.C. Cir. 2024)................................................................................. 5

*Doe A v. Spahn*,
  No. 1:23-cv-02859, 2025 WL 1305360 (D.D.C. May 6, 2025) ............................................... 19

*Doe v. Att'y Gen. of the U.S.*,
  941 F.2d 780 (9th Cir. 1991) ................................................................................ 19

*FCC v. Prometheus Radio Project*,
  592 U.S. 414 (2021)........................................................................................... 17

*FDA v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024).......................................................................................... 7, 8, 9, 10

*Food & Water Watch, Inc. v. Vilsack*,
    808 F.3d 905 (D.C. Cir. 2015) ................................................................. 2, 6, 9, 10

*Friends of Animals v. Jewell*,
    115 F. Supp. 3d 107 (D.D.C. 2015),
    *aff'd*, 828 F.3d 989 (D.C. Cir. 2016) .................................................................. 11

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) ....................................................................................... 8, 9

*Heckler v. Chaney*,
    470 U.S. 821 (1985) .......................................................................................... 15

*Heckler v. Ringer*,
    466 U.S. 602 (1984) .......................................................................................... 14

*Henrietta D. v. Bloomberg*,
    331 F.3d 261 (2d Cir. 2003) ................................................................................ 6

*Hisp. Affs. Project v. Acosta*,
    901 F.3d 378 (D.C. Cir. 2018) ........................................................................... 16

*J.L. v. Soc. Sec. Admin.*,
    971 F.2d 260 (9th Cir. 1992) ........................................................................ 19, 20

*Kushner v. Ill. State Toll Highway Auth.*,
    575 F. Supp. 2d 919 (N.D. Ill. 2008) ................................................................... 7

*Lincoln v. Vigil*,
    508 U.S. 182 (1993) .......................................................................................... 15

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990) .......................................................................................... 16

*Mandala v. NTT Data, Inc.*,
    975 F.3d 202 (2d Cir. 2020) .......................................................................... 22, 23

*Maryland v. USDA*,
    151 F.4th 197 (4th Cir. 2025) .................................................................... 7, 12, 13

*Mathis v. U.S. Parole Comm'n*,
    749 F. Supp. 3d 8 (D.D.C. 2024) ................................................................. 19, 21

*Menoken v. McGettigan*,
    273 F. Supp. 3d 188 (D.D.C. 2017),
    *aff'd sub nom. Menoken v. Pon*, No. 17-5228, 2018 WL 2383278 (D.C. Cir. May 9, 2018) ... 24

*Moya v. U.S. DHS*,
    975 F.3d 120 (2d Cir. 2020).................................................................... 19, 20, 21

*Nanko Shipping, USA v. Alcoa, Inc.*,
    850 F.3d 461 (D.C. Cir. 2017)....................................................................... 22

*Nat'l Ass'n for Latino Cmty. Asset Builders v. Consumer Fin. Prot. Bureau*,
    581 F. Supp. 3d 101 (D.D.C. 2022)................................................................ 10

*Nat'l Council of Nonprofits v. Off. Of Mgmt. & Budget*,
    775 F. Supp. 3d 100 (D.D.C. 2025)................................................................ 15

*Nat'l Fair Hous. All. v. Travelers Indemnity Co.*,
    261 F. Supp. 3d 20 (D.D.C. 2017)................................................................. 24

*Nat'l Veterans Legal Servs. Program v. U.S. Dep't of Def.*,
    No. 14-cv-01915 (APM), 2016 WL 4435175 (D.D.C. Aug. 19, 2016)...................... 9

*New Eng. Anti-Vivisection Soc'y v. U.S. Fish & Wildlife Serv.*,
    208 F. Supp. 3d 142 (D.D.C. 2016)............................................................. 9, 10

*Palmer v. Homecomings Fin. LLC*,
    677 F. Supp. 2d 233 (D.D.C. 2010)................................................................ 23

*Pharm. Rsch. & Mfrs. of Am. v. Becerra*,
    No. 1:21-CV-1395 (CJN), 2021 WL 5630798 (D.D.C. Dec. 1, 2021)..................... 11

*Pharm. Rsch. & Mfrs. of Am. v. Dep't of Health & Hum. Servs.*,
    656 F. Supp. 3d 137 (D.D.C. 2023)................................................................ 11

*POET Biorefining, LLC v. EPA*,
    970 F.3d 392 (D.C. Cir. 2020)...................................................................... 16

*Ranchers-Cattlemen Action Legal Fund v. USDA*,
    573 F. Supp. 3d 324 (D.D.C. 2021)................................................................ 12

*Sai v. DHS*,
    149 F. Supp. 3d 99 (D.D.C. 2015)................................................................. 19

*Shanks v. Int'l Union of Bricklayers & Allied Craftworkers*,
    134 F.4th 585 (D.C. Cir. 2025)..................................................................... 22

*Sierra Club v. EPA*,
    292 F.3d 895 (D.C. Cir. 2002)...................................................................... 11

*Smith v. City of Jackson*,
    544 U.S. 228 (2005)............................................................................... 22, 24

*Spencer v. Straw,*
   54 F.3d 196 (3d Cir. 1995) ................................................................................................ 20

*Steenholdt v. FAA,*
   314 F.3d 633 (D.C. Cir. 2003) ......................................................................................... 15

*Summers v. Earth Island Inst.,*
   555 U.S. 488 (2009) .................................................................................................... 10, 11

*TransUnion LLC v. Ramirez,*
   594 U.S. 413 (2021) ............................................................................................................ 7

*Twin Rivers Paper Co. LLC v. SEC,*
   934 F.3d 607 (D.C. Cir. 2019) ......................................................................................... 11

*United Spinal Assn' Inc. v. O'Malley,*
   No. 20-cv-2236 (TSC), 2024 WL 3400259 (D.D.C. July 11, 2024),
   *appeal dismissed*, No. 24-5208, 2024 WL 4631680 (D.C. Cir. Oct. 29, 2024) ...................... 14

*Valencia v. City of Springfield,*
   883 F.3d 959 (7th Cir. 2018) ........................................................................................... 20

*W. Wood Pres. Inst. v. McHugh,*
   292 F.R.D. 145 (D.D.C. 2013) ......................................................................................... 12

*W. Wood Pres. Inst. v. McHugh,*
   925 F. Supp. 2d 63 (D.D.C. 2013) ................................................................................... 11

*Watson v. Fort Worth Bank & Tr.,*
   487 U.S. 977 (1988) ......................................................................................................... 22

*Webster v. Doe,*
   486 U.S. 592 (1988) ......................................................................................................... 15

*Weingarten v. Devos,*
   468 F. Supp. 3d 322 (D.D.C. 2020) ............................................................................... 9, 10

**Statutes**

29 U.S.C. § 794(a) ............................................................................................... 18, 19, 21

29 U.S.C. § 794a(a)(1) ............................................................................................... 19

29 U.S.C. § 794a(a)(2) ............................................................................................... 19

42 U.S.C. § 902(a)(4) .................................................................................................... 17

42 U.S.C. § 902(a)(6) ............................................................................................... 15, 16

42 U.S.C. § 405(t) ........................................................................................................ 18

42 U.S.C. § 423(a)(1) ................................................................................................... 18

42 U.S.C. § 423(a)(2) ................................................................................................... 18

42 U.S.C. § 1383 .......................................................................................................... 18

42 U.S.C. § 1383(e)(6) ................................................................................................. 18

Act to Amend Rehabilitation Act of 1973, Pub.L. No. 95-602, § 119(2), 92 Stat. 2955, 2982
    (1978) ..................................................................................................................... 20

**Other Sources**

Kathleen Romig, SSA Staffing Shortage Hurts Hard-Working Americans, CTR. ON BUDGET
    & POL'Y PRIORITIES (Aug. 29, 2018), https://www.cbpp.org/blog/ssa-staffing-shortage-
    hurts-hard-working-americans ................................................................................... 3

SSA Press Release, Barton Mackey, Press Officer, *Inspector General Report Confirms
    Significant Customer Service Improvements at Social Securit*y (Dec. 22, 2025),
    https://perma.cc/X9WN-6DZ7 .................................................................................. 6

SSA Press Release, Mark Hinkle, Press Officer, Social Security Announces Workforce and
    Organization Plans (Feb. 28, 2025), https://perma.cc/D4Z4-3JN4 .......................... 17

SSA Office of Inspector General, *Audit Report: Social Security Administration's Telephone
    Metrics* (Dec. 25, 2025), https://perma.cc/9LZD-WT5J ........................................... 6

**INTRODUCTION**

In their opposition to Defendants' Motion to Dismiss the First Amended Complaint, ECF No. 46 ("Def.'s Mot. to Dismiss" or "Def. Br."), Plaintiffs (seven disabled individuals and five advocacy groups) assert that they are challenging what they call the "Workforce Reduction Policy" at SSA.[1]  *See* Pls.' Mem. of P. & A. in Opp'n to Defs.' Mot. to Dismiss First Am. Compl. at 1, ECF No. 47 (the "Opposition" or "Pls.' Opp.").  Plaintiffs nowhere define this phrase, but it appears to encompass the agency's plans in early 2025 to reduce the workforce by about 12%, from 57,000 to 50,000.  Regardless, it is undisputed in the Opposition that the agency never went forward with the 12% plan, and instead, through voluntary separation incentives earlier in 2025, SSA's workforce decreased by 6%.  Plaintiffs therefore are alleging harm to disabled persons from about a 6% reduction across the entire SSA organization.

Beyond this, Plaintiffs' case is elusive and contradictory.  This Court, when earlier denying preliminary relief, carefully considered the harms alleged by the Individual Plaintiffs—primarily "wait times [and] difficulties contacting the SSA"—and concluded that "Individual Plaintiffs largely complain about matters that predate the administrative actions at issue."  Mem. Op. & Order at 3-4, ECF No. 34 ("Op.").  Now, in the Opposition, Plaintiffs emphatically argue that "this case is not about 'customer service' or case-processing speed."  Pls.' Opp. at 1.  And while the Amended Complaint alleges that "SSA's workforce reduction policy has had the effect of denying individuals with disabilities timely and equitable access to *benefits* . . . [,]"  First Am. Compl. ¶ 196, ECF No. 49, 54 (redacted version) ("Amen. Compl." or "FAC") (emphasis added), it is undisputed in the Opposition that no Individual Plaintiff has alleged his or her benefits have been denied or delayed as a result of the workforce reductions.  *See also* Op. 4 ("not asserting any termination or diminution of benefits").

In any event, the Opposition fails to overcome the jurisdictional defects in this case.  The Opposition never grapples with the numerous standing defects for the Individual Plaintiffs.

---

[1] Abbreviated terms are defined in Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint.

Several pages of the Opposition are just paraphrased, conclusory accounts of the Individual Plaintiffs' customer service experiences, devoid of any legal analysis or response to Defendants' arguments. *See* Pls.' Opp. at 4-7. For the organizational plaintiffs, which the Court previously observed "fare no better" in this case, the Opposition relies upon an impermissible diversion-of-resources theory, among other flaws. *See* Op. at 5-6. Nor do Plaintiffs clear the other jurisdictional hurdles here: preclusion of their claims challenging federal workforce reductions, and preclusion of claims that "arise under" the Social Security Act.

The Opposition also does not overcome Defendants' (alternative) Rule 12(b)(6) arguments. Among other deficiencies, the Opposition fails to show that the purported "Workforce Reduction Policy"—which has not fully materialized—is reviewable under the APA as final agency action. And Plaintiffs assert that "the substantive basis of their claims is the Rehabilitation Act[,]" but that assertion fails to state a claim: among other reasons, the Act affords no private right of action. *See* Pls.' Opp. at 16-17.

Plaintiffs' Amended Complaint should be dismissed.

## ARGUMENT

## I.    The Court Lacks Jurisdiction

### A.    Plaintiffs Lack Article III Standing

As a threshold matter, Plaintiffs' standing arguments rest on the basic misconception that their "general factual allegations of injury" suffice. *See* Pls.' Opp. at 3 n.3 (quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015)). As the D.C. Circuit recently emphasized, however, "[t]o show standing at the motion-to-dismiss stage, the Plaintiffs need[] to plausibly allege *specific facts* . . . ." *Coubaly v. Cargill Inc.,* 144 F.4th 343, 349-350 (D.C. Cir. 2025) (emphasis added). "Article III requires more particularized allegations of fact"—not "general averments and conclusory allegations." *Id.* at 348 (citation omitted). As explained below, the Opposition fails to meet this burden for either the individual or organizational plaintiffs.

### 1.    The Individual Plaintiffs Never Respond To The Numerous Standing Defects Identified in Defendants' Opening Brief

The Individual Plaintiffs decline to grapple with the specific standing defects identified in Defendants' Motion. Instead, Plaintiffs rest their Opposition on several pages of non-responsive, purported "summaries" of the anecdotal customer experiences of each Individual Plaintiff. *See* Pls.' Opp. 4-7. Plaintiffs have waived any substantive response. *See, e.g., Day v. D.C. Dep't of Consumer & Regul. Affs.*, 191 F. Supp. 2d 154, 159 (D.D.C. 2002) ("If a party fails to counter an argument that the opposing party makes in a motion, the court may treat that argument as conceded."). The result, as explained below, is that the Individual Plaintiffs have not established standing across any of the "three primary access channels" they identify (telephone access, in-person service at field offices, or online) because they fail to plead facts showing: (1) their experiences are meaningfully worse than before the workforce reductions; (2) the workforce reductions were the cause of (any) meaningfully worsened experience; (3) these customer service grievances constitute cognizable injury in the first place, and (4) the relief sought likely would provide redress.

1.      As this Court previously concluded, the Individual Plaintiffs "largely complain about matters that predate the administrative actions at issue[,]" Op. at 3, and the Opposition never disputes this determination. In fact, the Opposition itself relies upon documents highlighting these preexisting matters—one cited document, for example, explains, "Most callers to SSA's national 800 number don't get their questions resolved; as hold times have risen, nearly half of callers hang up before connecting and a growing number get busy signals."[2]

*Telephone access*.  The Opposition ignores that the Individual Plaintiffs' own pleadings show similar telephone access issues predating the workforce reductions (as previously observed by the Court). Defendants' brief showed, for example, that in the Amended Complaint, Ms. Rouse alleged hour-plus wait times, and unanswered calls, prior to the workforce reductions. *See* Def. Br. at 12-13. Instead of responding to this argument, Plaintiffs purport to paraphrase the pleadings for Ms. Rouse, claiming she "cannot access SSA through her local office, by telephone, or by

---

[2] *See* Kathleen Romig, SSA Staffing Shortage Hurts Hard-Working Americans, CTR. ON BUDGET & POL'Y PRIORITIES (Aug. 29, 2018), https://www.cbpp.org/blog/ssa-staffing-shortage-hurts-hardworking-americans, *cited in* Pls.' Opp. 1 n.2.

SSA's online portal."  Pls.' Opp. at 4.  But the Amended Complaint contradicts this "paraphrase": Ms. Rouse actually alleges that on June 18, 2025, after a "25 minute wait," "an agent answered the phone," and later that afternoon, a live agent "made an appointment for [her]."  Am. Compl. ¶ 77.  Defendants also pointed out Ms. Hazen's allegation that she "frequently" spent "up to 90 minutes" on hold, evidently prior to the reductions, Def. Br. at 13 (quoting FAC ¶ 97), and Plaintiffs, yet again, decline to explain in the Opposition how there is a meaningful difference between that prior experience and the "85 minutes" Ms. Hazen allegedly waited during her June 17, 2025 call, *see* FAC ¶ 99.[3]  Plaintiffs also decline to respond to Defendants' point that Ms. Garvey alleged hold times for calls she made in April and June 2025, but no information was provided about her calls prior to the workforce reductions (and Plaintiffs decline to compare those wait times to those alleged for other Individual Plaintiffs, prior to the reductions).  Def. Br. at 13; Pls.' Opp. at 5.  And Defendants specifically pointed out the ambiguity in the pleading about the timing of the alleged calls made by Ms. Powell, Ms. Schoch, and Mr. Weiss.  *See* Def. Br. 13. Plaintiffs do not respond to any of these arguments.

**_In-person field office visits_**.  Plaintiffs likewise decline to square the waiting times at field office visits prior to the workforce reductions (*see id.* at 13 re Mr. Tiller and Ms. Hazen), with more recent visits reflecting improved wait times, for Ms. Rouse (FAC ¶ 75 (alleging "40 minutes to over an hour")) and Ms. Garvey (*id*. ¶ 84 (alleging no waiting time on her subsequent June 9 visit)).  The Opposition emphasizes that Ms. Garvey allegedly was "turned away from an SSA field office" visit on April 22 because she had not made an appointment, Pls.' Opp. at 5 (citing FAC ¶ 82), but this experience is no different than Mr. Weiss's pre-workforce reduction interaction in January 2025, when he was similarly "told he could not be seen without an appointment."  FAC ¶ 106.  Mr. Tiller (FAC ¶¶ 121-125), Ms. Hazen (FAC ¶¶ 96-100), and Ms. Powell (FAC ¶¶ 112-120) do not allege to have visited an office (at least after the workforce reductions).  *See* Pls.' Opp. at 5-7.

---

[3] Ms. Hazen never alleges that "receiv[ing] inconsistent information from different representatives" is unique to the post-workforce reduction time frame.  *See* Pls.' Opp. at 5.

***Online access***.  Plaintiffs also never respond to Defendants' argument that their Plaintiffs' own complaints about the SSA website portal "long predate the workforce reductions."  *See* Def. Br. at 14. The Opposition just makes conclusory references about the only two Individual Plaintiffs in the Amended Complaint who clearly allege to have tried using the SSA online channel, Ms. Rouse ("the automated response tool produced little to no helpful information" (FAC ¶ 76)) and Ms. Schoch ("encountered an error message that prevented her from using her online account" (FAC ¶ 93)).[4]  The Opposition fails to square these grievances with Plaintiffs' own earlier complaints (as noted above), and Plaintiffs have waived any substantive response.  *See Day*, 191 F. Supp. 2d at 159.  Notably, even documents cited in the Opposition emphasized that prior to the workforce reductions, "SSA needs to enhance the customer experience via . . . online services . . . . SSA needs online services that reduce barriers and improve service delivery."[5]

**2.**    Plaintiffs' theory of causation also falls short.  *See* Pls.' Opp. at 11-12.  As an initial matter, the Individual Plaintiffs do not dispute that their grievances pre-dated the workforce reductions, as explained above. And Plaintiffs do not appear to dispute that their causation theories are, in fact, attenuated.  *See id.*  Rather, Plaintiffs attempt to distinguish *Clapper v. Amnesty, Int'l USA,* 568 U.S. 398 (2005), as a "future injury" case, *id.*  But Defendants cited *Clapper* for the speculative nature of Plaintiffs' chain of causation, Def. Br. at 15-16, and in any event, the D.C. Circuit is unequivocal: "The chain of causation may not be 'attenuated[.]'" *Doe 1 v. Apple Inc.*, 96 F.4th 403, 409 (D.C. Cir. 2024) (quoting *Allen v. Wright*, 468 US 737, 752 (1984)); *Coubaly*, 144 F.4th at 347 (same) (citing *Apple,* 96 F.4th at 409).

Plaintiffs, in any event, do not overcome the defects identified in Defendants' motion.  For field office visits, it is undisputed that none of the Individual Plaintiffs visited (or attempted to

---

[4] The Amended Complaint refers only obliquely to any SSA online access by Mr. Tiller, FAC ¶ 123, but the opposition is silent about this.  It also is unclear if Ms. Powell actually attempted to access the SSA website, *see* FAC ¶ 119 ("[she] cannot navigate SSA's online platform without consistent and reliable screen-reader compatibility"); Pls.' Opp. at 6 ("[O]nline portal is unusable with her adaptive screen reader.").

[5] *See* Romig, SSA Staffing Shortage Hurts Hard-Working Americans, *supra*, at n.2, *cited in* Pls.' Opp. 1 n.2.

visit) any of the 40 field offices that Plaintiffs allege "have lost 25 percent or more of their staff[,]" Am. Compl. ¶ 49, upon which Plaintiffs base their claim that SSA has "hollow[ed] out the agency" and "gutt[ed] . . . its [w]orkforce." *See* Pls.' Opp. at 11–13. Nor do they point to any specific allegations in their pleadings showing a significant reduction in workforce at the field offices they *did* visit. For phone service, Plaintiffs do not dispute that, during the latter half of 2025, *after* the workforce reductions, phone wait times improved. *See* Def. Br. at 8. Indeed, the Opposition does not dispute that service across all three "channels" or "access points" has been improving, as confirmed in a recent SSA press release, discussing a report from the SSA Office of Inspector General, and highlighting:

- The average speed of answer for the National 800 Number has been in the single digits the last few months.
- Sixty-five percent more calls were answered in FY 2025 compared to FY 2024.
- The average wait time for visitors at field offices decreased by nearly 30 percent from FY 2024 to FY 2025, and those with an appointment wait on average just six minutes to be helped.
- The backlog of pending initial disability claims has decreased by 33% from the all-time high of 1.26 million pending claims in June 2024.
- Americans now have 24/7 access to their personal mySocialSecurityaccount, when previously the website was down 29 hours a week.[6]

Finally, Plaintiffs decline to posit any plausible theory as to how the *workforce reductions* (*i.e.,* 6% across the agency) caused Ms. Rouse's alleged difficulties making an appointment online, or caused the alleged "error message that prevented [Ms. Schoch] from using her online account[.]" *See* FAC ¶¶ 76, 93. Where "the [alleged] injury would occur regardless of the challenged action—say, because some separate action would independently cause it in full—then the fair traceability test is not met." *See Cherokee Nation v. U.S. DOI*, 643 F. Supp. 3d 90, 106 (D.D.C. 2022) (citing *Delta Constr. Co. v. EPA*, 783 F.3d 1291, 1297 (D.C. Cir. 2015)).[7] And contrary to Plaintiffs' assertion (Pls.' Opp. 12), "[i]n determining standing, [the court] may consider materials outside of

---

[6] *See, e.g.,* SSA Press Release, Barton Mackey, Press Officer, *Inspector General Report Confirms Significant Customer Service Improvements at Social Securit*y (Dec. 22, 2025), https://perma.cc/X9WN-6DZ7; *see also* SSA Office of Inspector General, *Audit Report: Social Security Administration's Telephone Metrics* (Dec. 25, 2025), https://perma.cc/9LZD-WT5J.

[7] Plaintiffs' citation to *Henrietta D. v. Bloomberg*, 331 F.3d 261, 278 (2d Cir. 2003), *cited in* Pls.' Opp. at 12, is unavailing—the relevant discussion there does not concern Article III standing.

the complaint" (see *Food & Water*, 808 F.3d at 913)—including evidence of the concurrent 18% increase in demand.

**3.**     Plaintiffs also fail to respond to Defendants' argument that these anecdotal customer service issues are not cognizable injuries for standing in the first place, and thus, any response is waived.  Critically, Plaintiffs never dispute the absence of any pleading that Individual Plaintiffs are being denied benefits, or that their benefits are being delayed.  In fact, Plaintiffs never dispute that at base, Ms. Hazen and Ms. Rouse, who are evidently currently receiving benefits, are really just alleging *fears* about speculative, unmaterialized harm—which cannot constitute Article III injury. *See* Def. Br. 17.  While "[a]n injury in fact can be a physical injury, a monetary injury, an injury to one's property, or an injury to one's constitutional rights, to take just a few common examples[,]" *FDA v. All. for Hippocratic Med.,* 602 U.S. 367, 1556 (2024), individual Plaintiffs fail to identify the "injury-in-fact" (or any historical tradition supporting such alleged injury) from their anecdotal experiences, which, as Defendants pointed out, is Plaintiffs' burden,  *see* Def. Br. at 17 (citing *TransUnion LLC v. Ramirez*, 594 U.S. 413, 426-27 (2021)); *see also, generally, e.g., Kushner v. Ill. State Toll Highway Auth.,* 575 F. Supp. 2d 919, 924 (N.D. Ill. 2008) ("The inconvenience of receiving a busy signal [at a government agency] for five days is not a legally cognizable injury.").

**4.**     Plaintiffs' remedy argument is unavailing.  "[S]crutiny of the requested relief under Article III standing doctrine, especially where plaintiffs are seeking an equitable remedy, ensures that the 'proper parties' are seeking the 'proper relief' to redress their injuries." *Maryland v. USDA*, 151 F.4th 197, 211-12 (4th Cir. 2025) (citation omitted).  The Amended Complaint seeks multiple injunctions each directed to ensuring "reasonable accommodations"—yet as the Court observed, no Individual Plaintiff even "claims to have recently tried to file a discrimination complaint or request an accommodation from SSA." Op. at 5.

Plaintiffs fall short in attempting to bridge this disconnect with the passing, conclusory assertion that "[Ms.] Rouse alleges SSA failed to accommodate her disability." Pls.' Opp. at 13 (citing FAC ¶ 78).  It is undisputed that Ms. Rouse never *requested* any accommodation (and Ms.

Rouse herself alleges that the representative she reached "made an appointment so she could have her questions answered in person at her local field office."). FAC ¶ 77.

Plaintiffs, moreover, fail to provide any basis for requesting an injunction that Defendants "[s]ufficiently staff the office(s) replacing the Office of Civil Rights and Equal Opportunity [OCREO]." Am. Compl., Relief Sought ¶ 4(c). Nowhere in the Amended Complaint is there any reference to the OCREO or any replacement office (apart from this lone reference in the Relief Sought). The same is true of the Opposition. And there is no allegation that Ms. Rouse—or anyone else—sought to file any form of accommodation request or discrimination complaint with "the office(s) replacing [OCREO]." *Id.* Plaintiffs therefore have not shown that their requested relief would redress any injury.[8]

### 2.    Organizational Standing

For organizational standing, Plaintiffs simply repackage the same diversion of resources theory that this Court has already rejected. As explained in the Defendants' Motion to Dismiss, (Def. Br. 20-23), the Supreme Court made clear in *Alliance for Hippocratic Medicine* that an organization does not establish standing merely by choosing to divert resources in response to challenged government action. 602 U.S. at 395. Despite that clear holding, Plaintiffs press the same theory again—indeed, they explicitly rely on it for each Organizational Plaintiff. *See* Pls.' Opp. at 7-10.

The Organizational Plaintiffs contend they are not traditional direct service providers, and instead focus on systemic advocacy, education, and empowerment, while also offering some limited assistance to individuals seeking access to SSA benefits. *Id*. at 2. According to Plaintiffs, SSA's policies have forced these organizations, whose core missions center on advocacy and education, to focus more on providing direct services to members and constituents. *Id.* at 4. Plaintiffs characterize this as the "paradigmatic diversion-of-resources harm recognized in *Havens*

---

[8] Plaintiffs mistakenly assert that Defendants limit their "attack" on redressability to "only" three forms of requested relief. *See* Pls.' Opp. at 13. Rather, the opening brief attacked the "considerable disconnect" between the entire Prayer for Relief and the allegations in the Amended Complaint. *See* Def. Br. at 18.

*Realty Corp. v. Coleman*, 455 U.S. 363 (1982): organizations forced to abandon their core mission to fill gaps created by unlawful or discriminatory conduct." *Id.* at 2. That is not what *Havens Realty* held. *Havens Realty* recognized organizational standing only where a defendant's conduct *perceptibly impaired* the organization's ability to carry out its core services. 455 U.S. at 379.

Subsequent decisions make clear that an organization does not establish standing merely by reallocating resources in response to challenged conduct. *See All. for Hippocratic Med.*, 602 U.S. at 395 and *Food & Water Watch*, 808 F.3d at 919. Consistent with that guidance, courts in this District have repeatedly held that a bare diversion of resources is insufficient to confer organizational standing. *See, e.g., Cigar Ass'n of Am. v. U.S. Food & Drug Admin.*, 323 F.R.D. 54 (D.D.C. 2017); *New England Anti-Vivisection Soc'y v. U.S. Fish & Wildlife Serv.*, 208 F. Supp. 3d 142, 165–66 (D.D.C. 2016); *Nat'l Veterans Legal Servs. Program v. U.S. Dep't of Def.*, No. 14-cv-01915 (APM), 2016 WL 4435175, at *1 (D.D.C. Aug. 19, 2016); *Ctr. for Responsible Sci. v. Gottlieb*, 346 F. Supp. 3d 29, 42-43 (D.D.C. 2018), *aff'd sub nom. Ctr. for Responsible Sci. v. Hahn*, 809 F. App'x 10 (D.C. Cir. 2020); *Weingarten v. Devos*, 468 F. Supp. 3d 322, 334 (D.D.C. 2020).

Plaintiffs' opposition does not directly confront any of the arguments Defendants made in their motion to dismiss, instead repackaging what was already stated in their Amended Complaint. Responding to each organization *seriatim*: Plaintiffs state in unambiguous terms that the challenged policy "has forced [AAPD] to divert staff and operational resources" away from its advocacy work and toward emergency constituent assistance. FAC ¶ 128. That allegation describes exactly the type of self-inflicted reallocation of resources the Supreme Court has held is insufficient to establish organizational standing. Plaintiffs make the same concession with respect to Deaf Equality, describing its response to SSA's policies as the "quintessential diversion-of-resources injury." Pls.' Opp. at 8. They likewise allege that MSAC "must devote far more time to one-on-one assistance, leaving less for collective advocacy." *Id*. These allegations do not identify any impairment imposed by the government on the organizations' operations. They instead describe discretionary choices to redirect resources in response to policy changes.

Plaintiffs repeat the same theory for NFB, alleging that SSA policies required it to "divert institutional resources, including reassigning staff and increasing its budget for individualized member assistance." *Id.* (citation omitted). And for NCPSSM, Plaintiffs again characterize the organizations' response as a "redirection of resources away from core advocacy work," which they label a "classic *Havens*-style organizational injury." *Id.* at 9.

As this Court aptly stated in *National Ass'n for Latino Community Asset Builders v. Consumer Financial Protection Bureau*, "[e]xpenditure of resources in response to agency action alone is not enough to establish a cognizable injury . . . ." 581 F. Supp. 3d 101, 106 (D.D.C. 2022). "Case law in this Circuit makes clear that there must be a separate perceptible impairment of the organization's ability to provide services—something that makes it more difficult for the organization to conduct its activities." *Id.*; *see Food & Water Watch,* 808 F.3d at 921; *Weingarten*, 468 F. Supp. 3d at 334; *New Eng. Anti-Vivisection Soc'y*, 208 F. Supp. 3d at 167. Plaintiffs have failed to make such a showing here.

Plaintiffs consistently rely on a single theory: that an organization establishes standing whenever it chooses to reallocate resources in response to government action. But it does not. As the Supreme Court has made clear, an organization cannot manufacture standing by altering its resource allocation in response to a challenged policy. *All. for Hippocratic Med.*, 602 U.S. at 395. The D.C. Circuit has said the same. *Food & Water Watch*, 808 F.3d at 919. Under controlling precedent, Plaintiffs' diversion of resources theory cannot support organizational standing.

### 3.    Associational Standing

Three Organizational Plaintiffs, NFB, MSAC, and NCPSSM, claim to have associational standing. That claim fails at the threshold because none of these organizations have identified a specific member who has suffered a cognizable injury.

To satisfy the first prong of associational standing, as stated in Def.'s Mot. to Dismiss at 19-20, it is "not enough to aver that unidentified members have been injured." *Chamber of Com. v. EPA,* 642 F.3d 192, 199 (D.C. Cir. 2011). Rather, "the petitioner must specifically identify members who have suffered the requisite harm." *Id.* at 199-200 (citation omitted); *see also*

*Summers v. Earth Island Inst.,* 555 U.S. 488, 498–99 (2009). In *Summers*, the Supreme Court rejected an organization's attempt to rely on its own characterization of member injuries, emphasizing that courts may not "accept[] the organization's self-description of the activities of its members[.]" 555 U.S. at 497–99. Instead, the Court stressed the importance of individual affidavits in "assur[ing] itself" of an organizational plaintiff's standing. *Id*. The D.C. Circuit applied the same rule in *Twin Rivers Paper Co. LLC v. SEC*, holding that an organization lacked standing where it "failed to submit any member affidavits with its opening brief," did not "identify any individual members" in its own affidavit, and "fail[ed] to identify individual members" in its brief. 934 F.3d 607, 613 (D.C. Cir. 2019). Although the organization asserted that its members would be harmed by the challenged rule, the court reiterated that a plaintiff must establish standing, "by affidavit or other evidence," and that "briefs are not evidence[.]" *Id*. (quotations omitted) (quoting *Sierra Club v. EPA*, 292 F.3d 895, 899, 901 (D.C. Cir. 2002)).

That principle controls here. Plaintiffs suggest that Defendants rest their argument on a single, unreported decision in *Commissioned Officers Ass'n of United States Public Health Service v. Bunch,* No. 21-853 (JDB), 2022 WL 951271 (D.D.C. Mar. 30, 2022); Pls.' Opp. at 9-10. To the contrary, the overwhelming majority of decisions in this District hold that, at the motion-to-dismiss stage, an organization invoking associational standing must identify at least one member who has suffered the requisite injury. *Conf. of State Bank Supervisors v. Off. of Comptroller of Currency*, 313 F. Supp. 3d 285, 298 (D.D.C. 2018) (Friedrich, J.) ("[T]he identification requirement serves an important gatekeeping role."); *see W. Wood Pres. Inst. v. McHugh*, 925 F. Supp. 2d 63, 69–70 (D.D.C. 2013) (Huvelle, J.); *Californians for Renewable Energy v. U.S. Dep't of Energy*, 860 F.Supp.2d 44, 48 (D.D.C. 2012) (Boasberg, C.J.) ("[T]he organization must name at least one member who has suffered the requisite harm."); *Common Cause v. Biden*, 909 F. Supp. 2d 9, 21 n.6 (D.D.C. 2012) (Sullivan, J.); *Pharm. Rsch. & Mfrs. of Am. v. Becerra*, No. 1:21-CV-1395 (CJN), 2021 WL 5630798 at *5 (D.D.C. Dec. 1, 2021) (Nichols, J.); *Pharm. Rsch. & Mfrs. of Am. v. Dep't of Health & Hum. Servs*., 656 F. Supp. 3d 137, 153 (D.D.C. 2023) (Kelly J.); *Friends of Animals v. Jewell*, 115 F. Supp. 3d 107 (D.D.C. 2015), *aff'd*, 828 F.3d 989 (D.C. Cir. 2016) (Bates,

J.); *but see Ranchers-Cattlemen Action Legal Fund v. USDA*, 573 F. Supp. 3d 324, 335-36 (D.D.C. 2021) (Moss, J.).[9]

Apart from NFB,[10] none of the Organizational Plaintiffs identifies a specific member—much less one who has suffered or is imminently threatened with concrete injury traceable to the challenged policies. Instead, Plaintiffs rely on generalized assertions about how unnamed members may be affected and invite the Court to infer standing from speculation. *See, e.g.*, Pls.' Opp. at 10 (explaining that MSAC members "have reported needing a replacement Social Security card, had questions regarding the Social Security Fairness Act, or needed documents from SSA" and that "[m]embers report having great difficulty reaching SSA or getting appointments to resolve these issues." (citations omitted)). *Summers* and *Twin Rivers* foreclose that approach.

**B.     This Court Lacks Jurisdiction To Consider Claims Concerning The Employment Of SSA Employees**

Plaintiffs also fall short in establishing this Court's jurisdiction to enjoin Defendants from "implement[ing] . . . its agency-wide workforce reductions," where Congress has precluded district court review of such employment-related claims, pursuant to the integrated scheme of the CSRA and FSLMRS. Am. Compl., Relief Sought ¶¶ 1, 2. Plaintiffs argue that "[they] are not federal employees, assert no employment claims, and seek no remedy related to any adverse employment actions." Pls.' Opp. at 16. But the Fourth Circuit recently rejected this type of argument in *Maryland*, 151 F.4th at 209, where state governments had challenged reductions in force (RIFs) implemented by federal agencies, based on an alleged failure of the federal agencies to comply with notice requirements to the states, and sought to unwind the termination of the affected federal employees. In vacating the district court's injunction (which ordered the agencies to rescind the

---

[9] Plaintiffs cite one case in this District where the court indicated a plaintiff did not need to identify any affected members by name: *Ass'n of American Physicians & Surgeons, Inc. v. Sebelius*, 901 F.Supp.2d 19, 31 (D.D.C. 2012). Pls.' Opp. at 10. There, however, "the relevant language in the case was only *dicta*, since Judge Jackson ultimately found that plaintiffs lacked standing based on their failure to establish an injury in fact." *W. Wood Pres. Inst. v. McHugh*, 292 F.R.D. 145, 148 (D.D.C. 2013).

[10] As stated in Defendants' Mot. to Dismiss at 19-20, the only organization to actually identify members is NFB. Even so, none of its members possess standing in their own right, *supra* Part I.A.1. Thus, NFB lacks associational standing.

terminations), the Fourth Circuit held that the states, in seeking to reverse the terminations, in effect were impermissibly seeking to manage or oversee federal employee relations:  "Quite simply, the federal court in this case lacked the affirmative power to manage the federal government's workforce at the behest of state governments."  *Id*. at 215.  The same applies here with respect to Plaintiffs, insofar as they seek to enjoin SSA from "implement[ing] . . . its agency-wide workforce reductions."  Am. Compl., Relief Sought ¶¶ 1, 2.  And *Maryland*, 151 F.4th at 215, also refutes Plaintiffs' arguments about the scope of the CSRA.

Plaintiffs' *Thunder Basin* arguments are unavailing.  Pls.' Opp. 15-16.  The D.C. Circuit has explained, "claims will be found to fall outside of the scope of a special statutory scheme in only limited circumstances, when (1) a finding of preclusion might foreclose all meaningful judicial review; (2) the claims are wholly collateral to the statutory review provisions; and (3) the claims are beyond the expertise of the agency."  *AFGE v. Trump*, 929 F.3d 748, 755 (D.C. Cir. 2019) (quotation omitted).  These limited circumstances are not present here.  First, a finding of preclusion would not foreclose all meaningful judicial review, because Plaintiffs' alleged injuries arise from workforce reductions, and the MSPB and FLRA can remedy such reductions in a proper case brought by a proper plaintiff  by ordering reinstatement. Second, the claims are not wholly collateral—Plaintiffs seek to challenge and reverse *workforce reductions*.  And third, Plaintiffs' claims are not beyond the expertise of the MSPB, because, again, at base, Plaintiffs challenge workforce reductions.   Indeed, it would be an odd result if claims that cannot be raised in district court by those most directly affected—the employees themselves—could be raised by plaintiffs whose asserted injuries are entirely derivative.  The Court thus lacks jurisdiction over Plaintiffs' employment- and termination-related claims because they must be litigated in another forum.

## C.    Plaintiffs' Claims "Arise Under" The Social Security Act, And Thus, The Court Lacks Jurisdiction

Plaintiffs do not dispute that the Social Security Act precludes federal question jurisdiction over "[any] claim arising under" it, and that the Supreme Court has construed the "arising under"-language "quite broadly to include any claims in which both the standing and the substantive basis

for the presentation of the claims is the Social Security Act." *See Heckler v. Ringer*, 466 U.S. 602, 615 (1984) (citation omitted). "A claim may arise under the Social Security Act if it also arises under another statute or the Constitution." *United Spinal Assn' Inc. v. O'Malley*, No. 20-cv-2236 (TSC), 2024 WL 3400259, at *9 (D.D.C. July 11, 2024) (citation omitted), *appeal dismissed*, No. 24-5208, 2024 WL 4631680 (D.C. Cir. Oct. 29, 2024). Thus, Plaintiffs' assertion that their claims also arise under the Rehabilitation Act and the APA are irrelevant. *See* Pls.' Opp. at 16-17.

Plaintiffs principally analogize to *United Spinal Ass'n,* where the district court reasoned that because "the relief [the organization] seeks does not affect whether its members are entitled to benefits[,]" the APA claim did not "arise under" the Social Security Act. 2024 WL 3400259 at *10. Here, by contrast, Plaintiffs repeatedly claim in their Amended Complaint that the challenged reforms may cause their benefits to be delayed or denied. *See, e.g.*, FAC ¶ 98 (Ms. Hazen worries reforms "could interfere with her benefits"; ¶ 77 (Ms. Rouse alleges that SSA "delayed [a] process that, if mishandled, would jeopardize her benefits"); *see also* ¶¶ 11, 50, 55, 77, 120, 172-173, 189, 196. Indeed, the Amended Complaint seeks relief expressly challenging SSA's alleged "denying individuals with disabilities meaningful access to Social Security services and *benefits*." Am. Compl., Relief Sought ¶ 1 (emphasis added). Plaintiffs thus must channel their complaints through the administrative process, and their claims here should be dismissed.

## II.    Plaintiffs Fail To State A Claim

### A.    Administrative Procedure Act (Counts II–III)

#### 1.    APA Review Is Precluded Because SSA's Administrative Reforms Are Committed To Agency Discretion

Turning to Plaintiffs' APA claims, Plaintiffs attempt to sidestep Defendants' arguments showing that the agency's workforce reduction policies are committed to agency discretion by law. Plaintiffs note that the present facts, unlike in *Heckler*, do "not involve nonenforcement discretion." Pls.' Opp. at 18. This is a chimera—whether a decision turns on a matter of enforcement discretion is not the test for evaluating whether an action is committed to agency discretion; it is but one example of the type of decisions that are committed to agency discretion.

*Heckler v. Chaney*, 470 U.S. 821, 838 (1985) (discussing "[t]he general exception to reviewability" for actions committed to agency discretion and finding that "within that exception are included agency refusals to institute investigative or enforcement proceedings[.]").  There are others, like where a "statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion."  *Steenholdt v. FAA*, 314 F.3d 633, 638 (D.C. Cir. 2003) (citation omitted).   That is the case here, where Plaintiff challenges various plans to administratively reorganize the agency and Congress vested the Commissioner of Social Security with broad, unreviewable discretion to make those decisions "as the Commissioner considers necessary or appropriate[.]"  42 U.S.C. § 902(a)(6).

Plaintiffs' unsupported refutation that the challenged actions do not "concern internal personnel matters of the kind reserved to agency judgment," cite, does not hold water as that is the very argument made in Defendants' opening brief.  Defendants cited *Lincoln v. Vigil*, 508 U.S. 182, 184, 191 (1993) and *Webster v. Doe*, 486 U.S. 592, 600 (1988) for the proposition that decisions to reallocate program resources and terminate employees is committed to agency discretion, and Plaintiffs do not address those cases.  Def.'s Mot. at 30.  Those cases are more apt comparators to the present facts than the sole case Plaintiffs cite in support, *National Council of Nonprofits v. Office Of Management & Budget*, 775 F. Supp. 3d 100, 115–16 (D.D.C. 2025) which found that grant terminations made by executive order are not committed to agency discretion.  Pls.' Opp. at 18.  For these reasons, and those stated in our Motion to Dismiss, SSA's workforce reforms are plainly committed to agency discretion.

### 2. Plaintiffs Impermissibly Seek Wholesale Improvement Of SSA, Rather Than Review Of Discrete, Final Agency Action

#### a. SSA's Programmatic Reforms Are Not Discrete Agency Action Subject To APA Review

Plaintiffs argue that they do not challenge SSA's "day-to-day operations," but instead, that they challenge a "single discrete policy: SSA's Workforce Reduction Policy." Provide citation if available.  Plaintiffs belie reality with a level of generality argument that attempts to bundle a host of actions at SSA into one "discrete" agency action.  Plaintiffs' "bundling" theory to escape the

clear command of *Lujan* that Plaintiffs must direct their attack at "some particular 'agency action' that causes [them] harm" should be disregarded as artful pleading. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990).

None of Plaintiffs' citations support a different result. Their invocation of *Hispanic Affairs Project v. Acosta*, 901 F.3d 378 (D.C. Cir. 2018) is puzzling, as the plaintiffs there challenged an agency's policy of ignoring a discrete statutory and regulatory requirement that open-range herders' work be temporary. *Id.* at 387. A challenge to a policy regarding a specific, discrete statutory command is a far cry from the blunderbuss claims that Plaintiffs bring here—challenging potential reductions in force, office closures, support communications procedures, and access to services and accommodations. *See* Am. Compl., Relief Sought, at 49-50.

      **b.**     **Any Discrete Agency Action Is Not Final For APA Purposes**

Any discrete action is not final either. Although the "possibility of revision . . . does not make an otherwise definitive decision nonfinal," Pls.' Opp. at 19 (quoting *POET Biorefining, LLC v. EPA*, 970 F.3d 392, 404 (D.C. Cir. 2020)), it is apparent from the record here that there was no definitive decision. Indeed, it has been nearly nine months since Plaintiffs first brought their claims before this Court. Besides the voluntary separation incentive payments, the voluntary early retirement authority, and the deferred resignation program that SSA announced in February of 2025, there have been no further agency-wide initiatives that may have led to reductions in the size of the workforce.

Plaintiffs also fail to show that any discrete action has impaired their rights. They claim that SSA's reduction in staff, closure of access points, and curtailment of services constitutes harm, but they do not grapple with Defendants' (and the Court's) point that no Plaintiff *has actually asserted* any "termination or diminution of benefits" caused by these actions. Def. Br. 33 (quoting Op. at 4).

      **3.**     **Plaintiffs' APA Claims Fail**

        **a.**     **Arbitrary And Capricious (Count II)**

Plaintiffs claim that the SSA policy is arbitrary and capricious because the reasons set forth in the SSA press releases did not have supporting evidence or analysis. As stated in the Motion to Dismiss, Plaintiffs mistake the deferential standard of review under the APA. The agency need only articulate "a rational connection between the facts found and the choice made," *id*. at 34 (citation omitted), acting within a wide "zone of reasonableness," *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Even "a decision of less than ideal clarity" will be upheld so long as "the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Ark.-Best Freight Sys. Inc.*, 419 U.S. 218, 286 (1974). SSA amply clears this bar. The agency's press releases clearly set out the reasons for the reforms—explaining, for example, that SSA plans to reduce its workforce size and organizational structure, and "will continue to implement efficiencies and reduce costs, with a renewed focus on mission critical work."[11]

Plaintiffs instead suggest that SSA is required to produce a formal evidentiary record, and empirically prove that workforce reductions will succeed. That is not the law. The APA does not require agencies to marshal studies, quantify outcomes, or persuade Plaintiffs that their policy choice is optimal. *Prometheus Radio Project*, 592 U.S. at 427 ("[T]he FCC did not have perfect empirical or statistical data. Far from it. But that is not unusual in day-to-day agency decision making within the Executive Branch" and "The APA imposes no general obligation on agencies to conduct or commission their own empirical or statistical studies.").

### b.    In Excess Of Statutory Authority (Count III)

Plaintiffs' argument that the agency acted in excess of statutory authority fails because it still does not identify any action by SSA that exceeds the authority Congress granted. Plaintiffs do not engage with Defendants' argument that the Social Security Act vests the Commissioner with the requisite authority over "all [SSA] personnel and activities," 42 U.S.C. § 902(a)(4), and that he generally "may establish, alter, consolidate, or discontinue such organizational units or components" as he "considers necessary or appropriate," *id*. § 902(a)(6).

---

[11] *See* SSA, Press Release, Mark Hinkle, Press Officer, Social Security Announces Workforce and Organization Plans (Feb. 28, 2025), https://perma.cc/D4Z4-3JN4, *cited in* Def. Br. 3 n.2.

Unable to identify any statutory constraint on that authority, Plaintiffs instead argue that SSA's workforce reforms violate Section 504 of the Rehabilitation Act and therefore must be set aside as *ultra vires*.  But as stated in our motion to dismiss, Plaintiffs fail to plausibly allege any violation of Section 504 capable of doing the work they demand.  Def. Br. 35-37.  Plaintiffs continue to fail to identify a statutory or regulatory provision that SSA violated, offer no elements of a cause of action, and rely on conclusory assertions that SSA has failed to provide adequate access or nondiscriminatory services.  *Compare* FAC ¶ 201 ("Defendants' ongoing violations of Section 504 render their actions void as ultra vires, and they must be set aside under . . . the APA."), *with* Pls.' Opp. at 23 (stating in conclusory fashion that Plaintiffs are not given "'meaningful access' guaranteed by Section 504" and that the agency policies "renders SSA unable to carry out both its own statutory mandates and binding civil-rights law, it exceeds the agency's authority and is contrary to law.").  Those allegations fall well short of *Twombly's* pleading standards.  And Plaintiffs' opposition adds nothing to their claim that SSA acted in excess of statutory authority, and nothing in the Rehabilitation Act withdraws SSA's discretion to reduce staffing or restructure operations.

Lastly, Plaintiffs' citations to statutory provisions requiring same-day, in-person service for claimants, Pls.' Opp. at 23, does not apply, as no Plaintiff falls within the limited scenarios in which those provisions' same-day service requirement might attach,  *id.* (citing 42 U.S.C. §§ 405(t), 423(a)(1)-(2), 1383, 1383(e)(6)).

### B.    Rehabilitation Act (Count I)

Plaintiffs' claim that the reforms violate Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), because they purportedly disparately impact disabled persons, fails for multiple reasons.

### 1.    There Is No Private Right Of Action Under The Rehabilitation Act

Plaintiffs strain interpretation in attempting to find a private right of action for Section 504 of the Rehabilitation Act when Congress unmistakably granted a private right of action to its other sister provisions, but not to the program-conductor provision.  The omission is clear and need not be contorted to support Plaintiffs' favored interpretation.  When Congress explicitly calls for a

private right of action for some actions, but not others, courts should not rewrite the statute to graft in a private right of action.

Indeed, Congress instructed agency heads in an amendment of Section 504 to "promulgate such regulations as may be necessary to carry out" the amendment.  29 U.S.C. § 794(a).  This structural choice—directing agencies to implement the amendment administratively as the default mechanism—confirms Congress's intent that agencies, in the first instance, address and resolve Section 504 compliance issues through the administrative process.  That intent is further reinforced by Congress's deliberate decision to exclude program-conductor violations from the private right of action and remedies framework set forth in Section 505, underscoring that such claims were meant to be handled administratively rather than through private litigation.

First, starting with precedent, the weight of authority from the court of appeals, as well as judges in this District, agree that no private right of action attaches to the program-conductor provision of 504(a).  The Rehabilitation Act provides that aggrieved persons may pursue remedies under federal civil-rights law against non-federal entities receiving federal financial assistance and against federal agencies acting as employers. 29 U.S.C. § 794a(a)(1)-(2).  But it does *not* contain similar language regarding claims against federal agencies in their operation of federally-run programs or activities.  Several judges of this Court have held that this asymmetry evinces Congress's exclusion of a private right of action in such cases.  *Sai v. DHS*, 149 F. Supp. 3d 99, 113 (D.D.C. 2015); *Doe A v. Spahn*, No. 1:23-cv-02859, 2025 WL 1305360, at *4 (D.D.C. May 6, 2025); *Mathis v. U.S. Parole Comm'n*, 749 F. Supp. 3d 8, 19 (D.D.C. 2024).  Other courts—including three of the four courts of appeals to have addressed the issue—have reached the same result.[12]  *See, e.g., Moya v. U.S. DHS*, 975 F.3d 120, 128 (2d Cir. 2020); *Cousins v. Sec'y of U.S. Dep't of Transp.*, 880 F.2d 603, 605-06 (1st Cir. 1989) (en banc) (Breyer, J.); *Clark v. Skinner*, 937 F.2d 123, 125-26 (4th Cir. 1991).  Among courts of appeals, only the Ninth Circuit has held otherwise. *J.L. v. Soc. Sec. Admin.*, 971 F.2d 260, 264 (9th Cir. 1992); *Doe v. Att'y Gen. of the*

---

[12] This issue is currently on appeal to the D.C. Circuit.  *Nat'l Ass'n of the Deaf, et al v. Donald Trump, et al*, No. 25-5402 (D.C. Cir.).

*U.S.*, 941 F.2d 780, 794-95 (9th Cir. 1991).  But even the Ninth Circuit recognizes the significance of the 1978 Amendments.  Specifically, when Congress directed agencies to "promulgate such regulations as may be necessary to carry out the amendments" extending Section 504 to programs and activities "conducted by any Executive agency," 1978 Act to Amend Rehabilitation Act of 1973, Pub. L. No. 95-602, § 119(2), 92 Stat. 2955, 2982 (1978), Congress made clear that "agencies themselves should take primary responsibility for compliance."  *J.L.*, 971 F.2d at 265.

Plaintiffs' citations are not convincing.  Plaintiffs state that "[c]ourts across circuits have entertained private Section 504 suits against federal agencies."  Pls.' Opp. at 29.  But three of their eight citations are to the Ninth Circuit; their Second Circuit case does not analyze Section 504 at all, and is in any event not on point as *Moya* displaces Plaintiffs' understanding by finding no private cause of action for Section 504; and their Seventh and Third Circuit cases do not address whether Section 504's program and activities clause includes a private right of action.  Indeed, *Spence v. Straw* addressed the federal-employer provision, *not* the program-conductor provision at issue here.  54 F.3d 196, 202 (3d Cir. 1995).  Similarly, *Valencia v. City of Springfield*, addressed the Rehabilitation Act generally, where two of the three covered activities *do* have a private right of action, but *not* the program-conductor provision at issue here.  883 F.3d 959, 967 (7th Cir. 2018).  What is more, in neither of these cases did the defendants raise the argument that the Rehabilitation Act's program-conductor provision lacks a private right of action.  The mere fact that courts have entertained Section 504 claims in other contexts proves nothing where the absence of a private right of action was never argued or decided.

Plaintiffs also fail to convincingly distinguish *Moya*, 975 F.3d 120, *Clark*, 937 F.2d 123, and *Cousins*, 880 F.2d 603.  Pls.' Opp. at 29.  Plaintiffs argue that each case involved agencies acting in their regulatory capacity where the APA was a better vehicle for suit—as opposed to alleged discrimination in the operation of a federal benefits program.  But this distinction suffers from several flaws.

First, this distinction has no basis in the text.  Section 504(a) generally prohibits discrimination "under any program or activity conducted by any Executive agency."  29 U.S.C.

§ 794(a). As Judge McFadden put it in *Mathis*, "liability attaches whenever an agency conducts a 'program or activity' in a discriminatory manner—whether that happens through implementing regulations or so-called 'substantive' conduct. In other words, the program-conductor provision 'presumably includ[es] regulatory programs' and substantive conduct alike." 749 F. Supp. 3d at 21 (alteration in original) (quoting *Cousins*, 880 F.2d at 605).

Second, the purported distinction is interchangeable, *i.e.,* any "regulatory" violation could be reframed as a "substantive" violation where the agency acts as the operator of a federal program, and vice versa. *Mathis*, 749 F. Supp. 3d at 21. *Moya* involved a challenge to "discriminatory regulations" governing the waiver of certain tests required for citizenship. 975 F.3d at 128. And *Cousins* involved a challenge to "DOT regulations [that] allow drivers to apply for a waiver of some of the . . . physical qualifications" required for operating a tractor trailer. 880 F.2d at 604. But fixating on the word "regulations" misses the point. The regulations in *Moya* and *Cousins* allegedly violated those plaintiffs' substantive rights under the Rehabilitation Act. *Clark* makes the point nicely. It, too, involved a challenge to a "waiver regulation" for commercial drivers. 937 F.2d at 124. Yet when the Fourth Circuit addressed the implied right of action question, it assumed that the regulation might make "the Department of Transportation . . . guilty of a *substantive violation* of the Rehabilitation Act[.]" *Id.* at 125 (emphasis added).

Third, Plaintiffs argue that because some courts have heard Section 504 actions and ruled on the merits, that presupposes the availability of a private right of action. Plaintiffs miss the point. Just because a court hears a case does not presuppose the validity of a private right of action. In fact, all three examples Plaintiffs cite (*Choate*, *Barnes*, *Lane*) did not find violations of Section 504 for other reasons that were directly before the court. This does not mean that an issue that was not before the Court is somehow validated just because the Section 504 claims were dismissed for a *different* reason. And, as noted above, a party's choice not to raise a non-jurisdictional argument does not establish the argument's validity.

In sum, Plaintiffs' attempt to manufacture a private right of action under Section 504's program-conductor provision cannot be squared with the statutory text, structure, or controlling

precedent.  Congress expressly authorized private enforcement against federally funded recipients and federal agencies acting as employers but conspicuously declined to do so for federal agencies operating programs or activities.  Courts are not free to erase that deliberate line-drawing.  The weight of authority—including decisions from this District and three courts of appeals—recognize that omission as dispositive.  Plaintiffs' efforts to distinguish precedent rest on atextual and thin distinctions, and their reliance on cases that merely assumed jurisdiction without addressing the question does nothing to supply the private right Congress withheld.  Because Section 504 provides no private cause of action against federal agencies acting as program operators, Plaintiffs' Rehabilitation Act claim fails for this reason alone and should be dismissed.

### 2.    Plaintiffs Have Not Shown A Disparate Impact

Plaintiffs claim that they have sufficiently pled their disparate-impact claim because they need not provide metrics showing a disparate impact at the motion to dismiss stage.  Pls.' Opp. at 30-31. Not so.  It is "not enough to simply allege that there is a disparate impact on workers, or point to a generalized policy that leads to such an impact."  *Smith v. City of Jackson*, 544 U.S. 228, 241 (2005).  Indeed, "[t]o nudge a disparate impact claim across the line from conceivable to plausible . . . plaintiffs typically rely on statistical evidence to show a disparity in outcome between groups."  *Mandala v. NTT Data, Inc*., 975 F.3d 202, 209 (2d Cir. 2020); *see also Watson v. Fort Worth Bank & Tr*., 487 U.S. 977, 987 (1988); *cf. Nanko Shipping, USA v. Alcoa, Inc.*, 850 F.3d 461, 467 (D.C. Cir. 2017).

Even at the "early juncture" of the pleading stage with its relaxed standard, "the statistics must plausibly suggest that the challenged practice *actually* has a disparate impact."  *Mandala* 975 F.3d at 210; *Adams v. City of Indianapolis*, 742 F.3d 720, 733 (7th Cir. 2014) (noting that while "basic" "statistical methods and comparisons" can be enough for a Title VII complaint to survive a motion to dismiss, those statistics must still "move the disparate-impact claims over the plausibility threshold"); *see also Shanks v. Int'l Union of Bricklayers & Allied Craftworkers*, 134 F.4th 585, 594 (D.C. Cir. 2025) (at this initial stage of the proceedings a plaintiff's complaint need not "prove in detail the methodological soundness of her statistical assessment to survive a motion

to dismiss" and a complaint need not "supplement its statistical analysis with corroborating evidence." (quoting *Mandala* 975 F.3d at 209-10)); *see also Davis v. District of Columbia*, 949 F. Supp. 2d 1, 10 (D.D.C. 2013) ("when plaintiffs ascribe statistical disparities to identifiable and facially neutral employment practices, they state a *disparate impact* claim[.]").

Several decisions in this Circuit are instructive. In *Boykin v. Fenty*, the D.C. Circuit addressed a disparate impact claim premised on the plaintiff's allegation that the District's closure of a shelter had an unlawful disparate impact on individuals with disabilities. 650 F. App'x 42, 44 (D.C. Cir. 2016). The court affirmed dismissal because the complaint contained no factual allegations showing that "the closure affected a greater proportion of disabled individuals than non-disabled[.]" *Id*. *Boykin* makes clear that a disparate impact claim requires more than conclusory assertions of disproportionate harm. A plaintiff must plausibly allege facts showing that the challenged policy affects a protected class more harshly than relevant comparators. Absent such comparative allegations, dismissal is required.

It is also not enough for Plaintiffs to allege (as they do), that the reduction in staff makes it more difficult for them to obtain services. That issue was squarely examined in *Boykin*, where the plaintiffs alleged that "some of them have disabilities and that the shelter's closure makes it more difficult for [them] to obtain services." *Id*.; FAC ¶ 50 (explaining why SSA's policy changes are "especially acute for individuals with disabilities"). As the D.C. Circuit explained, the allegations regarding the plaintiffs' "individual experiences . . . say nothing" about whether the neutral practice "had a disparate impact on persons with disabilities[] . . . as opposed to persons without disabilities[]" in general. *Boykin*, 650 F. App'x at 44. Similarly, in *Palmer v. Homecomings Financial LLC*, 677 F. Supp. 2d 233, 241–42 (D.D.C. 2010), the district court concluded that the plaintiff's "disparate impact claim [was] deficient" because she "only allege[d] a disparate impact on *herself*" and had not made allegations pertaining to the protected group as a whole.

By contrast, in *National Fair Housing Alliance v. Travelers Indemnity Co.*, 261 F. Supp. 3d 20, 33–34 (D.D.C. 2017), the court held that the plaintiffs adequately stated a disparate impact claim because they did more than "allege that some voucher recipients are members of a protected

class[.]" The complaint instead pleaded facts showing that voucher recipients are significantly more likely to be members of a protected class than the D.C. population as a whole. *Id.* Indeed, plaintiffs' complaint included a "statistical analysis" of the "relevant geographic region." *Id.* at 34; *accord Alexander v. Edgewood Mgmt. Corp.*, No. 15-cv-1140, 2016 WL 5957673, at *4 (D.D.C. July 25, 2016) (finding that the plaintiff properly stated a disparate impact claim because he included statistics in his complaint).

Plaintiffs' allegations in the Amended Complaint look nothing like *Travelers* or *Alexander*. As another court in this District recently explained, a complaint fails to state a claim where plaintiffs "have not alleged that Defendants' actions had a disparate impact on . . . disabled [claimants] as opposed to . . . able-bodied [claimants,]" and where plaintiffs likewise "[have not] supported their allegations with statistics." *Briggs v. Campbell*, No. 23-CV-116 (TSC), 2024 WL 1212294 at *3 (D.D.C. Mar. 20, 2024). Here, tellingly, the bulk of Plaintiffs' citations to their own Complaint do not address whether SSA's reforms fall more harshly on individuals with disabilities than on non-disabled individuals. *See* Pls.' Opp. at 30-31. Nor do Plaintiffs identify any factual allegations showing that disabled claimants as a class were denied "meaningful access" to SSA benefits in comparison to able-bodied claimants. That omission is fatal. A disparate impact claim requires plausible allegations of comparative disadvantage under controlling precedent. *Boykin*, 650 F. App'x at 44; *Menoken v. McGettigan*, 273 F. Supp. 3d 188, 199 (D.D.C. 2017) (finding that it is "not enough to simply allege that there is a disparate impact on workers, or point to a generalized policy that leads to such an impact.") (quoting *Smith*, 544 U.S. at 241 (2005)), *aff'd sub nom. Menoken v. Pon*, No. 17-5228, 2018 WL 2383278 (D.C. Cir. May 9, 2018).

Plaintiffs' failure to plead such comparative facts is not accidental. It reflects their fundamental misunderstanding of what constitutes "meaningful access" under Section 504. As *Choate* makes clear, the Rehabilitation Act does not guarantee equal outcomes or insulation from neutral policy changes; it requires only that disabled individuals be afforded meaningful access to benefits on equal terms. *Alexander v. Choate*, 469 U.S. 287, 301-09 (1985). Plaintiffs' allegations, which focus on generalized service delays, staffing changes, and increased inconvenience, do not

plausibly show that disabled claimants were denied access in a way that non-disabled claimants were not.  Plaintiffs' failure to do so is fatal to their Rehabilitation Act claim.

## CONCLUSION

The Amended Complaint should be dismissed.

DATED: January 9, 2026         Respectfully submitted,

                                BRETT A. SHUMATE
                                Assistant Attorney General
                                Civil Division

                                ERIC BECKENHAUER
                                Assistant Branch Director

                                */s/ Steven M. Chasin*
                                STEVEN M. CHASIN
                                PIERCE J. ANON (N.Y. Bar No. 6184303)
                                Trial Attorneys
                                United States Department of Justice
                                Civil Division, Federal Programs Branch
                                1100 L Street, N.W.
                                Washington, DC 20005
                                Email: Steven.M.Chasin2@usdoj.gov  Tel: (202) 305-0747
                                Email: Pierce.Anon@usdoj.gov   Tel: (202) 305-7573

                                *Counsel for Defendants*