**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **AMERICAN ASSOCIATION OF PEOPLE WITH DISABILITIES, *et al.*,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**FRANK BISIGNANO,** *in his official capacity as Commissioner of the Social Security Administration*, ***et al.***,[1]<br><br>**Defendants.** | **Case No. 25-cv-00977 (APM)** |

## MEMORANDUM OPINION

### I. INTRODUCTION

In early 2025, the Social Security Administration ("SSA") announced plans to reduce the agency's staff by thousands of employees. Plaintiffs in this action are a group of individuals with disabilities receiving Social Security Disability Insurance ("SSDI") benefits and various organizations[2] that serve individuals with disabilities. They collectively challenge the agency's reduction in workforce. Plaintiffs assert three claims: a violation of Section 504 of the Rehabilitation Act of 1973 (Count I) and two claims under the Administrative Procedure Act (Counts II and III). First Am. Compl., ECF No. 40 [hereinafter Am. Compl.], ¶¶ 166–201.

For the reasons explained below, the court grants Defendants' Motion to Dismiss.

[1] The court substitutes Frank Bisignano, Commissioner of SSA, for Leland Dudek, the past Acting Commissioner. *See* Fed. R. Civ. P. 25(d).

[2] The organizational Plaintiffs are the American Association of People with Disabilities, the National Federation of the Blind, Deaf Equality, the National Committee to Preserve Social Security and Medicare, and Massachusetts Senior Action Council. The individual plaintiffs are Deja Powell, Elizabeth Rouse, Marni Garvey, Martha Hazen, Merry Schoch, William Weiss, and Wilshawn Tiller.

## II. BACKGROUND

In January 2025, President Trump directed federal agencies to "undertake preparations to initiate large-scale reductions in force (RIFs)." Exec. Order 14210, 90 C.F.R. 9669, 9670 (2025). About two weeks later, SSA announced a plan to reduce its workforce of 57,000 employees by 7,000, or 12 percent, through various separation incentive payments and planned RIF programs ("RIF"). Am. Compl. ¶¶ 6–7, 61, 64.

Plaintiffs thereafter filed a complaint and sought a preliminary injunction that, among other things, would enjoin SSA from reducing staff without first meeting certain conditions to ensure individuals receiving benefits would not lose access to critical services. *See* Pls.' Mot. for Prelim. Inj., ECF No. 2, Mem. of P. & A. in Supp. of Pls.' Mot. for a Prelim. Inj., ECF No. 2-1, at 41. Plaintiffs did not meet their burden to demonstrate irreparable harm, and the court denied the motion for a preliminary injunction. Mem. Op. and Order, ECF No. 34.

Plaintiffs then filed an Amended Complaint.[3] In Count I, they allege that the RIF violates the Rehabilitation Act because SSA's elimination of thousands of staff "created systemic access barriers that disproportionately burden individuals with disabilities, including Plaintiffs and their members." Am. Compl. ¶ 174. In Counts II and III, Plaintiffs advance violations of the APA. *Id.* ¶¶ 179–201. Count II challenges the RIF as arbitrary and capricious on the grounds that SSA both failed to supply a reasoned explanation for the staffing reduction and did not consider beneficiaries' reliance interests on the size of the SSA's workforce. *Id.* ¶¶ 183, 188. Count III asserts that SSA exceeded its statutory authority because ordering the RIF violated Section 504 of the Rehabilitation Act. *Id.* ¶¶ 195, 199, 201. Defendants moved to dismiss all claims. *See* Defs.' Mot. to Dismiss

[3] The First Amended Complaint is narrower than its predecessor pleading, which challenged various agency actions in addition to the RIF. *See generally* Compl., ECF No. 1. Plaintiffs also eliminated their constitutional challenges to the RIF. *See id.* at 38–42 (Counts II and III).

Am. Compl., ECF No. 46 [hereinafter Defs.' Mot.], Mem. in Supp. of Defs.' Mot., ECF No. 46-1 [hereinafter Defs.' Mem.].

## III. LEGAL STANDARD

The Federal Rules of Civil Procedure require that a complaint contain "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.* at 570. A court "must construe the complaint in the light most favorable to the plaintiff and must accept as true all reasonable factual inferences drawn from well-pleaded factual allegations." *In re United Mine Workers of Am. Emp. Benefit Plans Litig.*, 854 F. Supp. 914, 915 (D.D.C. 1994). The court accepts well-pleaded factual allegations as true but must not accept "mere conclusory statements" and "legal conclusion[s] couched as . . . factual allegation[s]." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 681 (2009) (citation omitted).

## IV. DISCUSSION

Defendants move to dismiss for lack of standing or, alternatively, because various federal statutes divest the court of subject matter jurisdiction. *See* Defs.' Mem. at 10–29. They also seek dismissal for failure to state a claim. *See id.* at 29–44. The court holds that it has subject matter jurisdiction over this action, but Plaintiffs have failed to state plausible claims.

### A. Subject Matter Jurisdiction

#### *1. Standing*

Defendants argue that Plaintiffs have failed to adequately allege the elements of Article III standing: injury in fact, causation, and redressability. *See* Defs.' Mem. at 11–23; *Lujan v. Defs. of*

*Wildlife*, 504 U.S. 555, 561 (1992). "If at least one plaintiff has standing, the suit may proceed." *Biden v. Nebraska*, 600 U.S. 477, 489 (2023); *see also Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006) (limiting discussion to one plaintiff because "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement"). So, the court begins by determining whether any Plaintiff meets these requirements. Importantly, in conducting this analysis, the court must "assume that plaintiffs will prevail on the merits" of their claims. *In re Navy Chaplaincy*, 697 F.3d 1171, 1178, 1175 (D.C. Cir. 2012) ("[i]n reviewing the standing question, we must be careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims" (internal citation omitted)).

The court finds that at least one plaintiff, Merry Schoch, an individual who receives SSDI and is enrolled in Medicare, has plausibly alleged standing. *See* Pls.' Mem. of P. & A. in Opp'n to Defs.' Mot., ECF No. 47 [hereinafter Pls.' Mem.], at 5.[4] In late March 2025, after the RIF went into effect, "she sought assistance in completing an SSDI questionnaire," but was unable to get "timely help." *Id.*; *see also* Am. Compl. ¶ 92. She cites barriers that "substantially delayed her SSDI application," including "prolonged telephone delays, lack of timely field office access, and an inaccessible online portal," which "left her with no viable avenue to reach SSA." Pls.' Mem. at 5; *see also* Am. Compl. ¶¶ 90–94.

Defendants contest Plaintiffs' standing, including Schoch's, on several fronts. First, Defendants maintain that "Plaintiffs have not shown that their customer-service experiences have meaningfully deteriorated" and point out that Plaintiffs' complaints about SSA's delivery of

[4] When assessing Article III standing at this stage, the court "accept[s] the well-pleaded factual allegations as true and draw[s] all reasonable inferences from those allegations in the [Plaintiffs'] favor . . ." *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015).

services are "long-standing." Defs.' Mem. at 12. As a result, Defendants argue, Plaintiffs cannot claim that they have been injured by the RIF. *Id.* at 11–13. But, among Plaintiffs, Schoch uniquely contends that customer-service delays "have lengthened since early 2025, reflecting the agency's sharply diminished capacity." Am. Compl. ¶ 91. Defendants are critical of Schoch for her failure to plead specifics about a late March 2025 episode where she could not access her online account due to an error message. *Id.* ¶ 93; Defs.' Mem. at 14. True, Schoch does not describe this particular episode in great detail. She does, however, generally describe the challenges she has faced since the RIF in securing services telephonically, in-person, and online. *See* Am. Compl. ¶¶ 92–94. Accepting the truth of these allegations and drawing all reasonable inferences in Schoch's favor, as the court must, *see Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015), she has plausibly alleged that the customer-service experience has "meaningfully deteriorated" since the RIF.

Defendants further argue that Plaintiffs' alleged "customer-service issues" are not "cognizable harms to begin with." Defs.' Mem. at 16. They assert that because the Social Security Act "does not provide an entitlement to any particular level of customer service," and because Plaintiffs fail to allege a "denial or delay in benefits," Plaintiffs have not alleged a concrete injury. *Id.* at 16–17. But calling Plaintiffs' injuries "commonplace customer-service grievances" mischaracterizes their allegations. *See id.* at 17. Assuming the merits of the Rehabilitation Act claim, theirs is not primarily an injury about long lines or extended call wait times, but about "systemic access barriers" to SSA benefits that "disproportionately burden individuals with disabilities." Am. Compl. ¶¶ 174–175. Such disparate impact on the basis of disability is a cognizable injury sufficient to establish standing.[5]

[5] Even long lines and wait times alone may be a sufficient injury to establish standing. *See Khalid v. Blanche*, 172 F.4th 876, 884 (D.C. Cir. 2026) ("unreasonable processing delay of one's own visa application may constitute an injury"); *see also Jibril v. Mayorkas*, 20 F.4th 804, 814–15 (D.C. Cir. 2021) (finding airport burdens constituted an injury in fact for an individual on a Terrorist Watch sub-list).

Next, Defendants challenge causation by asserting that, "[e]ven if Plaintiffs ha[ve] shown a deterioration in customer service, they fail to show that it was caused by the workforce reductions." Defs.' Mem. at 15. They say that Plaintiffs rely on "conjecture" and a "highly attenuated chain of possibilities" to "suggest that their customer-service complaints are attributable to the workforce reduction." *Id.* (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013)). Relatedly, Defendants argue that "Plaintiffs' causation theory disregards 'obvious alternative explanation[s]'" for the delays faced, including an "18% rise in Social Security claims during the first half of th[e] year." *Id.* at 15–16. These arguments, however, go to the merits of the claims, not Schoch's standing to bring them. The court must assume Plaintiffs will prevail on their Rehabilitation Act claim. That means Plaintiffs will show that the customer-service fallout from the RIF has disproportionately burdened individuals with disabilities in securing access to SSA services and benefits. *See Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1266 (D.C. Cir. 2008) (stating that an element of a Section 504 claim includes a showing that the plaintiffs "were excluded from, denied the benefit of, or subject to discrimination under a program or activity"). Making that assumption plausibly establishes causation for standing purposes. *See In re Navy Chaplaincy*, 697 F.3d at 1178 (holding that the plaintiffs, who were military chaplains alleging a disparate impact claim based on religion, had established standing in part because the court assumed the merits of their claim that the challenged promotion selection process discriminated against their denomination).

Finally, Defendants assert that Plaintiffs have not plausibly established redressability. Defs.' Mem. at 18. They point out that some of the relief sought in the Amended Complaint stems from actions challenged in their original pleading that they no longer contest. *See id.* Fair enough. But they do seek prospective equitable relief that, if imposed, would restore equal access to

services for individuals with disabilities. *See* Am. Compl. at 49–50. That satisfies the redressability prong.

The court thus holds that at least one Plaintiff—Merry Schoch—has plausibly established Article III standing. The court therefore need not consider Defendants' arguments as to the remaining individual or organizational Plaintiffs.

*2. Federal Personnel Statutes*

Defendants next argue that the court is precluded from deciding this case because Congress has established an "exclusive means" for challenging agency employment decisions. *See* Defs.' Mem. at 24 (citing *Elgin v. Dep't of Treasury*, 567 U.S. 1, 5, 8 (2012)). According to Defendants, the Civil Service Reform Act ("CSRA") and the Federal Service Labor-Management Relations Statute ("FSLMRS") create a "comprehensive remedial scheme" that "implicitly precludes judicial review" of "Plaintiffs' employment-related claims." *Id.* at 25–26.

Once more, Defendants miscast Plaintiffs' claims. They are not "employment-related," as Plaintiffs do not challenge the termination of any agency worker. Rather, they assert that the RIF resulted in a substantial diminution of services that has discriminated against individuals with disabilities in accessing SSA services and benefits. That is not a claim covered by either the CSRA or the FSLMRS.

*3. Social Security Act*

Defendants similarly argue that the Social Security Act precludes review of Plaintiffs' claims by "depriv[ing] courts of federal question jurisdiction to hear other suits 'arising under' the Act." Defs.' Mem. at 28 (citing 42 U.S.C. § 405(h)). Defendants insist that Plaintiffs' claims "arise under" the Act because "[t]he core of their amended complaint is that the challenged reforms will cause their benefits to be delayed or denied." *Id.* (citing Am. Compl. ¶¶ 9 (describing access

crisis), 175 (describing harm as "extended delays, benefit disruptions, procedural denials, and the breakdown of accommodation systems"), 191 (describing harm as "wrongful benefit terminations, excessive delays, denial of accommodations, and exclusion from the agency's core programs"). Principles of "'broad' construction," Defendants reason, reach Plaintiffs' claims because the "arising under" language reaches "any claims in which 'both the standing and the substantive basis for the presentation' is the Social Security Act." *Id.* at 28 (citing *Heckler v. Ringer*, 466 U.S. 602, 615 (1984)).

Plaintiffs' causes of action, however, fall outside even the Act's broad jurisdictional reach because they neither concern an underlying Medicare claim nor are they "inextricably intertwined" with one. *See Row 1 Inc. v. Becerra*, 92 F.4th 1138, 1145 (D.C. Cir. 2024). The relief that Plaintiffs seek would not entitle them to benefits, *see id.* at 1146, nor would it leave "only essentially ministerial details . . . before [they] would receive reimbursement," *Ringer*, 466 U.S. at 615. They request only "meaningful access to Social Security services and benefits," not certainty of their receipt. Am. Compl. at 49–50. The Act does not preclude this court's review. *See, e.g., United Spinal Ass'n, Inc. v. O'Malley*, No. 20-cv-2236 (TSC), 2024 WL 3400259, at *9 (D.D.C. July 11, 2024) (holding that an agency policy alleged to "create obstacles that make it more difficult for [the plaintiff's] members to apply for SSDI benefits" did not "arise under" the Act).

**B. Failure to State a Claim**

Having concluded that Plaintiffs do have standing and that there are no jurisdictional bars to review, the court now turns to whether they have stated claims.

*1. Rehabilitation Act and Excess-of-Statutory Authority Claims*

The court considers together Plaintiffs' Rehabilitation Act and excess-of-statutory authority claims. The latter depends on proving the former. Am. Compl. ¶ 201 (alleging that "Defendants' ongoing violations of Section 504 render their actions void as *ultra vires*").

The parties disagree as to whether Section 504 of the Rehabilitation Act provides a private right of action for disparate-impact discrimination claims. *See* Pls.' Mem. at 23–30; Defs.' Mem. at 37–39. The D.C. Circuit has not resolved this question, but the Supreme Court in *Alexander v. Choate* "assume[d] without deciding that § 504 reaches at least some conduct that has an unjustifiable disparate impact upon the handicapped." 469 U.S. 287, 299 (1985). The Court "reject[ed] the boundless notion that all disparate-impact showings constitute prima facie cases under § 504 . . . ." *Id.* Instead, it held that only those restrictions or limitations that deny "meaningful access" to government services for individuals with disabilities are actionable. *Id.* at 301. Neither the Court nor the D.C. Circuit, however, has defined precisely "the severity of the deprivation that a plaintiff must experience in accessing a program, benefit, or service to demonstrate a denial of meaningful access." *See Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1269 (D.C. Cir. 2008). This court need not do so, either. Whatever the exact threshold may be, Plaintiffs have not plausibly met it. Nor have they plausibly alleged "an unjustifiable disparate impact." *Choate*, 469 U.S. at 299.

Plaintiffs contend that they have "experienced discrimination in accessing SSA services and benefits" because the RIF has "created systemic access barriers that disproportionately burden

individuals with disabilities, including Plaintiffs and their members." Am. Compl. ¶¶ 172, 174. Yet, as to benefits, no individual Plaintiff has asserted a denial or lost dollar of benefits because of the staffing cuts. *See, e.g.*, *id.* ¶ 78 (Plaintiff Rouse claiming that the cuts "have eliminated the minimal flexibility [she] once relied on"); *id.* ¶¶ 80–87 (Plaintiff Garvey alleging that she was determined to be ineligible for benefits for reasons unrelated to the RIF); *id.* ¶¶ 88–95 (Plaintiff Schoch recounting difficulties she had accessing assistance with SSA's services); *id.* ¶¶ 96–100 (Plaintiff Hazen recounting the same); *id.* ¶¶ 104, 110 (Plaintiff Weiss alleging a halt in benefits unrelated to the RIF and eventual reinstatement of benefits at a reduced amount); *id.* ¶¶ 112–120 (Plaintiff Powell describing challenges in learning the status of her appeal after an unexpected cessation of benefits). Nothing in the complaint supports the notion that the RIF has denied persons with disabilities "meaningful access" to benefits. *See Choate*, 469 U.S. at 301.

Nor have Plaintiffs pleaded facts demonstrating that the RIF had "a particular exclusionary effect on" people with disabilities with respect to SSA services. *Id.* at 302. "For a disparate impact claim, a plaintiff must generally demonstrate with statistical evidence that the practice or policy has an adverse effect on the protected group." *Shanks v. Int'l Union of Bricklayers and Allied Craftworkers*, 134 F.4th 585, 592 (D.C. Cir. 2025) (internal quotation marks omitted). "At the motion to dismiss stage, a plaintiff must plausibly allege that a disparity exists and identify a practice or policy that plausibly caused the disparity." *Id.*

Plaintiffs' complaint does not adequately plead that a "disparity exists." *See id.* The RIF did "not invoke criteria that have a particular exclusionary effect on the handicapped." *Choate*, 469 U.S. at 302. It was "neutral on its face." *Id.* Plaintiffs do not allege, for example, that the RIF targeted or disproportionately caused a reduction of agency staff who provide services to people with disabilities. What's more, Plaintiffs do not offer even "'basic allegations of statistical

comparisons," which can suffice "at the initial pleading stage." *Shanks*, 134 F.4th at 594 (quoting *Adams v. City of Indianapolis*, 742 F.3d 720, 733 (7th Cir. 2014)). That absence is pronounced here where the RIF is alleged to have obstructed the primary ways *all* people attempt to contact the agency: "in-person service at local field offices, telephone support via local offices and teleservice centers, and online systems." Am. Compl. ¶ 37. It is not self-evident from the complaint why the RIF's alleged impacts in accessing these channels are disproportionately greater on persons with disabilities than persons without. *See id.*[6]

To establish disparate impact, Plaintiffs rely primarily on personal anecdotes of individuals' struggles with accessing SSA customer services. *See* Pls.' Mem. at 30–31 (citing, in part, Am. Compl. ¶¶ 75–77 (Plaintiff Rouse recounting long lines at a local SSA field office, the inability to make an online appointment, and extended wait times on the telephone); *id.* ¶¶ 92–94 (same as to Plaintiff Schoch); ¶ 133 (Plaintiff Deaf Equality decrying a lack of American Sign Language interpreters at local field offices), ¶¶ 138–141 (Plaintiff Massachusetts Senior Action Council describing challenges in accessing services for Massachusetts residents), ¶¶ 151–153 (Plaintiff National Federation of the Blind recounting challenges faced by two members)). But "[a]llegations about [Plaintiffs'] individual experiences accessing services . . . say nothing about whether the [RIF] had a disparate impact on persons with disabilities' access to [SSA services] as opposed to persons without disabilities' access to [those services]." *Boykin v. Fenty*, 650 F. App'x 42, 44 (D.C. Cir. 2016) (affirming grant of summary judgment in favor of District Columbia on disparate impact claim brought by plaintiffs under the Americans with Disabilities Act).

[6] Plaintiffs allude to national patterns and statistics about people with disabilities' access to communication technologies to establish a disparity, but those allegations are largely conclusory. *See, e.g.,* ¶ 50 (alleging that the "impact is especially acute for individuals with disabilities, who disproportionately lack home internet connection, struggle to use inaccessible digital media, and cannot navigate SSA's overstressed phone system"); *id.* ¶ 56 (asserting that reliance on SSA's telephone systems is "particularly acute among individuals with disabilities" because internet adoption among individuals with disabilities is less than among nondisabled adults).

Accordingly, Plaintiffs have not alleged a plausible claim of disparate impact under Section 504 or the derivative excess-of-statutory authority claim under the APA. Those claims will be dismissed.

2. *APA Claim*

Plaintiffs' remaining APA claim rests on the dual contentions that SSA failed both to provide a reasoned explanation for the RIF and to account for reliance interests in a larger workforce. Pls.' Mem. at 20–22. Plaintiffs allege that, for FYs 2018 through 2020, SSA sought funding for over 61,000 workers. Am. Compl. ¶ 60. Although SSA's workforce dropped to less than 57,000 workers by FY 2022 due to the COVID-19 pandemic, SSA sought to restore its staffing levels to over 62,000 employees in its FY 2023 budget request. *Id.* ¶ 60 n.2. Yet, after the President's directive to agencies to prepare for RIFs, SSA "abruptly abandoned this evidence-based approach" without any "coherent justification for massively cutting its staff in contravention of its own longstanding analysis of its workforce needs." Pls.' Mem. at 21–22. Plaintiffs charge Defendants with failing both to explain this change in position and to consider the reliance interests of individuals with disabilities. *Id.* at 22.[7]

To satisfy the APA, "a decision of less than ideal clarity" will hold up as long as the "agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974). The agency need only articulate "a rational connection between the facts found and the choice made." *Bowman*, 419 U.S. at 285. SSA did so here. The agency points to its contemporaneous press release explaining the reasons for the RIF.[8] Defs.' Mem. at 34. In it, SSA articulated its view that its workforce and organizational structure were "bloated."

[7] The court assumes for present purposes that the February 2025 RIF is a reviewable final agency action.
[8] *See* SSA, Press Release, Mark Hinkle, Press Officer, Social Security Announces Workforce and Organization Plans (Feb. 28, 2025) (available at https://www.ssa.gov/news/en/press/releases/2025-02-28.html [https://perma.cc/6MZJ-VQX7]).

Pls.' Mem. at 21–22. The RIF would "implement efficiencies and reduce costs." *Id.* It would also enable the agency to "prioritize customer service by streamlining redundant layers of management, reducing non-mission critical work, and potential reassignment of employees to customer service positions." *Id.* Plaintiffs may not accept this explanation, but it satisfies the APA.[9]

As to Plaintiffs' second theory of arbitrary-and-capricious agency action, the change-in-position doctrine requires agencies "to provide a reasoned explanation when it departs from a settled practice or publicly articulated policy." *HMO Louisiana, Inc. v. HHS*, 179 F.4th 62, 71–72 (D.C. Cir. 2026). The doctrine's purpose is to "ensure that, before reversing course, an agency remains 'cognizant that [its] longstanding policies may have engendered serious reliance interests.'" *Id.* (quoting *FDA v. Wages and White Lion Invs., LLC*, 604 U.S. 542, 570 (2025)). The doctrine does not, however, apply to all agency actions. The Supreme Court has "traditionally applied [it] when an agency shifts from a position expressed in a more formal setting," and it has "assume[d], without deciding, that the change-in-position doctrine applies to an agency's divergence from a position articulated in nonbinding guidance documents." *Wages and White Lion Invs.*, 604 U.S. at 569 n.5.

The agency's efforts to secure from Congress a full-capacity workforce is not the type of "settled practice or publicly articulated policy" to which the change-in-position doctrine applies. *See HMO Louisiana, Inc.*, 179 F.4th at 71–72. The Supreme Court has held that an agency changed

[9] The court observes that the Supreme Court recently vacated a preliminary injunction of a RIF within the Department of Education, which the trial court had issued and the First Circuit had refused to stay in part on the ground that the agency had not satisfactorily explained its reasoning. *See McMahon v. New York*, 145 S. Ct. 2643 (2025) ("*McMahon II*") (vacating injunction entered in *New York v. McMahon*, 784 F. Supp. 3d 311 (D. Mass. 2025) ("*McMahon I*"); *McMahon I*, 784 F. Supp. 3d at 357–58 (finding that the agency's explanation for the RIF was not a "reasoned explanation, let alone an explanation at all"). The Supreme Court did not articulate its reasoning for vacating the injunction, *McMahon II*, 145 S. Ct. at 2643, so this court does not view it as authoritative. Nevertheless, the Court's action is noteworthy.

its position when it "rescinded a prior regulation," "expanded the scope of its enforcement activity," or "abandoned a decades-old practice applied in enforcement actions." *Wages and White Lion Invs.*, 604 U.S. at 570 (cleaned up). The SSA's workforce target, even though dating back years, is not comparable to any of these agency actions. It does not have the force of law like a regulation; nor does it provide guidance to the public on how the agency will carry out its statutory duties. It is merely an aspirational figure, whose attainment rests within Congress's discretion. Plaintiffs therefore cannot plausibly claim to have formed any "serious reliance interests" on SSA's pre-RIF staffing levels or the higher ones it sought from Congress.

## V. CONCLUSION

For the reasons explained above, Defendants' Motion to Dismiss, ECF No. 46, is granted. A final appealable order accompanies this memorandum opinion.

Dated: October 9, 2026

Amit P. Mehta
United States District Judge